UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Tampa, Florida |
| | ) | |
| Plaintiff, | ) | No. 8:18-cr-594-T-24JSS |
| | ) | |
| | ) | Docket No. 111 |
| vs. | ) | |
| | ) | May 7, 2019 |
| RUDOLPH RANDOLPH MEIGHAN, | ) | |
| JORGE RAMON NEWBALL MAY, and | ) | |
| CALBOT REID-DILBERT, | ) | |
| | ) | |
| Defendants. | ) | Courtroom 10B |
| _____ | ) | |


(Volume II of IV)

**TRANSCRIPT OF JURY TRIAL**
BEFORE THE HONORABLE SUSAN C. BUCKLEW
UNITED STATES DISTRICT JUDGE


*Official Court Reporter:*

*Scott Gamertsfelder, RMR, FCRR*
*801 North Florida Avenue*
*Tampa, Florida 33602*
*Telephone: (813) 301-5898*

*(Proceedings reported by stenotype; Transcript produced by computer-aided transcription.)*

**A P P E A R A N C E S**

**GOVERNMENT COUNSEL:**

      **Daniel M. Baeza, Assistant U.S. Attorney**
      **Nicholas G. DeRenzo, Assistant U.S. Attorney**
      United States Attorney's Office
      400 North Tampa Street, Suite 3200
      Tampa, Florida 33602
      (813) 274-6000

**DEFENSE COUNSEL:**

      **David A. Dee, Esq.**
      Law Offices of David A. Dee, PA
      311 South Brevard Avenue
      Tampa, Florida 33606
      (813) 258-0406

      **Bjorn E. Brunvand, Esq.**
      Bjorn E. Brunvand, PA
      615 Turner Street
      Clearwater, Florida 33756
      (727) 446-7505

      **Pedro Amador, Jr., Esq.**
      Law Office of Pedro Amador, Jr.
      2203 North Lois Avenue, Suite 925
      Tampa, Florida 33607
      (813) 250-0556

                **ALSO PRESENT:**

                    James Plunkett, Interpreter

                    Jesse Leonor, Interpreter

                    - - -

**TABLE OF CONTENTS**

**EXAMINATIONS**

| GOVERNMENT WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| BRANDON DICKINSON | 6 | 7 | | |
| ERIC LAUGINIGER | 10 | 45 | 64 | |
| DIEGO RIVERA | 67 | 81 | | |
| ALEXANDER RAMOS | 83 | 102 | | |
| PAUL FAHEY | 110 | 124 | | |
| TYLER PERIO | 129 | 143 | 147 | |
| DANIEL BROOKS | 150 | | | |
| STEVEN BOMENTRE | 186 | | | |

(Dickinson examinations resumed from May 6, 2019.)

(Bomentre examinations resumed on May 8, 2019.)


**EXHIBITS**

| GOVERNMENT | PAGE | LINE |
|---|---|---|
| 3A through 3M........... | 34 | 7 |
| 4A through 4I........... | 35 | 5 |
| 6...................... | 140 | 12 |
| 7A..................... | 179 | 19 |
| 7C..................... | 169 | 3 |

<u>**P R O C E E D I N G S**</u>

May 7, 2019                                          9:44 a.m.

- - -

1    COURT SECURITY OFFICER:  All rise.

The United States District Court in and for the
Middle District of Florida is now in session.  The Honorable
Susan C. Bucklew presiding.

Please be seated.

THE COURT:  Good morning.  Okay.  Could you get
your witness?

MR. DERENZO:  Your Honor, can I ask one question
of the Court while we're waiting?

THE COURT:  Sure.

MR. DERENZO:  With respect to any of these
witnesses, would it be appropriate if we could ask them
whether they're going to be subject to recall, and
potentially release them after their testimony?

THE COURT:  Sure.  Absolutely.  You can ask your
fellow counsel.  They can tell you, I'm sure.  Have you asked
with respect to the witness who testified yesterday?

MR. DERENZO:  I've talked with Mr. Dee.  I have
not consulted with Mr. Brunvand or Mr. Amador.

THE COURT:  Okay.  Can he go ahead and release the
witness that was called yesterday?  Mr. Amador, yes?

MR. AMADOR:  Yes, that is fine.

```
 1                THE COURT:  All right.  Mr. Brunvand, is that
 2     okay?
 3                MR. BRUNVAND:  Yes, Your Honor.
 4                MR. DERENZO:  Thank you, Your Honor.
 5                THE COURT:  All right.  Would you bring the jury
 6     in.
 7                COURT SECURITY OFFICER:  All rise for the jury.
 8                (Jury enters courtroom at 9:46 a.m.)
 9                COURT SECURITY OFFICER:  Thank you.  Please be
10     seated.
11                THE COURT:  Ladies and gentlemen, I apologize for
12     the delay.  Whatever the cases I had this morning just ran
13     longer than I had anticipated.
14                Let me ask if anything happened over the evening
15     hours that any of you think might affect your ability to
16     serve on this jury in any way?
17                (Unanimous negative responses.)
18                THE COURT:  And I'm not suggesting that it did.  I
19     always ask that question.  Any questions or any concerns
20     before we start?  Yes, sir.
21                THE JUROR:  Can you turn the air conditioner on in
22     the jury room?  It's kind of warm in there.
23                THE COURT:  It's warm in there?  Okay.
24     Miss Saylor, could you see if you can get the building people
25     to do that?
```

 1          THE COURTROOM DEPUTY:  Yes, Your Honor.

 2          THE COURT:  We've had that problem in the past.

 3    Thank you.  I'm not sure why.  But it tends to be cool in

 4    here but not out there.

 5          All right.  When we recessed, you will recall that

 6    Mr. Dickson was on the stand, and the government had finished

 7    their direct examination.  So we're going to start with the

 8    cross-examination.  So Mr. Dee.  Had you finished?

 9          MR. DERENZO:  I had about one more question,

10    Your Honor.

11          THE COURT:  Oh, I'm sorry.  I thought you had

12    finished.

13          MR. DERENZO:  May I proceed?

14          THE COURT:  Yes.

15                   BRANDON DICKINSON,

16    having been previously duly sworn on May 6, 2019, by the

17    Courtroom Deputy, testified as follows:

18               DIRECT EXAMINATION (resumed)

19    BY MR. DERENZO:

20    Q.    Can we pull up Exhibit 2L again, at approximately 12

21    minutes, 10 seconds.

22          Petty Officer Dickinson, when we left off

23    yesterday, we were talking about your observations of this

24    vessel after you observed it without any engines and without

25    the tarp removed.

 1            During this part of your patrol, are you still in

 2   an orbit around the vessel?

 3   A.    Yes, sir.

 4   Q.    And during your remaining time on scene, including this

 5   part of the patrol, did you observe any visual distress

 6   signals whatsoever?

 7   A.    No, sir.

 8            MR. DERENZO:  We tender the witness, Your Honor.

 9            THE COURT:  All right.  Mr. Dee.

10            MR. DEE:  Thank you, Your Honor.  May it please

11   the Court.

12                        CROSS-EXAMINATION

13   BY MR. DEE:

14   Q.    Mr. Dickinson, at the time when you are orbiting this

15   vessel, how far away from it are you?

16   A.    The range isn't necessarily consistent the entire time,

17   but within three to six miles most of the time.

18   Q.    And what about the altitude?

19   A.    The altitude stays consistently around 6700 feet.

20   Q.    So it goes without saying that you could not hear

21   anything that was being said or talked about on that vessel?

22   A.    No, sir.

23            MR. DEE:  No other questions, Your Honor.

24            THE COURT:  Mr. Brunvand.

25            MR. BRUNVAND:  No.  Thank you.

1        THE COURT:  All right.  Mr. Amador.

2        MR. AMADOR:  Thank you.

3                    CROSS-EXAMINATION

4   BY MR. AMADOR:

5   Q.    The camera that you said is on the plane, if we could

6   change to the ELMO, please.  Is the camera down here?

7   A.    No, sir.

8   Q.    It's on the nose, like you said?

9   A.    No, sir.  Can I circle it?

10  Q.    Sure.

11  A.    So this would be the camera right here.

12  Q.    Thank you.  Now, the videos that we have seen of the

13  boat and the bales, could you see that with the naked eye

14  from where you were?

15  A.    Yes, sir.  We did have visual of the boat with the

16  naked eye.

17  Q.    And you could see the bales with the naked eye?

18  A.    I do not recall, because I was watching the video the

19  entire time.

20  Q.    Is there a video anywhere else, that video feed

21  anywhere else on the plane?

22  A.    Yes, sir.  So that video feed is displayed at both MSO

23  stations as well as a cockpit tactical display, which will

24  show the pilots that video, as well.

25  Q.    And you mentioned that JIATF had sent you to this

1    general area?

2    A.    Yes, sir.

3    Q.    Thank you.

4            THE COURT:  All right.  Any redirect?

5            MR. DERENZO:  No.  Thank you, Your Honor.

6            THE COURT:  Can this witness be excused?

7            MR. AMADOR:  Yes.

8            MR. DEE:  Yes, Your Honor.

9            THE COURT:  Mr. Brunvand?

10           MR. BRUNVAND:  Yes, Your Honor.

11           THE COURT:  Thank you.  You may step down, sir.

12           You may call your next witness.

13           MR. DERENZO:  The United States calls Petty

14   Officer Eric Lauginiger, U.S. Coast Guard.

15           THE COURT:  If you will, come forward, sir, to be

16   sworn.

17           THE COURTROOM DEPUTY:  Please raise your right

18   hand.

19           Do you solemnly swear or affirm under penalty of

20   perjury that the testimony you shall give in this cause will

21   be the truth, the whole truth, and nothing but the truth?

22           THE WITNESS:  I do.

23           THE COURTROOM DEPUTY:  Please have a seat in the

24   witness box.  Please state your name, and spell your last

25   name for the record.

1              THE WITNESS:  Petty Officer Eric Lauginiger;

2    L-a-u-g-i-n-i-g-e-r.

3              THE COURT:  Mr. DeRenzo.

4                       ERIC LAUGINIGER,

5    having been first duly sworn by the Courtroom Deputy,

6    testified as follows:

7                       DIRECT EXAMINATION

8    BY MR. DERENZO:

9    Q.    Good morning, Petty Officer Lauginiger.

10   A.    Good morning, sir.

11   Q.    What do you do for a living?

12   A.    I am in the United States Coast Guard.

13   Q.    And do you have a specific job in the Coast Guard?

14   A.    I'm a maritime enforcement specialist.

15   Q.    Can you explain to the jury what it is that you do as a

16   maritime enforcement specialist?

17   A.    We conduct law enforcement on maritime realm for the

18   Coast Guard under Title 10 for our authority.

19   Q.    And how long have you been doing that?

20   A.    I've been in the Coast Guard for 13 years, doing law

21   enforcement for about 11 now.

22   Q.    How did you become a maritime enforcement specialist?

23   A.    So I originally went to boot camp in 2006.  After boot

24   camp I went up to Maine where I was an honorary -- I was a

25   buoy tender for a while, and I stood a lot of watch on

1    bridges and ships, bigger ships.

2              From there, I went to Gunner's Mate A School.

3    After A school, I went over and became a Coast Guard police

4    officer in Petaluma, California.  And I went to a police

5    academy, did that for about three and a half years.

6              After that I went to a maritime safety and

7    security team in Boston, where I did force protection and

8    maritime law enforcement, as well as a counter piracy

9    mission.

10             And then after that, I went to Pacific Tactical

11   Law Enforcement Team over in San Diego, California.  That's

12   where I currently am now, where our main job is to do

13   counter-drug.

14   Q.    And what is your particular role at that unit, the

15   Pacific Tac?

16   A.    I am a petty officer first class, and I'm a boarding

17   officer for my team.

18   Q.    And as a member of the Tactical Law Enforcement Team,

19   do you have any qualifications or certifications?

20   A.    I do.  I'm a boarding officer.  I'm an EMT.  I'm also

21   an aerial use force controller, as well, for counter-drug.

22   Q.    Do you have to have any specialized training to become

23   a boarding officer?

24   A.    Yes.  I have to do a whole -- we have to fill out -- we

25   have to go to school first, a boarding officer school.  And

 1   then we do a lot of practical factors in order to obtain the

 2   knowledge to be a boarding officer.

 3   Q.     You mentioned that you do -- in your current unit, you

 4   do some counter-drug operations.  How do you support that

 5   mission at your current unit?

 6   A.     My current unit, so our LEDET, which is a law

 7   enforcement detachment, what we do is we go on foreign allied

 8   boats and U.S. Navy boats.  And under Title 10, that gives us

 9   authority to do maritime law enforcement.  So that allows us

10   to actually go on these foreign boats and use them as a

11   platform so we can conduct law enforcement and do

12   counter-drug operations.

13   Q.     And are you a member of those LEDETS, as you put it?

14   A.     I am, yes.

15   Q.     Is this your first time doing counter-narcotics work in

16   the Coast Guard?

17   A.     This is not, no.

18   Q.     Can you describe your previous experience doing this

19   particular kind of law enforcement?

20   A.     So I've had three deployments down south in the Eastern

21   Pacific, about two months each.  And then I've done five

22   trips on patrols over in the Caribbean, as well.

23   Q.     And when you're on these patrols, generally speaking,

24   what are you looking for?

25   A.     We're looking for any sort of smuggling of contraband

1   or counter-drug operations at all.

2   Q.    And in your experience in these two regions, the

3   Caribbean and the Eastern Pacific, what kinds of vessels have

4   you encountered personally?

5   A.    A lot of go-fast vessels or pangas, smaller fishing

6   vessels.  I've boarded a couple of crate ships before, as

7   well.

8   Q.    Have you been involved personally in any interdictions

9   of those types of vessels?

10  A.    I have, yes, sir.

11  Q.    And if you had to estimate, approximately how many

12  interdictions have you been involved in?

13  A.    I've had about 18 to 20 interdictions, as well.

14  Q.    Have any of those resulted in any drug seizures?

15  A.    All of them.

16  Q.    And what kind of drug?

17  A.    They were all cocaine.

18  Q.    And in your previous experience in those cocaine

19  interdictions, how was the cocaine packaged for shipment in

20  the maritime environment?

21  A.    So each bale of cocaine, typically on average, they

22  have about 20 kilos in them.  Each kilo is wrapped with --

23  it's either sealed with a Saran wrap, and they put tape

24  around it and then they put rubber around it and put more

25  tape around it.  And it's multiple layers wrapped around each

1   kilogram.  And what they do is they place it flat down like a

2   book and do stacks of ten up high and wrap it around so each

3   ten is about this high (indicating).  And then they will put

4   those side-by-side, so two of them -- they're like two books

5   facing up.  And they'll wrap those around and put them in

6   like a burlap sack.

7           A lot of times we see, especially in the

8   Caribbean, the burlap sacks are white in color.  I've also

9   seen rainbow-colored burlap sacks, as well.

10  Q.    And have you had the occasion to transport by hand any

11  of those bales?

12  A.    I have, yes.

13  Q.    Okay.  Have you had any other occasions to encounter

14  bales of cocaine other than the interdictions you testified

15  about?

16  A.    Yes.  So we have our interdictions.  Also at sea, we

17  have sea transfers.  So a lot of times, we'll take other

18  ships' cases, and they'll give us multiple bales.  I've also

19  done a DEA offload, as well, in San Diego.

20  Q.    What does that entail?

21  A.    So that entails one boat will come in with all the

22  recent interdictions.  So it could be hundreds of thousands

23  of bales of cocaine.  And they come into port, and then they

24  offload and give them to the DEA.

25  Q.    So how many bales of cocaine would you estimate you've

1  either seen personally or handled in your over ten years of

2  experience as a Coast Guard law enforcement officer?

3  A.    I've personally seen or handled about 800 to a thousand

4  bales of cocaine.

5  Q.    Let's talk about the case you were involved in.

6              Were you deployed in December of 2018, last year?

7  A.    I was, yes.

8  Q.    And was that as a law enforcement detachment team at

9  your current unit?

10  A.    It was, on the HSMC MONCTON.

11  Q.    What does HCMS [sic] mean?

12  A.    Her Majesty's Ship.  I believe it's like our version of

13  saying USS ship, United States ship.  That's their way of

14  saying it in Canada.

15  Q.    This was a Canadian vessel that you were on board as a

16  boarding officer?

17  A.    Yes.

18  Q.    Okay.  And how long was that patrol, approximately?

19  A.    Approximately 60 days.

20  Q.    And what region were you patrolling?

21  A.    The Caribbean.

22  Q.    Did you have any vessel interdictions during that

23  patrol?

24  A.    We did, we had one.

25  Q.    What type of vessel?

 1   A.     It was a go-fast type vessel, or a panga, as well.

 2   Q.     How were you notified of this vessel?

 3   A.     We were notified by an MPA, which is a maritime patrol

 4   aircraft.  They had visual of a vessel in the water.  And

 5   they informed us of the location, and we started making way

 6   towards that location.

 7   Q.     And what was the date that you received that

 8   notification?

 9   A.     December 1st, 2018.

10   Q.     Did you receive any description or any identifying

11   features of the vessel?

12   A.     So they gave us the description, but they also sent us

13   photos of the vessel, as well, so we could see it beforehand.

14   Q.     Did you actually review those photos?

15   A.     I did, yes.

16   Q.     And before you actually launched, what happened --

17   well, let me back up.

18           What was your role in this interdiction?

19   A.     Originally, I was just the lookout.  But then due to

20   circumstances of the small boat that we originally launched,

21   I was turned into the boarding officer of the team.

22   Q.     Okay.  Did you and your team make any plans before you

23   left the MONCTON?

24   A.     We did, yes.

25   Q.     Can you describe what happened?

1   A.    So we get on -- we always get together on the back of

2   the boat, and we talk about what our plan is going to be

3   before we actually get in the small boat and get underway.

4          So our plan was I was the boarding officer.  So

5   myself and then my assistant boarding officer, Petty Officer

6   Ramos, we had a discussion.  We were going to do a right of

7   approach boarding, which is just -- we get alongside, and

8   it's just to determine the nationality of the vessel through

9   questioning.  That way we can see if we have jurisdiction or

10  authority to board it itself, or if we have to contact their

11  country and use a bilateral agreement to board their boat on

12  their behalf.

13         So once we get down there, Petty Officer Perio

14  took ionscan swabs and swabbed each member of the boarding

15  team.  And then we got in the small boat and started making

16  way towards the target of interest.

17  Q.    And how many -- is it just one boarding team or how

18  many boarding teams were actually launched from the MONCTON?

19  A.    There were two boarding teams.  The original boarding

20  team got underway, I want to say approximately an hour before

21  we did.  Due to the sea state and conditions, the ship -- the

22  MONCTON was outrunning our small boat.  So we got about 400

23  yards away from the target of interest, and then myself and

24  Petty Officer Ramos launched our small boat and went towards

25  the TOI.

1   Q.     So before you actually launched, how far was the

2   MONCTON away from the place where you eventually found the

3   vessel?

4   A.     Before I launched?

5   Q.     When you're back on the MONCTON.

6   A.     Okay.  Approximately 400 yards.

7   Q.     How about when the initial crew launched?

8   A.     They were -- I would have to relook at my actual

9   Appendix G, but I want to say about four nautical miles.

10  Q.     Okay.  And who was on the first crew to launch from the

11  MONCTON?

12  A.     That was Petty Officer Fahey and Petty Officer Diego

13  Rivera.

14  Q.     And then who was on the -- we'll call it the second

15  boarding team with you?

16  A.     That was myself and Petty Officer Ramos.

17  Q.     Okay.  Were you able to locate the vessel that you were

18  briefed on?

19  A.     We were, yes.

20  Q.     And what day did you find them?

21  A.     We found them on December 1st, 2018.

22  Q.     Could you describe what you observed as you came

23  alongside the vessel?

24  A.     Say again.

25  Q.     Could you describe what you observed when you came

1  alongside the vessel.

2  A.    Yes.  We came alongside the vessel, it took us a pretty

3  long time to find it.  We couldn't really see the vessel

4  until we were about 20 to 50 yards away, and that was with

5  our night vision goggles on.

6         Once we came alongside, we noticed there were four

7  persons on board huddled in the back of the boat, right

8  behind where you drive at the helm.  They were all holding

9  their clothing above their head for concealment.  We noticed

10  that the boat had no navigation lights.  There's multiple

11  lines hanging over the side, multiple fuel drums on board,

12  and it was dead in the water, DIW.

13  Q.    Why was the vessel so hard to see?

14  A.    The vessel was painted black and there's no navigation

15  lights.  So it was painted to blend in with the environment,

16  and there's no lights to actually illuminate its position.

17  Q.    And what was the location that you encountered this

18  vessel?

19  A.    Approximately 110 nautical miles southwest of Jamaica.

20         THE COURT:  You may have said this, what time of

21  day was this?

22         THE WITNESS:  It was nighttime, Your Honor.

23         THE COURT:  Thank you.

24         THE WITNESS:  You're welcome.

25  BY MR. DERENZO:

1    Q.    You mentioned that the individuals you saw were using

2    their clothes as concealment.  Were they standing up?

3    A.    They were not standing up.  They were crouched down.

4    Q.    Okay.  In what part of the boat?

5    A.    The back part of the boat.

6    Q.    How many people did you see on the vessel?

7    A.    There were four.

8    Q.    At some point, were you able to ascertain their

9    nationalities?

10   A.    I was, yes.

11   Q.    What were the nationalities?

12   A.    There was three Colombians and one was from Belize, as

13   well.

14   Q.    Were you able to identify a master or captain of the

15   vessel?

16   A.    I was, yes.

17   Q.    What was his nationality?

18   A.    Colombian.

19   Q.    Were you able to ascertain his name?

20   A.    I was, yes.

21   Q.    What was his name?

22   A.    Emiro Newbbooll.

23   Q.    You mentioned that you saw some fuel barrels.  What

24   kind of fuel barrels?

25   A.    They were larger fuel barrels, 55-gallon fuel barrels,

1  blue in color.

2  Q.    How many, approximately?

3  A.    Approximately 12.

4  Q.    Were you able to observe any engines on the boat?

5  A.    There were no engines on board the boat, no.

6  Q.    When you saw that, what were you thinking?

7            MR. AMADOR:  Objection.  Relevance.

8            THE COURT:  Sustained.

9  BY MR. DERENZO:

10 Q.    You mentioned you did some right of approach

11 questioning?

12 A.    Yes.

13 Q.    Describe what you did there.

14 A.    So right of approach questioning, that's just a --

15 that's a series of questions that allows us to figure out the

16 actual nationality of the vessel.

17           So during that questioning, as well, we started

18 asking them why they are out here and whatnot.  So when we

19 asked them what they were originally doing out here, they

20 said their -- their main purpose of the voyage was to fish.

21 And we asked what the target of species was, and they said

22 Mahi.

23           After we asked for their fishing gear, they said,

24 sorry, our type of species is conch shells.  So we asked them

25 how they were fishing for the conch shells, and they said

1   they were SCUBA diving.

2          When asked to see their SCUBA gear, they said they

3   did not have anymore SCUBA gear, and they were actually just

4   using snorkels.  So we asked to see their snorkels.  They

5   could not provide us a snorkel, but they provided one mask.

6          And then I told them that -- asked them where they

7   were fishing.  And they said that they were fishing around

8   the area.  And I said we're -- I called back to my deployable

9   team leader, and asked them the depth of the water.  And he

10  said it was roughly 1300 feet.

11         So when I asked the master if he knew what the sea

12  bed depth was, he just remained silent.  So after that, we

13  asked them how long have you been out here.  They said they

14  had been drifting for six days.  And then we asked them why

15  they didn't have any engines.

16         MR. BRUNVAND:  Objection, Your Honor.  It would be

17  helpful if we could identify who it is that's supposedly

18  making these statements.

19         THE COURT:  Sustained.

20  BY MR. DERENZO:

21  Q.   Petty Officer Lauginiger, who's making these statements

22  during your right of approach questioning?

23  A.   So during my questioning, I had my translator, Petty

24  Officer Rivera, questioning the master of the vessel.  And

25  then he was also questioning and talking to Jorge Newball, as

 1   well.

 2   Q.    Okay.  And so the statements you just talked about a

 3   minute ago, to the best of your knowledge, who was making

 4   those statements?

 5   A.    The master.

 6   Q.    And just for the jury's clarification, what was the

 7   master's name?

 8   A.    Emiro Newbbooll.

 9   Q.    And did the master say why they had been drifting for

10   six days?

11   A.    They said they ran out of fuel.

12   Q.    Now, you mentioned some sea shells.  Did the master

13   indicate what they did with those?

14   A.    So yes.  When we asked them to see their catch, their

15   conch shells, the master claimed that he threw over -- his

16   seashells overboard when he saw the Coast Guard plane.  And

17   when we asked them why he threw the seashells over, he

18   claimed that it's illegal for him to fish for conch shells in

19   Colombia.

20   Q.    Let's go back to the reason you're doing this

21   questioning in the first place.

22          You mentioned that one of the purposes is to

23   determine the purpose of their voyage.  What are some of the

24   other reasons you're doing this questioning?

25   A.    We want to figure out if there is enough reasonable

1  suspicion for us to actually get on board and do a full law

2  enforcement boarding.

3  Q.     Before you do that, what do you have to do?

4  A.     Before we get reasonable suspicion?

5  Q.     You have to at some point figure out what the

6  nationality of the boat is?

7  A.     Correct.  Yes.

8  Q.     Okay.  What did you do to ascertain whether or not this

9  vessel was registered anywhere?

10  A.     So we got a verbal claim from the master saying that

11  the vessel was Colombian, and that's what he was claiming.

12  Once we passed that over to our deployable team leader, he

13  contacts the district, and then they contact the country of

14  Colombia to verify the claim of nationality.

15  Q.     Did you ever receive a response whether or not that

16  could be confirmed?

17  A.     Yes.

18  Q.     What was that response?

19  A.     They could not confirm that it was Colombian.

20  Q.     Did you find anything else on the vessel that would

21  indicate it was, perhaps, registered in Colombia?

22  A.     We did not.  We also asked them for their zarpe, which

23  a zarpe is essentially -- it's all the essential American

24  countries, they will give their fishermen a zarpe, which is

25  documentation that tells them what they can fish for.  It

1    tells them how much fuel they can have on deck.  It tells

2    them how much horsepower the engines can have.  And it has a

3    list of the people that are actually on board.  And they are

4    required to have that on them when they're out.

5              When asked for their zarpe, they said they did not

6    have one, that they left it at home because they didn't want

7    to get it wet.

8    Q.    Was the vessel flying a flag of any kind?

9    A.    It was not, no.

10   Q.    Did it have any registration documentation?

11   A.    It did not.

12   Q.    And how close were you to the individuals on board

13   during this questioning process?

14   A.    We were right alongside.  So we weren't on board their

15   boat.  We are on our RHIB, but we were right alongside them.

16   Q.    Did you observe their -- you know, their physical

17   appearance from there?

18   A.    I did, yes.

19   Q.    And how would you describe that?

20   A.    They seemed alert.  They seemed hydrated, and a little

21   bit worried about what was going on.

22   Q.    You mentioned that you were an EMT?

23   A.    I am, yes.

24   Q.    Well, as an EMT and a boarding officer, are you

25   aware -- what is one of your initial concerns when you're

1    coming alongside a vessel, whether it's in a counter-drug

2    environment or maybe just doing a boarding out here?

3    A.    The health and well-being of the crew.

4    Q.    Okay.  What are some of the things that you are trained

5    to look for?

6    A.    So we're trained to look for dehydration, mostly, on

7    these type of cases.  Some of these guys can be out there for

8    a while.

9    Q.    And what would you expect to see if perhaps someone

10   was --

11   A.    You can see sunken eyes, dry lips, dry skin, a really

12   severe sunburn, and their alert status, if they actually are

13   alert and know what's going on.

14   Q.    Did you see any of those signs or symptoms when you

15   observed the crew members of that vessel?

16   A.    I did not.  No.

17   Q.    What happened next during your boarding?

18   A.    Next we got on board.  We got permission to actually do

19   a full law enforcement boarding.

20   Q.    And did you -- was it the same boarding team that

21   initially arrived?

22   A.    So, no.  We switched the boarding team up.  We -- my

23   original crew got a little sick, so they went back.  And then

24   we switched to Petty Officer Ramos and Petty Officer Perio

25   came out.

1   Q.    How were you able to determine the nationality of the

2   four individuals on the vessel?

3   A.    Through documentation.  They all -- they had

4   identification.

5   Q.    And what are the names of the four people you found on

6   the vessel?

7   A.    So we had Emiro Newbbooll.  We had Jorge Newball-May.

8   We had Calbot Dilbert, and then Mr. Jorge Newball.

9   Q.    Do you see any of these --

10  A.    Sorry.  Randolph.  I already said Jorge.

11         THE COURT:  All right.  Could you run through that

12  again.

13         THE WITNESS:  Yes, Your Honor.

14         Emiro Newbbooll was the master.  Then we had Jorge

15  Newball-May.  And then we had Randolph Rudolph, and then we

16  had Calbot Dilbert.

17  BY MR. DERENZO:

18  Q.    Do you see any of those people in the courtroom?

19  A.    I do, yes.

20  Q.    Do you see Mr. Reid-Dilbert in the courtroom?

21  A.    I do, yes.

22  Q.    Could you point him out?

23  A.    Right there (indicating).

24         MR. DERENZO:  For the record, he's pointing to the

25  defendant, Mr. Reid-Dilbert, sitting in the front row.

1            THE COURT:  Well, I'll tell you what.  Why don't

2    you point out and tell us what he's wearing, and that will be

3    helpful, I think, to some extent.

4            THE WITNESS:  Tell what, Your Honor?

5            THE COURT:  Tell us what he's wearing so we'll

6    know who you're talking about.

7            THE WITNESS:  Roger.  So he's wearing the

8    headphones right there in the black suit and white shirt.

9    BY MR. DERENZO:

10   Q.    And do you see Mr. -- as you put it, Rudolph Randolph

11   in the courtroom?

12   A.    I do.  Yes.

13   Q.    Point him out.

14   A.    He's right here in a suit and a blue shirt.

15           MR. DERENZO:  For the record, the witness has

16   identified defendant, Mr. Randolph Rudolph Meighan.

17   BY MR. DERENZO:

18   Q.    Do you say Mr. Newball-May in the courtroom?

19   A.    I do, yes.

20   Q.    Point him out and identify what he's wearing.

21   A.    A gray coat and blue shirt.

22           MR. DERENZO:  For the record, the witness has

23   identified the defendant, Jorge Newball-May.

24   BY MR. DERENZO:

25   Q.    After you received authorization to conduct the law

1   enforcement boarding, what did you do as a boarding officer?

2   A.    So we got on board of their -- of their vessel.  We

3   conducted an initial safety sweep of the vessel.  All that is

4   is it's ensuring that the vessel is safe for myself and my

5   boarding team to be on, and then we can conduct the rest of

6   the boarding.

7              Then after that, we conducted ionscan swabs of the

8   vessel.  I had my boarding team do that while I remained on

9   communications with my DTO, as well.

10  Q.    Who did you task with doing the ionscan swabs of the

11  vessel?

12  A.    I had Petty Officer Ramos and then Petty Officer Perio.

13  Q.    After -- did they actually do the swabs as you asked

14  them to do?

15  A.    They did, yes.

16  Q.    What happened after that?

17  A.    So after they had done the swabs, they put them in the

18  evidence bag and sealed it up.  And then I had Petty Officer

19  Perio bring that and the identification back to the MONCTON,

20  and I handed it off to my chief, Chief Brooks.

21  Q.    Just to clarify, when you say identification, what do

22  you mean?

23  A.    Their -- one was a passport and the others were

24  schedulas.

25  Q.    Of the crew members on board?

 1   A.    Correct.

 2   Q.    Okay.  What happened after that?

 3   A.    After that we did an ASSA, which is a at sea space

 4   accountability of the vessel, just ensuring that all spaces

 5   are accounted for and searched through.

 6   Q.    And what did you find during the at sea space

 7   accountability?

 8   A.    I found a cell phone that belonged to the master.  And

 9   then we also found flares which are used for an international

10   sign of distress in case of an emergency.

11   Q.    Did you smell anything on board?

12   A.    Yes.  We smelled a lot of fuel on board.  We noticed

13   excessive fuel inside the actual cargo area, as well, cargo

14   hold.

15   Q.    Did you find any contraband of any kind?

16   A.    I did not, no.

17   Q.    How about any SCUBA gear?

18   A.    There was no SCUBA gear.

19   Q.    Did you find any fishing gear?

20   A.    There was no fishing gear.

21   Q.    What about any bait or tackle?

22   A.    There was no bait or tackle or any ice, as well.

23   Q.    Did you find any fins of any kind?

24   A.    No.

25   Q.    After you completed your at sea space accountability,

1    what happened after that?

2    A.    After that, we stood by for permission to see what we

3    were going to do with the disposition of the individuals.

4    The sea state got a little rough out.  And while we were

5    standing by waiting, one of the members fell in the water.

6    When he fell in the water, his crew member tried assisting

7    him out, and he also fell in the water.  And we pulled them

8    out shortly after, put them back on board.  Grabbed life

9    jackets from our small boat, and put them on them, as well.

10   Q.    Did you at some point transport them back to the

11   MONCTON where you came from?

12   A.    I did, yes.

13   Q.    Okay.  After you returned to the MONCTON with the four

14   crew members from the vessel, what's the next step you took

15   as the boarding officer?

16   A.    Once we were back on the MONCTON, we ionscan swabbed

17   their -- the members' forearms and hands.

18              THE COURT:  What do you mean, the members?

19              THE WITNESS:  The crew members, Your Honor.

20              THE COURT:  The crew members, meaning the crew

21   members that you picked up?

22              THE WITNESS:  Correct, Your Honor, yes.

23   BY MR. DERENZO:

24   Q.    Now, is that something you had authorization to do or

25   did you have to request permission?

1  A.    We requested permission to do it.

2  Q.    Okay.  Did you receive authorization?

3  A.    We did, yes.

4  Q.    At some point, did you actually detain the four

5  individuals you found on the boat?

6  A.    So we do not detain them.  We treated them as safety of

7  life at sea survivors due to the sea state out there and

8  their boat not being capable of being out there.  Once we

9  transfer them over to another Coast Guard cutter, another

10  Coast Guard unit, they receive permission to treat them as

11  actual detainees.

12  Q.    And why -- why was that?  In other words, why weren't

13  you able to do that on the Canadian ship, as far as you know?

14  A.    So we brought them on as safety of life at sea due just

15  to the conditions, how rough it was out.  And we didn't

16  receive permission to treat them as detainees yet.  So it was

17  safer for them and for my crew to bring them on the MONCTON

18  rather than sitting out there on their panga.

19  Q.    And at that point, had you received the results of all

20  the, as you put it, ionscan swabs?

21  A.    We did, yes.

22  Q.    Had you received any video from the MPA at that point?

23  A.    We didn't receive video, no.

24  Q.    And where -- is that a decision you can make as a

25  boarding officer or does that have to come from somewhere

 1  else?

 2  A.    That comes from higher up.

 3           MR. DERENZO:  May I approach the witness, Your

 4  Honor?

 5           THE COURT:  You may.

 6  BY MR. DERENZO:

 7  Q.    Petty Officer Lauginiger, I've handed to you what's

 8  been marked as Government's Exhibits 3A through 3M for

 9  identification, and Exhibits 4A through 4I for

10  identification.

11           If you could, please, let's start with Exhibits 3A

12  through 3M.  Take a look at those and look up when you're

13  done.

14           Petty Officer Lauginiger, do you recognize

15  Exhibits 3A through 3M for identification?

16  A.    I do, yes.

17  Q.    How do you recognize them?

18  A.    As the pictures that we took that night of the

19  boarding.

20  Q.    When you say that night, do you mean December the 1st

21  of last year?

22  A.    Correct.

23  Q.    Are they fair and accurate depictions of the vessel you

24  boarded that evening and the individuals and items on board?

25  A.    They are, yes.

1              MR. DERENZO:  Your Honor, move to admit

2   Government's Exhibits 3A through 3M for identification as 3A

3   through 3M.

4              MR. DEE:  No objection, Your Honor.

5              THE COURT:  I'll receive into evidence 3A through

6   3M.

7              (Government Exhibits 3A through 3M received in

8   evidence.)

9   BY MR. DERENZO:

10  Q.    If you could, please, Petty Officer Lauginiger, take a

11  look now at Exhibits 4A through 4I for identification.  And

12  go ahead and look up when you're done looking at them.

13             Do you recognize those exhibits?

14  A.    I do, yes.

15  Q.    How do you recognize them?

16  A.    These were the pictures that we took on December 2nd,

17  2018.

18  Q.    That was the following day?

19  A.    Correct.

20  Q.    Are they fair and accurate depictions of the same

21  vessel that you boarded the previous night on December the

22  1st, 2018?

23  A.    They are, yes.

24             MR. DERENZO:  Move to admit Government's Exhibits

25  4A through 4I for identification as 4A through 4I.

1          MR. DEE:  Your Honor, we have no objection to

2   them, but we do believe they are somewhat cumulative.

3          THE COURT:  All right.  I will note the objection,

4   but I will receive into evidence 4A through 4I.

5          (Government Exhibits 4A through 4I received in

6   evidence.)

7          MR. DERENZO:  Permission to publish Government's

8   Exhibits 3A through 3M and 4A through 4I.

9          THE COURT:  You may.

10         MR. DERENZO:  We will start with 3A.

11  BY MR. DERENZO:

12  Q.    Just for the jury's benefit, Petty Officer Lauginiger,

13  what we are looking at here in 3A?

14  A.    This was the crew on board.

15  Q.    And we will start from left to right of this

16  photograph.  Who is the individual wearing the blue shirt?

17  A.    Mr. Dilbert.

18  Q.    And who is the individual in the foreground wrapped in

19  some kind of object that is orange in color?

20  A.    Mr. Randolph.

21  Q.    And who is seated next to him in a white beanie cap?

22  A.    That was the master, Emiro.

23  Q.    And what was his last name?

24  A.    Newbbooll.

25  Q.    And who is the individual seated to the right of him

1   with the, as far as I can tell, light --

2   A.    Mr. Newball-May.

3   Q.    And at what point in the boarding was this photograph

4   taken?

5   A.    This was once we were on board.

6   Q.    So this is -- is this during the at sea or the law

7   enforcement boarding portion?

8   A.    Correct, yes.

9   Q.    So not when you initially arrived on scene?

10  A.    No.

11  Q.    We can move now to 3B.  And what are we looking at in

12  Exhibit 3B?

13  A.    The master and Mr. Newball-May.

14  Q.    And for the record, which one is Mr. Newball-May, on

15  the left or the right-hand portion?

16  A.    On the right.

17  Q.    Let's move to 3C.  What are we looking at here in 3C?

18  A.    So this is the actual fish hold with the crew member

19  sitting next to it.  There is also a fuel drum in there, as

20  well.  And there was some excessive fuel in there, as well,

21  on the bottom.

22  Q.    Did you observe any particular smells coming from this

23  area?

24  A.    Yes.  There was a strong odor of fuel.

25  Q.    Did you smell anything that would resemble fish or

1  catch?

2  A.    There is no smell of fish or anything like that.

3  Q.    Move to 3D.  What is Exhibit 3D?

4  A.    So this is the picture of the flares that we saw, along

5  with their personal items.

6  Q.    Move to 3E.  What's depicted in Exhibit 3E?

7  A.    This is a picture of the -- they used this as a cooler

8  with a bunch of water in there; a toolbox, as well.

9  Q.    Move to 3F.  What is Exhibit 3F?

10 A.    This is a fuel hose.  So they used this to go from

11 barrel to barrel.  So when they run out of fuel in one

12 barrel, they take it out and they put it in another barrel.

13 So it keeps the fuel going towards the engines.

14 Q.    Have you ever seen anything like this before?

15 A.    Yes.

16 Q.    In what context?

17 A.    On similar vessels.

18 Q.    And in those instances, what was the occasion once you

19 observed those vessels?  Was that involved in some of those

20 interdictions you discussed earlier?

21 A.    Yes, that's correct.

22 Q.    Okay.  Let's talk -- let's move to 3G.  What is 3G?

23 A.    This is the back part of the boat where the engines

24 would have been.

25 Q.    Let's move to 3H.

1  A.    This is a cleat that had a line that was attached to it

2  that was -- appeared to be cut or shaved off.

3  Q.    Move to 3I.  What's 3I?

4  A.    This is a separate cleat that also has a line running

5  off of it that appeared to be cut, as well, and part of it

6  was hanging over the side, as well.

7  Q.    What part of the boat is this?

8  A.    This is the -- I believe it's the port side rail.  Port

9  or starboard rail.  I can't tell.

10  Q.    Towards the front, towards the back, towards the

11  middle?

12  A.    Towards the middle.

13  Q.    Move to the next exhibit, 3J.  And what's Exhibit 3J?

14  A.    We have another line that's hanging over the side that

15  was cut, also, and will have a fuel barrel on board.

16  Q.    Is that one of the fuel barrels you were talking about

17  earlier?

18  A.    Correct, yes.

19  Q.    Move to 3K.  What can we see in Exhibit 3K?

20  A.    This is a starboard side aspect of the boat, or right

21  side of the boat.  This just shows that it's really dark.

22  It's hard to see this vessel.  This was a couple of feet away

23  from the vessel, and with the camera and a flash, and it's

24  still hard to see the vessel.  So under my training and

25  experience, that's what it looks like if it's to be outfitted

1    for smuggling or to be hidden from the environment.

2    Q.    Move to 3L.  What we are looking at here?

3    A.    This is the stern, or the back of the boat, with the

4    fuel pumps for two engines.

5    Q.    Move to 3M.  And what are we looking at in 3M?

6    A.    This is the crew that's mustered on the boat itself,

7    while this is the port side or left side of the boat.

8    Q.    And if you recall, was there anything just forward of

9    the console where you might operate the boat?

10   A.    There is a cooler right there.  And then they also had

11   their fish hold, as well.

12   Q.    Was that in that location when you actually boarded the

13   vessel initially?

14   A.    The cooler?

15   Q.    Yes.

16   A.    Yes.  Yes.

17   Q.    We can move now to Exhibit 4A.  What is 4A?

18   A.    This is the same vessel that we boarded the night

19   before.  We actually placed a bunch of chem lights, which are

20   chemical lights or glow sticks, throughout the vessel so we

21   could keep eyes on it after we left.  So that's what all the

22   green little sticks are on the side, as well.

23   Q.    So those weren't there when you boarded the vessel?

24   A.    They were not, no.  That's something that we put on for

25   safety of the sea because we want -- there's no navigation

 1  lights on this vessel, so we want there to be some sort of

 2  visibility for other vessels that are in the area or our own

 3  vessel that we're on.

 4  Q.    So for the nautically challenged like me, why are

 5  navigation lights so important on a vessel of this size?

 6  A.    You need to have navigation lights so other vessels can

 7  see you, especially in high traffic areas.  It's very

 8  difficult to see vessels, especially this small, at

 9  nighttime.  We were actually not able to see this vessel, and

10  we were 400 yards away from it when I was on the bridge,

11  which is where the pilothouse is where you drive the boat.

12           I was up there and I couldn't see this vessel from

13  400 yards away.  We didn't see it until we got about 25 yards

14  away, and that was only because we had night vision goggles

15  on.

16  Q.    Move to 4B.

17  A.    This is the same boat.  This has a better picture of

18  the actual lines that were hanging over the side and how they

19  were cut.  You can see some rub marks over there towards the

20  front, as well.

21  Q.    Move to 4C.

22  A.    Again, it's the same boat.  Just the port side aspect

23  of it.  You can really see all the fuel drums on board, all

24  the line on the sides, a little bit of rub marks.  You can

25  see the color that's painted black to blend in with the

1   environment.

2   Q.    When we see the fuel drums at this point in 4C, were

3   they generally in the same area when you initially boarded

4   the vessel?

5   A.    The ones in the back were.  The ones in the front we

6   had to move around a little bit to give the guys a better

7   spot to sit down once it started getting a little rough out.

8   Q.    You actually had to search the entire vessel, right?

9   A.    We did, yes.

10  Q.    How easy was it to get around this vessel with all that

11  fuel on board?

12  A.    It's pretty difficult.  There is a lot of climbing

13  around.  You're climbing around on your hands and knees

14  all -- throughout the whole thing, trying not to slip off the

15  fuel drums.  Once it gets pretty rough out, you really have

16  to pay attention to what you're grabbing on to because you

17  don't want to fall overboard.  So it's not too easy to go

18  from bow to stern or from front to back on the vessel.

19  Q.    Go to 4D.  What are we looking at here?

20  A.    This is another picture of the middle of the vessel.

21  This is where the fish hold would be.  This is where

22  typically you would see all the ice and the catch.  You also

23  see some lines again that are cut.

24  Q.    And were you able to determine at some point in your

25  boarding what the color of the bottom of the --

1  A.    The bottom of the boat?

2  Q.    Yes, below the waterline, if you will.

3  A.    The thing -- it was all black, from what I can recall.

4  Q.    Move to 4E.

5  A.    This is the back of the boat, or the stern.  This is

6  also where you can see that these would be where the engines

7  would be mounted.

8  Q.    4F.

9  A.    This is another picture of the back of the boat,

10  showing where the engines would be.

11  Q.    4G.

12  A.    This would be the starboard side of the boat.  Again,

13  you see a little bit of rub marks near the bow there, or the

14  front, and some lines hanging off.

15  Q.    4H.

16  A.    Starboard side again.  Again, you see some lines and

17  those rub marks near the front.

18  Q.    And 4I.

19  A.    The starboard bow of the boat.

20  Q.    Now, from this view, did it appear like this boat had

21  been painted or that it came from the manufacturer black?

22  A.    So this view, you can see a little bit of the bottom of

23  the boat that's blue in color.  So it looks like it was a

24  rush paint job of some sort.  From my experience with the

25  actual fisherman out there, they really take pride in their

1   boats and they want to have a clean cut look to it.  You

2   never really see a rushed paint job like this, and it's never

3   painted black, from my experience.

4   Q.    Why not?

5   A.    Because they want mariners to see them if they're in

6   the water.  There's a lot of big traffic going around there,

7   container ships.  They don't want to run into one of them.

8   They want them to see them.

9   Q.    Okay.  We can pull up Exhibit 2P, previously admitted.

10  And press play.

11          So what you should see on the screen in front of

12  you, Petty Officer Lauginiger, is previously admitted

13  Exhibit 2P.

14          Do you recognize this vessel?

15  A.    I do, yes.

16  Q.    How do you recognize it?

17  A.    It's similar to the boat that I boarded.  It has the

18  same amount of POB, same structure, same build, same color,

19  and it is in the same location where we boarded the vessel.

20  Q.    Do you believe that to be the same vessel you boarded?

21  A.    I do, yes.

22  Q.    And how long were you on scene during your boarding?

23  A.    Roughly ten hours.

24  Q.    Did you see any other small vessel traffic in the area?

25  A.    I did not, no.

1   Q.    How about when you were up on the bridge before you

2   launched, did you see any others?

3   A.    No, we did not.

4   Q.    Bring up Exhibit 2Q.  Start at around 55 seconds.

5          The screen in front of you, Petty Officer

6   Lauginiger, is playing Exhibit 2Q, which was previously

7   admitted.  Take a look at this, and I'll ask you a couple of

8   questions about what you see.

9   A.    Okay.

10  Q.    How long did you say you've been involved in

11  counter-narcotics operations?

12  A.    Counter-narcotics operations, five years.

13  Q.    And in your five years of doing that kind of work, have

14  you ever seen anything like this white rectangular shape like

15  we have here?

16  A.    I have, yes.

17  Q.    And are you able to form an opinion based on your

18  previous experience about what you're observing?

19  A.    Yes.  Those packages are consistent with that of

20  cocaine or contraband that I've seen in the past.

21          MR. AMADOR:  Objection.  Foundation.

22          THE COURT:  Overruled.  I think he can express an

23  opinion.

24  BY MR. DERENZO:

25  Q.    And what is your opinion about what you're observing

1    floating in the water there?

2    A.    So in my past experience of seeing vessels jettison

3    just like this vessel, they tend to tie all the bales

4    together and then throw them overboard so they're all

5    floating together.  It's the same packaging that I've seen

6    before in the Caribbean, as well.  Same shape and size as

7    other packages of cocaine that I've seen.

8              MR. DERENZO:  May I have just a moment, Your Honor?

9              THE COURT:  You may.

10             MR. DERENZO:  Tender the witness, Your Honor.

11   Thank you.

12             THE COURT:  All right.  Mr. Dee.

13             Do you want to take down the video?

14             MR. DEE:  Yes, Your Honor.  Thank you.

15                       CROSS-EXAMINATION

16   BY MR. DEE:

17   Q.    All right.  Petty Officer Lauginiger, you were just

18   asked about what you saw as far as tying ropes to the boat?

19   A.    Correct.

20   Q.    And you said in your years of experience, you believe

21   that to be cocaine bales?

22   A.    Yes.

23   Q.    But you did not personally inspect or touch or see any

24   of these allegedly bales of cocaine?

25   A.    These ones, no.

1   Q.    Okay.  And you also did not take that video?

2   A.    I did not, no.

3   Q.    And so you don't have any personal knowledge of when

4   that video was taken?

5   A.    Besides the date on the actual video, yes.

6   Q.    Right.  And, of course, computers can change dates if

7   somebody wanted to do that?

8   A.    They could, yes.

9   Q.    I'm not saying the Coast Guard did that.  I'm just

10  saying you weren't personally there when the video was taken?

11  A.    I wasn't, no.

12  Q.    Okay.  And as far as -- you were asked some questions

13  about the boat itself being painted black.  On that last

14  video, there was a bright red tarp across the top of it; is

15  that correct?

16  A.    Correct.

17  Q.    Okay.  You said when you arrived on this vessel sitting

18  at sea, there was no engines on board the vessel; correct?

19  A.    There weren't.

20  Q.    Okay.  So you had four members sitting in a vessel that

21  was just adrift at sea or dead in the water?

22  A.    Correct.

23  Q.    Seas were relatively rough that night; correct?

24  A.    Correct.

25  Q.    In fact, I believe your testimony was that some of your

1   crew got sick and had to go back on board the MONCTON?

2   A.    Correct.

3   Q.    Now, when your crew was arriving there, you were on a

4   vessel, of course, that had engines?

5   A.    Excuse me?

6   Q.    Your vessel had engines?

7   A.    Yes.

8   Q.    Okay.  And you said some of your crew got ill when

9   y'all were trying to make the boarding of the vessel?

10   A.    The crew that was on the other vessel, the initial

11   boarding team did, yes.

12   Q.    Okay.  Not your crew, but the other crew got ill?

13   A.    Yeah.  The crew that was underway for about an hour

14   before me.

15   Q.    Okay.  However, the crew on board this go-fast, as you

16   called it, you said were healthy.  There were not any signs

17   of illness?

18   A.    Correct.

19   Q.    And they were just sitting there adrift in the waves

20   going up and down, whatever was happening?

21   A.    Correct.

22   Q.    I think you testified at one point that a crew member

23   fell overboard, and then another crew member attempted to

24   help and also fell overboard?

25   A.    Yes.

1  Q.    Was that due to the seas or do you have any idea why

2  they fell overboard?

3  A.    I'm not sure.  I'm assuming it had to do with the seas,

4  but I cannot --

5  Q.    Do you know who fell overboard?

6  A.    Yes.

7  Q.    Who fell overboard?

8  A.    Mr. Randolph, and then Mr. Newball-May was the second

9  one.

10 Q.    Is that why Mr. Randolph has what appears to be an

11 orange jacket or raincoat on him?

12 A.    They had those on before, as well.

13 Q.    All right.  And as far as when you came upon this

14 vessel, you said it was dark; correct?

15 A.    Correct.

16 Q.    Nighttime.  No street lights out a hundred miles off of

17 Jamaica?

18 A.    There is not, no.

19 Q.    So would that also have been a little bit making it

20 more difficult to find the vessel because of time?

21 A.    Yes.  That's why they are required to have navigation

22 lights.

23 Q.    Right.  But you testified, I think, just that you

24 couldn't find it because it was black in color and no

25 navigation lights?

```
 1   A.    Correct.

 2   Q.    It was also nighttime?

 3   A.    Yes.

 4   Q.    Okay.  Because we saw in the video when it's daytime,

 5   the vessel had a bright red tarp on it; is that correct?

 6   A.    Correct.

 7   Q.    And then as far as -- just so I'm clear, the captain of

 8   the vessel, you said that was Mr. Emiro Newbbooll?

 9   A.    Yes.

10   Q.    And he was the one who was answering your questions,

11   and claimed that he was the master of the vessel?

12   A.    Yes.

13              MR. DEE:  No further questions, Your Honor.

14              THE COURT:  All right.  Mr. Brunvand?

15              MR. BRUNVAND:  Thank you, Your Honor.

16                        CROSS-EXAMINATION

17   BY MR. BRUNVAND:

18   Q.    Good morning.

19   A.    Good morning.

20   Q.    Do you do this kind of work for the Coast Guard on a

21   daily basis?

22   A.    I do, yes.

23   Q.    And so since December 1st, you've handled other

24   matters, I assume?

25   A.    Excuse me?
```

1    Q.    You've been at sea since December 1st of 2018?

2    A.    Actually, no.  Once I was -- once I got back from that

3    deployment, I haven't been back out on a patrol.  I've been

4    doing training.

5    Q.    Okay.  But you've been working?

6    A.    Yes.

7    Q.    Okay.  And on this particular deployment, you were on

8    what vessel?

9    A.    The MONCTON.

10   Q.    Okay.  And was there a master of that vessel?

11   A.    There's a captain of the vessel, yes.

12   Q.    All right.  Master of vessel, captain of the vessel,

13   same thing; right?

14   A.    Um, in essence, I guess.

15   Q.    I mean, it's the person who is sort of in charge?

16   A.    Yes.

17   Q.    So Emiro Newbbooll, for example, you referred to him as

18   the master of the vessel.  He could also be the captain of

19   the vessel; right?

20   A.    Correct.

21   Q.    Okay.  Not the vessel that you were on but on the

22   go-fast boat; right?

23   A.    Correct.

24   Q.    All right.  The -- you indicated that -- I believe, and

25   correct me if I'm wrong, but I believe you indicated that the

1  people that were getting onto the smaller boats that were

2  approaching the vessel prior to leaving had ionscans done; is

3  that correct?

4  A.    Correct, yes.

5  Q.    Okay.  And where were these ionscans conducted?

6  A.    On the MONCTON itself.

7  Q.    Right.  But on the people that were boarding, what

8  parts of their bodies or --

9  A.    Oh, their palms and fingers.

10  Q.    The palms and fingers?

11  A.    Correct.

12  Q.    Okay.  And these individuals, the reason that they were

13  being subject to the ionscan was to make sure that they

14  didn't have any traces of cocaine on their arms or fingers;

15  is that correct?

16  A.    Correct, yes.

17  Q.    All right.  Because you can't see the things that may

18  show up on an ionscan; right?

19  A.    Correct.

20  Q.    And so it's to make sure that there is no

21  contamination, cross contamination?

22  A.    Yes.

23  Q.    Okay.  Now, you are wearing a uniform here today;

24  right?

25  A.    I am, yes.

1   Q.    Not the same uniform you would wear at sea?

2   A.    No.

3   Q.    Not the same uniform you would wear when you approached

4   the vessel at night?

5   A.    Different uniform, yes.

6   Q.    However, you and the others had uniforms that were

7   assigned to you; right?

8   A.    Correct.

9   Q.    All right.  I think in one of the photographs we see,

10  it almost looks like an Army fatigue type of uniform?

11  A.    Yes.

12  Q.    And this is something that each crew member would have,

13  and they would wear at sea on a regular basis; right?

14  A.    Yes.

15  Q.    Do you have multiple uniforms or just one?

16  A.    I have multiple uniforms.

17  Q.    Okay.  But you would wear it for a certain time period

18  and then, presumably, wash it and then wear it again?

19  A.    Yes.

20  Q.    Okay.  And that may vary from crew member to crew

21  member as far as how long they wore it before they wash it?

22  A.    Yes.

23  Q.    Okay.  Any ionscan done on those uniforms to see

24  whether or not there was any trace evidence of cocaine on the

25  uniforms?

1    A.    Not on the uniform itself, no.

2    Q.    The vessels that you were getting on when you go over

3    to check on the go-fast vessel, these are the same vessels

4    that have been used in the past approaching other go-fast

5    vessels; would that be a fair statement?

6    A.    The Canadian's RHIBs, I'm not sure what they use.  I'm

7    not sure if they had any other interdictions on those boats,

8    so...

9    Q.    Okay.  But if they had, those would be the vessels that

10   they would use?

11   A.    If that boat had another interdiction, sure.

12   Q.    Sure.  Okay.  And sometimes when you do these

13   interdictions, you actually recover bales of what turns out

14   to be cocaine?

15   A.    Correct, yes.

16   Q.    And when you recover it, generally you transport it on

17   these vessels that are assigned to your larger vessel; right?

18   A.    Correct, yes.

19   Q.    Okay.  Do you know if there was any ionscan done of

20   those vessels?

21   A.    On the RHIB?

22   Q.    Right.

23   A.    No.  We just do a fresh water wash-down of it every

24   time it comes in and out of the water.

25   Q.    I'm sorry?

1   A.    No.  But they do a fresh water wash-down of it every

2   time it goes in and out of the water.

3   Q.    But that in and of itself doesn't necessarily mean that

4   there may not be residue left on them?

5   A.    Okay.

6   Q.    Would you agree, or do you know?

7   A.    I'm not sure.

8   Q.    Okay.  Someone else might be able to answer that

9   question?

10   A.    Sure.

11   Q.    Okay.  The location that we're talking about here

12   today, I believe you said it's 110 miles southwest of

13   Jamaica?

14   A.    Correct, yes.

15   Q.    Okay.  Would that -- if you know, would that be sort of

16   southeast of the Cayman Islands?

17   A.    I'm not sure.  I would have to look at the map.

18   Q.    Would it be due south of Cuba?

19   A.    Yes.

20   Q.    Okay.  And would it be fair to say that you indicated

21   that it's very deep; right?

22   A.    Yes.

23   Q.    You don't SCUBA dive at that location?

24   A.    No.

25   Q.    All right.  Now, closer to Colombia or closer to

1    Jamaica you may SCUBA dive, but you're not doing it at that

2    particular location?

3    A.    Correct.

4    Q.    Okay.  You indicated that one of your primary concerns

5    initially is the crew member's safety?

6    A.    Yes.

7    Q.    Is that correct?

8    A.    Correct.

9    Q.    All right.  So after you ask for their consent to do

10   the ionscans, because you're concerned about their safety,

11   you bring them on to your larger vessel for their safety;

12   right?

13   A.    I didn't ask for their consent to do ionscans.

14   Q.    Oh, you did not.  I'm sorry.  I misunderstood.  Okay.

15         But after you are done meeting with them and

16   talking to them, you bring them on to your larger vessel

17   because you're concerned about their safety?

18   A.    Correct, yes.

19   Q.    Right.  Because it's in the middle of the ocean; right?

20   A.    Yes.

21   Q.    You can't -- it's not like you can swim, and you'd have

22   to be a pretty good swimmer to reach land and survive if

23   you're not on your vessel?

24   A.    Yes.

25   Q.    Okay.  So for someone who's on that vessel to all of a

1    sudden, excuse me, you know, I think I'm going to leave, it's

2    really not an option; right?

3    A.    No.

4    Q.    Okay.  You indicated that -- I don't know if I

5    understood you right.  You talked about you yourself having

6    been around or seeing 800 to a thousand bales of cocaine?

7    A.    Correct.  Yes.

8    Q.    Okay.  And a bale, from what you know, contains how

9    much -- how many kilos of cocaine?

10   A.    So it can vary.  You can have a bale that contains --

11   typically, your standard one would be 20, 20 kilos of

12   cocaine.

13   Q.    Right.

14   A.    Or you can have your bigger bales that could contain up

15   to 50 or 75.

16   Q.    And did you indicate that you had also been on a vessel

17   that had hundreds of thousands, or did I misinterpret you or

18   mishear you on that?

19   A.    No, I didn't say that.

20   Q.    Okay.  It sounded a little high.

21   A.    That would be a little high, yes.

22   Q.    Okay.  Would it be fair to say that your familiarity

23   reference is what happens at sea; right?

24   A.    What do you mean?

25   Q.    As it relates to what you've testified to here today.

```
 1   A.    Yes.
 2   Q.    All right.  As far as how people might be recruited to
 3   be on a vessel, be it in Colombia or Jamaica or Ecuador or
 4   wherever it might be, that's not part of your expertise?
 5   A.    No.
 6   Q.    Okay.  You have no idea how these men ended up on that
 7   vessel?
 8   A.    No.
 9   Q.    Okay.  You prepared a typed report of your involvement
10   in this case; is that accurate?
11   A.    I did, yes.
12   Q.    And it's a, what, it's a five-page report; right?
13   A.    Correct.
14   Q.    And at the end, you indicate that this statement is
15   true and accurate to the best of my knowledge, and it has
16   your name and your title; correct?
17   A.    Correct.
18   Q.    Okay.  So presumably, you prepared it, you reviewed it
19   for accuracy and what-have-you?
20   A.    Yes.
21   Q.    Okay.  And presumably, you reviewed it prior to coming
22   in here to testify to refresh your memory about what was said
23   and what happened?
24   A.    Correct, yes.
25   Q.    Okay.  When you testified today about who said what,
```

1  initially you referred to -- you said they said, they said,

2  they said; right?

3  A.   Correct.

4  Q.   Okay.  In reviewing your report, it was the master

5  really that you attribute all statements to from that day?

6  A.   So, for me, as the boarding officer, I'm on

7  communications with my deployable team leader.  I'm also

8  worried about the paperwork that's being filled out for the

9  alpha report, which is the right of approach questions.  And

10 then my interpreter, Petty Officer Rivera, was questioning

11 the crew itself, and he was reporting back to me what they

12 were saying.

13 Q.   Sure, sure.  But when that's all -- they're speaking

14 Spanish?

15 A.   Yes.

16 Q.   The person that is speaking is speaking Spanish, right,

17 the captain?

18 A.   Also English.

19 Q.   The captain is speaking English?

20 A.   Not the captain, but when he was talking to Jorge

21 Newball-May, was speaking English.

22 Q.   Mr. Newball-May was speaking English?

23 A.   Yes.

24 Q.   Okay.  So -- but you weren't really paying attention or

25 were you paying attention to him?

1   A.    So I have multiple things going on, so he was mainly in

2   charge of the questioning.

3   Q.    Okay.

4   A.    And he was reporting back to me what they're saying.

5   So I couldn't tell you exactly who said what in certain

6   situations.  But that is what was said from the crew.

7   Q.    Okay.  But you did prepare your report and it details

8   statements that were made similar to what you just indicated

9   before this jury?

10  A.    Correct, yes.

11  Q.    And when you detailed it in your report, you attribute

12  the statements to the master and no one else.

13  A.    Not necessarily.

14  Q.    Okay.  Do you have your report in front of you?

15  A.    I do not, no.

16        MR. AMADOR:  Here you go (handing).

17  BY MR. BRUNVAND:

18  Q.    Might it refresh your memory if you could take a look

19  at the report?

20  A.    Sure.

21        MR. BRUNVAND:  May I approach, Your Honor?

22        THE COURT:  Sure.

23        (*Document tendered.*)

24  BY MR BRUNVAND:

25  Q.    Take your time and just review it yourself, and let us

 1  know when you're ready.

 2  A.    Is there a particular spot you want me to look at or --

 3  Q.    If you could review the entire report in reference to

 4  the question about who you attribute the statements to.

 5  A.    So as far as all the claims go that was --

 6  Q.    First of all, does it refresh your memory as to who you

 7  attribute the statements to?

 8  A.    Yes.

 9  Q.    Okay.

10         MR. BRUNVAND:  May I approach the witness?

11         THE COURT:  You may.

12         (*Document retrieved.*)

13  BY MR. BRUNVAND:

14  Q.    Do you need this any longer?

15  A.    If I could keep reading it while you're asking

16  questions.

17  Q.    Who do you attribute the statements to?

18  A.    Which particular statements are you talking about?

19  Q.    The statements about what happened, the circumstances,

20  everything with the exception of the individual falling in

21  the water.

22  A.    Okay.

23  Q.    Mr. Newball-May, my client, trying to assist, and

24  falling in the water himself while he's trying to assist.

25  A.    So the original statements are saying about the voyage

1  and the purpose of the voyage and the engines was the master.

2  Q.    Right.

3  A.    After that, for instance, when I put, they claim not to

4  have -- they didn't claim not to have SCUBA gear, I couldn't

5  tell you if that was from the master or from your client.

6  Q.    Right.  But take a careful look at that from your

7  report.

8  A.    Okay.

9  Q.    Does it not attribute "they" to a statement that's made

10  by the master about they did this and they did that?

11  A.    I'm not sure.  I can't recall who made that statement.

12  That would be on my interpreter.

13  Q.    Could I approach?

14  A.    Sure.

15  Q.    So would it be fair to say that you're certain that the

16  statements were made by the captain?

17  A.    Not all of them, no.

18  Q.    Okay.  Would it be fair to say that it's certain that

19  you're not attributing any statements to my client in your

20  report?

21  A.    No.  I went off what my interpreter told me.  So he was

22  the one that would be able to tell you if he was the one that

23  said that.

24  Q.    Right.  And you don't attribute any statements directly

25  to my client in your report; correct?

1  A.    I didn't directly put his name in my report, no.

2  Q.    Right.  The only time that it appears is when someone

3  else falls in the water, and you indicate that my client

4  tried to help that person get out?

5  A.    Correct.

6            MR. BRUNVAND:  Okay.  That's all that I have.

7  Thank you, Your Honor.

8            THE COURT:  All right.  Let's take a brief recess

9  here.  It's 11 o'clock.  We'll take 15 minutes.  We're in

10 recess until 11:15.  You're welcome to walk around.  Please

11 don't discuss the case, and leave your pads on your chairs.

12            COURT SECURITY OFFICER:  All rise for the jury.

13            (Jury exits courtroom at 11:00 a.m.)

14            COURT SECURITY OFFICER:  Please be seated.

15            THE COURT:  Sir, you may step down.  We will

16 resume at 11:15.  Please don't discuss your testimony with

17 anyone.  We're in recess until 11:15.

18            (Recess taken from 11:01 a.m. to 11:16 a.m.)

19            COURT SECURITY OFFICER:  All rise.

20            This Honorable Court is now in session.

21            THE COURT:  Please get the jury.  Do you want to

22 get your witness?

23            MR. DERENZO:  Of course, Your Honor.

24            COURT SECURITY OFFICER:  All rise for the jury.

25            (Jury enters courtroom at 11:16 a.m.)

 1          COURT SECURITY OFFICER:  Thank you.  Please be

 2   seated.

 3          THE COURT:  Mr. Amador.

 4          MR. AMADOR:  Thank you, Your Honor.

 5                    CROSS-EXAMINATION

 6   BY MR. AMADOR:

 7   Q.    Officer Lauginiger, just a few questions.

 8   A.    Yes.

 9   Q.    Your boarding team, two of the boarding team swabbed

10   parts of the boat when you first arrived near the boat; is

11   that right?

12   A.    Once we got on board, yes.

13   Q.    And then they went back to the MONCTON?

14   A.    One of them did.  The other stayed with me.

15   Q.    And then two of the people that you detained fell in

16   the water?

17   A.    Correct, yes.

18   Q.    Completely soaked?

19   A.    They went about waist deep.  They were able to grab

20   onto the side of the boat when they fell in.

21   Q.    And then after they got wet, they got placed back on

22   the boat?

23   A.    Correct.

24   Q.    And then they went to the MONCTON?

25   A.    Correct.

1  Q.    And that's when they were swabbed, when they were on

2  the MONCTON?

3  A.    Yes.

4              MR. AMADOR:  Nothing further.

5              THE COURT:  All right.  Mr. DeRenzo, redirect?

6              MR. DERENZO:  Yes, Your Honor.

7                      REDIRECT EXAMINATION

8  BY MR. DERENZO:

9  Q.    Petty Officer Lauginiger, who did you task to do the

10  right of approach questioning?

11  A.    So my translator, Petty Officer Rivera, did the actual

12  questioning.  And then I was on the radio as well as Petty

13  Officer Fahey was writing down what the answers were.

14  Q.    And during this period of time, you know, where is your

15  attention focused, primarily?

16  A.    I had my head kind of going in both -- both areas.  I

17  was keeping my eyes on the crew themselves for safety.  And

18  then I was worried about documentation and getting the proper

19  documentation and reporting all the information back up to my

20  deployable team leader.

21  Q.    And in general, who's responsible for the entire

22  boarding operation here?

23  A.    I am.

24  Q.    And who's responsible for making sure you document

25  everything correctly?

1   A.     That's myself.

2   Q.     So you had a lot going on during this part of the

3   evolution?

4   A.     I did, yes.

5   Q.     And so who was the person who had the most direct

6   communication with the four persons on board the go-fast

7   vessel?

8   A.     Verbal communications would be Petty Officer Rivera.

9   Q.     Okay.  During this patrol on the MONCTON, had you had

10  any other drug interdictions prior to this?

11  A.     No.  This was the only one that we had.

12  Q.     How about any interdictions after this?

13  A.     No.  That was the only one.

14  Q.     And the MONCTON, is that a Coast Guard ship?

15  A.     It is a Canadian mine sweeper vessel.

16  Q.     Okay.  And the actual small boat that you were on, was

17  that a Coast Guard boat or a Canadian?

18  A.     It was a Canadian boat.

19  Q.     How much would you estimate in pounds that a typical

20  bale that you've encountered in your Coast Guard experience

21  weighs?

22          MR. AMADOR:  Objection, asked and answered.

23          MR. DERENZO:  I'm asking him in pounds, Your

24  Honor.

25          THE COURT:  Pounds?

1            MR. DERENZO:  Pounds.

2            THE COURT:  Okay.  Overruled.

3            THE WITNESS:  So each kilogram is 2.2 pounds.  And

4    then so if you do the math, there's about 10 -- there's about

5    20 in there.  So about 40 pounds and some change.

6    BY MR. DERENZO:

7    Q.   Will you pull up Exhibit 2K at around four minutes and

8    30 seconds, 2K.

9            Do you recognize that vessel in Exhibit 2K?

10   A.   Yes.

11   Q.   Is that the same boat you boarded on December the 1st,

12   2018?

13            MR. AMADOR:  Objection.  Asked and answered.

14            THE COURT:  Sustained.

15            MR. DERENZO:  No further question, Your Honor.

16   Thank you.

17            THE COURT:  Thank you, sir.  You may step down.

18            THE WITNESS:  Thank you, Your Honor.

19            THE COURT:  You may call your next witness.

20            MR. DERENZO:  The United States calls Petty

21   Officer Diego Rivera.

22            THE COURT:  Sir, if you will, come forward to be

23   sworn.

24            Miss Saylor, would you swear him in.

25            THE COURTROOM DEPUTY:  Yes, Your Honor.

 1              Please raise your right hand.  Do you solemnly

 2     swear or affirm under penalty of perjury that the testimony

 3     you shall give in this cause will be the truth, the whole

 4     truth, and nothing but the truth?

 5              THE WITNESS:  I do.

 6              THE COURTROOM DEPUTY:  Please have a seat in the

 7     witness box.

 8              State your full name, and spell your last name for

 9     the record.

10              THE WITNESS:  It's Diego Rivera, R-i-v-e-r-a.

11              THE COURT:  Thank you.  Mr. DeRenzo.

12              MR. DERENZO:  Thank you, Your Honor.

13                         DIEGO RIVERA,

14     having been first duly sworn by the Courtroom Deputy,

15     testified as follows:

16                       DIRECT EXAMINATION

17     BY MR. DERENZO:

18     Q.    Good morning, Petty Officer Rivera.

19     A.    Good morning.

20     Q.    What do you do for a living?

21     A.    I am a maritime enforcement third class in the United

22     States Coast Guard.

23     Q.    How long have you been doing that job?

24     A.    So officially I've been a maritime enforcement third

25     class for about -- August will be two years.  I've been in

1    the Coast Guard for, as well, August will be four years.

2    Q.    And do you have any law enforcement qualifications or

3    certifications?

4    A.    I do.  I'm a certified boarding officer.

5    Q.    Do you have any other language certifications?

6    A.    I'm a certified Spanish interpreter, as well.

7    Q.    How did you receive that certification?

8    A.    So I went through a test that was administered by the

9    Department of Defense, which I have to take every year.  It

10   is comprised of two sections.  One is a reading

11   comprehension, one of them is a listening comprehension.

12   Once I'm finished with the test, I take the printout that I

13   receive, and then I take it to my command.  And they assign

14   and certify me as an interpreter.

15   Q.    Where are you currently stationed?

16   A.    I'm in Tactical Pacific.

17   Q.    And how long have you been at that unit?

18   A.    August will be two years.

19   Q.    And do you deploy as a member of that unit?

20   A.    That is correct.

21   Q.    What mission do you support?

22   A.    The counter-drug mission.

23   Q.    Do you use your boarding officer qualifications when

24   you deploy?

25   A.    That is correct.

1   Q.    Okay.  Do you have any previous counter-narcotics

2   experience?

3   A.    No, I do not.  Not before being assigned to TACLET.

4   Q.    And how many patrols have you been on?

5   A.    I've been on three.

6   Q.    And have you been involved in any interdictions during

7   those patrols?

8   A.    Yes, I have.  My very first patrol in the Eastern

9   Pacific, that's where I had four interdictions.

10  Q.    Okay.  During those interdictions -- well, did those

11  interdictions result in any drug seizures?

12  A.    Yes, they did.

13  Q.    What drug?

14  A.    Cocaine.

15  Q.    How was that cocaine packaged?

16  A.    So packaged --

17              MR. AMADOR:  Objection.  Relevance.

18              THE COURT:  Did somebody say something?

19              MR. AMADOR:  I objected as to relevance.

20              THE COURT:  Overruled.

21  BY MR. DERENZO:

22  Q.    How was that cocaine packaged?

23  A.    They were packaged in burlap sacks.  So each individual

24  bale has about 10 or 20 kilos.  That makes up an entire bale.

25  Q.    What does a bale look like?

1   A.    So maybe about two feet long, a foot wide, maybe a foot

2   tall (indicating).

3   Q.    And have you had any other experiences seeing cocaine

4   bales other than those interdictions?

5   A.    I've been a part of two DEA offloads.

6   Q.    What's that?

7   A.    So basically after the end of a patrol, all our boats

8   have the amount of drugs that have been seized within that

9   time period.  And they bring them into the DEA lab and,

10  basically, we help assist with processing the packaging of

11  the narcotics.

12  Q.    And what drugs were involved in those offloads?

13  A.    Just cocaine.

14  Q.    Approximately how many bales of cocaine do you think

15  you've seen or handled as a Coast Guard boarding officer or a

16  boarding team member?

17  A.    It's in the hundreds.

18  Q.    Let's talk about the case you're here to testify about.

19  Were you deployed on December the 1st of last year?

20  A.    I was.

21  Q.    And what was your role in that deployment?

22  A.    I was the Spanish interpreter.

23  Q.    Were you involved in any vessel interdictions during

24  that patrol?

25  A.    Yes, this one.  That's the only one.

1    Q.    How many interdictions did you have on patrol?

2    A.    Just one.

3    Q.    At what point -- at some point were you launched to try

4    to locate that vessel?

5    A.    Excuse me?

6    Q.    At some point did you -- well, what vessel were you on

7    during that time?

8    A.    We were -- yeah, we were launched, myself and Officer

9    Perio, we were the primary boarding team to -- that was

10   launched to intercept this vessel.  Unfortunately, we were

11   not able to get there in time, we were not able to intercept

12   the vessel in time because of the rough sea state and the

13   lack of capability for the vessel, for the small boat that we

14   were on.

15   Q.    Let's back up.  What platform were you deployed on?

16   A.    I was on the HMCS MONCTON.  It's a Canadian mine

17   sweeper.

18   Q.    Did you at any point actually arrive on scene?

19   A.    I did.  Approximately an hour-and-a-half, two hours

20   after I was launched.

21   Q.    Okay.  And when you arrived on scene, what did you

22   observe?

23   A.    So the secondary small boat with the secondary boarding

24   team was already on scene right next to the go-fast vessel.

25   Q.    Can you describe the vessel you saw?

1   A.    Yeah.  It had no engines.  It was black in color.

2   Center console vessel with four people on board, and it --

3   multiple fuel barrels.

4   Q.    What was your role at this point when you came on

5   scene?

6   A.    I was the -- as I said, the Spanish interpreter,

7   boarding officer.  Officer Lauginiger came on board our boat,

8   and he directed me to begin the right of approach questions.

9   Q.    Did you have occasion to speak with the individuals on

10  the boat?

11  A.    I did.

12  Q.    Were you able to identify them at some point?

13  A.    Yes, I was.

14  Q.    How?

15  A.    So the master was -- I asked for who the master was,

16  and it was Emiro Hinestroza Newbbooll.  And then I asked the

17  crew members individually their names.

18  Q.    Did they provide their names?

19  A.    They did.

20  Q.    What are the names of the other three people you found

21  on the boat?

22  A.    One of the other crew members was a Jorge Newball-May.

23  The other one was Calbot Dilbert, and then the other one was

24  Randolph -- Rudolph Randolph.

25  Q.    Pull up Exhibit 3A.  You can see Exhibit 3A in the

1  monitor in front of you, Petty Officer Rivera.  Do you

2  recognize the individuals depicted in this exhibit?

3  A.    Yes.

4  Q.    Let's start from left to right.  Who is the individual

5  on the left with the blue shirt?

6  A.    That is Calbot.  This is Rudolph, the master himself,

7  Emiro, and then Jorge Newball right here.

8  Q.    And do you see any of those individuals here in the

9  courtroom today?

10  A.    I see Mr. Rudolph right here, Mr. Calbot Dilbert in

11  back, and then Mr. Jorge Newball.

12  Q.    So the first individual you pointed at, what's that

13  person's name?

14  A.    That is Rudolph.

15  Q.    And can you point out an article of clothing that he's

16  wearing in the courtroom.

17  A.    Right.  He's wearing a gray suit, blue shirt, blue

18  dress shirt.

19        MR. DERENZO:  For the record, the witness has

20  identified the defendant, Mr. Randolph Meighan.

21  BY MR. DERENZO:

22  Q.    And you mentioned an individual that you identified as

23  Mr. Newball-May.  Do you see that person in the courtroom?

24  A.    This gentleman right here.

25  Q.    What's he wearing?

1    A.    He's wearing a gray suit, blue shirt underneath, as

2    well.

3              MR. DERENZO:  Let the record reflect the witness

4    has identified the defendant, Jorge Newball-May.

5              THE COURT:  It will so reflect.

6    BY MR. DERENZO:

7    Q.    And do you see Mr. Reid-Dilbert in the courtroom?

8    A.    I do.  He's the gentleman right here.

9    Q.    What is he wearing?

10   A.    He's wearing a gray suit, as well.

11             MR. DERENZO:  Let the record reflect that the

12   witness has identified the defendant, Calbot Reid-Dilbert.

13             THE COURT:  The record will so reflect.

14   BY MR. DERENZO:

15   Q.    So let's start from left to right.  So you said it's

16   Mr. Reid-Dilbert on the left; is that right?

17   A.    This gentleman right here, yes (indicating).

18   Q.    Okay.  What language did he speak during the boarding?

19   A.    English.

20   Q.    How about the individual in the middle there who you

21   identified as Mr. Randolph?

22   A.    That gentleman right there, English.

23   Q.    How about the captain, the individual with the white

24   hat, what language did he speak?

25   A.    Spanish.

1    Q.    And the individual on the right, who you identified as

2    Mr. Newball-May, what language did he speak?

3    A.    English.

4    Q.    So during your right of approach questioning, did any

5    of the individuals on the boat make any statements?

6    A.    Yes.  I began by asking who the master was.  And I got

7    that information from them.  And I also asked them what was

8    the purpose of their voyage, and how long have they been out

9    here.

10   Q.    Okay.  Who answered the question, what the purpose of

11   their voyage was?

12   A.    So it was the master who I primarily directed my

13   questions to, as well as the gentleman, Jorge Newball.  I was

14   asking him, as well.

15            THE COURT:  I'm sorry.  As well as who?

16            THE WITNESS:  Jorge Newball, Your Honor.

17   BY MR. DERENZO:

18   Q.    And what did the captain say about what the purpose of

19   their voyage was?

20   A.    So he began by saying that they were out fishing for

21   Mahi.  And when I asked them to show their fishing gear, he

22   changed that statement to they were out fishing for -- or

23   looking for conch shells.

24   Q.    Okay.  Did you ask for any sort of registration

25   documentation?

1   A.     I did.  I asked for the zarpe.

2   Q.     Why would you do that?

3   A.     Because they were claiming that they were coming out of

4   Colombia, and the Colombian nationality for the vessel.  And

5   the country of Colombia requires that before a vessel departs

6   that they have an outbound clearance document, which is

7   called a zarpe.

8   Q.     What's that used for?

9   A.     That is basically like a trip itinerary that states

10  who's going to be on board that boat, what they're going to

11  do, how long they're going to be out, anything related to

12  their purpose of voyage.

13  Q.     Were any of the crew members able to provide a zarpe?

14  A.     No, they were not.

15  Q.     Did the captain mention how they were fishing for those

16  conch shells?

17  A.     So first, they said they were SCUBA diving for them.  I

18  asked them to see -- if they could show me some SCUBA gear.

19  They failed to provide that.  So then they changed that to

20  just they were free diving, and all they showed me was a

21  snorkel mask.  And that's it.

22  Q.     Did the master indicate how they had come to find

23  themselves in the middle of the ocean?

24  A.     They said they were having engine troubles.

25              MR. AMADOR:  Objection.  Judge, the witness

1    continues to respond as "they."

2              THE COURT:  Yes.  He's asking you specifically

3    about the master of the vessel.  So if you would, answer his

4    questions about the master, please.

5              THE WITNESS:  The master stated that they were

6    adrift for six days due to engine troubles.

7    BY MR. DERENZO:

8    Q.    Did you ask him what happened to their engines?

9    A.    So I did.  I asked them what happened to their engines,

10   and he said that they were using their engines as trouble --

11   or, excuse me, using their engines as anchors.  And

12   eventually the line took up too much tension and the line

13   snapped, and that's how they lost their engines.

14   Q.    Did you ask any of the other crew members any questions

15   other than the master?

16   A.    I did.  I asked them what was their purpose of the

17   voyage.

18             THE COURT:  Wait.  You've got to be specific.  It

19   would be helpful if you would ask, too, more specific.

20   You've got to be specific as to who you're talking about.

21             THE WITNESS:  So I asked Mr. Newball-May, I asked

22   him the same questions about what was the purpose of the

23   voyage and how they came about to be where they were at.  And

24   he said the exact same thing.

25   BY MR. DERENZO:

1    Q.    You say, the exact same thing.  What do you mean?

2    A.    As far as that they were adrift for six days, then they

3    were out there looking for conch shells.

4    Q.    Did you ask any other of the crew members those

5    questions?

6    A.    I did.  I remember asking Mr. Calbot the same thing

7    about their purpose of voyage and what they were out there

8    doing.

9    Q.    And what was his response?

10   A.    That they had been adrift for six days, lost their

11   engines, and that they were looking for conch shells.

12   Q.    How about Mr. Randolph Meighan, did you ask him any

13   questions during this portion of the boarding?

14   A.    I did not.

15   Q.    Do you recall if you asked the master what happened to

16   their catch?

17   A.    He said he -- the master said he threw it overboard.

18   Q.    Did he say when?

19   A.    The same day that we found them.

20   Q.    Okay.  Did he indicate whether there was anything that

21   prompted the decision to throw the catch overboard?

22   A.    Yes.  So they stated that they saw an airplane around

23   that day.

24         THE COURT:  Again, we have to -- will you answer

25   the question that's asked.  Will you ask your question again.

```
 1              MR. DERENZO:  Of course, Your Honor.
 2   BY MR. DERENZO:
 3   Q.    Petty Officer Rivera, at this point I'm just asking
 4   about what you asked the master.
 5              So did the master indicate in response to your
 6   question whether there was anything that prompted his
 7   decision -- or the decision to get rid of their catch?
 8   A.    Yes.
 9   Q.    What was that event?
10   A.    It was that they seen an airplane earlier that day that
11   they believed to be a Coast Guard airplane.  So as the master
12   explained to me, it is illegal where they are from to have
13   conch shells, so they didn't want to get in trouble for that.
14   That's why they threw the catch overboard.
15   Q.    And did you ask that question to any of the other crew
16   members?
17   A.    No.
18   Q.    Did the master -- you may have already answered this
19   question.  Did the master indicate how long they had been at
20   sea like this?
21   A.    He said -- yes, he did.
22   Q.    How long?
23   A.    He said six days.
24   Q.    If you could, pull up Exhibit 2K.  Approximately 60
25   seconds.  I'm sorry.  Could you fast-forward to four minutes
```

1   and 30 seconds in 2K.

2           So Petty Officer Rivera, on the monitor in front

3   of you, you'll see a portion of Exhibit 2K which was

4   previously admitted.

5           Do you recognize the vessel that's depicted there?

6   A.    I do.

7   Q.    How do you recognize it?

8   A.    From what I can see here, I see no engines.  I see the

9   same color, black.

10  Q.    And does that appear to you to be the same vessel that

11  you boarded on December the 1st, 2018?

12  A.    Yes, it does.

13  Q.    Would you pull up Exhibit 2Q.  Starting at about 60

14  seconds.

15          Petty Officer Rivera, I ask you to take a minute

16  and look at Exhibit 2Q.  And I'm going to ask you a couple of

17  questions about it.

18          Do you recognize what appear to be rectangular

19  white packages of some kind floating on the ocean?

20  A.    Yes, I do.

21  Q.    Based on your experience as a boarding officer and a

22  counter-narcotics, do you have an opinion of what you're

23  looking at?

24          MR. AMADOR:  Objection.  Foundation.

25          THE COURT:  Overrule the objection.  You may

```
 1   answer the question.

 2            THE WITNESS:  Appears to be packages of cocaine.

 3   Bales of cocaine.

 4   BY MR. DERENZO:

 5   Q.    I'm going to go back briefly to the right of approach

 6   questioning you did.  What was the demeanor of the crew when

 7   the master was telling you what the purpose of their voyage

 8   was?

 9   A.    So the crew, they seemed pretty receptive to the

10   questions, but they seemed nervous.

11            MR. DERENZO:  Tender the witness, Your Honor.

12            THE COURT:  Thank you.

13            Could you take the video down, please.

14            Mr. Dee.

15            MR. DEE:  Thank you, Your Honor.

16                      CROSS-EXAMINATION

17   BY MR. DEE:

18   Q.    Good morning, Petty Officer.

19   A.    Good morning.

20   Q.    You've talked about the paperwork, the zarpe?

21   A.    Yes.

22   Q.    And you said that was a documentation required from the

23   Colombian government for boats that leave their ports?

24   A.    Yes, sir.

25   Q.    Okay.  And it would be the captain's responsibility to
```

1    have that document, that zarpe?

2    A.    Yes, sir.

3    Q.    And then the only other question, you said you do not

4    recall asking -- I believe you referred to Mr. Randolph, but

5    any questions or receiving any answers from Mr. Randolph

6    during the boarding?

7    A.    I'm sorry.  Say that again.

8    Q.    Do you not recall asking any questions or receiving any

9    answers from Mr. Randolph when you boarded the vessel?

10   A.    Yes, that is correct.  I did not ask him any questions.

11            MR. DEE:  No further questions, Your Honor.  Thank

12   you.

13            THE COURT:  All right.  Mr. Brunvand?

14            MR. BRUNVAND:  No, thank you, Your Honor.

15            THE COURT:  Mr. Amador?

16            MR. AMADOR:  No questions.

17            THE COURT:  Any redirect?

18            MR. DERENZO:  No, Your Honor.

19            THE COURT:  Thank you, sir.  You may step down.

20   Can this witness be released?

21            MR. DEE:  Yes, Your Honor.

22            THE COURT:  Call your next witness.

23            MR. DERENZO:  United States calls Petty Officer

24   Paul Fahey of the United States Coast Guard.

25            THE COURTROOM DEPUTY:  The witness is not here,

 1   Your Honor.

 2          MR. DERENZO:  Calling Petty Officer Alexander

 3   Ramos.

 4          THE COURT:  Sir, if you will, come forward to be

 5   sworn.

 6          THE COURTROOM DEPUTY:  Please raise your right

 7   hand.

 8          Do you solemnly swear or affirm under penalty of

 9   perjury that the testimony you shall give in this cause will

10   be the truth, the whole truth, and nothing but the truth?

11          THE WITNESS:  I do.

12          THE COURTROOM DEPUTY:  Please have a seat in the

13   witness box.

14          State your name, and spell your last name for the

15   record.

16          THE WITNESS:  Petty Officer Alexander Ramos,

17   R-a-m-o-s.

18          THE COURT:  Mr. DeRenzo.

19          MR. DERENZO:  Thank you, Your Honor.

20                   ALEXANDER RAMOS,

21   having been first duly sworn by the Courtroom Deputy,

22   testified as follows:

23                   DIRECT EXAMINATION

24   BY MR. DERENZO:

25   Q.   Good morning, Petty Officer Ramos.

1    A.     Good morning.

2    Q.     Can you tell the jury what you do for a living.

3    A.     I am a boarding officer for the United States Coast

4    Guard, Pacific Tactical Law Enforcement Team.

5    Q.     And what is your rank and rating in the Coast Guard?

6    A.     I'm a second class petty officer, and I'm also a

7    machinery technician.

8    Q.     What does a machinery technician do?

9    A.     I'm an engineer, so I also deal with internal

10   combustion engines, hydraulics, air-conditioning, and

11   anything to do marine engine-wise.

12   Q.     And so we're talking about on an aircraft or on boats?

13   A.     Boats.

14   Q.     How long have you been a machinery technician?

15   A.     I've been a machinery technician for six years now.

16   Q.     How long have you been in the Coast Guard total?

17   A.     Twelve years.

18   Q.     And how long have you been doing law enforcement

19   specifically for the Coast Guard?

20   A.     Been doing it for nine years.

21   Q.     And where are you currently stationed?

22   A.     At Tactical Law Enforcement Team Pacific in San Diego,

23   California.

24   Q.     And what's your job there?

25   A.     I'm a boarding officer, a tactical operator, and also

1  radiation detection level two, and an ionscan operator, as

2  well, if need be.

3  Q.    Did you deploy with this unit?

4  A.    Yes, I do.

5  Q.    Okay.  And in support of what kinds of missions?

6  A.    Counter-narcotics.

7  Q.    And can you summarize your experience in the Coast

8  Guard doing that particular mission, counter-narcotics?

9  A.    I've been doing counter-narcotics since I joined in

10 2008.  I've had 14 interdictions.  All have been cocaine.

11 Varying from go-fast vessels to semi-submersibles, and also

12 low-profile vessels.

13 Q.    When -- during those interdictions, how was the cocaine

14 packaged?

15 A.    In medium to large bales, usually very tightly

16 packaged, square-like.  The colors vary, just depending on

17 the packaging that they use.  And they're pretty distinct to

18 tell from my professional knowledge and my actually on-scene

19 training.

20 Q.    And in your experience, why are they distinct?

21 A.    Why are these distinct?

22 Q.    Yes.  What makes it distinct to you as a boarding

23 officer in your experience?

24 A.    From the first time of conducting an interdiction to

25 recently on -- through these years, it's also shown that

1   their packaging type is all very similar, squared, use a lot

2   of tape, rubber to keep it nicely packaged to prevent from

3   any filtration of water in it to ruin the product.  And they

4   all pretty much look the same.  Just different colors from

5   different organizations.

6   Q.    And when you say look the same, what are you referring

7   to, the size or the shape?

8   A.    The size, how square and rectangular it looks.

9   Q.    Okay.  Other than those interdictions, have you had any

10  other occasions in the Coast Guard to encounter bales of

11  cocaine?

12  A.    Other than the interdictions themselves, no.

13  Q.    Okay.  How many approximately bales of cocaine do you

14  think you've seen or handled?

15  A.    Estimation, upwards in the 10 to 12 tons.

16  Q.    Okay.  Have you been involved in any processing of bulk

17  amounts of contraband?

18  A.    Yes, I have.

19  Q.    Okay.  And can you describe that experience?

20  A.    It was in San Diego when we did an offload to DEA and

21  HSI.  All these were sectioned off per case and then

22  offloaded per case, as well as individuals that were carrying

23  the narcotics.

24  Q.    And what drugs were involved in those offloads?

25  A.    Cocaine.

```
 1   Q.    That's it?

 2   A.    (Witness nods head.)

 3   Q.    Is that a yes?

 4   A.    Yes.

 5   Q.    Okay.  And so that number you gave us before about how

 6   many bales you've experienced, does that include the

 7   offloads?

 8   A.    Yeah.

 9   Q.    Let's talk about the case you're here to testify about.

10   Were you deployed in December of last year, 2018?

11   A.    Yes, I was.

12   Q.    And what asset were you deployed on?

13   A.    On the HMCS MONCTON.

14   Q.    Were you part of a law enforcement deployment team from

15   TACLET?

16   A.    Yes, I was.

17   Q.    Okay.  And so what was your role during that

18   deployment?

19   A.    My role was -- well, everyone on the deployment was

20   Boarding Officer Paul Fahey, and it varied depending on the

21   mission set that we had.

22   Q.    Okay.  Did you have any interdictions during that

23   deployment?

24   A.    We had a disruption, what we would call.

25   Q.    And how many?
```

1    A.    One.

2    Q.    And what was the date of that disruption, as you put

3    it?

4    A.    December 1st into December 2nd.

5    Q.    Of 2018?

6    A.    That is correct.

7    Q.    And how were you notified about the presence of this

8    vessel?

9    A.    Through a Marine patrolling aircraft or a maritime

10   patrolling aircraft that spotted the vessel.

11   Q.    After you received notification, what happened after

12   that?

13   A.    We started making best speed to get to the geographical

14   location of where the suspected vessel was at.

15   Q.    And what happened next?

16   A.    Once we got on scene, it was nighttime.  We launched

17   the first RHIB, which consisted of Officer Fahey and Officer

18   Rivera about ten miles out to intercept the vessel.  We

19   started realizing the sea state was making it difficult for

20   the small inflatable boat to keep up.  So then the HMCS

21   MONCTON got closer, within 400 yards, and they launched

22   Officer Lauginiger and I to intercept the vessel.

23         We're on night vision goggles trying to find the

24   vessel, couldn't really find it until we started getting

25   closer to the last location, and we spotted it and came

1    alongside.  And then I heard him asking him questions.  I was

2    standing security.  And the other -- RHIB 1, the first vessel

3    that launched came alongside.  We started noticing that our

4    boat was taking on a little bit of water.  So the boarding

5    officer, Officer Lauginiger, went over to the first RHIB, and

6    I stayed with the first RHIB to make -- escort it back to

7    ensure that it didn't continue flooding, and returned back to

8    the HMCS MONCTON.

9    Q.    Okay.  And could you describe for the jury the vessel

10   that you saw when you came alongside eventually?

11   A.    The low profile go-fast was dark in color, black, had

12   no engines on it, fuel barrels throughout the vessel itself.

13   And individuals were crouched down, hidden near the back of

14   the boat, near the cockswain console, the boat driver

15   console.

16   Q.    How many people did you see?

17   A.    Four.

18   Q.    Okay.  And had you ever seen a boat that looked like

19   that before?

20   A.    Yes.

21   Q.    Was there anything new about this particular boat?

22   A.    There were no engines on it.

23   Q.    Why was that notable to you as the engineer and the

24   boarding officer?

25   A.    Being that far out, you kind of need engines to get

 1   where you're going.  And in the event, too, there was no nav

 2   lights on the vessel, as well.

 3   Q.    Okay.  Did you get a good look at the individuals who

 4   were on board?

 5   A.    Yes.

 6   Q.    And do you recall their names?

 7   A.    Yes.

 8   Q.    What were they?

 9   A.    Newball-May, Calbot Dilbert, Hinestroza Newbbooll, and

10   I can't recall my statement.  Do you have it, by chance?

11   Q.    Do you remember the fourth's individual's name?  If

12   not, that's fine.

13   A.    I'm having trouble recalling the last name.

14   Q.    If you looked at a copy --

15   A.    I do.  Jorge Newball.

16   Q.    Okay.  I think you mentioned him.  If you looked at a

17   copy of your statement, would that refresh your recollection?

18   A.    Yes, it would.

19             MR. DERENZO:  May I approach the witness,

20   Your Honor?

21             THE COURT:  You may.

22             (*Document tendered.*)

23   BY MR. DERENZO:

24   Q.    Petty Officer Ramos, I've handed you a copy of your

25   statement.  Can you just take a look at it and look up when

 1   you're done.

 2          Has your memory been refreshed about who was the

 3   fourth person on the boat?

 4   A.    Yes, it has.

 5   Q.    And who was the fourth person that you --

 6   A.    Rudolph Meighan.

 7   Q.    Okay.  We'll start with Mr. Meighan.  Do you see him in

 8   the courtroom?

 9   A.    Yes, I do.

10   Q.    Could you point him out and identify an article of

11   clothing he's wearing?

12   A.    Wearing a gray and light blue shirt with a white

13   undershirt underneath.

14          THE COURT:  Can you point him out, please.

15          THE WITNESS:  (Indicating).

16          MR. DERENZO:  For the record, the witness has

17   identified the defendant, Mr. Randolph Meighan.

18          THE COURT:  It will so reflect.

19   BY MR. DERENZO:

20   Q.    Do you see Mr. Newball-May in the courtroom?

21   A.    Yes, I do.

22   Q.    Would you point him out and identify an article of

23   clothing he's wearing?

24   A.    Wearing the black suit.

25          MR. DERENZO:  And let the record identify that the

1    witness has identified the defendant, Mr. Newball-May.

2              THE COURT:  The record will so reflect.

3    BY MR. DERENZO:

4    Q.    Do you see Mr. Reid-Dilbert in the courtroom?

5    A.    Yes, I do.

6    Q.    Will you point him out and identify an article of

7    clothing that he's wearing?

8    A.    Wearing a dark gray jacket, I think.  And he's the one

9    in the back next to the gentleman wearing the lighter

10   brown -- I can't see his shirt from here.

11             MR. DERENZO:  That's okay.  For the record, the

12   witness identified the defendant, Mr. Reid-Dilbert.

13             THE COURT:  The record will so reflect.

14   BY MR. DERENZO:

15   Q.    Approximately where did you encounter this vessel?

16   A.    About 110 nautical miles from Jamaica.

17   Q.    After you arrived on scene and observed the

18   individuals, what happened after that?

19   A.    After on scene, we started telling them to move forward

20   to the center hold area.  And by that time, that's when the

21   other vessel came alongside and switched boats, and I went

22   back to the vessel.  So I was not present for the right of

23   approach questioning.

24   Q.    Okay.  So what part of the boarding did you have a role

25   in?

1  A.     The law enforcement boarding.

2  Q.     Okay.  So what's the first step you took in that

3  portion of the boarding?

4  A.     First step, we conducted the initial safety sweep.  And

5  this is to ensure that the vessel is safe for us to be on and

6  the personnel, as well.

7  Q.     Okay.  And was it seaworthy?

8  A.     It was seaworthy, but it didn't have engines or any

9  form of propulsion.  If the sea state were to worsen, then

10 there would be no way to sustain the stability of the vessel.

11 Q.     You mentioned before that you're an engineer.  Did you

12 examine any of the mechanical equipment on the boat?

13 A.     Yes, I did.

14 Q.     What, if anything, did you observe?

15 A.     I observed that they had numerous amounts of fuel

16 barrels with very little to no fuel left in them.  They had

17 fuel filters on the back with hoses and lines running on the

18 boat from the left and right side of the vessel so they can

19 interchange into the fuel tanks.  Also, the fuel filters

20 itself are used to prevent any sediment or clogging of the

21 fuel injectors for it to continuously make speed.

22 Q.     Okay.  Based on what you observed during this portion

23 of the boarding, were you able to determine how recently the

24 engines were removed?

25 A.     Well, if -- in one of the pictures that I witnessed,

1    and also during my time when I was actually taking the

2    pictures on the back deck, there is a little bit of

3    fiberglass from where they removed that, basically the

4    holding areas for the engine.

5    Q.    Okay.  If we could pull up at this point Exhibit 3F.

6    And you should see in the monitor in front of you, Petty

7    Officer Ramos, Exhibit 3F, which is previously admitted.

8    What we looking at here?

9    A.    We're looking at fuel hoses, and it's all coiled up.

10   Q.    And as an engineer and a boarding officer, what's that

11   used for?

12   A.    They use that to be able to drastically switch over

13   fuel barrels so they don't have to prevent loss of speed or

14   creating distance.  So it's an easy way for them to be able

15   to outrun law enforcement members.

16   Q.    Have you seen this setup before?

17   A.    Yes, I have.

18   Q.    In what context?

19   A.    I've seen it before in interdictions on go-fast

20   vessels.

21   Q.    If we could pull up Exhibit 3G.  What are we looking at

22   here?

23   A.    Okay.  So if you're looking, you have your fuel filters

24   right here.  You're also going to have your fuel cables

25   running out of the fuel filters that would have connected to

1  the engines that were there.  You also have your battery

2  cord, your throttle cord.  And then you also have your holes

3  where the engines used to be screwed into the back of the

4  boat.

5  Q.    What, if anything, did you observe about those holes?

6  A.    Just the sediment around them from where the engine

7  used to be at.

8  Q.    Okay.  Was there any water in this area of the vessel?

9  A.    A little bit.

10  Q.    Okay.  Have you ever removed any outboard engines from

11  a boat?

12  A.    Yes, I have.

13  Q.    And in your experience, can you do that by yourself or

14  would you need help to do that?

15  A.    You would need help.

16  Q.    How long would it take you to remove two engines from a

17  boat?

18  A.    Depending on the right type of tools and personnel

19  strength, it could take upwards from 30 minutes to an hour.

20  Q.    Move to Exhibit 3L.  What are we looking at in

21  Exhibit 3L?

22  A.    The back part of the vessel.  You have the fuel

23  filters.

24  Q.    Can you circle those?

25  A.    (Indicating).  Usually in my experience, from fuel

1  filters that size, you're going to be pumping and clearing a

2  lot of fuel sediment to prevent blockage of the fuel

3  injectors.  So you're going to have to be running decent size

4  engines.

5  Q.    Bring up Exhibit 4F.  And what we are looking at here,

6  Petty Officer Ramos?

7  A.    Looking at a daytime photo of the aft deck of the

8  vessel with the same fuel filters, with the fuel lines that

9  are running up the vessel on either side.

10  Q.    And can you zoom out on 4F.

11        Can you explain, Petty Officer Ramos, in your

12  experience how those fuel lines would be used in connection

13  with the fuel barrels you see depicted in Exhibit 4F.

14  A.    So the way -- since you have two separate enclosed fuel

15  portions of it, so you'll have one line that's running to

16  this fuel filter and to the engine that would have been

17  there.  So you'll have your own fuel source, and then on the

18  same thing with the opposite side.

19  Q.    And where would those lines go to?

20  A.    The fuel barrels.

21  Q.    Okay.  Have you ever seen this particular fuel delivery

22  system on a fishing boat?

23  A.    No.

24  Q.    Did you participate in any other portions of the

25  boarding other than the initial safety sweep?

1   A.    Then we went in from the initial safety sweep, and we

2   deemed the boat seaworthy to be on.  We started conducting

3   ion swipes.  I was the one taking the order of the ion swipes

4   just where they were being swabbed at, so when they get

5   passed over, you would have a direct line of where they were

6   swabbed at.  So then we would have a chronological order and

7   then a list, as well.

8   Q.    Okay.  Let's talk about those swipes briefly.  Did --

9   typically before you're going to go on board a vessel, are

10  you trained to have the boarding team swabbed before you

11  leave?

12  A.    Yes, we are.

13  Q.    Did you do that in this case?

14  A.    Yes, we did.

15  Q.    Who actually did the swipes, as you put it, of the

16  portions of the vessel during this boarding?

17  A.    Officer Perio.

18  Q.    And, I guess, what was your role specifically in that

19  evolution?

20  A.    I was just taking where he was swabbing at and writing

21  them down.

22  Q.    Where were you recording that information?

23  A.    On a notepad to be transferred over to the ionscan

24  operator.

25  Q.    Okay.  And after you all completed the swipes of the

1  vessel, what's the next part of the boarding that you

2  participated in?

3  A.    ASS.  That's at sea space accountability.

4  Q.    And what's the purpose of that evolution?

5  A.    To account for all space on the vessel to make sure

6  there's no hidden compartments.

7  Q.    Okay.  What did you find during that portion of the

8  boarding?

9  A.    Found the -- it wasn't a hidden compartment, it was a

10 forward compartment, middle compartment, and then other trash

11 that was in the vessel itself.

12 Q.    Okay.  Did you find any contraband?

13 A.    No.

14 Q.    What did you find, if anything?

15 A.    We found just the excess fuel barrels, the filters, the

16 missing engines, and the four personnel on the boat.

17 Q.    Did you find any SCUBA gear?

18 A.    A snorkel, from what I recall.

19 Q.    How about a tank, dive tank?

20 A.    No.

21 Q.    How about a breathing apparatus that you would use with

22 the SCUBA tank?

23 A.    No.

24 Q.    How about any fins?

25 A.    No.

1  Q.    How about any -- did you find any fishing gear of any

2  kind?

3  A.    No.

4  Q.    How about bait or tackle, did you find any of that?

5  A.    No.

6  Q.    How about ice in case people on the boat caught the

7  fish; did you find any of that?

8  A.    No.

9  Q.    When you encountered the four crew members of the

10  go-fast vessel, how would you describe their appearances?

11  A.    Alarmed, hidden.

12  Q.    Did you see any signs of physical distress with any of

13  the people on the boat?

14  A.    No.

15  Q.    And what are some of the things that you would be

16  looking for as a boarding officer?

17  A.    Happy that they -- maybe that we found them, asking for

18  water, asking to be taken off the boat.

19  Q.    Did you get any of those indications from the four

20  people during your portion of the boarding?

21  A.    No.

22  Q.    Bring up Exhibit 2A at approximately four minutes, 30

23  seconds.

24        Petty Officer Ramos, you'll see on the screen in

25  front of you Exhibit 2K, which has been previously admitted.

1    And in a moment here you'll see a vessel.  Take a look at

2    that vessel, and I'm going to ask you a couple of questions

3    about it.

4              Do you recognize that vessel?

5    A.    Yes.

6    Q.    How do you recognize it?

7    A.    The color of the vessel, there are no engines on the

8    back, it would -- appears to be the color of the individuals

9    on the boat's shirts.

10   Q.    Is that the same vessel that you boarded on December

11   the 1st, 2018?

12   A.    Yes.

13   Q.    If we can bring up Exhibit 2Q, starting at about a

14   minute.

15             On that monitor, Petty Officer Ramos, is

16   Exhibit 2Q.  Take a look at that, and I'm going to ask you a

17   couple of questions.

18             Now, based on your counter-narcotics experience

19   that you described earlier, do you recognize those

20   white-in-color packages that you see floating in the ocean?

21             MR. AMADOR:  Objection.  Foundation.

22             THE COURT:  Overruled.

23             THE WITNESS:  Yes.

24   BY MR. DERENZO:

25   Q.    Do you have an opinion about what you're observing in

1    Exhibit 2Q?

2    A.    From previous interdiction cases and from my

3    professional experience, they look like a bale field, and

4    they're tied together.

5    Q.    And are those consistent in size, shape and appearance

6    to the bales of cocaine described earlier?

7    A.    Yes.

8              MR. AMADOR:  Objection.  Leading.

9              THE COURT:  What's leading?

10             MR. DERENZO:  I'll rephrase, Your Honor.

11   BY MR. DERENZO:

12   Q.    Are you able to -- what, if anything, can you -- is

13   distinct about what you see in Exhibit 2Q?

14   A.    I've seen it before in prior cases that I've had, and

15   they've done the exact same thing.

16   Q.    In those prior cases, what drug substance was involved?

17             MR. AMADOR:  Objection.  Relevance.

18             THE COURT:  Overruled to relevance.

19             THE WITNESS:  Cocaine.

20             MR. DERENZO:  Thank you.  May I have just a

21   moment, Your Honor?

22             THE COURT:  Okay.

23             MR. DERENZO:  Tender the witness, Your Honor.

24             THE COURT:  Mr. Dee?

25             MR. DEE:  Your Honor, I have no questions of this

 1  witness.

 2          THE COURT:  Mr. Brunvand?

 3          MR. BRUNVAND:  Briefly, Your Honor.

 4                      CROSS-EXAMINATION

 5  BY MR. BRUNVAND:

 6  Q.    Good afternoon.

 7  A.    How are you, sir?

 8  Q.    The -- you indicated that you believe that you saw a

 9  snorkel on the boat?  You need to answer out loud.

10  A.    Yes.

11  Q.    Okay.  Was there a mask with that, as well; do you

12  recall?

13  A.    No, I do not recall.  Just the snorkel.

14  Q.    Okay.  Could have been a mask with it, but you don't

15  recall?

16  A.    Just a snorkel.

17  Q.    Right.  Just a snorkel, meaning what, that there could

18  not have been one or that there could have been one?

19  A.    No, there was a snorkel.

20  Q.    Right.  What about a mask?

21  A.    Can't recall.

22  Q.    Can't recall.  Okay.  Bottom line is, at the particular

23  point where this vessel was at the time when you boarded it,

24  it was not suitable for snorkeling; right?

25  A.    Yes.

1   Q.    Okay.  However, at an earlier time, they may have been

2   in a different area where snorkeling may have been suitable?

3   A.    No.

4   Q.    At some point they leave shore; right?  Presumably?

5   A.    Yes.

6   Q.    Okay.  So presumably, when someone leaves shore, the

7   coastline close to the shore is generally suitable for

8   snorkeling?

9   A.    Yes.

10  Q.    Okay.  So it may be at some point that they were in an

11  area where snorkeling was suitable?

12  A.    Yes.

13  Q.    Okay.  You indicated that the -- talking about the

14  bales, you were asked about different types of bales and how

15  it's packaged and what-have-you.  And you indicated on direct

16  examination, I believe you said something to the effect of

17  different color for different organizations.  Is that a fair

18  statement of what you said?

19  A.    Yes.

20  Q.    Different color for different organizations; right?

21  A.    Yes.

22  Q.    Okay.  When you reference organizations, you're

23  referencing the organizations that generally own the cocaine;

24  right?

25  A.    Yes.

1   Q.    Okay.  Generally large organizations?  Yes?

2   A.    I would say.

3   Q.    Okay.

4           THE COURT:  If you know the answer, you can answer

5   it.  Don't guess.  Do you know the answer?

6   BY MR. BRUNVAND:

7   Q.    Are they large organizations?

8   A.    Yes.

9   Q.    Okay.  The -- based on what you know in this case, you

10  don't know anything about what, if any, relationship there

11  was between the organization and my client; would that be a

12  fair statement?

13  A.    That is correct.

14  Q.    Okay.  You don't know anything about the relationship

15  between the organization and the captain of the vessel?

16  A.    That is correct.

17  Q.    Approximately 7:30 Zulu time, one of the crew members

18  fell overboard.  Do you recall that?

19  A.    Yes.

20  Q.    Okay.  And Zulu time is what's also sometimes referred

21  to as Greenwich Mean Time?

22  A.    Yes.

23  Q.    And so basically if you're in -- if you're 110 miles

24  southwest of Jamaica at 7:30 Zulu time, that's about 1:30 in

25  the morning local time?

1   A.    That is correct.

2   Q.    Okay.  So presumably it was dark outside?

3   A.    Yes, it was.

4   Q.    Did you have artificial lighting?

5   A.    We have flashlights and a handheld bigger light that

6   was being broadcast to the boat.

7   Q.    Okay.  The seas were fairly rough?

8   A.    They were picking up.

9   Q.    Okay.  We've seen the video in daylight.  Looks like

10  the seas at that time are fairly rough?

11  A.    Yes.

12  Q.    Are they about the same at 1:30 in the morning?

13  A.    At 1:30 they started to -- the swell started to pick up

14  on itself.

15  Q.    Okay.

16  A.    And you were referencing about the individual who fell

17  off was due to the sea state picking up.

18  Q.    Sure.  Sure.  So an individual falls overboard, it

19  appears, as a result of large seas; right?

20  A.    Yes.

21  Q.    Okay.  In fact, during this same time period, two of

22  your fellow crew members end up having to be relieved of

23  their duties because they ended up getting sea sick because

24  of all the motion?

25  A.    That is correct.

1    Q.    Okay.  And so when the particular individual falls

2    overboard, my client, Jorge Ramon Newball-May, tries to

3    assist in keeping him from getting lost in the water; right?

4    A.    That is correct.

5    Q.    And when it's dark and it's rough seas, I mean, it can

6    be very hazardous to fall overboard; would you agree?

7    A.    Yes, it is.

8    Q.    Okay.  It appears that the person who fell overboard

9    fell into the water, and then he was grabbing onto the side

10   of the boat that you were in, or the boat that he was in?

11   A.    The boat that we were in.

12   Q.    Okay.  And so was he grabbing on with both hands, one

13   hand?

14   A.    So when I had noticed that he had fell over, all

15   individuals started shifting to one side of the boat.  Me and

16   Officer Perio shifted to the opposite side to prevent the

17   boat from capsizing.

18   Q.    Okay.  So you moved away from the people that were in

19   the water?

20   A.    No.  So we were actually near the aft part.  They were

21   near the center area where Officer Lauginiger was.  We were

22   in the aft part taking photographs of the vessel when that

23   occurred.  So we made sure we stayed on one side of the

24   vessel to prevent it from capsizing and all personnel going

25   into the water.

 1    Q.    Okay.  Presumably the one person is in the water,

 2    holding onto the vessel; right?  Correct?

 3    A.    Correct.

 4    Q.    My client at that time is trying to assist that

 5    individual; right?

 6    A.    Correct.

 7    Q.    Before he himself falls in the water?

 8    A.    Correct.

 9    Q.    Presumably, he's leaning over the railing as he's

10    trying to assist?

11    A.    Correct.

12    Q.    Okay.  When he falls in the water, does he fall into

13    the water head first?

14    A.    No.

15    Q.    Okay.  Is he --

16    A.    He's at an angle.

17    Q.    He's at an angle.  Okay.  So he falls in sideways?

18    A.    Sideways, still holding onto the side of the boat.

19    Q.    Well, is he not holding onto the person he's trying to

20    rescue?

21    A.    He's also holding onto the boat, as well.

22    Q.    So one hand on the boat and one hand on the person he's

23    rescuing?

24    A.    Because he's trying not to fall in, either.

25    Q.    There was a second time when my client ended up in the

1  water; is that correct?

2  A.    That is correct.

3  Q.    And that was about 9:28 Zulu time, so about 3:28 a.m.?

4  A.    That is correct.

5  Q.    And that happened when my client was leaping, trying to

6  jump from the vessel he was on onto your vessel; correct?

7  A.    That is correct.

8  Q.    All right.  And he didn't make it, and he fell in the

9  water; right?

10  A.    That's correct.

11  Q.    Okay.  Did he fall in feet first?

12  A.    Yes.

13  Q.    Okay.  Arms up, arms down; do you recall?

14  A.    Arms up, outreaching for the other boat.

15  Q.    Was he able to hold on?

16  A.    I can't recall, because at that time I was starting to

17  clean up the rest of the boat.  But I do remember him falling

18  in.

19  Q.    Okay.

20        MR. BRUNVAND:  One moment, Your Honor.  That's all

21  that I have.  Thank you.

22        THE COURT:  Mr. Amador?

23        MR. AMADOR:  I don't have any questions.

24        THE COURT:  Any redirect, Mr. DeRenzo?

25        MR. DERENZO:  No, Your Honor.  Thank you.

1          THE COURT:  Thank you, sir.  You may step down.

2          THE WITNESS:  Thank you, Your Honor.

3          THE COURT:  Ladies and gentlemen, we're going to

4    recess for lunch at this time.  It's about 12:20.  We'll be

5    in recess for about an hour and 15 minutes.  Let's put it

6    over at about 1:35.  Let's just say we'll start at 1:30.

7    We'll start back up at 1:30.

8          Please don't discuss the case.  Leave your pads on

9    your chairs, and we'll start again at 1:30.

10          COURT SECURITY OFFICER:  All rise for the jury.

11          (Jury exits courtroom at 12:22 p.m.)

12          COURT SECURITY OFFICER:  Please be seated.

13          THE COURT:  We're in recess until 1:30.

14          (Recess taken from 12:23 p.m. to 1:30 p.m.)

15          COURT SECURITY OFFICER:  All rise.

16          This Honorable Court is now in session.

17          THE COURT:  Do you have any -- does the defense

18    have any objections to Petty Officer Ramos and Petty Officer

19    Lauginiger being excused?

20          MR. AMADOR:  None.

21          MR. DEE:  No.

22          THE COURT:  That's fine.

23          MR. DERENZO:  Thank you, Your Honor.

24          THE COURT:  Would you bring the jury in.

25          COURT SECURITY OFFICER:  All rise for the jury.

1          (Jury enters courtroom at 1:32 p.m.)

2          COURT SECURITY OFFICER:  Thank you.  Please be

3   seated.

4          THE COURT:  You may call your next witness.

5          MR. DERENZO:  The United States calls Petty

6   Officer Paul Fahey, U.S. Coast Guard.

7          THE COURT:  Sir, if you will, come forward to be

8   sworn.

9          THE COURTROOM DEPUTY:  Please raise your right

10  hand.

11         Do you solemnly swear or affirm under penalty of

12  perjury that the testimony you shall give in this cause will

13  be the truth, the whole truth, and nothing but the truth?

14         THE WITNESS:  I do.

15         THE COURTROOM DEPUTY:  Please have a seat in the

16  witness box.

17         Please state your name, and spell your last name

18  for the record.

19         THE WITNESS:  Yes, ma'am.  My name is ME1 Paul

20  Fahey, F-a-h-e-y.

21                    PAUL FAHEY,

22  having been first duly sworn by the Courtroom Deputy,

23  testified as follows:

24                  DIRECT EXAMINATION

25  BY MR. DERENZO:

1    Q.    Good afternoon, Petty Officer Fahey.

2    A.    Good afternoon.

3    Q.    What do you do for a living?

4    A.    I'm in the United States Coast Guard.

5    Q.    How long have you been in the Coast Guard?

6    A.    Seventeen years, close to 18.

7    Q.    And what's your job specifically in the Coast Guard?

8    A.    I'm a maritime enforcement specialist, first class

9    petty officer.

10   Q.    Okay.  And what does that job entail, generally?

11   A.    My primary job is for maritime law enforcement.  I've

12   been doing it since 2003.  Prior to that, I did search and

13   rescue for three years.

14   Q.    Do you hold any law enforcement qualifications or

15   certifications?

16   A.    Yes, sir.  I'm a boarding officer and a boarding

17   officer certified ashore.

18   Q.    Okay.  And how long have you been doing law enforcement

19   specifically?

20   A.    Law enforcement specifically, sir, since 2003.

21   Q.    Okay.  And where are you currently assigned?

22   A.    Actually, at Tactical Law Enforcement Team Pacific,

23   located in San Diego.

24   Q.    What is your role at that unit?

25   A.    I'm a lead petty officer for one of the law enforcement

1    detachments there.

2    Q.    What mission do you support as the lead petty officer?

3    A.    Counter-drug operations.

4    Q.    In your time in the Coast Guard, have you had any prior

5    experience with counter-drug operations other than at the

6    tactical law enforcement team?

7    A.    No, sir.

8    Q.    How many patrols have you been on in support of that

9    particular mission?

10   A.    I've been on three patrols.  Two were in the Eastern

11   Pacific, and this is my first Caribbean patrol.

12   Q.    When you say these two, are you referencing a

13   deployment in December of 2018?

14   A.    Yes.

15   Q.    Or on or about?

16   A.    Yes, sir.

17   Q.    Prior to that deployment, have you personally been

18   involved in any drug smuggling vessel interdictions?

19   A.    Yes, sir.  I've been involved in seven drug smuggling

20   interdictions on the Eastern Pacific.

21   Q.    Okay.  And what kind of drugs did those interdictions

22   involve?

23   A.    All was for cocaine.

24   Q.    And what kind of vessels were involved in those

25   particular interdictions?

1    A.    They were called go-fast vessels, very similar to 30-

2    35-foot panga styles with multiple outboard engines.

3    Q.    Okay.  How is the -- did you actually make any seizures

4    during those interdictions?

5    A.    Yes, sir, we did.

6    Q.    How were the drugs packed?  Well, what kind of drugs

7    are we talking about?

8    A.    These were all cocaine.  And they were packed in bales,

9    approximately -- they must have had individual kilo packages,

10   they must have been about 50 per each bale, and they're

11   approximately four feet by three feet in length.

12   Q.    And other than those interdictions, have you had any

13   occasions to see cocaine bales in any other context?

14   A.    The other contexts that I've actually been part of,

15   we've observed and pulled out of the water jettisoned

16   packages, as well as just floating in the water as we came

17   across them.

18   Q.    How about any transportation or offloading of bulk

19   amounts of contraband?

20   A.    Yes, sir.  We've been involved in transferring from one

21   Coast Guard cutter to another, several -- several hundred

22   packages.

23   Q.    Okay.  And I'm not looking for an exact number, but

24   approximately how many bales of cocaine have you either

25   personally handled or personally observed in your Coast Guard

 1   career?

 2   A.    A couple hundred.

 3   Q.    Let's talk about the patrol you mentioned earlier.

 4   What was your role during that patrol?

 5   A.    The patrol from October to December 2018 was on Her

 6   Majesty's Canadian ship MONCTON.  We were on an allied

 7   vessel, Navy Canadian ship, and our patrols were in the

 8   western, central and eastern Caribbean.  I was the lead petty

 9   officer for that patrol.

10   Q.    During that patrol, did you have any vessel

11   interdictions?

12   A.    Just the one that we're currently here for, sir, but

13   nothing prior to.

14   Q.    Okay.  And what was the date of that encounter?

15   A.    December 1st, 2018.

16   Q.    So no drug busts before that date on the MONCTON?

17   A.    No, sir.

18   Q.    Okay.  And did you at some point on the 1st of December

19   launch as a member of a boarding team?

20   A.    Yes.  I was a part of the initial boarding team.

21   Q.    And who was with you?

22   A.    It was myself and Petty Officer Diego Rivera.

23   Q.    Were you all the first on scene?

24   A.    We were not the first ones on scene.  What happened, we

25   were launched first, but due to the unfortunate sea state and

1  the weather conditions, we could only go about eight knots.

2  And the vessel, the MONCTON, was able to pass us and get to

3  the scene first, and they were able to launch a small boat

4  prior to us getting there.

5  Q.    So how far did you have to travel from when you

6  initially launched until you initially --

7  A.    It was approximately 12 nautical miles.

8  Q.    Once you arrived on scene, what did you observe?

9  A.    When I arrived on scene, I saw the -- initially saw the

10  other boarding team that was there.  It had Petty Officer

11  Lauginiger on board, as well as Petty Officer Alexander

12  Ramos.  They were there, and they were communicating with the

13  crew members on board the small boat.

14  Q.    And what did the -- can you describe the vessel that

15  you encountered?

16  A.    Yes.  It was approximately a 30-foot panga-style

17  vessel.  I noticed it didn't have any outboard engines on

18  board.  There were no navigation lights.  I had noticed as I

19  was coming around, the crew was -- the crew members were

20  already mustered in the middle of the boat.

21         I noticed multiple fuel barrels on board.  And I

22  thought it was odd not having fuel barrels -- or having fuel

23  barrels with no engines on board.  There were frayed lines on

24  both the left side and the right side of the port and

25  starboard side of the boat.  There were yellow, kind of like

1  plastic lines, looked like they were cut.

2  Q.    And were you present for the right of approach

3  questioning?

4  A.    Yes, I was.

5  Q.    And at any point during that questioning, did the

6  master of the vessel indicate the last port of call?

7  A.    Yes, he did.  Mr. Hinestroza Newbbooll, he was the --

8  said that he was the master of the vessel, and the last port

9  of call was in Cartegena, Colombia.

10 Q.    Do you recall if anyone on the vessel spoke English?

11 A.    Yes.

12 Q.    Who?

13 A.    It was Mr. Jorge Newball-May.  He spoke some broken

14 English, but he could understand what we were saying a little

15 bit.

16 Q.    And did you overhear Mr. Newball-May make any

17 statements during the right of approach questioning?

18 A.    He had made statements -- we asked what the purpose of

19 their voyage to be out there.  He said they were fishing.

20 And they didn't have any fishing equipment on board, but they

21 were fishing for conch.

22         I thought it odd because they didn't have any

23 catch on board, as well as we were in the middle of the

24 Caribbean Sea, and it's fairly deep down.  They didn't have

25 any SCUBA equipment on board.

1  Q.    Did you ask -- well, did Mr. Newball-May make any

2  statements about the lack of engines on the boat?

3  A.    He said -- yes, sir.  He said that they used the

4  engines as anchors.

5  Q.    Did Mr. Newball-May indicate how long they had been at

6  sea?

7  A.    Yes.  They said they were adrift for approximately six

8  days.

9  Q.    Did you find any electronics on the vessel during your

10  boarding of the vessel?

11  A.    The only electronics that they said they had on board

12  and we found out later was just a cell phone.

13  Q.    During your portion of the boarding, were you able to

14  get a good look at the four people on the boat?

15  A.    I was.

16  Q.    How would you describe their physical appearances?

17  A.    They seemed to be coherent, alert, awake, and they were

18  able to answer the majority of our questions that they could.

19  Q.    Did you see any signs of physical distress, given their

20  claim of being adrift for six days?

21  A.    No, sir.  They seemed pretty calm in their demeanor.

22  Q.    Were you on scene the entire time, the entire boarding?

23  A.    No, I was not.

24  Q.    Who released you?

25  A.    It was Petty Officer Tyler Perio and Petty Officer

1    Alexander Ramos.

2    Q.    And can you describe the vessel that you were on,

3    initially launched on, what kind of vessel was that?

4    A.    It was a small RHIB, rigid-hulled inflatable boat.  It

5    was approximately maybe 20 feet in length.  And we had a

6    small outboard engine.  I don't remember the horsepower of

7    that one.

8    Q.    And you mentioned another boarding team.  Were they on

9    a similar boat?

10   A.    Yes, they were.

11   Q.    Okay.  How long were you on the MONCTON during this

12   deployment.

13   A.    Overall for the deployment?

14   Q.    Yes.

15   A.    Okay.  I was there for 50 some odd days, close to 60

16   days.

17   Q.    And in your time on the MONCTON, are you aware of any

18   of the routine maintenance that's done on these small boats?

19   A.    Yes.  Every morning they would -- the Canadian Navy,

20   they would do their daily boat checks, which include a fresh

21   water wash-down over all of their equipment, as well as just

22   a routine maintenance, make sure the engines were working

23   properly and so forth.

24            MR. DERENZO:  May I approach the witness, Your

25   Honor?

 1                THE COURT:  You may.

 2    BY MR. DERENZO:

 3    Q.    Petty Officer Fahey, I've handed you what's been marked

 4    as Government's Exhibits 5A through 5D.  Do me a favor and

 5    take a look through those.

 6    A.    Sure.

 7    Q.    And then look up at me when you're done.

 8               Petty Officer Fahey, do you recognize Government's

 9    Exhibits 5A through 5D for identification?

10    A.    Yes, I do.

11    Q.    How do you recognize them?

12    A.    These were the crew members that we eventually pulled

13    onto the HMCS MONCTON.

14    Q.    Well, how do you recognize those particular documents?

15    A.    These documents specifically, we took photos of these

16    items that they had on their person the following day.

17    Q.    Were you present during that process?

18    A.    I was.

19    Q.    And what was your role during that process?

20    A.    I was taking inventory.  I was logging it as we had a

21    witness taking photo -- photographs.

22    Q.    Okay.  And is that a standard process that you're

23    normally involved in as a boarding officer?

24    A.    Yes, sir.  Two person integrity.

25    Q.    Okay.  And so what are you inventorying at this point?

1   A.    Inventory everybody's individual and personal effects,

2   all the crew members.

3   Q.    Okay.  And when you say crew members, do you mean the

4   individuals you encountered on that boat on December the 1st?

5   A.    Yes.

6   Q.    Okay.  Do Government Exhibits 5A through 5D for

7   identification fairly and accurately depict the inventories

8   that you participated in on or about December the 1st, 2018,

9   last year?

10  A.    Yes, they do.

11          MR. DERENZO:  At this time, Your Honor, I move to

12  admit Government's Exhibits 5A through 5D, as Government's 5A

13  and 5D.

14          MR. DEE:  No objections, Your Honor.

15          THE COURT:  Receive into evidence 5A and 5D.

16          MR. DERENZO:  Excuse me, Your Honor, 5A through

17  5D.

18          THE COURT:  Oh, I'm sorry.  5A, 5B, 5C, and 5D.

19          MR. DERENZO:  Thank you, Your Honor.

20          Permission to publish 5A through 5D.

21          THE COURT:  You may.

22  BY MR. DERENZO:

23  Q.    Pull up 5A.

24          So on the screen in front of you, Petty Officer

25  Fahey, you should see Exhibit 5A.

1   A.     Yes.

2   Q.     What are we looking at here?

3   A.     Well, what we're looking at here, it looks like

4   different types of currency.  It belongs to Mr. Dilbert.  It

5   has his forms of identification there, some currency from --

6   U.S. currency as well as Colombian currency.

7   Q.     Okay.  We can move now to Exhibit 5B.  What's depicted

8   in Exhibit 5B?

9   A.     It's Mr. Jorge Newball-May.  It has various types of

10  currency, as well, U.S. and Colombian, as well as other forms

11  of identification, and some -- looks like different notes and

12  cards.

13  Q.     Now, when you did these inventories, did you ask any

14  questions of the individuals you encountered on the vessel to

15  ensure that that was their property?

16  A.     We did.

17  Q.     Is that something you personally did?

18  A.     Yes.

19  Q.     Did every one of the crew members acknowledge that this

20  was their property when you inventoried it?

21  A.     Yes, they did.

22  Q.     So we can move now to 5C.  And what's depicted here?

23  A.     Looks like Mr. Meighan's.  It has other forms of

24  currency, as well.  Looks like Mexican currency, mostly.  All

25  Mexican currency, and his passport as well as other

1    identification.

2    Q.    And did you have an opportunity to review that

3    passport?

4    A.    We did.

5    Q.    From what country was that passport issued in, if you

6    could tell?

7    A.    Belize, I believe.

8    Q.    Move to 5D.  And what's depicted in 5D?

9    A.    This was the master, Mr. Hinestroza Newbbooll.  And

10   that was the only form of electronics they had on -- they

11   said they had on board was the cell phone that you see there.

12   Q.    So the vessel did not have a marine radio of any kind?

13   A.    No.

14   Q.    How about a GPS to navigate?

15   A.    No, sir.

16   Q.    A compass?

17   A.    They did have a compass on board.  That was it.

18   Q.    Pull up Exhibit 2K, four minutes and 30 seconds.

19   Again, Petty Officer Fahey, on the screen in front of you you

20   should see in a moment here a vessel.  And I'll ask you a

21   couple of questions about it.

22   A.    Yes, sir.

23   Q.    Do you recognize that vessel?

24   A.    It looks very similar to the vessel that we approached.

25   Q.    On December the 1st, 2018?

1  A.    Yes, sir.

2  Q.    And what are the -- I mean, what are the distinguishing

3  characteristics in your mind?

4  A.    I'm looking at the stern, the back of the boat right

5  now, once it comes out through the clouds here.  I didn't

6  notice -- notice any engines on board there on the stern.

7  Q.    For the record, press and play at 40 minutes and 47

8  seconds at Exhibit 2K.  Go ahead and press play.

9         Did you encounter any other vessels with no

10 engines during your patrol on the MONCTON?

11 A.    I did not, sir.

12 Q.    Pull up Exhibit 2Q, beginning at around one minute.

13         If you could, look at what's displayed on the

14 monitor in front of you, and then I'm going to ask you a

15 couple of questions, Petty Officer Fahey.

16 A.    Yes, sir.

17 Q.    Based on the counter-narcotics experience you testified

18 to earlier, are you able to form an opinion about those blank

19 packages that you see floating in the water?

20         MR. AMADOR:  Objection, foundation.

21         THE COURT:  Overrule the objection.

22         THE WITNESS:  Those look like packages that could

23 be possibly contraband the way they strung them together to

24 try to keep them together as a bundle, and just the overall

25 size of the packages themselves.

1          MR. DERENZO:  May I have just a moment, Your Honor?

2          THE COURT:  You may.

3          MR. DERENZO:  Tender the witness, Your Honor.

4   Thank you.

5          THE COURT:  All right.  Mr. Dee?

6          MR. DEE:  Yes, Your Honor.

7          THE COURT:  Could you turn off the video.

8                      CROSS-EXAMINATION

9   BY MR. DEE:

10  Q.    Good afternoon, sir.

11  A.    Good afternoon, sir.

12  Q.    You testified that you were -- I'm using the word

13  deployed, use a different word if I'm wrong, though -- as to

14  Her Majesty's Canadian Ship MONCTON; right?

15  A.    Yes, sir.

16  Q.    What date were you deployed on that ship?

17  A.    We were deployed from October of 2018, and we returned

18  to port I think it was December 5th or 6th, 2018.

19  Q.    So you returned to port shortly after this

20  interdiction?

21  A.    Yes, sir.

22  Q.    And did you -- and I may have missed it in my notes,

23  did you personally take the pictures of the property or did

24  you organize them?

25  A.    I organized them, sir.

1    Q.    You organized them and someone else took the photos?

2    A.    Yes, sir.

3    Q.    Okay.  And when you testified as to Mr. Rudolph

4    Meighan's property, you said there was some Canadian

5    currency; is that correct?

6    A.    No, sir.

7    Q.    Mexican currency.  I asked that wrong.  I'm sorry.

8    A.    Yes, sir.

9    Q.    And that was the only currency he had; is that correct?

10   A.    That's correct.

11   Q.    There was no Colombian currency?

12   A.    No, sir.

13          MR. DEE:  Thank you.  No further questions, Your

14   Honor.

15          THE COURT:  Mr. Brunvand.

16          MR. BRUNVAND:  Thank you.

17                     CROSS-EXAMINATION

18   BY MR. BRUNVAND:

19   Q.    Good afternoon.

20   A.    Good afternoon, sir.

21   Q.    Mr. Jorge Ramon Newball-May, you indicated that he

22   spoke broken English?

23   A.    Yes, sir.

24   Q.    His primary language is Spanish; is it not?

25   A.    I believe so.

1    Q.    Okay.  But he communicated with you to some degree in

2    his broken English?

3    A.    That's correct.

4    Q.    Okay.  In Government Exhibit 5B, which is the contents

5    of my client's belongings?

6    A.    Yes, sir.

7    Q.    You identified some Colombian currency?

8    A.    Correct.

9    Q.    And there are two bills that are -- they say 50 and

10   then MIL; right?

11   A.    Yes.

12   Q.    And that's 50,000 Colombian pesos; right?

13   A.    I believe so.

14   Q.    Do you know that the exchange rate basically makes

15   50,000 Colombian pesos is worth about 15 U.S. dollars?

16   A.    I'm not sure exactly the currency exchange rate.

17   Q.    You're not familiar with that?

18   A.    No, sir.

19   Q.    So you don't know what, if any, value that has?

20   A.    No, sir.  Not offhand.

21   Q.    That's fine.  You indicated that certain statements

22   were made by my client as to what had occurred on the vessel?

23   A.    Yes.

24   Q.    Were you also present when the captain gave his

25   scenario of what had occurred on the vessel?

1  A.    When I was filling out the documentation, what I heard

2  from the master, a Mr. Hinestroza Newbbooll, was that what

3  their last port of call was doing.

4  Q.    Okay.  But so had he been given information up until

5  prior to your arrival, is that -- or did you not hear what he

6  said from the very beginning?

7  A.    I may not have heard the first point of contact with --

8  because Petty Officer Diego Rivera was translating, and I was

9  getting the paperwork and documentation done.

10  Q.    But you're there on the initial approach; right?

11  A.    We were the second boat.  We were the second boarding

12  team that came out.  We were initially launched first, but

13  the second boarding team came on scene on arrival first.

14  Q.    All right.  So by the time you arrived, you had been

15  having discussions with the crew members at that time?

16  A.    The first boarding team that made the initial contact,

17  and we came on afterwards.

18  Q.    Are we talking minutes, seconds?

19  A.    Within maybe minutes, a few minutes.

20  Q.    All right.  Would it be fair to say that you don't know

21  what instructions the captain may have given my client on

22  that vessel before you arrived?

23  A.    That's correct.

24  Q.    Okay.  And you don't know anything about what

25  instructions the captain may have received from the

 1   organization above him?

 2   A.    That's correct.

 3          MR. BRUNVAND:  That's all that I have.  Thank you,

 4   Your Honor.

 5          THE COURT:  Mr. Amador?

 6          MR. AMADOR:  No questions.

 7          THE COURT:  Any redirect, Mr. DeRenzo?

 8          MR. DERENZO:  No, Your Honor.

 9          THE COURT:  Thank you, sir.  You may step down.

10          THE WITNESS:  Thank you, Your Honor.

11          MR. DERENZO:  Your Honor, may the witness be

12   excused?

13          THE COURT:  Any objections?

14          MR. DEE:  No, Your Honor.

15          MR. BRUNVAND:  No.

16          THE COURT:  Yes.  You may call your next witness.

17          MR. DERENZO:  United States calls Petty Officer

18   Perio.

19          THE COURT:  Sir, if you will, come forward to be

20   sworn.

21          THE COURTROOM DEPUTY:  Please raise your right

22   hand.

23          Do you solemnly swear or affirm under penalty of

24   perjury that the testimony you shall give in this cause will

25   be the truth, the whole truth, and nothing but the truth?

 1              THE WITNESS:  I do.

 2              THE COURTROOM DEPUTY:  Please have a seat in the

 3  witness box.

 4              Please state your name, and spell your last name

 5  for the record.

 6              THE WITNESS:  Petty Officer Tyler Perio,

 7  P-e-r-i-o.

 8              THE COURT:  Thank you.  Mr. DeRenzo.

 9          MR. DERENZO:  Thank you, Your Honor.

10                        TYLER PERIO,

11  having been first duly sworn by the Courtroom Deputy,

12  testified as follows:

13                    DIRECT EXAMINATION

14  BY MR. DERENZO:

15  Q.    Good afternoon, Petty Officer Perio.

16  A.    Good afternoon, sir.

17  Q.    Tell the jury what you do for a living.

18  A.    I'm a maritime enforcement specialist third class in

19  the United States Coast Guard.

20  Q.    How long have you been in the Coast Guard?

21  A.    About five years now.

22  Q.    And do you have any law enforcement qualifications?

23  A.    I do, sir.  I'm a boarding officer, certified, Tactical

24  Law Enforcement Team Pacific.  Before that, I was on a cutter

25  out of San Diego, as well.

1   Q.    And where are you currently assigned today?

2   A.    Tactical Law Enforcement Team Pacific.

3   Q.    What's your job at that unit?

4   A.    Maritime law enforcement.

5   Q.    Are you on one of those deployable teams?

6   A.    Yes, sir.  I'm on a deployable team.  We go out on

7   deployments to counter-drug boardings.

8   Q.    Okay.  How long have you been doing counter-drug

9   operations total?

10  A.    Around two-and-a-half years.

11  Q.    Have you been part of any drug seizures?

12  A.    Yes, sir.  Four different cases.

13  Q.    And what kind of vessels did those cases involve?

14  A.    Fishing vessel for the first one and go-fast for all

15  the rest.

16  Q.    Okay.  What kind of drugs were involved?

17  A.    Cocaine, sir.

18  Q.    In those particular cases you just described, how was

19  the cocaine packaged for transportation?

20  A.    I've had super bales, like 75 keys apiece for each

21  bale, and I've also had regular size bales and individual

22  size kilos.

23  Q.    Okay.  You just described two different kinds of bales.

24  What is a super bale?

25  A.    A super bale is around 75 keys, packaged into one

1   burlap sack.  Regular bales is around 20 keys packaged into

2   one sack, burlap sack, and then individual kilos.

3   Q.    Okay.  And in those -- in the cases you had regular

4   bales, what was the size and shape of the bales?

5   A.    It's like kilo -- two kilos next to each other stacked

6   about ten high, wrapped together and then put in a burlap

7   sack.  So probably like that (indicating).

8   Q.    And for the record, you just held your hands up

9   vertically?

10   A.    Size reference for how tall the bale is.

11   Q.    Okay.  So if you had to estimate how far apart your

12   hands are, what would you say?

13   A.    About two feet.

14   Q.    Okay.

15   A.    Three feet.

16   Q.    Have you been involved with the offload of drug

17   seizures?

18   A.    I'm sorry, sir.  Can you repeat the question?

19   Q.    Of course.  Have you been involved in any offloads or

20   bulk processing of bales of cocaine?

21   A.    Yes, sir, I have.

22   Q.    How many?

23   A.    One big offload when I was assigned to my cutter.

24   Q.    And what does that entail, for the folks of the jury

25   who might not understand?

1    A.    All the -- on the flight deck, you have a bunch of

2    wooden pallets with all the drugs stacked on them and Saran

3    wrapped and then craned off the boat.

4    Q.    And so in total, your entire law enforcement career in

5    the Coast Guard thus far, approximately how many bales of

6    cocaine have you either seen or handled?

7    A.    Over a hundred.

8    Q.    You mentioned earlier that you deployed at your current

9    unit.  Were you deployed in December of last year?

10   A.    Yes, sir, I did.

11   Q.    On what platform were you deployed?

12   A.    Canadian Ship, HMCS MONCTON.

13   Q.    And during your deployment, did you have any vessel

14   interdictions?

15   A.    Yes, sir, I did.  Just zero one.

16   Q.    Okay.  And what was your role during that event?

17   A.    I was a boarding team member.

18   Q.    And who were -- who did you launch from the MONCTON

19   with?

20   A.    I launched with the assistant boarding officer, Petty

21   Officer Ramos.

22   Q.    Okay.  And were you one of the first ones on scene?

23   A.    I was not, sir.

24   Q.    How did you get on scene?

25   A.    I got on scene, me and Petty Officer Ramos launched.

1   We got on scene to replace Petty Officer Fahey and Petty

2   Officer Rivera.  Once we got on scene, we were filled in by

3   Petty Officer Lauginiger of what was going on.

4   Q.    And how many individuals -- well, did you see anybody

5   on the vessel when you arrived?

6   A.    Yes, sir.  I saw 04 people.

7   Q.    Okay.  And can you briefly describe the vessel that you

8   eventually boarded?

9   A.    We got on scene.  I observed there was no engines on

10   the go-fast style panga.  It was painted a dark color.  There

11   was four people on board, a bunch of fuel drums that I could

12   see.

13   Q.    What part of the boarding did you personally

14   participate in?

15   A.    Once we were conducted -- or authorized to get a full

16   law enforcement boarding, we got on board, did the ISS, which

17   is the initial safety sweep to ensure the safety and the

18   seaworthiness of the vessel.  After that, we frisked the

19   individuals for boarding team safety, looking for weapons.

20           After we -- me and Petty Officer Ramos started

21   conducting ionscan swabs.  We swabbed the starboard rail, the

22   port rail, the forward rail, the forward hatch, the center

23   console, or the central compartment, and the actual console

24   where the helm was.

25           After we got the ionscan swabs all completed, I

1  gathered the ionscan swabs and the crew identification, and I

2  brought them back to maintain chain of custody to Petty

3  Officer Chief Brooks.  I handed them to him, and then went

4  back to the go-fast vessel.

5  Q.    All right.  Let's back up just a little bit so the

6  folks in the jury that might not -- this might be their first

7  day hearing about ionscan swabs.  What is a swab?

8  A.    An ionscan swab is like a -- it's a little piece of

9  paper about this long (indicating).  And you take it and we

10 swab a certain part of the boat that we suspect there might

11 have been drugs on.  It picks up trace amounts when you put

12 it through the ionscan instrument.

13 Q.    Is it a piece of paper like this or a different

14 material?

15 A.    It's a different material.

16 Q.    What kind of material are we talking about?

17 A.    I'm not sure.

18 Q.    Okay.  In what -- is there a container?  Where do these

19 swabs come from when you use them on the boat?

20 A.    The swabs come from a metal container straight from the

21 Smith Detection Company.

22 Q.    And so the swabs you used on this particular boarding

23 on December the 1st, where did those swabs come from?

24 A.    The swabs came from the same metal tin that the Smith

25 Detection Company ships out to us.

1    Q.    And is there ever an occasion that you're going to take

2    those swabs out of the container and put them in a different

3    container, maybe use them later?

4    A.    No.  That's not -- we don't do that.

5    Q.    Okay.  You mentioned some areas that you swabbed on the

6    vessel.  Can you describe in a little more detail exactly

7    what you did on the boat?

8    A.    As far as the areas I swabbed?

9    Q.    Yes.  Can you just describe for the jury the physical

10   action you took, the location that you swabbed.

11   A.    Yes, sir.  So when I swabbed the starboard rail, I

12   grabbed a swab -- I had multiple nonlatex gloves on, or

13   non-powdered latex gloves on my hands.

14   Q.    Why do you do that?

15   A.    To prevent contamination between each swab.  We took --

16   I took one swab, I swabbed the starboard rail on the forward

17   portion, then wrote a number down on the swab while Petty

18   Officer Ramos was taking inventory.  For example, I wrote one

19   on that.  The inventory he was taking said one, and then the

20   place that I swabbed.  And then I peeled the glove off of my

21   hand with my fingers underneath the glove to prevent

22   contamination.

23   Q.    What was on your other hand that you just described

24   with the glove on it?

25   A.    I had multiple gloves on that hand, as well.

1    Q.    Both hands you have multiple gloves?

2    A.    Yes.

3    Q.    All right.  Please continue.

4    A.    I peeled the gloves off so that they rolled up to

5    prevent contamination.  I placed them in an evidence bag.

6    And then I continued to do that for each place that I

7    swabbed.

8    Q.    And are these -- what color are these gloves?  Are they

9    clear, are they --

10   A.    They're clear.

11   Q.    And why do you put numbers on the swabs?

12   A.    We put a number on the swabs so that we can identify

13   where the swab was swabbed.  That's why we have the other

14   personnel talking inventory of it so that when we transfer it

15   back to -- in this case, transferred it back to the MONCTON.

16   When Chief Brooks ran it, he would know that this swab came

17   from this location and could pass us that information.

18   Q.    And were you able to observe how Petty Officer Ramos

19   was recording which swab went with which location?

20   A.    Like observe him writing it down?

21   Q.    Yes.

22   A.    Yes, sir, I was.

23   Q.    Where was he recording these observations?

24   A.    He was recording them on a piece of paper.

25   Q.    After you took all the swabs on the vessel, what

1    happened next?

2    A.    After I took all the swabs on the vessel, I gathered

3    the crew identification and boarded the RHIB and went on the

4    small boat from the MONCTON and went back to the MONCTON to

5    hand the ionscans and the identification over to Chief

6    Brooks.

7    Q.    So when you say ionscans, do you mean the swabs

8    themselves that you just took from --

9    A.    Yes, sir, the swabs that I just took.

10   Q.    And what were they contained in?

11   A.    In an evidence bag that was sealed.

12   Q.    Okay.  At any point, did you perform any swabs of the

13   individuals you encountered on the vessel?

14   A.    We did after the boarding when we got them on board

15   HMCS MONCTON.

16   Q.    Why not just do it on the go-fast vessel?

17   A.    We didn't have authorization to do it on the go-fast

18   vessel.

19   Q.    Is that something that has to come from somebody else?

20   A.    Yes, sir.

21   Q.    Okay.  And can you describe the process -- well, were

22   you personally involved in swabbing the crew members of the

23   go-fast vessel?

24   A.    Yes, sir.  I was the one who swabbed them.

25   Q.    Okay.  Can you take -- can you describe the process

 1   that you used?

 2   A.    Yes, sir.  So again, we put the gloves, the clear

 3   gloves back on, multiple of them.  I grabbed a swab out of

 4   the metal tin.  I swabbed -- starting with one individual, I

 5   swabbed their hands.  Numbered that one.  Rolled the glove

 6   back up.  And then grabbed another fresh swab with a fresh

 7   pair of gloves, swabbed their forearms.  Rolled that glove

 8   up.  And that's what I continued to do with the rest of the

 9   individuals.

10   Q.    What part of the -- what body part of the crew members

11   did you swab?

12   A.    Their hands and forearms.

13   Q.    Why those locations?

14   A.    We swabbed the hands and forearms after we got

15   authorization because that's the part of their body that

16   would be most in contact with any kind of contraband.

17          MR. DERENZO:  Could we pull up -- excuse me, Your

18   Honor.  May I approach the witness?

19          THE COURT:  You may.

20          (Document tendered.)

21   BY MR. DERENZO:

22   Q.    Petty Officer Perio, I've handed you what's been marked

23   as Government's Exhibit 6 for identification.  Take a look at

24   that and then look up when you're done.

25          Do you recognize Government's Exhibit 6 for

1   identification?

2   A.    Yes, sir.  It's the at sea space accountability sketch

3   that I drew.

4   Q.    Okay.  And can you describe the -- what is an at sea

5   space accountability?

6   A.    At sea space accountability is something that we use to

7   identify any hidden compartments on the vessel or what could

8   be hidden compartments on the vessel.

9   Q.    And what was your particular role during this evolution

10  on December the 1st of last year?

11  A.    I conducted an at sea space accountability with Petty

12  Officer Ramos.

13  Q.    Okay.  And what did you do to create Government Exhibit

14  6 for identification?

15  A.    We grab graph paper and then do a quick sketch of the

16  vessel layout overhead.  And then we take measurements from

17  different compartments to see if there's any inconsistencies

18  within the vessel.

19  Q.    Did you personally take those measurements?

20  A.    I don't recall.

21  Q.    The document in front of you, is that something that

22  you actually created?

23  A.    Yes, sir.

24  Q.    Is Government Exhibit 6 for identification a true and

25  accurate copy of the vessel sketch that you just referenced?

 1  A.    Yes, sir, it is.

 2  Q.    That you did on December the 1st of last year?

 3  A.    Yes, sir, it is.

 4  Q.    And does it fairly and accurately depict the

 5  dimensions, not to scale, of the vessel that you boarded on

 6  December the 1st of last year?

 7  A.    Yes, sir, it does.

 8            MR. DERENZO:  Your Honor, move to admit Government

 9  Exhibit 6 for identification as Government 6.

10            MR. DEE:  No objection, Your Honor.

11            THE COURT:  Received into evidence, 6.

12            (*Government Exhibit 6 received in evidence.*)

13            MR. DERENZO:  Permission to publish Government

14  Exhibit 6.  May we publish Government 6, Your Honor?

15            THE COURT:  Oh, yes.  I'm sorry.

16  BY MR. DERENZO:

17  Q.    Petty Officer Perio, how long is this vessel that you

18  boarded?

19  A.    Approximately 30 feet.

20  Q.    How wide was it?

21  A.    Approximately seven feet.

22  Q.    And the area near where a person would drive the

23  vessel, what were the dimensions of that area?

24  A.    Six feet eight inches in width and approximately three

25  foot ten inches in length.

1  Q.    Thank you.  Bring up Exhibit 2K, approximately four

2  minutes, 30 seconds.

3           Petty Officer Perio, the vessel you see on your

4  screen in front of you on Exhibit 2K which was previously

5  admitted, do you recognize that vessel?

6  A.    Yes, sir.

7  Q.    And how do you recognize it?

8  A.    There's no engines on it.  I can make out -- there's no

9  engines on it, and it's the same exact style of vessel that I

10 came across that I visually acquired when I came on scene.

11 Q.    Is that the same vessel you boarded?

12 A.    Yes, sir.

13 Q.    If we could pull up Exhibit 4C.

14          Petty Officer Perio, could you point out in

15 Exhibit 4C the areas that you swabbed on the vessel?

16 A.    Yes, sir.

17 Q.    And on the screen in front of you, you can actually

18 draw with your finger, if that would help.

19 A.    Right here (indicating).

20 Q.    So what is the area you're marking right now?

21 A.    That is the console where the helm is.  That would be

22 contact with hands, usually.

23 Q.    Where else did you swab?

24 A.    (Indicating).

25 Q.    What area is that?

1   A.    The starboard rail.

2   Q.    And, again, for the nautically challenged in the

3   courtroom like myself, starboard means right?

4   A.    Yes, sir.

5   Q.    All right.  Where else did you swab?

6   A.    (Indicating).

7   Q.    What is that area you just circled?

8   A.    The center hold area.

9   Q.    Why would you swab there?

10   A.    You could easily put drugs up on that when you're

11   pushing them overboard.

12   Q.    Okay.  And where else did you swab?

13   A.    (Indicating).  The forward hatch area.

14   Q.    And where else did you swab?

15   A.    (Indicating).  Then the port rail, sir, which is the

16   left rail.

17   Q.    If we could bring up Exhibit 2Q.  It's at one minute.

18          Take a look in that monitor in front of you.

19   Exhibit 2Q is playing.  I want to ask you a couple of

20   questions about it.

21          Petty Officer Perio, do you see white rectangular

22   objects floating in the water in front of you?

23   A.    Yes, sir, I do.

24   Q.    Do you have an opinion as to what those are?

25          MR. AMADOR:  Objection.  Foundation.

 1          THE COURT:  Overruled.

 2   BY MR. DERENZO:

 3   Q.    Do you have an opinion?

 4   A.    Yes, sir.  They appear to be contraband-like packages.

 5   Q.    Okay.  Are you able to -- do you have an opinion on

 6   what type of contraband you observed?

 7          MR. AMADOR:  Objection.  Foundation.

 8          THE COURT:  Overruled.  You may answer, if you

 9   can.

10          THE WITNESS:  From the way they look on the video,

11   how tight they are packaged, it appears to be cocaine

12   contraband.

13          MR. DERENZO:  Thank you, Petty Officer Perio.  No

14   further questions, Your Honor.  Thank you.

15          THE COURT:  All right.  Mr. Dee.

16          MR. DEE:  Yes, Your Honor.  May I have one moment?

17                CROSS-EXAMINATION

18   BY MR. DEE:

19   Q.    Good afternoon, Petty Officer Perio.

20   A.    Good afternoon, sir.

21   Q.    So when you said you were the person tasked with

22   swabbing the individuals, I believe your testimony was you

23   swabbed each of the crew member's hands and forearms?

24   A.    Yes, sir.

25   Q.    So are you sure you swabbed every crew member's hands

1  and forearms?

2  A.    Yes, sir.

3           MR. DEE:  No other questions, Your Honor.

4           THE COURT:  All right.  Mr. Brunvand.

5                    CROSS-EXAMINATION

6  BY MR. BRUNVAND:

7  Q.    Good afternoon.

8  A.    Good afternoon.

9  Q.    You indicated that before you swabbed various places on

10  the vessel itself, that you put multiple gloves, latex gloves

11  on; is that correct?

12  A.    Non-latex, non-powder.

13  Q.    I'm sorry?

14  A.    Non-latex, non-powder gloves.

15  Q.    Non-latex, non-powder gloves?

16  A.    Yes, sir.

17  Q.    Okay.  What's that?

18  A.    They're clear gloves that we use when we're ionscanning

19  to prevent contamination.

20  Q.    Okay.  Prior to putting the gloves on, do you have an

21  idea as to how many places you were going to swab?

22  A.    An idea, yes, sir.

23  Q.    Okay.  So in this particular case, had you -- prior to

24  actual starting it, had you determined how many different

25  places you were going to swab?

1  A.    No, sir.  We had an idea about it.  We started swabbing

2  and then inventoried after every single swab.

3  Q.    How many gloves did you put on each hand?

4  A.    During the whole thing or at one time?

5  Q.    My understanding is that you put multiple gloves on

6  each hand at the beginning before you start swabbing; is that

7  not correct?

8  A.    Yes, sir.  And then you grab more gloves as needed.

9  Q.    Okay.  So you carry it with you?  Does it come in a box

10 or --

11 A.    It's a Ziploc bag from the manufacturer.

12 Q.    All right.  So initially you put multiple gloves on and

13 then, as you need them, you then put additional gloves on; is

14 that accurate?

15 A.    Yes, sir.

16 Q.    My client, Jorge Ramon Newball-May, it appears fell

17 into the ocean on two separate occasions before you conducted

18 the ionscan.

19 A.    Yes, sir.  Are you talking about the ionscan on his

20 actual self?

21 Q.    On him, yes.

22 A.    Yes, sir.

23 Q.    When you're doing the ionscans on the vessel itself, do

24 you take multiple samples of each spot so that possibly one

25 sample can be preserved for future testing and the other one

1  can be submitted into the machine?

2  A.    No, sir, we don't.

3  Q.    Is that a decision that you make or is that something

4  that others have made for you?

5  A.    It's not a decision I made, sir.

6  Q.    Okay.  So if you wanted to take additional samples that

7  would be preserved for future testing, could you do that?

8  A.    Yes, sir.

9  Q.    Okay.  You just choose not to?

10  A.    Yes, sir.

11          MR. BRUNVAND:  That's all that I have.

12          THE COURT:  Mr. Amador.

13                    CROSS-EXAMINATION

14  BY MR. AMADOR:

15  Q.    Petty Officer Perio, you said you took the gloves and

16  you put them in an evidence bag.

17  A.    Yes, sir.

18  Q.    Just one evidence bag?

19  A.    Yes, sir.

20  Q.    All the gloves are in one evidence bag?

21  A.    Yes, sir.  Every glove that I took off is rolled up and

22  put in the evidence bag.

23  Q.    And for the swabbing of the forearms and hands, was it

24  just -- was it the same procedure, putting it in an evidence

25  bag?

1   A.    No, sir.  We were on HMCS MONCTON at that time that I

2   did that.  So I took the swabs and then brought them up to

3   Chief Brooks.

4   Q.    So you were holding them in your hand?

5   A.    In the gloves rolled up, so they were sealed off.

6   Q.    Okay.  And those gloves -- there's eight different

7   swabs.  So how were you holding the eight different --

8   A.    How was I holding the eight different gloves?

9   Q.    The eight different swabs that you had, yes.  That's my

10  question.

11  A.    Each swab is in one glove.

12  Q.    And you were holding the gloves -- all the gloves

13  together in a bunch?

14  A.    I was holding them all -- like the cuff part that goes

15  around your wrist was all in my hand pinched together like

16  this (indicating).

17  Q.    Thank you.

18  A.    Yes, sir.

19          THE COURT:  Any redirect?

20          MR. DERENZO:  Briefly, Your Honor.

21                    REDIRECT EXAMINATION

22  BY MR. DERENZO:

23  Q.    Petty Officer Perio, how have you been trained to

24  conduct ionscan swabs, say, on a vessel?

25  A.    I've been trained to conduct ionscan swabs by putting

1    on the multiple different gloves, grabbing a fresh swab every

2    time out of the metal tin.  Swabbing the place, writing the

3    number down on the bottom part of the swab that didn't get

4    used against the contact of the vessel, while you have

5    another person taking inventory of it, and then roll the

6    gloves up with the swab in your hand so that the swab is not

7    going to get contaminated with anything else.

8    Q.    Mr. Brunvand asked you a question about choices you're

9    making in terms of additional ionscan swabs.  Is that -- is

10   the procedure used in this case something you've been trained

11   on or do you have latitude to do what you want?

12   A.    No, sir.  This is something that I've been trained on.

13   Q.    So based on your training, what is done with all of the

14   ionscan swabs that you would do in any given case, including

15   this one?

16   A.    They're thrown away after they're run through the

17   ionscan instrument.

18   Q.    Okay.  And did you take any steps in this particular

19   case to ensure that the swab itself that made contact with

20   whatever surface you were analyzing was not exposed to either

21   the other swabs or anything else?

22   A.    Yes, sir.  When I rolled it off my -- rolled the glove

23   off my hand, I made sure that the cuff was rolled over, and

24   they were placed in the evidence bag neatly.

25   Q.    Okay.  And when you carried the gloves up to Chief

1    Brooks, was the swab all the way inside the glove?

2    A.    Yes, sir, it was.

3    Q.    Did you hand it to anybody else before you handed it to

4    Chief Brooks?

5    A.    No, sir, I did not.

6              MR. DERENZO:  No further questions, Your Honor.

7    Thank you.

8              THE COURT:  You may step down.  Thank you, sir.

9              MR. DERENZO:  Your Honor, may the witness be

10   excused?

11             THE COURT:  Any objections?

12             MR. DEE:  No, Your Honor.

13             MR. BRUNVAND:  No.

14             THE COURT:  Call your next witness.

15             MR. DERENZO:  United States calls Petty Officer

16   Daniel Brooks.

17             THE COURTROOM DEPUTY:  Please raise your right

18   hand.

19             Do you solemnly swear or affirm under penalty of

20   perjury that the testimony you shall give in this cause will

21   be the truth, the whole truth, and nothing but the truth?

22             THE WITNESS:  Yes.

23             THE COURTROOM DEPUTY:  Please have a seat in the

24   witness box.

25             Please state your name, and spell your last name

 1   for the record.

 2           THE WITNESS:  Daniel William Brooks, B-r-o-o-k-s.

 3                   DANIEL BROOKS,

 4   having been first duly sworn by the Courtroom Deputy,

 5   testified as follows:

 6                   DIRECT EXAMINATION

 7   BY MR. DERENZO:

 8   Q.    Good afternoon, Chief.

 9   A.    Good afternoon.

10   Q.    What do you do for a living?

11   A.    What do I do for a living?  I serve in the United

12   States Coast Guard as a chief petty officer, currently

13   assigned to the Taclet Law Enforcement Pacific.

14   Q.    How long have you been in the Coast Guard?

15   A.    Coming up on 15 years this July.

16   Q.    What is your current rank for your job?

17   A.    I'm a maritime law enforcement specialist, pay grade

18   E-7.

19   Q.    And how long have you been doing that particular job?

20   A.    Since 2010.

21   Q.    Do you hold any qualifications or certifications?

22   A.    Yes.  I currently am a deployable team leader and a

23   boarding officer.

24   Q.    Okay.  And how long have you been at your current unit?

25   A.    Right now I'll be coming up on my first year of my

1  second tour.  Prior I was there for six years.  So altogether

2  at this unit, seven years.

3  Q.    And what's your role as the chief petty officer at that

4  unit?

5  A.    I'm in charge of all the enlisted members of my team,

6  assuring that we're sustaining the right training, and

7  coordinate that through our staff.

8  Q.    Do you deploy, as well?

9  A.    Yes, I do.

10 Q.    Okay.  How long have you been doing -- well, let me ask

11 you this question:  What's the primary mission you're

12 supporting at TACLET Pacific?

13 A.    Primary mission is counter-drug.

14 Q.    And how long have you been doing that particular

15 mission in the Coast Guard?

16 A.    Since 2009.

17 Q.    And how many patrols have you been on?

18 A.    I've done approximately 17 patrols in the Eastern

19 Pacific and Caribbean, to include the Horn of Africa.

20 Q.    Have you been involved in any vessel interdictions

21 during that time period?

22 A.    Yes.  Combined, I've done approximately 45

23 interdictions.

24 Q.    Have any of those 45 -- well, what type of vessels have

25 you been involved in interdicting?

1   A.    The vessels I've interdicted in the past have been your

2   go-fast style vessels, panga vessels, fishing vessels,

3   self-propelled semi-submersibles, or your drug subs, and your

4   container ships, bulk container ships trafficking in drugs.

5   Q.    Have any of those interdictions resulted in drug

6   seizures?

7   A.    Yes.

8   Q.    Approximately how many?

9   A.    Those are the ones I interdicted, so all 45.

10  Q.    And what kind of drugs of those 45?

11  A.    Primarily cocaine.

12  Q.    In the seizures that -- when you say primarily, would

13  you estimate what percentage of them involved cocaine versus

14  some other drug?

15  A.    Yes.  About 98 percent were cocaine and about

16  two percent was marijuana.

17  Q.    No heroin?

18  A.    No.

19  Q.    And of the interdictions that resulted in a cocaine

20  seizure, how was the cocaine packaged?

21  A.    They were packaged in brick-like 2.2 pound kilogram

22  sized packages, and wrapped up in anywhere from 20 to 25

23  kilograms of bricks taped together and concealed inside a

24  burlap sack.  That constitutes a bale.

25  Q.    So in your entire Coast Guard law enforcement career,

1    approximately how many bales of cocaine have you either seen

2    personally or handled in the course of your duties?

3    A.    Thousands.

4    Q.    Were you deployed in December of last year, 2018?

5    A.    Yes.

6    Q.    On what platform?

7    A.    I was on the Canadian Naval Vessel MONCTON for a

8    counter-drug patrol in the Caribbean Sea.

9    Q.    And what was your role in that deployment?

10   A.    My role there was I was breaking in.  I wasn't

11   qualified as a deployable team leader, so I was under the

12   supervision of my officer in charge, but I was a certified

13   boarding officer.  And while the boarding team would go out

14   to do boardings, I would support by running the ionscan, as

15   well.

16   Q.    You say ionscan.  What's that?

17   A.    An instrument we use to look for traces of cocaine on

18   vessels actively underway or underway there in that AOR.

19   Q.    Okay.  And we'll talk about that instrument more in a

20   minute.

21          During your patrol, did you have any vessel

22   interdictions?

23   A.    Just the one that we're here today to talk about.

24   Q.    And was that on December the 1st of last year?

25   A.    Yes.

1    Q.    So what was your role in that particular boarding?

2    A.    My role was just to run the ionscan swabs that the

3    boarding team brought back to the Canadian Naval Ship

4    MONCTON.

5    Q.    And prior to that date, did you have any qualifications

6    or certifications to operate that instrument?

7    A.    Yes.  The first time I was certified as the ionscan

8    operator was in 2009 on the older version.  It was a 400B.

9    And then we switched -- the Coast Guard switched to the

10   500DT.  And I got certified on that in 2012.

11   Q.    Did you have to undergo any training or anything to get

12   qualified and certified?

13   A.    Yes.  There's initial training, and we also conduct

14   just refresher training at our unit.

15   Q.    Approximately -- well, was December 1st the first time

16   you've actually used one of these instruments?

17   A.    No.

18   Q.    How many times have you actually run samples through

19   that instrument?

20   A.    Approximately a hundred.

21   Q.    And can you briefly describe in general terms what

22   you're doing when you operate the instrument.

23   A.    When I'm operating it, we'll take the sample that I

24   have, and I will run it through the machine to sample.  Like

25   from when the boarding team gave it to me, is that where you

1    want me to start?

2    Q.    Well, let's back up to the -- you've actually done --

3    have you done every part of the ionscan testing procedures

4    before?

5    A.    Yes.

6    Q.    From taking the swab of a surface to the actual test?

7    A.    Yes.

8    Q.    Okay.  So let's start from the beginning.  What's the

9    procedure that you're trained on on how to actually take

10   these?

11   A.    If I were to take a swab, what would I do?

12   Q.    Yes.

13   A.    All right.  So if I was going to conduct an ionscan

14   swab on a vessel that I'm boarding, what I will do is I will

15   put our non-powdered latex gloves on, multiple ones on one

16   hand and on both hands.  And then I will write down the

17   number that the swab is.  And I'll be taking a swab while my

18   partner will have a piece of paper writing down what number

19   one is, if it's the forward rail of the ship or the starboard

20   rail or left or right side of the vessel.

21        And when you take that one swab, you'll keep it in

22   between your fingers like so, and you'll take that one glove

23   and you'll turn it outside out to keep it from getting

24   cross-contaminated.  Then we'll take that glove, and we'll

25   put it inside an evidence bag.  And then we will go and

1    repeat those steps through each ionscan swab we take, while

2    noting what the location was on another piece of paper.

3    Q.    And as an ionscan instrument operator, why would you --

4    why is it important to record where and what number that is?

5    A.    It's important for us to note the location so it can

6    help us as law enforcement officers track down where exactly

7    the drugs might be hidden on board the vessel.

8    Q.    And then let's move to actually doing the test itself.

9    What does that look like, using the instrument itself?

10   A.    So as the ionscan operator, once you receive the bag

11   full of ionscan swabs, you'll open up the bag.  And at that

12   point, we've already had the machine on running because we

13   would test our boarding team prior to going out, and the

14   machine was running.

15          So you'll have the green screen.  I'll take my

16   first swab, and I'll have the latex gloves on, as well.  And

17   I will insert the swab, and I'll hit the analyze button.  And

18   then it will go through and analyze that swab to pick up any

19   substances.

20   Q.    When you're ready to examine or analyze the swab, how

21   do you know the machine is ready to test?

22   A.    It has a green screen, and it says ready up on the top

23   center.

24   Q.    And if you get a positive result for some kind of drug,

25   what would the screen look like?

1  A.    The screen turns red.

2  Q.    And when that occurs, do you -- how do you receive

3  notice as the instrument operator if it's positive, what kind

4  of drug is present, et cetera?

5  A.    It has an audio alarm which starts beeping numerous

6  times.  And also you have the red screen which lets you know.

7  And then there's a window that pops up telling you what the

8  substance says it is.

9  Q.    Now, after you get a positive hit, if you will, what's

10 the next step you will take after that?

11 A.    I can't go further.  I can't run another swab unless I

12 clear down the machine.  So I have to get a minimum of two

13 cleared swabs to run the next sample.

14 Q.    And how do you know if it's ready to test another

15 sample?

16 A.    The screen will go back to green, saying ready.

17 Q.    And as an instrument -- ionscan instrument operator,

18 what do you do to memorialize the results of your test?

19 A.    Can you rephrase that?  I'm sorry.

20 Q.    Sure.  What do you do to record the results of the

21 testing you're performing?

22 A.    I print out the receipt for the substance being found.

23 I write down the location of where it was at.  And I also

24 write it on a -- on our ionscan sheet for that specific

25 boarding that has the location, the sample number, and also

1    has the alarm if it sounded, and the percentage of what the

2    substance was.

3    Q.    And whose job is it to maintain those documents, both

4    the log you just referenced and then the receipts from the

5    individual tests?

6    A.    That's the ionscan operator's responsibility.

7    Q.    So let's talk about the testing that was done in this

8    case.

9          You mentioned the boarding team a minute ago.

10   Were you involved in any swabbing of the boarding team who

11   deployed?

12   A.    I only swabbed Officer Perio.

13   Q.    Okay.  And why was that?  Was he swabbing the other

14   people?

15   A.    Yes.  And he was the last boarding team member to

16   depart to assist with the boarding.

17   Q.    And when did that occur?

18   A.    I can't recall what time that was.

19   Q.    And I don't mean specific time.  But relative to their

20   deployment off the MONCTON, was it before or after?

21   A.    It was before.

22   Q.    Okay.  And why do you do that?

23   A.    Just to make sure that any interdictions that we have,

24   that patrol, we don't cross-contaminate on that next boarding

25   that we do.

1   Q.    And you did that -- did you do that in this case?

2   A.    Yes.

3   Q.    Even though you hadn't had any interdictions during

4   this entire patrol?

5   A.    Yes.

6   Q.    What happened to the swabs from the boarding scene?

7   A.    They're just discarded.

8   Q.    Okay.  Did you have a chance to test them before they

9   were discarded?

10  A.    Yes.

11  Q.    Did you personally do those tests?

12  A.    Yes.  I ran every ionscan swab for this boarding.

13  Q.    And what were the results of these swabs that were

14  taken of the boarding team itself?

15  A.    None of the boarding team members alarmed for any

16  substances.

17  Q.    Did you record the results of that testing anywhere?

18  A.    Yes, on the ionscan log.

19  Q.    Did you test any swabs that were taken from the vessel

20  that your shipmates boarded on December the 1st?

21  A.    Yes.  I did all the ionscans for the boarding.

22  Q.    You did the testing itself?

23  A.    Yes.

24  Q.    And how did you receive the swabs from the vessel?

25  A.    Petty Officer Perio came alongside and handed me the

1   evidence bag that was sealed with all the ionscan swabs.

2   Q.    And how were the swabs -- what did you observe when you

3   looked in the bag?

4   A.    I saw the swabs wrapped up inside the gloves that they

5   were taking.

6   Q.    You described the process earlier about how it's

7   normally done.  Did you notice anything that appeared to

8   deviate from how you were trained or how you had done it in

9   the past?

10  A.    No.

11  Q.    Did you -- and we'll get to the results in a minute.

12  But did you actually record the results from the analysis of

13  the -- well, let's back up.

14          Did you actually test the swabs from the vessel?

15  A.    Yes.

16  Q.    Did you record those results anywhere?

17  A.    Yes.  I recorded them on the ionscan log, and I also

18  printed out the receipts that alarmed for any substance that

19  came up.

20  Q.    Now let's talk about the crew of the vessel.

21          Were you involved in the swabbing of the four

22  persons on the vessel?

23  A.    Yes.

24  Q.    What was your role in that process?

25  A.    I made sure that I looked at their identification or

1    their passports, verified the spelling of their name.  And I

2    gave each swab a specific number because we were swabbing

3    their hands and their forearms.

4    Q.    Who did the actual swabbing?

5    A.    That was Officer Perio.

6    Q.    Okay.  And so what did you -- maybe you can explain in

7    more detail.  What did you do with the IDs as he's swabbing

8    the individuals?

9    A.    I took the identification, showed it up to make sure

10   that was the member, I asked him his name, and then wrote it

11   down -- his name, and then made sure that it was a correct

12   spelling, and also reflects all of his identification and

13   to -- to each crew member, and they each said that was their

14   name.

15   Q.    And then after the swab was done by Petty Officer

16   Perio, what did he do with the swabs?

17   A.    Same steps we do for the boarding.  He put it inside

18   the glove, made sure it didn't -- it wasn't exposed to

19   anything, and put it inside a bag.

20   Q.    And at some point, did you actually test the swabs of

21   the four individuals that were found on the go-fast vessel?

22   A.    Yes.  I tested them after we were done swabbing each

23   member, each crew member.  I took all the swabs, took them to

24   the -- where we have the ionscan instrument, and I analyzed

25   all of the ionscan swabs.

1   Q.    Did you record the results anywhere?

2   A.    Yes.  I printed out receipts and also wrote down who

3   the receipt belonged to and whether it was their hands or

4   their forearms, and I also noted that in our ionscan log, as

5   well.

6   Q.    Okay.  You mentioned that you were actually standing

7   there looking at these individuals and looking at their

8   identification.  Do you see any of the individuals who you

9   observed being swabbed on December -- on or about December

10  the 1st of last year?

11  A.    Yes.  I see three of them.

12  Q.    And who are the people that you see?

13  A.    I see Mr. Meighan here in the light gray jacket with

14  the blue shirt, Mr. Dilbert here with the darker gray and

15  white shirt, and Mr. Newball-May right here in the blue shirt

16  and the gray jacket.

17            MR. DERENZO:  Your Honor, for the record, the

18  witness has identified all three defendants present in the

19  courtroom.

20            THE COURT:  The record will so identify.

21            MR. DERENZO:  Your Honor, may I approach the

22  witness?

23            THE COURT:  You may.

24            (Documents tendered.)

25  BY MR. DERENZO:

1   Q.    Chief, I've handed you what's been marked as Government

2   Exhibits 7A and 7C for identification.  Take a minute,

3   please, and look at those documents, and then look up when

4   you're done.

5           Let's talk about Exhibit C for identification

6   first.  Do you recognize that document?

7   A.    Yes.

8   Q.    How do you recognize it?

9   A.    It's my handwriting.

10  Q.    Who prepared Exhibit 7C for identification?

11  A.    I did.

12  Q.    And when did you prepare it?

13  A.    The -- from the 1st to the 2nd of December, the day of

14  the boarding.

15  Q.    And as the -- during that deployment -- well, as the

16  ionscan instrument operator, did you have a duty to make that

17  document?

18  A.    Yes.

19  Q.    Is that part of your routine duties as an ionscan

20  instrument operator?

21  A.    Yes.

22  Q.    And the information that's contained in Exhibit 7C for

23  identification, where did that information come from?

24  A.    All this information here is what I gathered from each

25  swab that I took from the machine itself.

1    Q.    So when you made the log, did you have personal

2    knowledge of that information?

3    A.    Yes.  It comes up on the screen and lets you know

4    exactly what you have.

5    Q.    Okay.  And is that something that's kept in the regular

6    course of your duties as a Coast Guard boarding officer?

7    A.    Yes.  As a boarding officer, sometimes you will be

8    running the ionscan machine.

9    Q.    And if you create, for example, a case package or

10   something, is that something that you have to include in

11   that?

12   A.    Yes.

13         MR. DERENZO:  At this time, Your Honor, the

14   government moves to admit Exhibit 7C for identification as

15   Government Exhibit 7C.

16         THE COURT:  Any objections?

17         MR. BRUNVAND:  Could we approach sidebar?

18         THE COURT:  Sure.

19         (*The following was held at sidebar:*)

20         MR. BRUNVAND:  Your Honor, as to 7C -- and I would

21   suggest while we're here, 7A, as well, we would renew the

22   motion in limine.

23         MR. DEE:  7B, as well.

24         MR. BRUNVAND:  A, B, and C.  Renew the motion in

25   limine.

1          MR. AMADOR:  Also based on hearsay.

2          MR. BRUNVAND:   And also based on hearsay.

3          THE COURT:  All right.  I am assuming you're going

4    to introduce 7B?

5          MR. DERENZO:  7A.  7B is our -- if there was going

6    to be hearsay objection, 7B is our backup plan, Judge.

7          THE COURT:  All right.  Well --

8          MR. DERENZO:  So I can address each one, if it

9    pleases the Court.

10          THE COURT:  No.  He said you only offered A and C.

11          MR. DERENZO:  Right.

12          THE COURT:  And 7B came up, and that's why I asked

13   if you intended to.  At this time you do not intend to offer

14   in 7B?

15          MR. DERENZO:  That's correct.

16          THE COURT:  Okay.  All right.  And so then 7A are

17   the individual printouts from the ionscan instrument?

18          MR. DERENZO:  That's right, Your Honor.

19          THE COURT:  And 7C is the log that this witness

20   did?

21          MR. DERENZO:  That this witness talked about, yes.

22          THE COURT:  Okay.  Was there something you would

23   like to say other than what you've said?

24          MR. DERENZO:  Well, with 7C, it's our position

25   that it's the record of regular conducted activity.

1    Obviously, this witness has personal knowledge it was made at

2    or near the time that he had the knowledge, and it's made in

3    the course of his regular duties as an ionscan operator, and

4    there shouldn't be a confrontation issue since he's up here

5    on the stand.

6              With respect to the receipts themselves, the data,

7    the machine is not a declarant, so it's not a hearsay issue

8    with respect to the data itself.  With respect to his notes

9    on there, I can see that there could be a hearsay issue.

10             THE COURT:  His notes on the printouts?

11             MR. DERENZO:  Right.  I would expect him to

12   testify that, essentially, he's recording what he -- the

13   information that he was passed so that he can distinguish

14   which results relate to which swab.  So on the log, for

15   example, there is a sample number that's generated by the

16   machine itself, and that's -- so he's marrying up his log to

17   the receipts themselves.

18             THE COURT:  Okay.  As to the renewing of the

19   *Daubert* challenge and the challenge that we -- I did an order

20   on and we handled pretrial as far as reliability, the

21   methodology and so on, I would overrule that objection.

22             It would seem to me that as far as C is concerned,

23   it is his log.  It's a record that he keeps in the regular

24   course of his business.  He's the one that prepared it.  He's

25   the one that wrote it down.  So it would seem to me that

 1   comes in over either of the objections regarding ionscan

 2   testimony and evidence in general, or the fact that it's

 3   hearsay.

 4           7A, I'm not sure that you have really asked him

 5   about what's on the bottom of these yet.

 6           MR. DERENZO:  I intend to elicit testimony about

 7   what area alerted.  Our position was, you know, we talk about

 8   it with the expert, anyway, so he can certainly, you know,

 9   show it to everybody as to what information he relied upon in

10   forming his opinion.

11           THE COURT:  But my issue went more to, I'm

12   assuming or you haven't at this point asked him if he's the

13   person that wrote what's on the bottom.

14           MR. DERENZO:  No.  I was going to ask him when he

15   got to that exhibit.  But I'll proffer to the Court he will

16   say, yes, as soon as it came out of the machine, I wrote down

17   the location that the swab was taken from, and recorded it

18   right there.

19           THE COURT:  Okay.

20           MR. DERENZO:  Arguably, it could be, I guess, a

21   present sense impression with respect to whatever he observed

22   with the defendants themselves.

23           THE COURT:  Okay.  So if there -- some of them

24   appear to have notes at the bottom and some of them appear to

25   be blacked out.

1          MR. DERENZO:  On 7B, Your Honor, yes.

2          THE COURT:  Oh, I'm sorry.  I was looking at the

3    wrong thing.  I apologize.

4          MR. DERENZO:  And I neglected to add earlier, I

5    think with 7A, as well, I mean, this is also much like the

6    log, a record of regularly conducted activities.  So when I

7    get to the foundation for 7A, I was going to elicit similar

8    testimony that we did with 7C, which is, is this something

9    that you normally do, when did you make it, et cetera.

10          THE COURT:  Okay.  All right.  Well, I'll note the

11    objections as to both 7A and 7C.  You've only offered 7C at

12    this point.  So I will -- I'm going to overrule the objection

13    and receive 7C into evidence, and both over the objection

14    regarding the ionscan technology in general, and also any

15    kind of hearsay, that this might be a log that contains

16    hearsay, finding it's a record regularly kept in the course

17    of business, but he's also the witness that has testified

18    this is his record.  So I think it's reliable.  I'll receive

19    it in evidence.  I'll say it out loud.

20          MR. DEE:  On this witness, Mr. Brunvand is going

21    to go first on cross-examination, and then we'll go after in

22    whatever order you wish to call us.

23          THE COURT:  Okay.  We'll probably end up taking a

24    break before we actually start cross-examination.

25          (Sidebar ended.)

 1          THE COURT:  Over objection, I will receive into

 2   evidence 7C.

 3               (*Government Exhibit 7C received in evidence.*)

 4          THE COURT:  The ionscan log.

 5          MR. DERENZO:  May we publish 7C, Your Honor?

 6          THE COURT:  You may.

 7   BY MR. DERENZO:

 8   Q.    Chief, on the screen in front of you, you should see

 9   Exhibit 7C, which was recently admitted.  Can you describe

10   for the jury what we are looking at in this document?

11   A.    Yes.  That's the ionscan boarding sample log.  On the

12   top left, you have the serial number of the machine, which is

13   52143.  You have the date, which is the 2nd of December,

14   2018.  The vessel's name, it didn't have a name, so it's an

15   unknown go-fast vessel to treat without nationality, is what

16   that means.  And the ionscan operator is myself, Officer

17   Brooks.

18   Q.    Okay.  And let's move now to the bulk of the document

19   here.  What's recorded in this area?

20   A.    So the -- what's recorded there is your location, your

21   ionscan sample number, which is the number -- numerical order

22   of what swab has been taken throughout that machine's life.

23   And then you have the alarmed substance and percentage.  So

24   we started with the boarding officer.  Do you want me to

25   continue going down?

 1   Q.    If you could hold up just there.  So the location, what

 2   is that?

 3   A.    Location is where you're swabbing, where you're taking

 4   that swab.  So in this instance, it was the boarding officer,

 5   the assistant boarding officer, and boarding team member

 6   number one.

 7   Q.    I see.  So ionscan sample number, where does that

 8   number come from?

 9   A.    That number comes from, like I stated before, it's a

10   number that is recorded within the instrument itself.  And it

11   stays with -- inside there and records it throughout the

12   machine's life.  So that was Sample No. 2,403 of that ionscan

13   machine.

14   Q.    It's a counter that runs inside the machine?

15   A.    Yes.

16   Q.    Okay.  And is that number recorded anywhere else, other

17   than the instrument itself?

18   A.    No.

19   Q.    Okay.  Now, if you print out a receipt, like you talked

20   about earlier, would you find the ionscan sample number

21   there?

22   A.    Say again.

23   Q.    The receipt that you talked about earlier, when you

24   have a positive test?

25   A.    Yes.

1   Q.    Would you find the ionscan sample number on the receipt

2   itself?

3   A.    Yes.

4   Q.    Okay.  And then, again, the third column, what's that?

5   A.    Third column, that's your alarm substance and

6   percentage.  So any substance that's picked up through that

7   ionscan analysis will come up, and it will tell you what the

8   substance is and the percentage.

9   Q.    Okay.

10  A.    Then I'll record that on there, as well as printing the

11  receipt.

12  Q.    Let's go through the individual tests that you did.

13  Which samples are we looking at right now?

14  A.    That's the boarding team.

15  Q.    Okay.  And what are the results in the third column?

16  A.    Had no traces of substance.

17  Q.    Thank you.  In the first column, if it says blank, what

18  does that mean?

19  A.    Oh, for that, since I left the machine after I was done

20  running the boarding team, I ran two blanks just to ensure

21  the -- before I ran any swabs of the boarding, I wanted to

22  make sure that the machine was cleared out.  So I just ran

23  two blanks to ensure that it was good to go, and then I

24  proceeded with the first swab that was taken on the -- on the

25  vessel.

1  Q.    Which was what area?

2  A.    The console.  That's where the helm and the throttles,

3  pretty much the steering wheel of where the vessel is being

4  steered.

5  Q.    Okay.  And what are we looking at right here, Chief?

6  A.    The location is the starboard rail or your right side

7  of the boat, the main rail of the vessel.  You have the

8  sample number, and then you have the substance and

9  percentage.  The first one I ran didn't have any substance,

10 but the second one I ran had seven percent for cocaine.

11 Q.    Thank you.  And the entries between the starboard rail

12 and the forward hatch, what are those?

13 A.    So the blanks that I ran there, because like I stated

14 before, you need a minimum of two blank swabs to continue to

15 analyze another sample.  I had to run three, so it just took

16 an extra blank swab to clear out the machine for me to

17 further test the other swabs of the boarding.

18 Q.    After you did that third blank, what screen did you

19 see?

20 A.    A green screen that says ready.

21 Q.    All right.  Let's move now to the forward rail and the

22 center hold.

23 A.    Do you want me to talk about the blanks in between or

24 just start from the forward rail?

25 Q.    Well, what are those?

1   A.    Those are blanks I took, I believe it was six blanks to

2   clear the machine from the prior sample that was analyzed for

3   the substance it found.  And then I went and analyzed the

4   next forward rail sample, and the two that I ran did not have

5   any substance found.

6   Q.    How about the center hold?

7   A.    The center hold alarmed for 12 percent of cocaine.

8   Q.    Thank you.  We can move to the next portion of 7C.

9   A.    Here you have the two blanks that I had to run just so

10  I can get the green screen again to analyze my next sample,

11  which was the port rail, which also alarmed for three percent

12  of cocaine.

13  Q.    And I see one, two, three, four, five blanks?

14  A.    Yes.  Since it took me five blank swabs to clear out

15  the machine before I could proceed to the next sample.

16  Q.    And in the left-hand column here we see P-1-1.  Do you

17  know who that person was?

18  A.    Yes.  P-1-1 is Mr. Dilbert.

19  Q.    And what does the 1-1 denote?

20  A.    So P is personnel, 1 is the number of sample or the

21  person.  So it's the first person.  And then the second

22  number -- numerical number is the number of samples.  So for

23  this instance, P-1-1 was Mr. Dilbert, and the first swab I

24  took was for their hands.

25  Q.    Okay.  And when you analyzed that swab, what were the

1    results?

2    A.    The results was three percent for cocaine.

3    Q.    Okay.  We can move to the next portion.  How many

4    blanks did you run after you performed the swab of --

5    A.    Three blanks.

6    Q.    -- Mr. Dilbert's hands?

7    A.    Three.

8    Q.    What's the next swab that you ran?

9    A.    P-1-2.

10   Q.    What is that?

11   A.    That is the forearms of Mr. Dilbert.

12   Q.    What are the results of that analysis?

13   A.    Three percent cocaine.

14   Q.    And what is the next swab that you analyzed?

15   A.    I did two blanks, and then the next swab I analyzed was

16   Mr. Newball-May, which was labeled P-2-1, which was his

17   hands.

18   Q.    What were the results of that analysis?

19   A.    It alarmed for eight percent cocaine.

20   Q.    I cut you off, Chief.  I apologize.  You said it was

21   what part of his body?

22   A.    The first swab was for his hand.  P-2-1.

23   Q.    And before you ran that particular swab, what did the

24   screen look like before you put the -- before you conducted

25   the analysis?

1  A.     It was green.

2  Q.     And if we can move to the next page of Exhibit 7C.  Who

3  is P-2-2?

4  A.     P-2-2 is Mr. Newball-May, and that's his forearms.

5  Q.     So those didn't alarm for any drug; is that right?

6  A.     No.

7  Q.     Okay.  Who is P-3-1?

8  A.     P-3-1 is Mr. Meighan.

9  Q.     And why didn't you run any blanks in between when you

10 tested Mr. -- the swab for Mr. Newball-May's forearm and the

11 swab for Mr. Meighan's hands?

12 A.     Because there's no alarm found, so the machine will --

13 the screen will be green, saying that it's ready for a new

14 sample.

15 Q.     Okay.  And what were the results of the testing of the

16 swab for Mr. Meighan's hands?

17 A.     His hands was one percent for cocaine.

18 Q.     And what's the next swab that you analyzed?

19 A.     The next swab, we had quite a few blanks there, about

20 six blanks.  And then the next one was P-3-2, which is

21 Mr. Meighan's forearms.

22 Q.     Did those alarm for any substance?

23 A.     No.  I had to run the swab twice.  The reason, I can't

24 recall, but I ran the same swab twice and nothing came up, so

25 I just proceeded to the next swab.

1    Q.    Which was what?

2    A.    Which was 4 -- P-4-1, which was for the master, the

3    claimed master of the vessel, Mr. Newbbooll.

4    Q.    What was the results when you ran that swab?

5    A.    The first one, P-4-1, alarmed for seven percent of

6    cocaine.

7    Q.    And that was what body part?

8    A.    His hands.

9    Q.    And did you analyze a swab of his forearms?

10   A.    Yes.  That's P-4-2, which alarmed for two percent of

11   cocaine.

12   Q.    And how many blanks did you do in between those two

13   tests?

14   A.    A minimum, I believe it was two.  I'd have to look.

15   Between his hands and forearm was two, two blanks.  And then

16   I ran four blanks after that, and then that was the end of my

17   job as the ionscan operator for this boarding.

18   Q.    So when you did each of these tests of the swabs

19   themselves, did you print a receipt for every test that

20   tested positive?

21   A.    Yes, I did.

22   Q.    Okay.  Is that something you're trained to do as an

23   instrument operator?

24   A.    Yes.

25   Q.    Take a look at Government Exhibit 7A for

1  identification.  When you're done, look up.

2         Do you recognize that document?

3  A.    Yes.

4  Q.    How do you recognize it?

5  A.    My handwriting.

6  Q.    And when was Government Exhibit 7A for identification

7  prepared?

8  A.    It was prepared the day of, as well as the ionscan log

9  we spoke of before.

10  Q.    Okay.  So on or about the 1st through the 2nd of

11  December, last year?

12  A.    Yes.

13  Q.    Okay.  And did you actually prepare that document?

14  A.    Yes, I did.

15  Q.    How did you prepare it?

16  A.    I pressed print on the machine, and then wrote the

17  location and what the actual location of the swab was on the

18  bottom of the receipt.

19  Q.    Okay.  So what is Government Exhibit 7A for

20  identification?

21  A.    These are the ionscan receipts.  This is the printout

22  of exactly what substance they found and a lot of different,

23  like, higher-end stuff, like levels of what it found and how

24  long it took to find those substances in the machine.

25  Q.    Other than the handwriting that you referenced, is that

1  something that's automatically generated by the instrument?

2  A.   Yes.

3  Q.   So do you have any way to change what comes out on that

4  receipt?

5  A.   No, I don't.

6  Q.   Okay.  And these receipts, is this something that you

7  have a duty to record that information that's on there as an

8  instrument operator and a boarding officer?

9  A.   Yes.

10  Q.   And the data that's there -- well, not the data, but

11  the notes you've made, is that something that you had that

12  came from your personal knowledge?

13  A.   Yes.  It was all the information that the boarding team

14  gave to me for all locations.  Right when I swabbed that, as

15  I was writing the location here on the boarding team log, I

16  would then -- once the substance would alarm, I would press

17  print, take that receipt, and I would write the location

18  right away.

19  Q.   So approximately how long after you received any

20  information from the boarding team about where the swab came

21  from did you record that information?

22  A.   Well, I had all the information written down from the

23  boarding team.  All that information of where the swabs and

24  locations came from are written on the evidence bag with a

25  permanent marker.  So I had that.  And then I would read it

 1  off the bag, and then whatever swab I was taking, I would

 2  take the location, put it on my log here.  And if a substance

 3  sounded, press print and then put -- and then relay that

 4  information directly onto the receipt that alarmed for that

 5  substance.

 6  Q.    Okay.  And is that document something that's kept in

 7  the normal course of your duties as an ionscan instrument

 8  operator and a boarding officer?

 9  A.    Yes.

10  Q.    And if there were a case package prepared, is that

11  something that you would be required by the Coast Guard to

12  include in that?

13  A.    Yes.

14          MR. DERENZO:  Your Honor, move to admit

15  Government's 7A for identification as Government's 7A.

16          MR. AMADOR:  We renew our objections, Judge.

17          THE COURT:  All right.  Over objection, I will

18  receive into evidence the composite 7A.

19          (*Government Exhibit 7A received in evidence.*)

20          MR. DERENZO:  May we publish 7A, Your Honor?

21          THE COURT:  You may.

22  BY MR. DERENZO:

23  Q.    We're looking now at the first page of 7A.  What is

24  this, Chief?

25  A.    That is a receipt for the -- one of the swabs that I

1    took that alarmed for a substance.

2    Q.    And we don't have to get into all of the various

3    numbers on there.  But generally speaking, what is this

4    document?

5    A.    It's shows proof that that swab taken alarmed for a

6    substance.

7    Q.    Okay.  And the information I see in the comment

8    section, that's what?

9    A.    That is what I had handwritten, the location and what

10   that actually was.

11   Q.    You say location.  Is that the area where the swab was

12   taken?

13   A.    Yes.

14   Q.    Okay.  We can move to the next page of 7A.

15              What are we looking at here, Chief?

16   A.    These are two more receipts that were taken for

17   substances that alarmed on board that vessel, as well.

18   Q.    So what's the receipt here on the left side?

19   A.    The left side, that's for your port side rail or your

20   left side of the vessel.

21   Q.    Okay.  And the one on the right?

22   A.    That is the center hold, or the center portion where --

23   like a storage, a little storage area of the vessel.

24   Q.    Okay.  And where on the receipt would I find the

25   substance that it alarmed for?

1    A.    You'll see right there where it says alarm, and then

2    under there it will tell you what alarm.  So for this

3    instance, it was cocaine and at 12 percent.

4    Q.    Okay.  If we can move to the next page of 7A, Page 3,

5    what's on the left side of Page 3?

6    A.    The left side is a sample that I took for Mr. Calbot

7    Reid-Dilbert for his arms.

8    Q.    And the right side of Page 3?

9    A.    The right side is the receipt for Calbot Reid-Dilbert's

10   hands.

11   Q.    Next page.  What's the receipt on the left?

12   A.    The receipt on the left is for Rudolph Randolph

13   Meighan's hands.

14   Q.    Okay.  And the one on the right?

15   A.    The receipt on the right is for Jorge Ramon

16   Newball-May's hands.

17   Q.    Move to the next page, Page 5 of 7A.  And the receipt

18   on the left?

19   A.    The receipt on the left is for the claimed master of

20   the vessel, Mr. Emiro Hinestroza Newbbooll for his forearms.

21   Q.    All right.  What's the receipt on the right-hand side?

22   A.    The receipt on the right is for, again, the claimed

23   master, Hinestroza Newbbooll, for his hands.

24   Q.    Move now to Page 6 and 7.  What are Pages 6 and 7?

25   A.    Pages 6 and 7 is for the one swab that was on the

1    starboard side rail.

2    Q.    Bring up Exhibit 2Q at a minute.  On that monitor in

3    front of you, Chief, you'll see some video of Exhibit 2Q,

4    which was previously admitted.  Take a second and look at

5    that, and I'm going to ask you a couple of questions.

6          Chief, based on those -- well, those 45

7    interdictions that you've been involved in, and the thousands

8    of bales of cocaine, are you able to form an opinion about

9    those white rectangular packages that you see floating in the

10   ocean?

11          MR. AMADOR:  Objection.  Foundation.

12          THE COURT:  Overruled.  An opinion as to what they

13   are?

14          MR. DERENZO:  Yes.

15   BY MR. DERENZO:

16   Q.    Are you able to form an opinion, Chief?

17   A.    Yes.  In my opinion, they look consistent with bales of

18   cocaine that I've interdicted.

19          MR. DERENZO:  May I have just a moment, Your

20   Honor?

21          THE COURT:  You may.

22          MR. DERENZO:  Tender the witness, Your Honor.

23   Thank you.

24          THE COURT:  Let's take an afternoon recess.  It's

25   3:20.  We'll be in recess until 3:35.  You're welcome to walk

1    around.  Please don't discuss the case.  Leave your pads on

2    your chairs.

3                COURT SECURITY OFFICER:  All rise for the jury.

4                (Jury exits courtroom at 3:19 p.m.)

5                COURT SECURITY OFFICER:  Please be seated.

6                THE COURT:  Chief, you may step down.  We will

7    start again at 3:35.  Please don't discuss your testimony

8    over the recess.

9                THE WITNESS:  Yes, Your Honor.

10               (Recess taken from 3:20 p.m. to 3:34 p.m.)

11               COURT SECURITY OFFICER:  All rise.

12               This Honorable Court is now in session.

13               THE COURT:  Mr. Brunvand, you're going to go

14   first?

15               MR. BRUNVAND:  Judge, this witness, I anticipate

16   we're not going to have any cross.  As to the next witness, I

17   believe I will be going first.

18               MR. DEE:  I mistakenly jumped the gun on

19   witnesses.  The next witness Mr. Brunvand will be going first

20   on.  Thank you.

21               THE COURT:  I anticipate we will recess -- I'm

22   going to recess a little early this afternoon, maybe about 20

23   minutes early or something like that.  So wherever we are, we

24   will stop.

25               MR. BRUNVAND:  Okay.  Your Honor, if you recess

1  early, will I have a chance to speak with my client a little

2  bit in the courtroom?

3          THE COURT:  Fine with me, if you get the marshals

4  to cooperate with you.

5          MR. BRUNVAND:  Thank you.

6          COURT SECURITY OFFICER:  All rise for the jury.

7          (Jury enters courtroom at 3:35 p.m.)

8          COURT SECURITY OFFICER:  Thank you.  Please be

9  seated.

10          THE COURT:  Mr. Dee, let's wait.  We don't have

11  the witness.

12          MR. DERENZO:  Thank you, Your Honor.

13          THE COURT:  Sir, if you will retake the witness

14  chair.

15          Mr. Dee.

16          MR. DEE:  Your Honor, no questions of this

17  witness.  Thank you.

18          THE COURT:  Mr. Brunvand?

19          MR. BRUNVAND:  No questions.  Thank you.

20          THE COURT:  Mr. Amador?

21          MR. AMADOR:  No questions.

22          THE COURT:  Okay.  Then, Chief, you don't need to

23  pour that water because you can step down.

24          THE WITNESS:  I have to stay hydrated, Your Honor.

25          THE COURT:  Yes.  But you're finished.  So you can

1    stay hydrated somewhere else.

2              THE WITNESS:  Thank you, Your Honor.

3              MR. DERENZO:  Your Honor, may the witness be

4    excused?

5              THE COURT:  Is it okay?

6              MR. DEE:  No objections.

7              THE COURT:  All right.  You may be excused.  Thank

8    you.

9              MR. DERENZO:  May I approach to clear the witness

10   stand?

11             THE COURT:  You may.  Who is your next witness?

12             MR. DERENZO:  Steven Bomentre.

13             THE COURT:  Okay.  If you can, get the next

14   witness, Mr. Fitchett.

15             THE COURTROOM DEPUTY:  Please raise your right

16   hand.

17             Do you solemnly swear or affirm under penalty of

18   perjury that the testimony you shall give in this cause will

19   be the truth, the whole truth, and nothing but the truth?

20             THE WITNESS:  I do.

21             THE COURTROOM DEPUTY:  Please have a seat in the

22   witness box.  State your name for the record and spell your

23   last name.

24             THE WITNESS:  Senior Chief Steven Bomentre,

25   B-o-m-e-n-t-r-e.

1          THE COURT:  Mr. DeRenzo.

2          MR. DERENZO:  Thank you, Your Honor.

3                    STEVEN BOMENTRE,

4    having been first duly sworn by the Courtroom Deputy,

5    testified as follows:

6                    DIRECT EXAMINATION

7    BY MR. DERENZO:

8    Q.    Good afternoon, Senior Chief.

9    A.    Good afternoon.

10   Q.    What do you do for a living?

11   A.    Senior Chief Maritime Enforcement Specialist in the

12   United States Coast Guard.

13   Q.    How long have you been doing that job?

14   A.    Almost 14 years.

15   Q.    And how did you become a maritime law enforcement

16   specialist?

17   A.    Something that I've always wanted to do.  In 2010, when

18   they established the rating, I was one of only three people

19   allowed to transfer over from my previous rating based on my

20   training and experience in the law enforcement realm.

21   Q.    And did you have to go to any schools or training to

22   become that particular rating?

23   A.    I did.

24   Q.    Okay.  When did you do that?

25   A.    I've been to multiple schools and maritime law

1  enforcement academy, boarding officer school, boarding team

2  member school, maritime drug trafficking course, lots of

3  fishery schools, IONSCAN schools.

4  Q.    And we will talk about those in a minute.

5          You mentioned you're Senior Chief.  Where does

6  that place you?  On which rung of the ladder in the enlisted

7  workforce is that?

8  A.    One below the top.

9  Q.    And how long total have you been in the Coast Guard?

10  A.    It will be 14 years in September.

11  Q.    And where are you currently assigned?

12  A.    I'm currently the assistant training officer at

13  Tactical Law Enforcement Team Pacific, located in San Diego,

14  California.

15  Q.    What are your roles and responsibilities as assistant

16  training officer?

17  A.    I'm responsible for maintaining and assuring that all

18  high-risk training and all training related to law

19  enforcement is conducted properly.  One of my primary

20  responsibilities is certifying operators in the IONSCAN.

21  Q.    And how did you become -- let's go back a little bit in

22  your career.  Have you been involved in any counter-narcotics

23  operations while you've been in the Coast Guard?

24  A.    I have.  I've been involved in 14 separate

25  interdictions.  Two of them were hidden compartment vessels;

1   interdicted over 20 metric tons of cocaine and detained more

2   than 45 suspected smugglers.

3   Q.    And in what geographic regions have you been deployed?

4   A.    The Eastern Caribbean, Central Caribbean, Western

5   Caribbean, and Eastern Pacific Oceans.

6   Q.    Prior to your arriving at your current unit, have you

7   had any, shall we say, non-operation jobs in the Coast Guard?

8   A.    I have.  From 2012 to 2017 I was an instructor at the

9   Maritime Law Enforcement Academy located at the Federal Law

10  Enforcement Center in Charleston, South Carolina.  There I

11  taught boarding officer school, boarding team member school.

12  It's a federal law enforcement training accredited program.

13  Q.    And you mentioned the IONSCAN instrument.  How did you

14  become qualified to do your job with respect to that

15  instrument?

16  A.    My first certification was back in October of 2007

17  where I was trained to be an operator on the Smith Detection

18  IONSCAN 400Bravo -- 400B model.

19  Q.    And after that, have you received any subsequent

20  training?

21  A.    I have.  In 2018, June, I attended the Smith Detection

22  course for operator training, technician training, and

23  instructor training -- training the trainer training -- in

24  Edgewood, Maryland.

25  Q.    And what did that specific training allow you to do in

1  the Coast Guard?

2  A.    It allowed me to certify other members to be IONSCAN

3  operators, per Smith Detection.

4  Q.    And is that something you currently do at your unit?

5  A.    It is.

6  Q.    What geographic region are you responsible for

7  overseeing that training?

8  A.    I'm responsible for the Pacific area, which is anything

9  west of the Mississippi, including Alaska, Hawaii, and Guam.

10 Q.    How many people in that region have the same

11 qualifications that you just talked about?

12 A.    Two.

13 Q.    You're one of those people?

14 A.    I am.

15 Q.    Which models have you been certified as an actual

16 operator as opposed to a trainer on the instrument you just

17 described?

18 A.    I've been certified in the 400B model and the 500DT

19 model as well.

20 Q.    Are you still qualified to use those instruments?

21 A.    I am qualified to use both instruments, correct.

22 Q.    Okay.  Let's just start with, what is an IONSCAN

23 instrument?

24 A.    To put it in layman's terms, an IONSCAN instrument is

25 the equivalent of having a K9 detection dog, only in the

1  machine form.  It detects trace amounts of narcotics and

2  explosives.

3  Q.    Okay.  And is this something -- well, you mentioned

4  you've been using it for some time.  How long have you been

5  using this instrument?

6  A.    Since 2007.

7  Q.    Okay.  And why does the Coast Guard use the IONSCAN?

8  A.    As far as the science behind it, ion-mobility

9  spectrometry is highly reliable.  It's an extremely sensitive

10  piece of equipment.  It's portable.  It doesn't have a very

11  big footprint.  It has a wide range of parameters for

12  operating.  So as far as temperature, it operates at regular

13  air pressure.  It's cost affordable.  So a lot of reasons why

14  that instrument is used for trace detection.

15  Q.    You mentioned that it's portable.  Why does that matter

16  to a Coast Guard boarding officer or boarding team member?

17  A.    The Coast Guard does the counter-drug mission in the

18  areas mentioned before -- Eastern Pacific and the Caribbean.

19  Every ship that goes down there to conduct counter-drug

20  operations will have an IONSCAN instrument on board.

21  Q.    And since you've been working with these instruments

22  since 2007, do you know if it's used only in the narcotics

23  environment or in other contexts as well?

24  A.    No, the instrument is used every day at the airport.

25  TSA uses it to screen passengers for explosives.  It's used

1   at border checkpoints as far as people crossing into the

2   U.S. -- people and cargo.  It's used at ports of entry.  I

3   know Capitol Police use it.  It's widely used.

4   Q.    And how often is the Coast Guard using these particular

5   instruments?

6   A.    I would say on a daily basis, while deployed.  Maybe

7   not daily, but every time they go aboard it will be used.

8   Q.    How frequently will a Coast Guard slip or a ship that

9   has Coast Guard personnel on it have an IONSCAN instrument on

10  board?

11  A.    Every time.

12  Q.    And when a Coast Guard vessel or a vessel that's got

13  Coast Guard personnel on board and has one of these

14  instruments on board, what's the purpose?  What is the

15  boarding team going to use it for?

16  A.    The purpose is to detect trace amounts of drugs left

17  behind on board vessels.  A lot of times drugs aren't hidden

18  in plain sight.  They are sometimes in hidden compartments or

19  other areas, which would cause them to have to search the

20  vessel more extensively to find them.

21          The IONSCAN, because it's highly sensitive and

22  it's detecting trace amounts not visible to the human eye,

23  will give the boarding team results if cocaine is present or

24  any other drug, for that matter, is present on board a vessel.

25  Q.    Other than situations where there might be a hidden

1  compartment on a boat, are there other operational contexts

2  in which the boarding team might use an IONSCAN instrument?

3  A.    Sure.  They can use it to see if passengers or people

4  on board have come into contact with the substance that was

5  either on board or maybe what was on board at a certain time.

6           There are a lot of times -- there is something

7  called a Nat-T transfer where one vessel might meet up with

8  another vessel and transfer the drugs off for further

9  trans-shipment.  It is a way of linking those vessels

10  together as a conspiracy case.

11  Q.    So in a case like that, you might have a vessel with

12  people but no drugs on it?

13  A.    Correct.

14  Q.    And throughout your experience using these instruments

15  and the training you received, do you know if this instrument

16  has a known error rate?

17  A.    It does.  The published false alarm rate for this

18  instrument is less than 1 percent.

19  Q.    You used the word "false alarm."  What does that mean

20  to you?

21  A.    A false alarm would be the instrument alarming for a

22  substance that wasn't present.

23  Q.    And are you familiar with a term called "false

24  negative"?

25  A.    I am.

1    Q.    What does that word mean to you?

2    A.    That would mean that the instrument should alarm for

3    something but it does not.

4    Q.    And what kind of situations in your experience would

5    you encounter a false negative result?

6    A.    The machine or the instrument is -- variations in

7    humidity or air pressure or temperature can affect what the

8    instrument is detecting.  So a sample that was wet would slow

9    down or possibly change the detection time period for an ion

10   it's looking for.

11   Q.    So, if you have a false negative, there might be drugs

12   but the instrument didn't alert for that?

13   A.    Correct.  There is an alarm algorithm that needs to

14   meet all the requirements of the algorithm for it to show the

15   alarm.  If one of those is not met, it will not alarm.

16   Q.    How many times have you used an IONSCAN?

17   A.    Hundreds.

18   Q.    And do you have any roles or responsibilities in

19   maintaining these instruments in your current unit?

20   A.    I do.  I'm also certified as a technician from Smith

21   Detection.  Operators are allowed to conduct standard

22   preventive maintenance on the instruments -- changing filters

23   and whatnot.  I am authorized to go inside the instrument and

24   change out motherboards, air purification system, flow

25   control modules, everything on the inside, with the exception

1   of the ion-mobility spectrometer itself.

2   Q.    In terms of the scope of maintenance and inspecions

3   that you're authorized to do, is that something every IONSCAN

4   operator can do?

5   A.    It is not.

6   Q.    So how many people in the Pacific Region can perform

7   the maintenance and inspections that you're authorized to do?

8   A.    Two.

9   Q.    And are you aware of an interdiction that took place on

10  or about December 1st of last year?

11  A.    I am.

12  Q.    And are you aware of which IONSCAN instrument was

13  actually used to conduct testing in that case?

14  A.    I am.

15  Q.    Have you had an opportunity to take a look at that

16  instrument?

17  A.    I have.

18  Q.    And what were the results of your examination of the

19  instrument?

20  A.    Before sending an instrument out the door on a

21  deployment, it's verified that the instrument is working

22  properly and that upon return, preventive maintenance is done

23  on the instrument.  Changing filters and consumable items

24  that can be used up during its deployment and then verified

25  again.  And both times the instrument was operating properly.

1   Q.    And what model instrument was actually used in that

2   interdiction?

3   A.    It was a Smith Detection IONSCAN 500DT.

4   Q.    Could you describe to the jury exactly how that

5   instrument is used?

6   A.    Sure.  I put a PowerPoint, couple of slides together,

7   if I can.

8   Q.    Would that aid you in your testimony this afternoon?

9   A.    It would.

10  Q.    Can we pull up demonstrative 1.

11            MR. BRUNVAND:  May we approach, Your Honor?

12            THE COURT:  Yes.

13            (The following was held at sidebar:)

14            THE COURT:  I'm assuming this is the same thing

15  you had put up for the hearing, or is it something different?

16            MR. DERENZO:  Pared down from that, Your Honor.

17  It's the first slide that shows the exterior, the third line

18  shows the cross-section, and the last slide --

19            MR. BRUNVAND:  Okay.  Then, no objections.

20            THE COURT:  Okay.

21            (Sidebar ended.)

22            (Documents handed to the witness.)

23            THE WITNESS:  So this is a picture of the actual

24  instrument itself.  It's not very big.  Like I mentioned

25  before, the footprint is small, about the size of a

1   microwave.

2           The top part here is your display screen in which

3   the operator who runs the sample gets to visually see the

4   results of each sample as it's run through.  This front

5   section here is where the sample is inserted.

6           So we get the next slide and I'll explain how the

7   whole process works.  One more slide.  This is a dissection

8   of what the ion-mobility spectrometer is actually doing.

9           When the sample is inserted, this ring raises up

10  and heats the sample to vaporize any particles that are

11  contained within it.  The sample then drifts into this region

12  here where there is a weak radioactive source, in this case,

13  Nickel-63, which gives the sample or the analyte a specific

14  electrical charge.

15          Additionally, in here is something called a

16  reactant or Dopin, which aids in the drug or explosive to

17  receive that charge.

18          From there, this electrical grid or fence is

19  lowered.  I can give you exact numbers here in a second.  It

20  goes all the way across to a collector, where the collector

21  gets a reading, and then that reading is displayed on a

22  plasmogram for the operator to see.

23          If it meets all the criteria for an alarm, being

24  the amplitude, the rate, time, the full width, half-maximum,

25  and the number of segments, the display will alarm and alert

1  the operator that one of its items was detected.  In this

2  case, cocaine.

3  Q.    Okay.  And you said a plasmogram.  Is that a certain

4  kind of graph or something that's used?

5  A.    Correct.  It's pretty much a graph showing peaks on it.

6  Q.    What are the primary data points or criteria that the

7  instrument will use to evaluate whether this is cocaine or

8  Coca-Cola?

9  A.    So the reactant or the Dopin that's actually used in

10  the instrument is designed to bond with drug chemicals rather

11  than anything else that might be stuck within the swab.

12         Then the specific requirements for each of

13  those is in a library, as well.  So, for instance, cocaine

14  has a minimum amplitude of 50 DU.  It has a drift time of

15  15.66, depending on the atmospheric pressure and everything,

16  time to get from point A to point B.

17  Q.    So using this view here of the instrument that we have

18  displayed, this cross-section here, can you describe where

19  the drift time comes from here?

20  A.    Sure.  So from this gate here to this collector here,

21  every analysis takes about 8 seconds to run.  It's divided

22  into 30 segments.  Then each segment is broken down into

23  further scans.

24         The first 18 segments have five scans each and the

25  last 12 segments have 20 scans each.  During those 30

1   segments, the gate -- or during each scan the gate is raised

2   and lowered, allowing a small portion of the charged ions to

3   transit from point A to point B, so from here to here

4   (indicating).

5   Q.    And why is that time important in analyzing a

6   particular substance?

7   A.    Because every molecule, based on its geometry, its

8   mass, the way it tumbles through the air, has a specific

9   drift time that identifies it.

10  Q.    Would it be fair to say this is like a fingerprint, of

11  sort, for that particular substance?

12  A.    That's exactly what it is.  It's a fingerprint to

13  identify specific substances.

14  Q.    Okay.  You mentioned the word "segments."  Can you

15  describe in layman's terms, what does segment mean?

16  A.    Sure.  So one of my alarm criteria is segments, meaning

17  that I can't get it to alarm just one time.  I need a minimum

18  of two alarms to ensure that, yes, that is exactly what I'm

19  looking for.

20          So let's say I went to a Publix and they are

21  having a special today and inside their deli slicer there is

22  a box hiding it.  I don't know how much meat is on there, but

23  I get a free sandwich.  It could be zero meat.  It could be a

24  whole ham.  Who knows.  I'm not greedy.  All I want is two

25  slices of ham for my sandwich, but you can get up to 30

1  slices of ham.

2  Q.    And then in terms of -- and so I put a swab in.  There

3  might be cocaine or something else on it.  I mean, what's

4  physically happening to the amount of substance on there?

5  Can you test it 30 times?

6  A.    It is -- because the DT in the 500 is a dual tube,

7  automatically half of the vapor is sent to an explosives tube

8  for analysis, so that's already gone.  Then the other half is

9  sent to a narcotics tube for analysis.

10  Q.    Okay.  So each time we have a segment that's a separate

11  test, if you will?

12  A.    Correct.  So once the analysis begins, it's held here

13  (indicating).  Each segment is a separate test during that

14  period.

15  Q.    That number 30, is that fixed or does that change?

16  A.    No, it's always 30.

17  Q.    And does -- the IONSCAN instrument, the 500DT in

18  particular, does it have any built-in features that enhances

19  for reliability or accuracy?

20  A.    Yes, the 500DT has a built-in calibrant.  Since the

21  instrument is based on air pressure, temperature, humidity,

22  it's constantly calibrating to its environment or wherever

23  it's at.  This is every second it is being run through the

24  instrument it is constantly calculating and making

25  adjustments for where it sees the calibrant.

1   Q.    You mentioned before that the Coast Guard uses this

2   instrument because it's sensitive.

3   A.    Correct.

4   Q.    How sensitive?  Do we need some white powder on a

5   surface to detect cocaine?

6   A.    No.  It's designed to detect for trace amounts that's

7   not visible to the human eye because trace contamination

8   is -- it's hard to hide.  If I touch something, next thing I

9   touch I'm going to transfer it over to it.  And I might think

10  I'm not transferring anything, but I am because it's on my

11  hands.

12  Q.    So in your experience in the counter-narcotics

13  environment, why is that likely to occur in maritime coke

14  trafficking?  You're surrounded by water; right?

15  A.    Correct.  What's the question again?

16  Q.    Why would you expect, as a boarding officer or an

17  IONSCAN instrument operator, to find trace amounts of cocaine

18  either on a person or a boat?

19  A.    Because the primary method for shipment of cocaine is

20  via boat.  A lot of times from the packaging, even though

21  it's wrapped in multiple layers, hands are involved in the

22  packaging process, and eventually trace amounts are

23  transported to kilograms, kilogram trace amounts are

24  transferred to bales, and then those are concealed within a

25  vessel or placed on deck on a vessel.  Then whatever they

1    come into contact with will deposit trace amounts of cocaine

2    from there, as well.

3    Q.    In your experience in the field, have you ever seen a

4    bale that's been compromised in any way?

5    A.    I have.

6    Q.    What have you observed in those instances?

7    A.    Because it's getting beat around for days, you know, a

8    lot of times there is water intrusion, too, you will get kind

9    of -- you'll get one that's soggy.  The packaging has been

10   compromised and it's leaked a cocaine liquid pretty much into

11   where it's held.

12   Q.    And are there any steps that -- an operator, rather

13   than the person taking the swabs, are there any steps that

14   individual takes to make sure the machine is working?

15   A.    Sure.  There is something called a "verific," which is

16   short for a verification.  What it does is it helps the

17   operator build confidence in the instrument and that it is

18   working properly.

19   Q.    What happens if for some reason the operator forgot to

20   do that?

21   A.    If the operator did not do a verific, the chances of

22   them missing alarms is possible.  So a false negative is

23   likely.

24   Q.    How would not doing a verific test affect the

25   likelihood of a false positive?

1   A.      It would not.

2   Q.      And could you describe the -- when you're actually

3   using the machine itself, what steps are you going to take?

4   A.      As far as from start to finish?

5   Q.      Put in the sample to getting a result.

6   A.      So we are a little unique in the way we operate.  Most

7   of the time the person collecting the sample is the one

8   that's also operating the system.  Because our instrument is

9   kept separate from the area where the samples are collected,

10  it's a different person that operates and runs the samples.

11          From start to finish, the boarding team would --

12  they would put on -- well, even before going over, the

13  boarding team would be swabbed to make sure they are not

14  introducing any contamination into the vessel itself.  Then

15  once over there, the boarding team will -- the person taking

16  the samples wears gloves, and then take a sample of an area

17  that the hands -- that's how we train them, wherever the

18  hands come into contact with or possibility of hands coming

19  into contact with, take samples of those areas.

20          Then after each sample they will remove the glove,

21  they will label the sample, and then they will place that

22  sample -- it's still inside the glove -- inside a watertight

23  bag, and they will do this until the finish.  They will seal

24  the bag and send it back to the instrument for analysis.

25  Q.      So once you're ready to actually test these swabs and

 1   figure out if there is anything on there, what's the next

 2   step?

 3   A.    So then the operator will, at the instrument itself,

 4   take the bag.  He'll be gloved as well.  He'll remove each

 5   sample from the bag, log the -- he'll run the analysis

 6   through there and he'll either get two results, either an

 7   alarm or no alarm.  And I do have another slide to kind of

 8   show the jury what that looks like to them.

 9   Q.    What are we looking at here on the slide?

10   A.    So before the operator can even run the analysis, he

11   has to have a green screen that says "Ready."  If he has any

12   other screen, he won't be allowed to analyze.  As you can see

13   over at the side, the yellow screen analyze button and the

14   red screen analyze button are stippled out.  They are greyed

15   out.  It won't even allow them to select that button for

16   analysis.

17          Once the instrument is ready, meaning it's met all

18   the parameters -- it detects the calibrant, it's the right

19   temperature, right air pressure -- the green display lets the

20   operator know they can run an analysis.

21          When they run the analysis, they will either get

22   one of two responses.  The bottom screen would be an alarm,

23   which would display and turn red and say "Alarm" at the top

24   and give a display reading what it detected, or it will be

25   green and say "No alarm detected."

1              So back to the operator.  So they will run that.

2    Once they get the reading from this, they will log the

3    results and continue on to the next sample.  If they get an

4    alarm, they are required to clear out the instrument to make

5    sure that there is no trace left in there.  The instrument

6    requires a minimum of two blanks to be run and they have to

7    be consecutive and they have to show that there is no trace

8    amounts left in there that are detectable for an alarm.

9    Q.    And if you get that red screen right there on the

10   bottom, it says "Alarm," what's the significance of that

11   screen?

12   A.    If you get an alarm, it's -- a hit is a hit.  So if you

13   get an alarm, it's present.

14   Q.    So what if, you know, it's 1 percent as opposed to

15   25 percent?

16   A.    One percent, twenty-five percent, one hundred percent,

17   an alarm is an alarm.

18   Q.    The presence of whatever is alarmed for?

19   A.    Correct.

20   Q.    Based on what you know about the instrument and your

21   hundreds of times using it, is it possible to falsify an

22   alarm for a substance like cocaine?

23   A.    It is not.  The only way that could happen is if you

24   would have to physically introduce that substance into the

25   instrument for it to alarm.

1   Q.    You would have to have cocaine in some form and put it

2   on a swab?

3   A.    Correct.

4   Q.    Has any of your training and experience included

5   instruction on how to actually interpret and verify the

6   results of an IONSCAN instrument?

7   A.    It has.

8   Q.    And just in a general -- we will go through the results

9   in this case in a minute, but in a general sense, what are

10  the things you're looking at to determine if this is a good

11  hit or not?

12  A.    Whenever an alarm is displayed, a printout can be

13  received from the instrument and it displays at the bottom

14  the characteristics of what that alarm was.  Some of those

15  items include the drift time, your delta, which is your

16  difference from where it's expected to be, you have your

17  amplitude and number of segments, are the four criteria for

18  what makes an alarm.

19  Q.    You mentioned the word "delta."  In layman's terms,

20  what is the significance of the delta?

21  A.    A delta of zero would be a dead-center bullseye,

22  whereas a delta 50 might be the outer ring of the bullseye.

23  Q.    And what's the -- what number are you looking for in

24  terms of the delta?

25  A.    Anything less than 30 is a good number.

1    Q.     And what about the amplitude?

2    A.     Amplitude has to be a minimum of 50.

3    Q.     And what other criteria do you need to ensure it's a

4    positive hit?

5    A.     So you need a minimum amplitude of 50 and your delta of

6    plus or minus 50.  You need that a minimum of two times.

7    Q.     So those criteria at least twice in a row?

8    A.     Correct.

9    Q.     Okay.  Or twice out of the 30?

10   A.     Correct.  And has to be consecutive.  It has to be two

11   consecutive.  It can't be just one and then one later on.

12   Q.     Okay.  Prior to your testimony here this afternoon,

13   have you reviewed any results from IONSCAN analysis that was

14   conducted for go-fast vessel interdiction on December 1st of

15   2018?

16   A.     I have.

17   Q.     And based on your review of those results, are you able

18   to form an opinion regarding the presence of drugs on that

19   vessel?

20   A.     I am.

21   Q.     Okay.  And are you also able to form an opinion

22   regarding the contact by that crew with respect to any

23   surface areas that touched drugs?

24   A.     I am.

25   Q.     We will talk about the first one.  What is your opinion

1   regarding the presence of drugs on that vessel?

2   A.    Do you have a printout of the results I can look at to

3   speak to it as well?

4   Q.    Sure.  We can pull up Exhibit 7A.  If it helps, we can

5   go through each one.

6   A.    Sure.

7   Q.    Let's start with page 2.

8   A.    Okay.

9   Q.    And just in a more general sense, what is your opinion

10  with respect to whether or not there were drugs on that

11  vessel?

12  A.    There was cocaine present on this vessel.

13  Q.    Okay.  And what, if anything, do you have about the

14  contact by the crew members of the vessel with any surface

15  they touched?

16  A.    That the members -- the people that were on board the

17  vessel came into contact with cocaine.

18  Q.    Okay.  Just so the jury is clear, are you able to tell

19  from these results exactly how much cocaine was on board?

20  A.    The instrument doesn't tell you a quantitative.  I

21  can't tell you exactly how much cocaine is present.  I can

22  tell you the quality.  It's a qualitative machine, that

23  cocaine was present.

24  Q.    Okay.  And, again, just to be clear, are you able to

25  determine exactly at this hour, on this day, when cocaine was

1   present on the vessel?

2   A.    As far as time goes, I cannot.  However, I can, based

3   on my training and experience, give a reasonable time frame

4   of the time that it was on board.

5   Q.    Okay.  And what is your opinion with respect to the

6   reasonable time frame?

7   A.    One, the makeup of the vessel is fiberglass, so it's a

8   nonporous material.  Additionally, it's in an environment

9   that's wind and water, so it's easily -- anything that was

10  trace amounts on there is easily washed away or blown away.

11  So based on just the environmental factors, it would not last

12  on the vessel for very long.

13  Q.    Okay.  So let's talk about this particular result here.

14  A.    Is there a way we can go up a little bit?  That way you

15  can see --

16  Q.    Sure.

17  A.    That's fine.  Thank you.

18          MR. DERENZO:  If you could, just zoom out from

19  there for a minute, please, and then just capture the bottom

20  half of the receipt.

21  A.    Where it says "tube and channel"?

22  Q.    For the record, this is labeled as location, portside

23  rail.  What is the basis for your opinion that this surface

24  came into contact with cocaine?

25  A.    This surface came in contact with cocaine.

1   Q.    What is the basis for that?

2   A.    So, one is your drift time.

3   Q.    Can we stop there for just a second.  You mentioned a

4   library before.  Is that something that the Coast Guard

5   operator on board the vessel is going to input into the

6   machine?

7   A.    It's not.  It's programmed from the factory.  Smith

8   Detection has done extensive research on the drift time based

9   on reasonability of the ion to determine what the expected

10  drift time should be for that specific -- for that particular

11  compound, for that element.

12  Q.    That's the center of the bullseye you talked about

13  before?

14  A.    The instrument is saying that it expects to see cocaine

15  at 15.659 milliseconds.

16  Q.    And what did it find in this particular swab?

17  A.    It found that based on that time of where that would be

18  a perfect time, it found it at 4 microseconds away from

19  there.  So to put that in perspective, a blink of an eye is a

20  third of a second.  That would be -- you know, 1 microsecond

21  is 300,000 times faster than a blink of an eye.

22  Q.    I became a lawyer because I'm not very good at math.

23  Microsecond, is that one out of a million?

24  A.    Correct.

25  Q.    Okay.  So in this case, it was four over a million

1   within the center of the bullseye?

2   A.    Correct.

3   Q.    What's the number you're looking for, plus or minus,

4   with respect to that category, the delta?

5   A.    For alarm for cocaine, the acceptable range is plus or

6   minus 50.

7   Q.    Okay.  And what's one of the other data points that you

8   relied on in forming that opinion?

9   A.    So the other one is the amplitude.  In this case it

10  says amplitude 93 on here.  The minimum amplitude threshold

11  to alarm for cocaine is 50.

12  Q.    What's the data point to the left of there?

13  A.    Cumulative amplitude is how much -- well, we will go

14  over the first one.  The number is 11 segments, meaning the

15  instrument saw cocaine 11 times out of 30 during the

16  analysis.  Then cumulative amplitude is the total amplitude

17  of all 11 of those segments.

18  Q.    Okay.  So if you added up all the amplitudes for all

19  11, that's the cumulative amplitude?

20  A.    Correct.

21  Q.    What, if anything, can you infer about the segment

22  number in the cumulative amplitude?

23  A.    The more segment number and higher cumulative

24  amplitude, one, it could help me discover a hidden

25  compartment, if there was one.  Two, the higher the number,

1    the likelihood increases.  So if I had amplitude of 500, that

2    would be ten times greater than the amount that I would need

3    for an alarm.

4    Q.    Is there any correlation between those data points, the

5    segment and the cumulative amplitude, in terms of the

6    quantity, the amount of substance on the swab?

7    A.    It means there was more substance on the swab.  The

8    issue that the operators run into is because it's not

9    detectable by the naked eye, I could have a large amount, and

10   this one section here -- and I took a sample that was just

11   kind of skirting the edge of that, so I might not have gotten

12   a full amount of what was actually on board, but I got enough

13   to tell me that it was there.

14   Q.    And what is the correlation between -- if we could zoom

15   out from here and go to toward the top of the receipt.

16          What is the correlation between those data points

17   you just described and that percentage number there, the

18   cocaine 3 percent?

19   A.    So the alarmed 3 percent really has no bearing on --

20   it's not saying that, oh, this is 3 percent chance it's

21   cocaine.  It's a hundred percent chance it's cocaine.  And

22   the threshold for the instrument, because it's so sensitive,

23   is set at an amplitude of 1500, and then the minimum is 50.

24   So if I had a hit of 50, it would say a 1 percent alarm,

25   where if I had a hit of 1500, it would say a hundred percent

1    alarm.  That's where you come back to an alarm is an alarm.

2    If it meets the requirements, it's present.

3    Q.    Okay.  Is there any correlation between that number

4    and, say, the segment and cumulative amplitude?  In other

5    words, if you have a higher or lower segment and cumulative

6    amplitude we have a higher or lower percentage when you look

7    at this slide?

8    A.    The higher the cumulative amplitude -- they will all be

9    based on the amplitude itself.  So that alarm is based on

10   amplitude, not the cumulative amplitude.

11              MR. DERENZO:  Okay.  And if we can, go to the next

12   receipt here.  And go to the bottom where the individual data

13   points are at, please.

14   BY MR. DERENZO:

15   Q.    So we are looking now at what's labeled "Location,

16   center hold."  What are the -- in your analysis of this

17   particular result, what are the important data points?

18   A.    Again, detection time or drift time, your delta, your

19   number of segments, and your amplitude.

20   Q.    Okay.  So delta, what were you expecting to see there?

21   A.    A perfect sample would be zero.  This is as near

22   perfect as you can probably get in an operating environment.

23   Q.    Okay.  What about the other data points you talked

24   about just a minute ago?

25   A.    So drift time and delta, those go hand in hand.  In

1    this sample that was run, it was only 2 microseconds off of

2    the expected drift time.

3            Your amplitude here of 227 is almost five times

4    greater than what was needed to alarm, and the number of

5    segments, 24.  Since I only need two consecutive segments to

6    alarm, this one had 24.  So if we go back to the deli analogy

7    where Publix is giving away free ham sandwiches, I only

8    needed a sandwich of two slices of ham.  This sandwich had 24

9    slices of ham.

10   Q.    Twenty-four out of how many?

11   A.    Out of 30.

12   Q.    What, if any, conclusion can you draw about the data

13   points in this particular swab?

14   A.    Based on how close and the near perfect it is and the

15   amplitude, I would, in my professional opinion, say that

16   center hold was where the cocaine was located.

17            MR. DERENZO:  Zoom out of that.  Move to the next

18   page, please.

19   BY MR. DERENZO:

20   Q.    So this receipt on the left side of Page 3 is labeled

21   "Forearms, Calbot Reid-Dilbert."  In your analyzing this

22   particular result, what were the important data points?

23   A.    Again, the drift time, your delta, your amplitude and

24   your number of segments.

25   Q.    Okay.  Again, what was the range you're looking for

1  here?

2  A.    I'm looking for plus or minus -- where it says, "Delta

3  plus or minus 50," in this case it was 4.  For my amplitude,

4  I'm looking for 50 or higher.  In this case it was a hundred.

5  And for number of segments, I'm looking for two, and in this

6  case it was 12.

7  Q.    Okay.  Move to the next receipt.

8            Again, what conclusions did you draw about this

9  particular result?

10  A.    Again, for cocaine, this one is 20 microseconds off of

11  the expected drift time, well within the acceptable range.

12  The amplitude is above 50, and then the number of segments is

13  at 17.  So 15 more than what was needed.

14  Q.    Move now to the next page.  To the left we have the

15  receipt from the analysis of sample labeled "Rudolph Randolph

16  Meighan, hands."  What is your opinion about this particular

17  sample?

18  A.    That his hands did come into contact with cocaine.

19  Again, the drift time, delta, amplitude, and number of

20  segments all meet the criteria for an alarm for cocaine.

21  Q.    Move now to the right-hand side, which is labeled

22  "Jorge Ramon Newball-May, hands," what is your opinion with

23  respect to this individual analysis?

24  A.    That Mr. Newball-May's hands did come into contact with

25  cocaine.

1   Q.    Is there anything notable about this particular result?

2   A.    Again, the delta, amplitude, and number of segments, it

3   alarmed for 17 out of 30 segments for cocaine.

4   Q.    So that cumulative amplitude number --

5   A.    It's a higher amplitude.  So if I were to look at all

6   of them together, I think the center hold had an amplitude of

7   4,000 or somewhere around there.  This amplitude is really

8   high.  In fact, probably almost each one of the segments that

9   alarmed had an amplitude of 161, so three times the

10  required -- little more than three times the required amount

11  to alarm for cocaine.

12  Q.    When you reviewed all of these results, what was the

13  highest cumulative amplitude?  Which slot?

14  A.    That was the center hold.

15  Q.    What was the second highest?

16  A.    I believe it was this one (indicating).

17  Q.    Move to the next page.  This is receipt labeled "Emiro

18  Hinestroza Newball, forearms."  What is your professional

19  opinion about the particular results?

20  A.    That Mr. Newball's forearms came into contact with

21  cocaine.

22  Q.    What are you basing that on?

23  A.    Based again on the number of segments, the amplitude,

24  the delta, and the drift time, D-time.

25  Q.    We are looking now at the receipt labeled "Emiro

1   Hinestroza Newball, hands."  What is your professional

2   opinion about this result?

3   A.    That Mr. Newball's hands came into contact with cocaine

4   based on the number of segments, amplitude, delta, and drift

5   time.

6   Q.    Now, of all the results that you examined, if you

7   recall, how many alarmed positive for cocaine?

8   A.    Out of 18 possible results from the vessel itself, nine

9   of them resulted in positive hits for cocaine.  So 50 percent

10  of their swabs tested positive for cocaine.

11  Q.    Did that include the crew members as well?

12  A.    Correct.

13  Q.    And knowing what you know about the instrument itself

14  and its potential rate error, in your professional opinion,

15  what is the likelihood that all nine of those positive alarms

16  were actually false positives?

17  A.    It's not likely at all.  It's not possible.

18           MR. DERENZO:  All right.  May I have just a

19  moment, Your Honor?

20           THE COURT:  Yes.

21  BY MR. DERENZO:

22  Q.    Just one more question, Senior Chief.

23  A.    Yes, sir.

24  Q.    Based on your experience in the maritime environment,

25  working on counter-narcotics operations and the results

 1   you've analyzed in this particular case and what you know

 2   about the interdiction itself, in your professional opinion,

 3   which is more likely to have occurred, that there were

 4   essentially false negatives or false positives?

 5           MR. AMADOR:  Objection.  Compound.

 6           THE COURT:  Overruled.

 7           THE WITNESS:  False negative is more likely than a

 8   false positive.

 9   BY MR. DERENZO:

10   Q.    Why is that?

11   A.    Because to get a positive alarm I need to meet all the

12   requirements for that alarm.  Whereas, if any of those

13   requirements is off by a very minute amount, I won't get an

14   alarm.

15           MR. DERENZO:  I tender the witness, Your Honor.

16           THE COURT:  I think, Mr. Brunvand, we will take an

17   evening recess.

18           Ladies and gentlemen, before we start the

19   cross-examination of the witness, we are going to recess a

20   little early this afternoon.  We are running on time, maybe a

21   little ahead of time from the schedule I told you.

22           So we are going to recess, and it's almost 4:30.

23   We will be in recess until 9:30 tomorrow morning.  I think we

24   will start promptly at 9:30 tomorrow morning.

25           Please leave your pads on your chairs.  Please

 1   don't discuss the case, and I'll see you in the morning at

 2   9:30.

 3           COURT SECURITY OFFICER:  All rise for the jury.

 4           (Jury exits courtroom at 4:27 p.m.)

 5           COURT SECURITY OFFICER:  Please be seated.

 6           THE COURT:  Chief, you may step down.  Please

 7   don't discuss your testimony with anyone over the recess, and

 8   we will start tomorrow morning at 9:30.

 9           Anything else?

10           MR. DEE:  No, Your Honor.

11           THE COURT:  Okay.  I do have statuses in the

12   morning, so you'll have to take your things with you.

13   All right, 9:30.

14           (Proceedings adjourned at 4:28 p.m. and reconvened

15   on May 8, 2019.)

16                           - - -

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT   )
                               )
MIDDLE DISTRICT OF FLORIDA     )


### REPORTER CERTIFICATE


        I, Scott N. Gamertsfelder, Official Court Reporter

for the United States District Court, Middle District of

Florida, do hereby certify that pursuant to Section 753,

Title 28, United States Code, that the foregoing is a true

and correct transcript from the stenographic notes taken by

the undersigned in the matter of *UNITED STATES vs. RUDOLPH

RANDOLPH MEIGHAN, JORGE RAMON NEWBALL MAY, and CALBOT

REID-DILBERT*, Case No. 8:18-cr-594-T-24JSS (Pages 1 through

218), and that the transcript page format is in conformance

with the regulations of the Judicial Conference of the United

States.



 /s/ *Scott N. Gamertsfelder*, RMR, FCRR

 *Official Court Reporter*

                                Date: September 23, 2019