UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA, ) Tampa, Florida
)
Plaintiff, ) No. 8:18-cr-594-T-24JSS
)
) Docket No. 117
vs. )
) May 8, 2019
RUDOLPH RANDOLPH MEIGHAN, )
JORGE RAMON NEWBALL MAY, and )
CALBOT REID-DILBERT, )
)
Defendants. ) Courtroom 10B
_______________________________)

(Volume III of IV)

**TRANSCRIPT OF JURY TRIAL**
BEFORE THE HONORABLE SUSAN C. BUCKLEW
UNITED STATES DISTRICT JUDGE

*Official Court Reporter:*

*Scott Gamertsfelder, RMR, FCRR*
*801 North Florida Avenue*
*Tampa, Florida 33602*
*Telephone: (813) 301-5898*

(*Proceedings reported by stenotype; Transcript produced by computer-aided transcription.*)

## A P P E A R A N C E S

**GOVERNMENT COUNSEL:**

**Daniel M. Baeza, Assistant U.S. Attorney**
**Nicholas G. DeRenzo, Assistant U.S. Attorney**
United States Attorney's Office
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
(813) 274-6000

**DEFENSE COUNSEL:**

**David A. Dee, Esq.**
Law Offices of David A. Dee, PA
311 South Brevard Avenue
Tampa, Florida 33606
(813) 258-0406

**Bjorn E. Brunvand, Esq.**
Bjorn E. Brunvand, PA
615 Turner Street
Clearwater, Florida 33756
(727) 446-7505

**Pedro Amador, Jr., Esq.**
Law Office of Pedro Amador, Jr.
2203 North Lois Avenue, Suite 925
Tampa, Florida 33607
(813) 250-0556

**ALSO PRESENT:**

James Plunkett, Interpreter

Jesse Leonor, Interpreter

- - -

**TABLE OF CONTENTS**

**EXAMINATIONS**


| GOVERNMENT | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| STEVEN BOMENTRE | | 11 | 28 | |
| STEVEN RAY | 38 | 91 | 106 | |
| JENNIFER DOHERTY | 111 | 125 | 128 | |
| CARLOS GALLOZA | 130 | 142 | | |
| JOHN BOTTONE | 144 | | | |
| JEREMY MONTES | 153 | | | |

(Bomentre Examinations resumed from May 7, 2019.)


**EXHIBITS**


| GOVERNMENT | PAGE | LINE |
|---|---|---|
| 8...................... | 160 | 24 |
| 9...................... | 60 | 19 |


**ADDITIONAL INDEXING**


| | PAGE | LINE |
|---|---|---|
| Governmemt rests Case-in-Chief............... | 174 | 16 |
| Defense Rule 29 Motion....................... | 175 | 11 |
| Defendant Meighan rests...................... | 188 | 11 |
| Defendant Newball May rests.................. | 188 | 14 |
| Defendant Reid-Dilbert rests................. | 188 | 17 |

**P R O C E E D I N G S**

May 8, 2019 9:27 a.m.

- - -

COURT SECURITY OFFICER: All rise.

The United States District Court in and for the Middle District of Florida is now in session. The Honorable Susan C. Bucklew presiding.

Please be seated.

THE COURT: Welcome. We are happy to have you. And you're going to be with us all day, this morning or what? This morning?

AUDIENCE MEMBER: All day.

THE COURT: Okay. Has anyone told you what kind of a case this is?

AUDIENCE MEMBER: More or less.

THE COURT: More or less. Okay. We started the trial on Monday, and picked the jury on Monday, did opening statements on Monday, and I believe, if I recall correctly, had one witness on Monday. And then yesterday, we had a number of witnesses testify, eight witnesses testify. And all Coast Guard witnesses, members of the United States Coast Guard.

Right now where we are in the trial, the defendant called an expert witness who is an expert in the area of ion technology. And the defendants were swabbed, their boat was

swabbed, and the government has alleged that they found traces of cocaine on the defendant's fingers or forearms and also on the boat.

So where we're picking up this morning is with the expert witness. And we're going to -- the government has finished examining him, and we're going to start now with the cross-examination by the defense.

So that's generally where we are. I would anticipate that this morning is going to be with that witness and perhaps some other witnesses, but the attorneys tell me that we probably will not finish the evidentiary portion of the trial until tomorrow, maybe.

So that's where we are. And on the recess, if you have any questions, I'll come back and address any questions you would like to ask.

Mr. Brunvand?

MR. BRUNVAND: Your Honor, I believe the Court inadvertently said the defendant called the expert. It was actually the government.

THE COURT: You're right. It's usually the defendant. The government -- if I did, I misspoke. The government called the expert, and we're about to begin with the defense's cross-examination.

MR. BAEZA: That's correct, Your Honor. And before we proceed, there is just one housekeeping matter that

I wanted to take care of. After the Coast Guard expert testifies, one of the Panama Express strike force agents will be testifying. And as demonstratives to aid the jury, and also because we have been viewing from miles away these packages that are testified to being cocaine, bales of cocaine, we have three demonstratives to demonstrate what a bale looks like, what a bale floating in the water looks like, and what a bale looks like when it's open.

I'm going to put all of these on the screen, starting with the first one, and I provided these to defense counsel, as well. And the purpose of this is just to, you know, give the opportunity for objections now and to -- if there is an objection, get a ruling prior to testimony as to their appropriateness as demonstratives.

This would be the first demonstrative, demonstrating a series of white bales from a prior interdiction. The second demonstrative is an image of bales floating in the water. The probative value, of course, there is we've been watching a video of similar bales floating in the water.

Then there's been testimony about the contents of a bale. At the low end of approximately 20 kilograms. This is a demonstrative of what a bale looks like when it's opened with 20 kilograms or bricks, as they've been described in prior testimony. So those are the demonstratives that we

intend to present. And we just wanted to raise that with the Court in advance of testimony this morning.

THE COURT: Who would like to address this?

MR. DEE: Probably all three of us, Judge. I would object to it. First of all, I think the prejudicial effect greatly outweighs the probative value here. There is absolutely no evidence before the Court that that's what was thrown off this boat.

The government has given some opinion that this looks like cocaine that was thrown off the boat. But to show the jury this 20 kilogram bale and then it wrapped up and all this kind of stuff, the prejudicial effect I think under 403 greatly outweighs the probative value here.

The jury has seen the actual video of what actually happened. And I think that's the better evidence. And I think it's totally -- and it's not relevant, either.

THE COURT: Anybody else?

MR. BRUNVAND: No.

THE COURT: Wish to add anything?

MR. AMADOR: Did he say any of these pictures are not relevant? I just wanted to make sure that we have that objection on the record.

THE COURT: Okay.

MR. AMADOR: And just for the -- I'm sorry. But I think ad nauseam the government has shown bales for the

better part of this trial and bales in the water and what do they look like and what is your opinion about bales. So this is -- if not irrelevant, it's certainly cumulative.

THE COURT: All right. It's my understanding that what you would propose to do is to call a witness. And this witness has some expertise or knowledge about what bales look like and cocaine looks like and that kind of thing?

MR. BAEZA: That's correct, Your Honor. It's a special agent with the Coast Guard who has served in the DEA, served in a boarding team capacity for the Coast Guard, and as a Coast Guard agent, who has also participated in hundreds of Panama Express interdiction cases, as well as conducted, you know, at this point I don't even -- I think he's lost count of the number of offloads he's done, and probably thousands of bales that he has been involved in carrying and transporting for purposes of evidence collection in these cases. So his familiarity is established.

And because, again, we're talking about -- this is not -- this is not cumulative in the sense that we are showing the same thing over and over again. This is an illustration of what we keep showing on the video in a close-up view. What is actually -- what's behind the actual packages that we're talking about here. So we do believe it has substantial probative value, does not -- it's not substantially outweighed by any cumulative or prejudicial

effect. It's certainly relevant to the jury's consideration of whether there was cocaine involved here. And it would aid the jury in that end, as well.

So we believe for all those reasons, plus we can also limit the scope of this by having it put on the record that these are not the bales that were recovered. Nothing was recovered in this case.

THE COURT: All right. And I understand why you would like to use this as demonstrative evidence, but I agree with the defense in this case, I think it's far more prejudicial than probative of anything, even though it's not being admitted. You know, they're seeing bricks. We don't know, we've had the testimony of the Coast Guard that that's what generally is inside those bales. But showing them the bricks, I think, is an entirely different thing. Showing them bales that may or may not look like the bales or be the -- similar to the bales in the water, I think that's for the jury to decide. And then showing them a picture up close of apparently some tied-up bales, again, that's not what the evidence has shown.

The evidence has been shown on the video, and I think that's your evidence. So I, too, think it's far more prejudicial than probative. And I will not allow you to use those demonstrative photos.

MR. BAEZA: Yes, Your Honor.

THE COURT: Anything else before we start? Would you bring the jury in, please.

COURT SECURITY OFFICER: Yes, ma'am.

THE COURT: Then you can go get the witness.

COURT SECURITY OFFICER: Yes, ma'am.

All rise for the jury.

(Jury enters courtroom at 9:38 a.m.)

COURT SECURITY OFFICER: Thank you. Please be seated.

THE COURT: Good morning. Ladies and gentlemen, did anything happen over the evening hours that any of you think might affect your ability to serve on this jury in any way?

(*Unanimous negative responses.*)

THE COURT: Any questions or any concerns before we start this morning?

*(Unanimous negative responses.)*

THE COURT: I anticipate we will follow a similar schedule and recess mid-morning, and then recess sometime between 12 and 12:30 for lunch. Again, if anybody needs to recess at a time other than that, just raise your hand and let me know.

Mr. Fitchett, could you get the witness.

While he's doing that, you will recall when we recessed yesterday afternoon, Senior Chief Petty Officer

Steven Bomentre was on the stand. The government had finished their direct examination of the witness, and we are going to start now with the defendant's cross-examination.

Sir, if you would, retake the witness chair. I won't swear you in again. I will remind you, you are under oath. And for everybody's -- so we all remember, would you state your name.

THE WITNESS: Yes, Your Honor. Senior Chief Steven Bomentre.

THE COURT: Mr. Brunvand.

MR. BRUNVAND: Thank you, Your Honor.

STEVEN BOMENTRE,

having been previously duly sworn on May 7, 2019, by the Courtroom Deputy, testified as follows:

CROSS-EXAMINATION

BY MR. BRUNVAND:

Q. Good morning.

A. Good morning, sir.

Q. The analogy that you gave the jury involving the ham sandwich, I think you said if there were two slices of ham, up to 30 slices of ham, it would be identified as a ham sandwich.

A. Correct.

Q. Okay. That's the analogy to how this machine operates; right?

A. Correct. That's how the machine operates.
Q. And, so, if it was only one slice of ham, it would not identify it as a ham sandwich; right?
A. It doesn't have enough to alarm for a ham sandwich.
Q. Right. That's the machine we are asking the jury to rely on; correct?
A. Correct.
Q. Now, in 2007, I believe, you were in the Coast Guard. Yes?
A. Correct.
Q. You have to answer out loud. Otherwise, there is no record of it.

You were at that time taught how to operate an IONSCAN machine that was made by Smith Detection; right?
A. That's correct, sir.
Q. Okay. And the people who taught you how to operate the machine -- and it was the predecessor machine to the one we have here today; right?
A. It is. It's still in service, though. The 400B is still in service.
Q. In fact, one of the claims that Smith Detection has is that these machines are good for ten years; right?
A. I don't know offhand what they claim for lifespan.
Q. All right. That's fine.

But certainly, if you have some from 2007 that are

still in service, fair to say those have been used for ten years; right?

A. I would believe so, yes.

Q. At the time you were taught by other members of the Coast Guard how to operate the machine?

A. Yes, sir.

Q. And those individuals have been taught by Smith Detection how to teach you how to operate the machine; right?

A. That's correct, sir.

Q. All right. At that time you were not able to service the machine?

A. Other than standard preventive maintenance, no.

Q. Okay. Other than being taught by other Coast Guard members who had been taught by Smith Detection, no one else back in 2007 taught you how to operate the machine. Is that a fair statement?

A. That is.

Q. Okay. In 2018, is that when you go for additional training?

A. Yes, sir.

Q. And on this occasion your additional training takes place at, what, at the manufacturing location?

A. At the Smith Detection facility in Edgewood, Maryland.

Q. And that's where they manufacture these machines?

A. There is a depot there, so they do repairs and they

also assemble. They don't necessarily make everything in house, but they assemble the components to manufacture an instrument, correct.

Q. Understood. These machines, from what you understand, they sell for about $50,000 apiece; right?

A. Around that range, yes, sir.

Q. All right. Presumably, in addition to the $50,000 initial cost of the machine, it requires service throughout its lifespan; right?

A. There are consumables that are required throughout its life. Correct, sir.

Q. And, presumably, those are in addition to the 50,000 per machine?

A. They are, sir.

Q. Okay. You are here not only as an operator, but you basically have been here and you testified as an expert of sorts; right?

A. Yes, sir.

Q. About the reliability of the machine?

A. Yes, sir.

Q. About the potential for error results from the machine, false positive results of the machine; right?

A. Yes, sir.

Q. And, so, in order to make your way from an operator to someone who holds himself out as an expert, you went to these

classes at the manufacturer's facility; right?
A. Correct, sir.
Q. And you were taught by people who worked for the manufacturer who sells these machines; right?
A. Yes, sir.
Q. And it was those people who told you that the error rate for this machine is less than 1 percent?
A. Not only did they say that, it's also published in the technical manual.
Q. Let's talk about that. We talked about -- are you talking about the technical manual that's prepared by the manufacturer?
A. It is.
Q. Okay. Well, can we agree that if a representative of the manufacturer says less than 1 percent error rate and the manual for the machine that's prepared by the manufacturer says less than 1 percent error rate, it's coming from the same voice?
A. Sure.
Q. Okay. Now, in order to make sure that you are accurate and certain about what you present to this jury, I assume that you have done some additional investigation into whether or not these allegations that are made by the manufacturer, in fact, are corroborated by anyone?
A. I've done my own research on IONSCAN technology

separate from what Smith supplies, correct.

Q. Okay. And other than -- let me ask you this: Can you cite an article that you can say definitively is not in any way connected with Smith Detection that supports your testimony?

A. In front of me or off the top of my memory, I cannot.

Q. Okay. And you knew you were coming here to testify yesterday and today as relates to that matter; right?

A. I knew I would be testifying today, correct, sir.

Q. And if you do the research, you do know how you can go about figuring out who authored a paper; right?

A. Yes, sir.

Q. When it was authored; right?

A. Yes, sir.

Q. And in what publication it may have been published; right?

A. Yes, sir.

Q. And you can't present any of that to us; right?

A. I don't have any in front of me at this time, sir.

Q. I assume you know based on literature that you've read and press releases from the manufacturer that in 2011 Smith Detection, the company, had sold in excess of 10,000 of these machines. Were you aware of that?

A. I didn't know how many they sold. I assume there is at least 15,000 -- not necessarily Smith's, but 15,000 IONSCANs

in service throughout.

Q. Would you agree that 10,000 IONSCANs, at the rate of $50,000 apiece, is $500 million? Would you agree with that?

A. Correct.

Q. Half a billion dollars; correct?

A. Correct.

Q. As part of your research and preparation for coming in here today, have you researched cases that are known to the public where, in fact, false positive results took place, it was determined that false positives took place and it was corrected?

A. I've not come across any of those articles, sir.

Q. Have you Googled -- you are familiar with Google, I assume?

A. Yes, sir.

Q. Have you Googled false positives Smith Detection?

A. I have not.

Q. Have you Googled false positives IONSCAN 500DT?

A. I have not.

Q. You explained to the jury how this machine works; right?

A. Yes, sir.

Q. You call it an instrument. I call it a machine. Right? Same thing?

A. Not necessarily. An instrument is doing an analysis where a machine could give you a soda.

Q. You talked to the jury about how it works; right?
A. Yes, sir.
Q. And in order to be trained on it, you have to be able to see, initially I believe, a green light that comes on that says it's ready to submit this piece of paper; right?
A. That's correct, sir.
Q. And the little piece of paper we are talking about, it's similar to one that you might have seen in an airport when someone gets stopped and they are asked to either swab their shoes or computer laptop and they put it into that machine; right?
A. Similar. I would assume it's a similar type of swab, yes.
Q. That's what this machine does; right?
A. It does. It traps particles into a swab and vaporizes them and analyzes their speed based on drift time.
Q. Okay. So you have a green light. What's the next light?
A. The instrument will display "Ready" at the top of the title and the status bar will be green. A yellow screen will be waiting as the instrument is waiting for a parameter to be met, whether it be flow, temperature, or pressure, and then the red screen is alarm.
Q. Okay. And if the alarm shows up, that means something has been detected?

A. Something that's programmed into the library that has been detected.

Q. Something that's been programmed into the library of this computer/machine; right?

A. Yes.

Q. Do you know everything that's been programmed into the library?

A. One of the printouts in the IONSCAN in evidence shows a list of every item on there.

Q. Do you know every item that's been programmed into this machine?

A. If I were to look at that sheet, I could tell you every item that was programmed into that instrument.

Q. Is it, like, one page?

A. It's probably about maybe a foot-and-a-half long (indicating).

Q. So what are we talking, a couple of hundred items?

A. I would say around a hundred. Probably around a hundred items.

Q. About a hundred items. Okay. And these are microscopic ion items; right?

A. They could be down to the size of between a microgram and a nanogram.

Q. So seems to me a hundred items is fairly significant in the universe of ions that might be surrounding us.

A. It is.

Q. Okay. Would it be fair to say that, unfortunately, there is no alarm that tells the operator that the reading is false?

A. It would just show as an alarm if it was.

Q. Right. Right. It doesn't show any -- there is no warning that says, whoa, we have a false result; right?

A. There is not.

Q. The only way that you can have confirmation of the false result is if, in fact, the items that have been submitted could be tested by another machine; right?

A. In theory, I would say yes.

Q. A more sophisticated machine?

A. Something that could analyze the exact makeup of what's on there.

Q. Right. There are other machines that are much more sophisticated than these; right?

A. Sure.

Q. Okay.

A. The issue is when you run a sample you've exhausted anything that's on that sample, so there is nothing left to run.

Q. Right. So the only way you could really have a second sample that you might be able to corroborate or vindicate to show that it's a false result is if you take two samples in

the same general area, you preserve one for testing later, and you test one on the ship; right?

A. That could present the same problem. Since it's trace detection, you can't see it. The second sample might not gather anything.

Q. Might not, but it might gather something; right?

A. Possibility.

Q. Would it be fair to say that there are others, for example, toxicologists and physicists, who may be better able to answer those questions?

A. Sure.

Q. Okay. Presumably, you're not a physicist; right?

A. I am not.

Q. You're not a toxicologist?

A. I am not.

Q. You're not an electrical engineer; right?

A. I'm not.

Q. Okay. Presumably, when these machines are made by this manufacturer, Smith Detection, they have a team of experts that are assisting them in making it.

A. Presumably, I would say, yes.

Q. Okay. We would hope so; right?

A. I would imagine so, to sell 10,000 instruments.

Q. Okay. And would it be fair to say that you have no idea what type of experts or who might be part of the team

that created this machine?

A. I do not know offhand.

Q. You testified that a false negative is more likely than a false positive.

A. Yes, sir.

Q. Again, this is information that you have as a result of your training by the manufacturer; correct?

A. Not necessarily. This is some reading I've done from other papers.

Q. Okay. So, again, you are talking about reading that you've done. Can you please cite any of these studies that you've read that lead you to these conclusions?

A. Offhand, no, I cannot, sir.

Q. Not a single one; right?

A. No, sir.

MR. BRUNVAND: May I have a moment, Your Honor?

THE COURT: Yes.

BY MR. BRUNVAND:

Q. When you went through the results of that printout from this machine -- right?

A. Yes, sir.

Q. -- there's indications of cocaine 2 percent, cocaine 7 percent, cocaine 8 percent.

A. Yes, sir.

Q. I believe you indicated it really doesn't matter --

A. That's correct.
Q. -- whether it's 1 percent or a hundred percent.
A. Yes, sir.
Q. Okay. So it's just a fancy number that's put down?
A. The relative strength, or bar FS is what the manufacturer calls it, it's based on a maximum amplitude of 1,500. That number is arbitrary. It doesn't mean anything. The percentage for an alarm threshold, the absolute bottom is 50. So 50 would be a 1 percent, but still enough to alarm for cocaine.
Q. Could we agree that the item that we are looking -- that the machine is supposedly looking at is microscopic; right?
A. Yes.
Q. Can't see it?
A. It would be like looking in a sunbeam and seeing a flake of dust or something like that.
Q. Sure. It's like those air cleaners that they advertise where they zap the ions out of the sky, right, and help you have a cleaner room? They are microscopic. You can't see them.
A. Yes, not detectable to the naked eye.
Q. And so when it's 8 percent, does that mean it's 8 percent of that item that we cannot see?
A. It means that an 8 percent would be somewhere around a

400 -- I have to do the math here for a second.

Q. Well, a hundred percent is 1500?

A. Yes, 1500.

Q. So 50 percent would be what?

A. Seven-fifty. Six hundred would be 37 percent. If I have a scratch paper, I could give you the exact percentage of what it would come out to. But it's directly related to -- so whatever your amplitude height is, it's directly in relation to the strength of the alarm.

Q. Understood. And it's assuming that the ion that we are looking at is included in this list of about a hundred items, right, that are included in the lab library?

A. Correct.

Q. Okay. Do you have any idea how many thousands or millions or billions of ions exist?

A. So to eliminate false alarms and the prevention of other ions that exist in the universe from being detected, the instrument uses something called a Dopin or a reactant for the narcotics tube. The Dopin is called nicotinamide, which helps give an electrical charge to drugs and anything else that does not receive an electrical charge. So anything that the instrument is reading is going to be a drug or reactant.

Whereas, the same is true for the explosives tube where it uses a Dopin called hexachloroethane, which bonds

with the explosives to give the reading. Everything else that doesn't receive a charge is washed out through an exhaust flow or the drift air or receives an opposite charge and it's immediately drawn to a side of the instrument, which it loses its charge and is exhausted out of the intake.

Q. Did you misunderstand my question?

A. Can you repeat it, then, sir?

Q. You have a list of a library of about a hundred ions; correct?

A. Correct.

Q. Do you have any idea how many hundreds or thousands or hundreds of thousands or millions of ions exist in our universe?

A. Lots.

Q. Okay. Does that mean you don't know or you do know?

A. I know that there is more than a hundred ions that exist in the universe.

Q. My question is, do you know how many?

A. I do not.

Q. Do you know if it's in the millions?

A. I do not.

MR. BRUNVAND: That's all that I have, Your Honor. Thank you.

THE COURT: Mr. Amador?

MR. AMADOR: No questions.

THE COURT: Mr. Dee?

MR. DEE: Very briefly, Your Honor.

CROSS-EXAMINATION

BY MR. DEE:

Q. Chief, you testified that -- I believe your words were a wet sample could slow down the process or slow it down. Can you explain that to me?

A. There are three items that could slow down or speed up, for that matter, the drift time. Humidity greater than 95 percent or a possible wet sample would release the water molecule, which would bond with the reactant and possibly bond with the drug that was on the swab.

Pressure is another one. A sudden drop in air pressure or a quick increase in air pressure would either slow down or speed up the drift time. And then heat, sudden increase in heat would make it faster and a decrease in heat would make it slower.

Q. Prior to swabbing someone's hands they had fallen into the ocean, could that possibly affect the outcome?

A. I don't know offhand who did the swabs, how they were taken. I wasn't there. However, the operators are trained not to submit wet samples.

Q. So if someone fell into the ocean, then the operator would probably hand them a towel or something to dry off before they take the sample?

A. Again, I wasn't there. I don't know what they did for that.

Q. Okay. Now, you also talked about -- I think you said touch it, have it, or something, was the term you used as far as the actual element that would be found, where the ingredient that would be found in the swab?

A. Can you rephrase that? I'm sorry.

Q. I'll show you. I have, if you touch it, it will transfer to it.

A. Correct.

Q. Can you explain -- does that mean, if there is something on this podium and I'm standing here talking to you like this and I turn around and walk away, it's possible I have that on my hand?

A. Possibility. Another way to think about it is, if somebody sneezes into their hand and then they touch a door and someone comes along and touches that door, they can get sick later on, but it's transferred because it's trace.

Q. It's possible that someone whose hand tested positive for cocaine could have touched something else that the cocaine was on?

A. It's possible, yes.

MR. DEE: No other questions, Your Honor. Thank you.

THE COURT: Mr. DeRenzo, redirect?

MR. DERENZO: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. DERENZO:

Q. Senior Chief, how long has the Coast Guard been using the 500DT, the current model?

A. The 500DT was manufactured in 2005. They have been using it since, as far as I know, 2009.

Q. And you were asked about articles you might have researched prior to your testimony here today. Is there anything that might refresh your recollection regarding --

A. Yes, sir. I did print out some articles, and I do have them here with me.

MR. DERENZO: May I approach the witness, Your Honor?

THE COURT: You may.

MR. BRUNVAND: Your Honor, may we approach?

(The following was held at sidebar:)

MR. BRUNVAND: When he testified the other day, he supplied some notes with an uncited article. He just testified that he can't supply us with any articles or any cites to any articles, and it appears now that the prosecutor --

THE COURT: No, that's not what he said. He said, not offhand. He said -- you asked him if he could cite any articles, and he said, not offhand.

MR. BRUNVAND: He could have said, I can't remember. I have them here in the courtroom. But now we are not going to have an opportunity to requestion him about these articles.

THE COURT: Let me see what you are going to ask him. What are you going to use the articles to refresh his recollection about?

MR. DERENZO: That's it, Judge, just to ask him on the question that Mr. Brunvand asked about do you know, and he said, not off the top of my head. I was going to give him an opportunity to cite some articles he reviewed with respect to the reliability of the instrument.

MR. BAEZA: Also, the question that Mr. Brunvand asked was a question about false negatives, if I recall correctly. He was talking about the citation of articles about false negatives. The articles that are going to be referenced here are broader than that.

THE COURT: Okay. I'm not sure I understand what you are saying.

MR. DERENZO: Reliability. And I think you asked him about false positives as well. I was just going to allow him to explain his answer with respect to his inability to recall the specifics of the articles off the top of his head.

THE COURT: He didn't recall the specifics. He didn't recall the articles, period.

MR. DERENZO: Manual, article, et cetera. I'm not going to ask him to read from it. I'm going to ask if this refreshes your recollection.

THE COURT: All right.

MR. BRUNVAND: If that's allowed, I'm asking to either be allowed to recross or I'm going to ask that he remain so that we can recall him.

THE COURT: Well, it just depends on what he asks him. If you ask the question about any articles off the top of his head, he said no; if you ask him, is there something to refresh your recollection about any articles and he says yes, then you can ask him if that refreshes his recollection. If it doesn't, it doesn't. If it does, it does. Rather than asking him about content. That's a whole different story.

(Sidebar ended.)

MR. DERENZO: May I proceed, Your Honor?

THE COURT: You may.

MR. DERENZO: May I approach the witness?

THE COURT: Well, I'm sorry, I'm not sure where we left it. Why don't you start again with your questioning.

BY MR. DERENZO:

Q. Okay. I think my last question was, you were asked on cross-examination about some articles that you might have reviewed prior to your testimony here this morning, and I believe your response was, I can't remember off the top of my

head.
A. Correct. Off the top of my head, I cannot remember the title or author of those articles.
Q. Is there anything that would refresh your recollection?
A. Yes. I did print out those articles and bring them with me.
MR. DERENZO: May I approach the witness, Your Honor?
THE COURT: You may.
MR. BRUNVAND: Your Honor, can we see whatever it is he's going to show the witness?
THE COURT: To refresh his recollection, sure.
(*Documents tendered.*)
BY MR. DERENZO:
Q. If you would, Senior Chief, take your time and review whatever you need to review, and then just put them face down and look up at me when you are done.
A. Okay.
Q. Senior Chief, has reviewing those documents refreshed your recollection about the articles that Mr. Brunvand asked you about?
A. Yes, sir.
Q. And what are the articles that he specifically asked you?
A. This is an article written by FIU, "Field Detection

Using INS Technology For Drugs and Narcotics."

THE COURT: I'm sorry, we are not understanding the acronym, FIU meaning?

THE WITNESS: Florida International University.

THE COURT: Thank you.

BY MR. DERENZO:

Q. Any others?

A. I had some excerpts from the technical manual, and then there is an NCBI article that covers the uses in the medical field, as well as different future uses for the ion-mobility spectrometer.

Q. Do you know what NCBI stands for?

A. National Center for Biochemistry Institute, I believe.

Q. Okay. You testified earlier you are in the Coast Guard. How long have you been in the Coast Guard?

A. Almost 14 years, sir.

Q. Have you ever worked for Smith Detection?

A. Worked with them?

Q. Worked for them.

A. I have not.

Q. Do you make any money by testifying here today from Smith?

A. I do not.

Q. Have you ever been paid by them for anything?

A. I have not.

Q. Mr. Brunvand was asking you about the multitude, I'm sure, of ions that are present on planet Earth. What specifically is the IONSCAN instrument designed to look for?
A. The IONSCAN 500DT is optimized to look for narcotics and explosives.
Q. So, for example, is it designed to look for anything else on planet Earth other than those two things?
A. INS technology can be designed to look for anything. The particular instrument that we use is only designed to look for narcotics and explosives.
Q. Why is that?
A. Because that's what we expect to find with it.
Q. And other than the Coast Guard, who else uses this instrument?
A. TSA uses it daily at airports to screen for explosives. Ports of entry, so your land borders and sea borders use it to screen cargo, use it to screen people entering into the United States.
Q. Okay. You mentioned on cross-examination you're not a chemist or a scientist of any kind.
A. That's correct.
Q. And you didn't learn everything that you talked about today when you became a maritime enforcement specialist; right?
A. I have not.

Q. Have you done throughout your number of years working with the IONSCAN instrument your own research on this technology?
A. I have.
Q. Okay. And based on not only your training from Smiths and your independent research, do you know how to interpret the results that come out of the instrument?
A. I do.
Q. Based on your examination of the particular instrument used in this case, was it working properly on December 1st, 2018?
A. It was.
Q. Mr. Brunvand was asking you about the library or the list of items that you can look for in the instrument. In general terms, how is that library created?
A. The library is created -- it's based on extensive testing to discover what the reduced mobility of that ion specifically is. It's a constant, so once the mobility is discovered, it's put into an equation to solve for that specific ion. It's definitely done -- I don't have the ability to do that. It's done at the factory or the depot.
Q. What kinds of people are involved in that analysis?
A. Again, I testified I don't know who exactly works there, but I would assume chemists, physicists. Anyone that would be involved in that.

Q. And what setting are we talking about? In a factory where it's built, or is this in the field, or where is this done?
A. This would be in a laboratory setting.
Q. And, again, are you able -- was the Coast Guard able to -- you or any one of the operators able to actually authorize or to actually change that information in the instrument?
A. We are not. And we wouldn't even know what to change it to.
Q. You were asked, I think, by Mr. Dee about the impact of water on an IONSCAN analysis.
A. Yes, sir.
Q. If the swab is wet, are you more likely to get a false negative or a false positive for cocaine?
A. Most likely a false negative.
Q. Why is that?
A. Because the water molecule slows down the drift time of the cocaine molecule, pushing it outside the detection window.

MR. DERENZO: Again, can we bring up Exhibit 7A. And if you could, zoom to the bottom right.

BY MR. DERENZO:
Q. Right here we are looking at page 1 of Exhibit 7A, the results, labeled location center hold. If you are talking

about drift time being off, what would you expect to see if there was a problem with it being wet?
A. If the drift time was upwards of above 30 to 50, I would say that I might question the sample.
Q. But in which column would you expect to see that? Is that the delta?
A. That's the delta column.
Q. So if that happened, would you likely see that red screen or would it still run green?
A. If it still fell within the parameters of the plus or minus 50 delta, you would still get an alarm screen.
Q. If it was above 50?
A. If it was above 50, it would fall outside the detection window.
Q. On this particular result, what is the delta?
A. The delta is negative 2, which is 2 microseconds off of perfect.
Q. Mr. Brunvand was asking you about some Google searches you apparently hadn't done. I think I have one more question.
In your professional opinion, based on all of the training you've received, your experience with the machine, what is the likelihood of having nine false positives all from one vessel and one crew?
A. It's not likely at all. It's not possible.

MR. DERENZO: No further questions, Your Honor. Thank you.

THE COURT: All right. You may step down, sir. Thank you.

THE WITNESS: Thank you, Your Honor.

(The witness exits the courtroom.)

THE COURT: You may call your next witness.

MR. DERENZO: The United States calls Special Agent Steven Ray, Coast Guard Investigative Service.

THE COURT: Sir, if you will, come forward to be sworn.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE COURTROOM DEPUTY: Please have a seat in the witness box. State your name for the record and spell your last name.

THE WITNESS: Steven Ray, R-a-y.

THE COURT: Mr. Baeza.

MR. BAEZA: Yes, Your Honor.

STEVEN RAY,

having been first duly sworn by the Courtroom Deputy,

testified as follows:

DIRECT EXAMINATION

BY MR. BAEZA:

Q. Good morning, sir.

A. Good morning, sir.

Q. Would you kindly tell the jury who you work for.

A. I am a special agent with the Coast Guard Investigative Service, assigned to Operation Panama Express.

Q. How long have you been a special agent with the Coast Guard Investigative Service?

A. Since 2008.

Q. Is that the entirety of your law enforcement experience?

A. It is not.

Q. Would you tell the jury the entirety of your law enforcement experience.

A. Yes. I graduated from the United States Military Academy in 1995 and was commissioned as a military police officer. From 1995 to 2000 I served at Fort Stewart Hunter Army Airfield in Georgia at the provost marshal office, which is the military version of the police.

I did deployments to Bosnia and Herzegovina, as well as into Kuwait at Camp Doha, provost marshal. In 2000, I left the Army active duty and became a special agent with the Drug Enforcement Agency. I served there in Seattle and in Yuma, Arizona.

In addition, I joined the Coast Guard Reserves in 2003, where I initially served as a diver, but then in 2006 I became a reserve special agent with the Coast Guard Investigative Service. When I became a full-time civilian, I became a maritime law enforcement specialist with the Coast Guard. I served in Sector San Diego, the Tactical Law Enforcement Team South, Sector St. Petersburg, and then I finally retired out of the Coast Guard Reserves at Station St. Petersburg in 2016.

Q. Thank you for your service, sir.

So we are on year 25, 24?

A. It's 24 years, as federal law enforcement; 19 as a special agent.

Q. We are going to get into the Panama Express Strike Force in a moment, but you said at the start of your time with the Coast Guard you were a diver and you were involved in maritime law enforcement as well.

Will you expound on those, please.

A. I came into the Coast Guard in 2003. I was at -- it's called the Maritime Security Team in Seattle, Washington. I missed 9/11/01. They conducted maritime law enforcement. One of the aspects of it was with diving. They would conduct sweeps of the piers and ensure that boats would be fine. We would go recover weapons. I had training in improvised explosives for in the water in the maritime environment.

So when I transferred with the DEA from Seattle to Yuma, Arizona, I transferred to the Coast Guard to Los Angeles/Long Beach, where I dove on the Queen Mary II when it came into harbor to make sure it was free of any improvised munitions, along with Adelaide Police.

At one point I became a special agent with CGIS where I was doing law enforcement. Then from there, when I became a civilian, they wouldn't allow me to be a civilian and a reservist, so that's when I became a maritime law enforcement specialist with the Coast Guard, where I would conduct boardings on boats and enforce federal laws on boats.

Q. I just need to backtrack a little bit.

At the government, we love acronyms. CGIS, Coast Guard Investigative Service?

A. Yes, sir.

Q. At anytime during your experience with the Coast Guard, have you ever served on a law enforcement detachment during a cocaine interdiction?

A. Yes, I have.

Q. Will you describe that for the jury, please.

A. I was working with TACLET South, Tactical Law Enforcement Team South, down in Miami, and I did a deployment on the first Canadian ship that came in. It was the first time that Canada actually brought in ships and we would deploy on that. I participated in one of those.

Q. So you are now with the Panama Express Strike Force as a special agent with the Coast Guard Investigative Service. How long have you been doing that?

A. Since 2011.

Q. Would you describe your duties and responsibilities as a special agent, in general, and then we will talk about Panama Express.

A. Absolutely. As a special agent, in general, for the Coast Guard, what we do is we investigate crimes in the maritime environment. If you think of the regular Coast Guard as like a uniform police, CGIS, C-G-I-S, would be the detective. So we would enforce any of the laws that reach a felony level, anything that the Coast Guard enforces. Then, specifically, what I do at Panama Express is I enforce maritime narcotics smuggling coming out of South America into Central America and the Caribbean.

Q. Big picture, what is the Panama Express Strike Force?

A. It is a national strike force that is designed to dismantle and disrupt transnational criminal organizations that utilize the maritime environment in the Eastern Pacific and in the Caribbean.

Basically, what we do is any vessel on or below the water that leaves South America, going either into the Eastern Pacific or into the Caribbean, into Central America or the Caribbean Islands, we target to arrest and detain the

mariners who do it.

From there, what we will do is find out who the recruiters and dispatchers are. Using our host country companions in Colombia, we'll indict them, arrest them, extradite them to the United States. From there we will learn who the actual owners of the cocaine are and, basically, do the same process after indicting them and arresting them. That's basically taking out an entire drug trafficking network from the base -- from the bottom mariners, financiers, to the head people who own it.

Q. You used two terms. Disrupt and dismantle. What you are referring to with extraditions working with foreign countries, you would agree that's referred to as a dismantling in your training and experience?

A. Yes, it is.

Q. You also refer to a disruption. What is a disruption?

A. A disruption is, if you take out an element of an organization -- and if you look at a criminal organization, you have a head member, and if you take some of the parts out of it and arrest them, well, they are still going to function.

They will assign a new lieutenant. They will have someone else. You've disrupted their abilities to function in the short term, but they are still able to continue operating. So you've disrupted them a little bit. The whole goal is to arrest them and take out the whole organization,

and that's a complete dismantlement.

Q. How would you define an interdiction of a vessel in international waters, disruption or dismantle?

A. It's a disruption.

Q. We spoke about the objectives of the Panama Express Strike Force, and let's talk about areas of responsibility.

Where does the Panama Express Strike Force operate?

A. There is a Panama Express North and Panama Express South. The reason was when it first was created, one was up in Clearwater and one was in Sarasota, so it was literally north and south. But Panama Express North targets the Caribbean. So the Caribbean ocean, Atlantic side, the Panama Express South does the Eastern Pacific.

Q. What's your area of responsibility with Panama Express?

A. I started my first five years at Panama Express North and the last four I've been with Panama Express South.

Q. You just answered the question of why is an interdiction south of Jamaica here in the Middle District of Florida. What federal district is the Panama Express Strike Force located?

A. We are located here in Clearwater, which is the Middle District of Florida.

Q. All right. How is the Panama Express Strike Force composed?

A. We have agents from the Federal Bureau of

Investigation, the Drug Enforcement Agency, and Homeland Security investigations, as well as the Coast Guard Investigative Service. We work in conjunction with each other to maximize their ability.

Our laws, we have to go and disrupt and dismantle, like I stated, these criminal organizations operating on the water, you have different agencies, different funding sources, as well as their different databases.

We are unique in the fact that as a strike force, we actually get along well and we cooperate among each other. One of the additional duties that I have as being a Coast Guard Investigative Service is I liaison between the Coast Guard uniformed and our law enforcement partners. So I do a lot of logistics with the drugs and detainees, working with them, so if a case comes through, we will coordinate the movement of the detainees and drugs coming into Guatemala, Guatemala flying into the Middle District of Florida for prosecution.

Q. In the course of your time with the Panama Express Strike Force, approximately how many cases have you been involved in within any capacity there?

A. I've been either a lead or co-case on about 70, but probably involved in over 500 cases overall where I have knowledge about who is doing what, the type of vessels, the detainees, the amount of cocaine and having an operational

knowledge based on my interactions with the Coast Guard and my federal fellow agencies.

Q. And that includes this case; correct?

A. That does.

Q. Approximately how many maritime interdictions have you been involved in? We are talking about cases. So I just want to make clear here, the entirety of those cases that you've been dealing with, are those maritime interdictions?

A. Yes. All of them.

Q. Are you familiar with common cocaine smuggling routes utilized in the Caribbean Sea?

A. Yes, I am.

Q. Are you familiar with common smuggling tactics utilized in the Caribbean Sea?

A. Yes, I am.

Q. Are you familiar with the appearance of cocaine?

A. Yes, I am.

Q. Are you familiar with the packaging and preparation of cocaine for distribution?

A. Yes, I am.

Q. Are you familiar with the packaging of cocaine for distribution in international waters?

A. Yes, I am.

Q. Are you familiar with common surveillance and counter-surveillance techniques utilized by drug traffickers

in the Caribbean Sea?

A. Yes, I am.

Q. Are you familiar with common attempts to evade law enforcement by drug traffickers in the Caribbean Sea?

A. Yes, I am.

Q. Let's talk about cocaine. First of all, synthetic/organic drugs, which one is cocaine?

A. Cocaine is an organic. It's made from the coca plant, which is grown in the mountains of the Andes. What happens is they will gather the plant -- actually, for thousands of years people have used the coca leaves. If you go there, the indigenous people use it in teas as well as to chew on it.

They will gather these coca leaves. They will, basically, use types of solvents. And it's kind of like -- if you've ever seen people making wine, when they stomp on the grapes, they will use powerful solvents. Unfortunately, people's feet tend to get chewed up, but they convert it from the plant to cocaine paste -- this happens, typically, deep in the jungle -- to another lab where they will convert it from a cocaine paste into a cocaine hydrochloride, which your table salt is sodium chloride, so it goes from the paste into a powder form.

In that powdered form, they will convert it into these little brick-size things, typically a kilo size. A lot of times they will put an individual stamp on during the

pressing of it, and that's kind of like a logo for marketing. Ferrari, Pokémon. It really depends on what the latest fad is where it's going to be sold at. It's kind of the moniker about, hey, this cocaine was packaged here because I'm the owner further selling it, and it's kind of a branding.

Q. You said a brick of cocaine is approximately 1 kilogram; right?

A. Correct.

Q. Converting that from the metric system, that's about 2.2 pounds?

A. Yes, 2.2 pounds.

Q. When you talk about the brick, what is the actual process in packaging the cocaine in that brick shape?

A. So what happens is they will manufacture, basically, this powder-type form and then they have a machine that kind of, like, vacuum seals it and sucks it together. As soon as they seal it, they will wrap it up in plastic. From there they take a rubberized plastic and seal that, and then they will put tape around it, and then they will put wrapping tape around it. What it does is that one brick of kilo is now packaged and protected from the environment.

Cocaine is a powder. In kilo form it's hard, but it's susceptible to dissolving in water. So they will, basically, waterproof it through this taping of it and putting a rubber membrane around it and then further taping

it up.

Q. So multiple layers of cover on a brick of cocaine?

A. Correct.

Q. Are you familiar with what is generally done with cocaine after it leaves a cocaine laboratory and then is transported for distribution in the Caribbean Sea?

A. Yes, I am.

Q. Would you explain that, please.

A. What happens is the cocaine will go from this lab and it will move in bulk to a -- in the Caribbean or in the Pacific, it will move through the jungle to a launch point where it will get gathered up, so that way it can get put on a maritime vessel. So it's put in bulk and moved there because, ideally, it's easier to move things in bulk from the source than it is further down the line.

So they will package up these individual bricks, and then they will put them into a bale. A bale will be between 20 -- typically between 20 and 40 kilograms. So you will have this 10-kilogram stack, another 10-kilogram stack, and what they will do is they will wrap that again in more plastic, another type of rubber protective coat, and they typically cover it with a plastic type of burlap and have two handles on the side and, therefore, it's easier to transport.

If it's 20 kilos, that's 44 pounds, to about 40, which is 88. If you get heavier than that, the problem is it

takes more people to move it, as well as it's kind of symmetrical and in bulk shape.

Q. What are the -- for the lowest-size bales, what are the dimensions of those approximately?

A. You are talking maybe about 3 feet by 2 feet by maybe a foot-and-a-half.

Q. Okay. And have you had any experience in handling these kinds of bales?

A. Yes, I have.

Q. Ballpark estimate, how many?

A. Well, last year, for example, PanEx itself was responsible for the seizure of approximately 70 tons. Out of those 70 tons, I probably processed about 50 of them. Over the course of eight years, let's say 400 tons of cocaine.

That's 400,000 kilos of cocaine that I've opened up bales, because when we count them, what we do is open all the bales, we will strip them out and count individual bricks, and then we will put that in and then send it off to DEA lab for processing and storage.

Q. So approximately 400,000 kilograms of cocaine you have personally had experience in handling while a Coast Guard Investigative Service special agent in the PanEx Strike Force?

A. Yes, sir.

Q. Approximately 20 kilograms per bale, 400,000. Let's do

the math. That's approximately 20,000 bales you've handled?

A. Yes, sir. A lot.

Q. How do you handle these bales? How do you carry them?

A. Carry them by the strap. And typically what we will do for processing is we will get them from the Coast Guard, they will put them on pallets, put them in a truck, from the truck we take them. You grab them by the handles. You throw them out, stack them up, photograph it, and you go through and start slicing them open, take a photograph of the total amount of bricks, and you start putting them in boxes so that way you can count them.

Q. In those 20,000 occasions where you are carrying a bale of cocaine by the handle -- approximately 20,000, have they ever come into contact with your forearms?

A. Yes.

Q. In your training and experience, are you familiar with the price of a kilogram of cocaine?

A. Yes, I am.

Q. Would you describe for the jury, what is the price of a kilogram of cocaine?

A. Sure. In Colombia, in the jungle, the price is going to be about a thousand dollars a kilo. As you get to the coast, it goes up to 4,000. As it gets transported going north, if you are talking about Honduras and Central America, it's worth about 10,000. The cost of cocaine in Tampa is

about 30,000.

Realize, when I'm talking about the cost, this is the Costco version of cocaine. You are talking the bulk. This cocaine is sold at the kilo level, and individual use of cocaine is approximately a gram. If you guys are -- if anyone is drinking coffee or tea and you get those little packets of sugar, Stevia or Sweet 'N Low, that's approximately 1 gram.

The cocaine that we are seizing on the high seas is about 95, 99 percent pure. When it's sold here in the United States, it's called stepped on. What they do is, basically, cut it. It's kind of like if you are cooking and you do one drop of vinegar, one tablespoon of vinegar and three cups of water to mix it up to dilute it, they do the same thing with the cocaine.

The cocaine purity on the street here in Tampa, for example, is closer to 20 percent to 25 percent. So it gets stepped on four to five times. But for us, what we do, because we are doing bulk and it's pure, we use an average of $30,000.

Q. So in your training and experience, putting aside the wholesale value of a brick of cocaine, after it's stepped on, as you say, that kilogram of cocaine/hydrochloride would be a value in excess of $30,000?

A. Absolutely.

Q. By several factors; right?

A. Correct. They will sell it at the gram dosage of between 50- and a hundred dollars. So even if you are going to be conservative, 1 gram, $50. A thousand grams, that would be $50,000. But now you've made it five times because you stepped on it five times. Now your price is up to 250,000.

But like I can said, some people sell it at the ounce. If you sell it at the ounce, now you are going to get a discount because it's the higher cut rate. When we talk about kilos of coke, it's the Costco packaging. Think about it that way. We are dealing at the high-level retailer pure, not the street-level end user.

Q. So you've been around this substance for a while. Have you ever had an opportunity to smell it?

A. Yes, I have.

Q. Would you describe the smell of cocaine for the jury, please.

A. It smells like cocaine. Sorry. It's a very distinct smell. I've been a DEA agent. I've smelled methamphetamine, heroin, cocaine, marijuana. They have distinct smells. I would say it's a bit of a solvent smell. It smells like cocaine. It's like how does a roast smell. A roast smells like a roast. I know what cocaine smells like.

Q. But you would describe it as a chemical smell that has

a distinct quality to it?
A. Correct, based on the manufacturing of it with the different solvents that it has.
Q. You've been detailed at sea with the Coast Guard. You've had experiences as a diver. Have you ever in your experience confused the smell of cocaine with the smell of fish?
A. Never.
Q. What about conch?
A. Never.
Q. Let's talk about Colombia as a distributor of cocaine. Are you familiar with that in your training and experience?
A. Yes, I am.
Q. In the course of your duties as a special agent in the PanEx -- Panama Express Strike Force, have you had occasion to travel to Colombia?
A. Yes, I have.
Q. Any other Central American countries or South American?
A. I've been to Honduras, Guatemala, Costa Rica, Dominican Republic, Puerto Rico, Panama.
Q. That's not a country but --
A. Panama. Mexico.
Q. Are you familiar with the chief narcotic exports in the Republic of Colombia?
A. Yes, I am.

Q. How many are there?
A. Primarily cocaine. There is heroin and there is marijuana, but marijuana is almost grown everywhere. But they still will move it.
Q. Okay. Are you familiar with which countries are the primary exporters of marijuana and heroin in Central and South America?
A. Yes.
Q. Which country is that?
A. It's Mexico.
Q. Are you familiar with the appearances of bales of marijuana?
A. Yes, I am.
Q. Would you describe a bale of marijuana for the jury, please.
A. A bale of marijuana is going to be larger than a bale of cocaine. It's normally around about 80 to a hundred pounds. It will be wrapped in much more of the plastic wrapping. Marijuana is compressed, so they make it into these, basically, squares and it's compressed, wrapped up.
When I was in San Diego there was an operation I did where we seized approximately 40,000 pounds of marijuana in the maritime area.
Q. In your training and experience, have you ever confused marijuana with cocaine?

A. I have not. The density is a lot different because marijuana is -- even though it's packed tightly, it is not nearly packed as tightly as cocaine. It's a powder that's pressed. Marijuana is a plant, and even though it's pressed it is a lot less dense than cocaine.
Q. How do you compare the dimensions of a bale of marijuana to cocaine?
A. Cocaine, like I said, is much more rectangular, where marijuana is more square and a lot larger. Because even with the same weight, it's like comparing feathers to lead. That's an extreme, but one pound of feathers is going to be a lot bigger than one pound of lead based on the density of what it is.
Q. And in your training and experience, how often do you encounter heroin in international waters?
A. I haven't encountered it on the water. I have heard there's been some intermixed at small levels, but I have not personally encountered it.
Q. Let's talk about the triad of methods of exporting cocaine from Colombia. What are the three main conveyances?
A. Well, there are more than three. You'll have go-fast boats, you'll have fishing vessels, you'll have commercial containerized vessels, you'll have sailing boats, you'll have semi-submersibles, self-propelled semi-submersibles. In that category you also have what are called low-profile go-fast

vessels, which they are barely above the waterline so they are harder to see.

In the jungles -- we have never caught one on the water, but in the jungles they have caught fully submersible submarines.

Q. Let me qualify my question. You are referring to maritime conveyances; right?

A. Correct.

Q. Are there any other general conveyances of cocaine absent maritime?

A. Yes. Aircraft.

Q. Anything else?

A. Over land.

Q. So land, sea, and air?

A. And air.

Q. What is the primary conveyance of cocaine based on your training and experience?

A. It's maritime.

Q. After cocaine reaches a destination, are you familiar with land-based smuggling routes of cocaine?

A. No.

Q. Are you familiar, in general terms, with the intended destination of cocaine in Central America?

A. Yes.

Q. Would you explain that answer, please.

A. Basically, once it comes on the land, it will then be transported via different routes and on different vehicles into Mexico. From Mexico through pretty much the land border of the United States and then brought into the United States that way.

Q. So you spoke about maritime routes and you referred to fishing vessels, freighters, go-fast vessels, low-profile vessels, submarines, and semi-submarines; right?

A. And sailboats.

Q. Sailboats. Are you familiar with the vessel that was involved in this case?

A. Yes, I am.

Q. How would you describe that vessel?

A. As a go-fast vessel.

Q. Are you familiar with common smuggling routes utilized by go-fast vessels in the Caribbean Sea?

A. I am.

Q. Would you describe the extent of your familiarity based on the amount of case -- actually, let me rephrase that question.

Are you familiar with the -- you said you were familiar with the common smuggling routes in the Caribbean utilized by go-fast vessels. Approximately how many main conveyances are there?

A. Main routes or main conveyances?

Q. My apologies. Main routes.

A. Four.

Q. Would you describe those routes, please.

A. Sure. The first route is called the Hyperlitoril route. What it does is you'll have a boat that will basically weave in and out of -- at 12 nautical miles is where countries' international waters end, and what they will do is hug between 10 and 14 miles, hugging the coast, trying to mix in with local fishing traffic.

And if for some reason they are detected, they will try to run into a country's water, because as you go up the coast from Colombia to Panama, Nicaragua, Honduras, there are different areas where they can go in.

The second route is commonly referred to as kind of like the Honduran Rise, which basically leaves from the corner of Venezuela and Colombia. It goes up north, and as it gets close to Honduras it makes -- they will head straight west and then they will put landings in Nicaragua, Honduras, Belize, Guatemala, that area.

Third route, they will basically go straight up from Colombia, heading toward outside of Hispaniola, Haiti, Dominican Republic, at which point they can either go to Haiti, Dominican Republic, or Puerto Rico.

The last route is they basically follow the Lesser Antilles. If you know the Caribbean, all the islands on the

outside, the ABCs, they go from Colombia and then they basically go up through the different islands, intermixing in with traffic that way.

MR. BAEZA: May I approach the witness, Your Honor?

THE COURT: You may.

(Documents tendered.)

BY MR. BAEZA:

Q. Special Agent Ray, I presented you with what has been previously marked for identification as Government's Exhibit 9. Please take a moment to look at it and look up when you are finished.

First of all, do you recognize Government's Exhibit 9?

A. I do.

Q. What is it?

A. It's a depiction of the map of the Caribbean. In particular, it shows Cartagena, San Andres, an island belonging to Colombia, the Serrana Bank, which is at the interdiction point which is southwest of Jamaica, and it depicts Belize.

Q. Can you recognize the source of the document?

A. Google Earth.

Q. And are you familiar with the layout of this portion of the Caribbean Sea that you've described?

A. Yes, I am.

Q. And is Government's Exhibit 9 a fair and accurate representation of the portion of the Caribbean Sea that also includes Cartagena, San Andres Island, the Serrana Bank, the interdiction point, and Belize?

A. Yes, it is.

Q. So this map has a couple of markings on it for those locations as well?

A. That is correct.

Q. Based on your training and experience and familiarity with this area, are those true and accurate representations of the locations of the areas depicted on the map?

A. Yes, they are.

MR. BAEZA: At this time we would move for the admission of what has been identified as Government's Exhibit 9 into evidence as Government's Exhibit 9.

THE COURT: Any objection?

MR. DEE: No objection, Your Honor.

THE COURT: Received into evidence, 9.

(*Government Exhibit 9 received in evidence*.)

MR. BAEZA: Permission to publish, Your Honor.

THE COURT: You may.

BY MR. BAEZA:

Q. Special Agent Ray, there is a projection behind you as well as a screen in front of you. You also can make markings on the screen as you see fit. And to erase, there is a

little module in the upper-right corner of the screen, and there will be a series of editing tools, and one of those is to clear the image when you are done.

First, in general terms, will you describe for the jury what is being depicted here in Government's Exhibit 9.

A. Sure. This is the Caribbean Sea, basically around Central America, showing Colombia and Central America. It depicts the point where the vessel was interdicted. It shows the land belonging to Colombia, that San Andres and Serrana Bank.

Q. You were previously discussing various smuggling routes that you are familiar with utilized by go-fast vessels in the Caribbean based on your training and experience. Are there any that you can depict within Government's Exhibit 9 based on that testimony?

A. Yes, there are two of them. Actually, three.

Q. Okay. And what three are those?

A. The Hyperlatoril, the Honduran Rise, and basically the straight route up to Hispaniola.

Q. Hispaniola, for everyone, based on your knowledge, includes the Dominican Republic?

A. Haiti and the Dominican Republic.

Q. Would you draw on the map the Latoril route that you previously discussed?

(Witness complies.)

BY MR. BAEZA:

Q. When you make the markings, will you tell the jury what you just did.

A. Basically what they do is the vessels will hug the coast. As I said, they will go between 10 and 14 miles out to sea. Basically going between international waters and territorial seas. They do that to blend in with the local traffic.

Like I said, if they are being chased by Colombians, they run into Panama. They are going to be safe in Panama from the Colombians. Then, if they are being run out by Panama, they could run up to Nicaragua. Their main goal is to hug close to the coast.

Also, their refueling points will be inland where they will basically make a beeline inland and stop for the day, park their boats on the beach, get some food, refuel and resupply.

Q. We will get to refueling in a moment.

What in your training and experience are the advantages and disadvantages of the Latoril route?

A. The advantage is that you are relatively close to land, so you are easily able to communicate with the people who are doing it.

You can run, typically, smaller loads because they are smaller vessels because they want the horsepower to move

out. If there is a problem, it's easy to get to shore. The downside is that you have to have a lot of logistical support for it. You have to have more boats because you are moving smaller loads, as well as you are now in jeopardy of being caught by -- every country along the way can arrest you or interdict you, so you're worrying about multiple countries and multiple police and law enforcement agencies detecting you.

Q. So to be clear, then, for the Latoril route we are talking more countries you are at risk for interdiction, have to travel slower, have to be refueled more, have to carry smaller cocaine loads?

A. Correct.

Q. All right. Let's just address the Hispaniola route real quick. Will you depict what that is, please.

A. Do you want me to erase this one? Does that do this?

Q. You can leave it up there.

A. The Hispaniola one, they come up to this point and then they will shoot off into different places or even Puerto Rico. And it's a straight shot. Basically they go as fast as they can to get to a point. They will have some type of intelligence that tells if there is law enforcement present. Based on that, they will split into different areas to go to land.

Q. Is the location of law enforcement assets part of the

surveillance that you said you were familiar with?

A. Yes, it is.

Q. And the area of Colombia that you marked, this is a peninsula known as Guajira?

A. Yes, it is.

Q. Let's go now to the Honduras Rise route.

A. Basically it goes straight north and then hits a certain point and they bank west and they start heading toward Honduras.

Q. Let's clear the screen and go --

A. You may need to walk me through that one.

Q. Upper right you'll see an arrow.

Would you depict, based on your training and experience, the Honduras Rise route if the boat left the Cartagena area.

(Witness complies.)

BY MR. BAEZA:

Q. Okay. Would you describe what you've depicted on the screen for the jury, please?

A. Pretty much it goes straight north, hits a certain degree and will head west toward Honduras.

Q. With respect to this route, what are the advantages and disadvantages based on your training and experience?

A. Typically you're not worried about as many countries interdicting you. You are only worried as you leave Colombia

for the destination or the U.S. Coast Guard that will be in the middle.

You can carry a larger load. You do need a refuel point that will be somewhere around that turn that you make. So you need at least one logistical vessel to help refuel you. You need to have coms that are, basically, satellite fed so you can maintain communication back with your dispatcher because you're not in an area that is covered, obviously, by cell phone service.

It's typically around a two-day trip, so the things in the Caribbean are fast because the area and the space is a lot smaller than, for example, the Eastern Pacific where a trip can take five to six days.

Q. Let's describe the refueling process. Are you familiar with that based on your training and experience?

A. Yes, I am.

Q. Are you familiar with the general range of go-fast vessels in the Caribbean?

A. Yes.

Q. Okay. You said that a vessel undertaking the Honduras Rise route would need at least one refueling?

A. Correct.

Q. Why do you say that?

A. Because the distance is so great that, basically, they can do the trip and they will be full of fuel when they

leave. They need to swap out, get full of fuel and then they will able to land. Typically most of the refuelers are coming out of San Andres and Providencia.

Q. Let's describe the logistics and coordination behind the refueling at sea. Will you describe that for the jury, please.

A. Typically what happens is as the vessel gets dispatched and leaves Colombia, it will have a rendezvous point, typically a GPS coordinate, and a code, whether it's going to be a satellite or a radio code. Then they are supposed to meet at a certain time, certain location.

They will break squelch and say, hey, I'm here. The refuel boat will typically break radio silence and say, hey, we are here, and then they will meet. Then they will swap the fuel over from one vessel to the other.

If they need some food and extra supplies, they will give it, and then the refuel boat goes a different direction and the drug boat continues on its venture.

Q. Let's talk about some characteristics of go-fast vessels now. Are you familiar with that based on your training and experience?

A. Yes, I am.

Q. First of all, what is the purpose behind a go-fast vessel?

A. The purpose of a go-fast vessel -- and it sounds

silly -- is to move things from point A to point B rapidly. Thus, they call them semi-submersibles. The main object is that speed is their main attribute because they want to move through where -- you know, they want to move through the point where they can be interdicted as quickly as possible. So they will typically have normally two engines, sometimes more, and a lot of fuel to move it. Then the rest of the space is primarily done for storage of drugs.

The vessels tend to be blue or dark in color so it kind of hides their overall -- if you are flying, from above it's difficult to see it. They don't normally use running lights or any type of AIS, automatic information system, like major ships. They'll always beacon where they're at because they don't want to get hit and run over. Well, go-fast boats don't do that. They try to hide and go as fast as they can.

Q. You spoke about the purpose behind the hull color, the equipping of fuel, equipping of engines, and the equipping of controlled substances.

Let's talk about navigation lights. What are those?

A. Navigation lights are lights on a boat to let people know where you are, as well as what direction you are heading. They will be green and blue and they mark your vessel. There are a requirement on pretty much all registered vessels.

That brings me to the point, most of these vessels are called stateless, which means that they don't register. Like if you are familiar here in Florida and you go down to St. Petersburg or Tampa, you will notice there will be FL numbers on the boats, or on the back of it it will say, like, the Sassy. Those boats are all registered with Florida or the United States, which means it's property of the United States. So there is governing rules with it.

A lot of these vessels do not actually, in fact, register with the countries that they belong to, so when the Coast Guard comes along, if a vessel is registered, you're part of that property. Even if that vessel says Florida or Sassy in the United States, as it travels the ocean, it is property of the United States.

If another country wants to board it, they need permission from the United States to get on board that vessel because it's United States property.

If you don't claim any nationality, you don't get to escape and go, hey, guess what. No one gets to board me. In fact, any country that comes upon it can board it as if it belonged to itself, so you get punished for not registering your boat. But people who are smuggling don't want to register a boat because then there is a paper trail that that boat belongs to me, and people want to inspect it, make sure it has safety equipment, make sure it has lights, make sure

it follows in some form of that country's safety standards.

I'm not saying every country is as stringent as the United States Coast Guard, but every country has rules about what you need to do on vessels.

Q. Let's talk about some of that. You talked about a registration number sometimes being present on the hull of the boat.

THE COURT: Mr. Baeza, we are going to have to take a morning recess, and perhaps this is a good time.

Ladies and gentlemen, we are going to take a recess. We will be in recess until about 16 minutes after 11. You are welcome to walk around. Please don't discuss the case, and we will start again at that time.

COURT SECURITY OFFICER: All rise for the jury.

(Jury exits courtroom at 11:01 a.m.)

COURT SECURITY OFFICER: Please be seated.

THE COURT: Agent, you may step down as well. Please don't discuss your testimony over the recess. We will start again at 11:16.

(Recess taken from 11:04 a.m. to 11:15 a.m.)

COURT SECURITY OFFICER: All rise.

This Honorable Court is now in session.

THE COURT: Okay. Will you get the jury.

COURT SECURITY OFFICER: All rise for the jury.

(Jury enters courtroom at 11:15 a.m.)

COURT SECURITY OFFICER: Thank you. Please be seated.

THE COURT: Mr. Baeza.

MR. BAEZA: Yes.

BY MR. BAEZA:

Q. Special Agent Ray, before we continue any further, just a reminder that there is a court reporter making a transcript of your testimony and there are translators for the defendants, and also for some people in the audience, so just please speak as slowly as possible.

A. Yes, sir.

Q. Thank you.

THE COURT: Or slower.

THE WITNESS: Yes, ma'am.

BY MR. BAEZA:

Q. Fair enough. I had to stop to think whether I said as fast as possible or as slow as possible.

We were talking about vessel registration. Do you recall that testimony?

A. Yes, sir.

Q. And you were talking about the registration numbers, commonly seen on vessels registered in the United States. Do you recall that?

A. I do.

Q. Based on your training and experience, what other

indicia for a vessel's registration could be placed on a go-fast vessel?

A. You can actually place the flag of the country it belongs to. They will normally have names, as well as most countries will actually have some type of number or registration on that vessel.

Q. What about a home port?

A. Yes.

Q. When you talk about the flag, is it flying a flag? Is it painted on? Explain that.

A. It could be any of those things. A lot of vessels, especially if you are looking at the commercial ones, will actually fly the flag or they will have, like, an emblem of the country they belong to or the home port where it is, and they will say not only the port but the port and the country. That is all an indication of which country owns and is responsible for that vessel and has the rules and regulations responsible for it.

Q. Are you also familiar with a document known as a zarpe?

A. Yes, I am.

Q. Would you explain that for the jury.

A. What it is, in Colombia it's the allowable amount of fuel that a vessel is supposed to be carrying or is authorized to carry.

Q. In your training and experience, are zarpes commonly

found on semi-submersibles?

A. They are not.

Q. Would you describe that, please.

A. Because go-fast vessels are going to have numerous fuel barrels and move the cocaine, they are not going to want to register they have an illegal amount of fuel on board a vessel, because they are going to take more fuel than what a legitimate fishing trip would be or some other transportation because they are using excessive fuel because, like I said, they are trying to go as fast as possible, moving from point A to point B and trying to make as few stops as possible. So they balance it out with taking large quantities of fuel, which would be in excess of what would be reported to the Colombian government.

Q. Let's talk about common provisions found on a vessel for these crews based on your training and experience. Are you familiar with that?

A. I am.

Q. Would you explain that for the jury, please.

A. So because these guys are out on the sea for two days and their primary purpose is to move, they are going to have bottled water, canned foods, things like that which are easy to grab, that are waterproof. They tend to be higher priced things than what fishermen would use.

If you are fishing, you would tend to use a whole

storage container of water because it's cheaper to put in a hose-type thing or a pot of water than it is if they buy small bottles. Canned food and prepackaged items, they are more expensive than what you would do if you are out on the water for several days and you are trying to save money.

Q. Okay. Let's talk about electronic equipment next. What kind of electronic equipment have you encountered on these types of vessels?

A. Satellite phones, GPSs, handheld GPSs, as well as the two-way communicating GPSs, and sometimes buoys or tracking devices.

Q. We are going to get into methods of evading law enforcement in a moment. But in your training and experience, what is often done with electronic equipment in anticipation of a law enforcement boarding?

A. It's thrown overboard.

Q. What is the significance of retrieving the electronic equipment in your training and experience?

A. Well, it allows you to look through the GPS, the route of travel, as well as way points, because a lot of times either they will preprogram the GPS with the way points and give a sheet to the captain, saying, hey, these are the points that you need to stop to. This is your departure point. This is your refuel point. This is your end point.

If there are multiple refuel points, they will be

marked along the route, as well as the satellite phone. There is no cell phone service out there. The only way to communicate back and forth to dispatch is through satellite phone.

Almost all of those boats carry a normal radio. They'll typically only use the radio because it's a short-wave line-of-sight communication. If they are at a refuel point, at that point they will use a radio, use a coded word to indicate, hey, I'm here. That way they can communicate directly with the refueling boat.

Q. Is it common in your experience for these interdictions to result in the seizure of no electronic equipment?

A. Yes.

Q. Let's talk about the composition of the crews now. In your experience, approximately how many people do you see on these go-fast vessels?

A. Typically you'll see between three and four.

Q. And are you familiar now with the roles of the crew members on a go-fast vessel?

A. Yes, I am.

Q. Are you familiar with the role of the captain?

A. I am.

Q. Would you describe the role of the captain for the jury, please.

A. The captain is the one who's overall responsible for

the boat. He is the one that normally operates the GPS and knows the coordinates of where they are going. He's the one that will operate the satellite phone and make the communication back with dispatch to give updates or if he's using it to send text messaging. He will be the one who will help direct other people on what line of travel. So when you are driving a boat, he may take a break and say, hold course, you know, 207 and hold that course, so someone relieving him knows which way to steer the boat.

Q. Are you also familiar with a navigator?

A. Well, typically the captain is the navigator. Normally you will have a mariner or a mechanic and/or load guard.

Q. Let's talk about, first, the mariner on a four-person crew. Would you explain that.

A. So a mariner has been out on the sea, probably been a fisherman for a while. Their general purpose is to help with handling of items on the boat and typically refueling of the boat because engines are in the back and typically they have jugs of fuel.

What they will do is move these pipes back and forth from different fuel barrels until they empty out to maintain the flow of fuel to the engines, as well as handling any gear or generally whatever is needed by the captain. They will relieve the captain on steering of the boat.

Q. What about a mechanic?

A. The mechanic's job is to make sure the engines keep functioning. And if there is an issue with the engines, to make whatever repairs to keep the engine functioning and operating.

Q. Are you familiar with the term "load guard"?

A. Yes, I am.

Q. Would you explain what a load guard is for the jury, please.

A. So a load guard is responsible for the cocaine that's on board the vessel. Typically, if you have a crew of four, three are going to be from one country. The other is going to be from the destination country. His job or her job is to fly down to observe where the cocaine is, to make sure it gets on the boat properly and that nothing happened to it from its start to its final destination.

Q. So is it fair to say that the load guard is the representative for the organization receiving the cocaine?

A. Yes.

Q. And that the responsibility of the load guard includes making sure that all of the cocaine that leaves Colombia makes it to its intended destination?

A. Correct. The load guard will also give updates to the people who are receiving it to make sure that things are flowing, as I said, from the people who are sending it off.

Q. How are these crew members recruited?

A. Typically what happens is that most of these people are fishermen in villages. If you are fishing, your normal trip you are going to make maybe a hundred dollars to $200 a week doing legitimate fishing. The recruiters know this. Typically a recruiter has done several trips himself and will basically go up to fishermen and ask them if they want to make significantly more money. A typical trip can make anywhere between 10,000 to $40,000 one way depending on the amount of cocaine, the length of the trip, and the responsibility.

So what they will do is they prey upon people and say, hey, I'll give you money if you go ahead and do this. What they will normally do is give an amount of the money up front as a forwarding of it. For example, they promise that I'll give you $5,000 up front, but out of that I'm taking 1,000 as a finder's fee. That's how the recruiter makes his money. He's taking money from the money he's giving to these people he's sending off.

Q. These recruiters, do they approach people they trust for recruitment purposes?

A. Yes.

Q. And what do you mean by that?

A. The people that they are approaching will be receptive to them saying, yes, I'm interested in a trip. Or if they are not this time, they will be, like, yeah, that's not a

problem. I'll think about it. And then depending on my circumstances, a couple of months later I might go back and say, you know what? I think that's good. Especially when they see other people who have successfully returned, coming back and bringing in large amounts of money.

Q. You spoke a little bit about nationality composition on a vessel. Would you explain that a little further, please.

A. Typically the people who are operating the boat are from the same country because they are the ones recruited by the same recruiter. They are the fishermen, captain, and the mechanic.

Typically the load guard is recruited from the country that the drugs are going to. So they will fly from Mexico down to Colombia, hang out with the mariners until the drugs are loaded on board the boat and stay with the drugs and follow them to the final destination. A lot of times the load guards do not have a nautical background. Their main goal is to watch and observe drugs, not necessarily be on boats.

Q. You spoke a little bit about the pricing of a kilogram of cocaine and the amount of kilograms in a bale. Approximately $30,000 in Tampa for wholesale value and approximately 20 kilograms in a bale. Is that accurate?

A. That is correct.

Q. Is it fair to say, then, that a bale, based on your

training and experience, in Tampa would be about $600,000?

A. That is correct.

Q. Are you familiar with the nationality composition of the crew in this case?

A. I am.

Q. What is it?

A. You have three Colombians and a Belizean.

Q. Based on your training and experience and knowledge of the investigation, what do you believe was the role of the Belizean?

A. He was the load guard for the final destination in Belize.

Q. And the other three Colombians?

A. They were the ones operating the boat. They were the captain, mechanic, and mariner.

Q. We talked about captains, mariners, mechanics, load guards, how they are paid, how they are recruited. What about the friends on the boat that are just going along for the ride, what about them?

A. There are no friends that go on a boat just for a ride.

Q. Would you explain your answer, please.

A. These people are moving high levels of drugs. They are not going to include anyone into a conspiracy that isn't part of it, that isn't getting paid. It's a business. They pay these people money to move that. They are not going to bring

anyone who would help further -- who would have knowledge that wouldn't be getting paid or have responsibility for that.

If they lose a load and they escape, then they are going to owe basically two loads for free that they now have to make for the next trip. So when they sign up for it, they are signed up for the one trip. And their understanding, they are not going to take along somebody else that has no basis, being paid, or doesn't understand what's going on on these trips.

Q. Let's talk about methods of surveillance and counter-surveillance by semi-submersibles and the organizations that dispatch them. First of all, how would you define surveillance?

A. Surveillance is basically observing a specific area, looking for something of interest.

Q. What is counter-surveillance?

A. Counter-surveillance is, if I know I have something going on, I'm looking for law enforcement or military that might interfere or some other operation -- in this case, like I said, there will be people looking for law enforcement and to give them a warning that they are there in the area, so I would postpone sending my trip out.

Q. These transnational criminal organizations that you spoke about, in your training and experience, do they often

acquire suspected locations of naval assets, meaning vessels in the water?

A. They do.

Q. Are these obtained by legal or illegal means?

A. It's a mix of the two. They normally have a report before they ever dispatch. You have a mix of -- these people are fishermen and they live in villages. If they are fishing today and moving drugs tomorrow, they will more likely tell their friend, hey, I was out fishing and I saw a Coast Guard boat, and relay that to people, saying, hey, I know we saw this Coast Guard in this area. So you might want to watch out.

In addition, there are some corrupt government officials that will be willing to sell potential layouts of the host country assets to drug people. And it's not unheard of that Colombian or Panamanian or Nicaraguan law enforcement/military will be in the pockets of cartels and say, hey, so you know, we are sending a patrol out on this date and going to this location.

Q. Let's slow down a little bit on your answers.

A. Okay.

Q. So we have elements of corruption in host countries, as well as human intelligence or HUMINT?

A. Correct.

Q. What are the methods of counter-surveillance while at

sea by a go-fast vessel?

A. What they will do is they will sometimes come to a stop, look around and listen. They will send their members out to look out in the horizon. Most marked vessels have lights on them that they see, as an alternate. And in addition they sometimes stop in the daytime and put a blue tarp over their boat to gain some sleep, as well as if it's a hard-to-see boat with a blue tarp, it blends in with the ocean very well.

Q. Does it always have to be a blue tarp?

A. No.

Q. All right. The methods of law enforcement detection you are familiar with, does that include the maritime patrol aircraft?

A. It does.

Q. What about helicopters?

A. Yes.

Q. And the Coast Guard cutter/law enforcement detachment people; right?

A. Correct.

Q. What's the role of the maritime patrol aircraft?

A. An aircraft up 10,000 feet has a much wider view and able to see vessels on the ocean. It's a lot easier to see vessels that are moving because they leave a wake. So they will patrol certain areas looking for vessels, especially in

areas that aren't normal fishing ground or transit areas that drug trafficking happens.

One aircraft can cover a lot more water than a boat can. In addition, a lot of the aircraft have, like, radar capability and things to identify, especially if they see a boat and it's not listed, like I said, on AIS. AIS is an automatic information system that most major boats that are transiting the ocean, you know, broadcast where they are at so they don't get run over or hit by any other vessel.

Q. What's the role of a helicopter?

A. The role of the helicopter is once a target has been identified, they get up and get a closer view of it to help identify what country it belongs to. For example, if it belongs to Colombia and it shows a Colombian registration and has a flag of Colombia, the Coast Guard needs to ask Colombia permission before they can actually go and say, hey, we want to board your boat.

The helicopter helps verify if it's a vessel with nationality. And in addition, because a lot of these vessels, in fact, are faster than some of our Coast Guard vessels, they are armed and they will do what's called disabling fire and they can actually shoot out the engines of these go-fast vessels so that the Coast Guard can actually stop them and say, hey, what country are you from? We want to board you.

Q. Hypothetically, if the engines are already at the bottom of the ocean, what need, if any, is there for the helicopter?

A. The helicopter will maintain surveillance on the vessel until the boat can come. The helicopter can fly, obviously, a lot faster than a Coast Guard boat can drive out there. It will mark where it is and then help steer in a small Coast Guard vessel or small boat so they can conduct the boarding.

Q. In this case we are talking about a law enforcement detachment on a Canadian vessel. Do you know what, if any -- you don't know whether this Canadian vessel had helicopter capability?

A. I do not. What the Coast Guard does is -- obviously we have Coast Guard ships, but because we also have countries like England, the Dutch, and the Canadians who bring cutters down, they offer the United States Coast Guard and these law enforcement detachments a team so that we can use our team upon that ship. Then when they board the small boat, it's acting as if it's a U.S. boat. It's basically the conveyance of it and it allows us, as the Coast Guard, to employ more assets out there than what we have ships to do.

Q. So when we talk about going from a patrol aircraft to a helicopter to a boarding ship, that's typically the procedure from a Coast Guard cutter and patrol aircraft?

A. Correct.

Q. Okay. And in other scenarios, the interdiction would fall to the closest allied nation with an asset in the water?

A. Correct. There are a lot of times the allied ship will do an interdiction and then pass it on to the Coast Guard for prosecution. Pretty much England, the Netherlands, and Canada have written agreements that will prosecute. If the French grab it, they will do their own prosecution. They're French.

Q. I'll reserve comment.

Is it fair to say that -- withdrawn.

Let's talk about methods of evidence spoliation. Are you familiar with that?

A. Getting rid of evidence?

Q. Yes.

A. Yes.

Q. What in your training and experience are methods of destroying evidence of narcotics on a go-fast vessel?

A. The first thing is to throw it overboard and get it as far away from you as possible. The second thing is to sink it by either attaching weights or objects to it. The third thing is to set it on fire, where they douse the boat or douse the drugs and they light it in any effort to keep drugs away from you. As well as they will a lot of times use gasoline to wipe down a boat in hopes it will remove any evidence of trace elements of drugs.

Q. Let's talk about sinking of bales. What instrumentalities are you familiar with in your training and experience that could be used to sink cocaine bales?

A. Sometimes they will actually weight the bales in advance, or other times what they will do is attach the bales to the engine and then sink the engine.

We had one case where they weren't able to detach the engine because they didn't take all the cords that connected it to the steering mechanism, so the engine is hanging off with about 20 bales attached to it.

Q. Are you familiar with what happens when a bale of cocaine is thrown into the water? I'm talking about the buoyancy of the bale.

A. I do.

Q. What happens to a bale?

A. It floats. Cocaine bales are buoyant, so they will float out there and drift. In fact, sometimes if you catch on Bay News 9 you'll hear someone say, oh, we drove by and picked up floating drugs and reported it to FWC, because the drugs will stay floating out there until they are recovered.

Q. In addition to sinking the cocaine, what, if anything, is done with any electronic equipment that was used to communicate with other members of the organization that's involved?

A. They will throw it overboard so that it will sink.

Sometimes they throw it in a bag and it doesn't always sink, but the exposure to saltwater degrades the ability of being able to extract any information from electronics.

Q. Would you explain further your answer about using gasoline on the vessel?

A. Yes. They have a lot of gasoline. It's a solvent, so a lot of times they will rub themselves down or rub the boat down, trying to use it kind of like Clorox, to remove any elements they think would be on there or eliminate any evidence. In addition, they think that because now you have fuel on all that, it creates a safety hazard so that the Coast Guard might be less [sic] hesitant to get on board or do a more thorough inspection because of gasoline being present.

Q. You said less hesitant. Do you mean more hesitant?

A. I'm sorry. More hesitant.

Q. We have talked about what you do with the physical objects on the vessel. What about the crew themselves? What, if anything, in your training and experience is done by the crew in order to evade law enforcement?

A. Well, the crew, normally, if they get detected, they will try to flee. When they flee, they try to throw the drugs overboard or fuel overboard or try to make distance, especially if they see the boat.

A lot of times, if they see just the aircraft,

they may just dump everything and then hoping and waiting for the Coast Guard to arrive. Then a lot of times during that time they will sit down and start concocting a version of events that explain why they are where they are at.

Q. In your training and experience, what are the common explanations utilized by go-fast vessel crew members about their purpose at sea?

A. They were fishing, they were evading pirates, they found the drugs just floating and they didn't know what they were, they were SAR survivors or they will tell the truth and say it was a drug venture.

Q. So, just to summarize, you said fishing, pirates --

THE COURT: You shouldn't summarize, Mr. Baeza.

MR. BAEZA: Yes, Your Honor.

BY MR. BAEZA:

Q. Let's talk about -- you said SAR survivors. Is that search and rescue?

A. Search and rescue.

Q. Would you explain that, please.

A. They will claim they were lost at sea, drifting for days at a time, and that explains why they are in the location that they are at.

Q. What methods, if any, are used in your training and experience to assess the validity of that explanation?

A. Well, normally because we have eyes on the boat and we

know it's moving, we know that when they say they are lost at sea, that's not accurate.

In addition, just even the actions that they have. People who are lost at sea have no provisions and water. They tend to be dehydrated. They can't talk. When they happen to see the Coast Guard, they get really excited and they wave. They use any method they can to communicate to an aircraft or a vessel, even if it's not Coast Guard, to any vessel because they want to be rescued.

Whereas, most people who have done something illegal and get caught and arrested have the head down and they are just in despair because they realize their freedom is up and the venture they are doing is over and now they have serious consequences to face.

Q. I'm not going to go through all five. The other one I want to talk to you about is the fishing story. Would you explain that, please.

A. A lot of times people say, oh, we were just fishing. And while these vessels are capable of fishing and you will occasionally even find a single fishing pole, a fishing vessel, if it was, in fact, fishing, would have nets, bait, ice, reels, hooks. It would have limited fuel because the whole point is to capture as much fish as possible. Just because it has a single fishing pole doesn't make it a fishing boat.

I've been on many a United States cutter where a nice chief brought his fishing pole. That cutter is not a fishing vessel. It's still a United States Coast Guard cutter doing its mission. Just because there is a fishing pole doesn't make it a fishing vessel.

Q. Are you also familiar with conch, Agent Ray?

A. I have a familiarity with it. I'm not an expert on conch.

Q. I'm not asking you to be an expert; but just in your experience with conch, what exactly is it?

A. It's a --

MR. AMADOR: Objection. Foundation.

THE COURT: Do you know generally what it is?

THE WITNESS: Yes, ma'am.

THE COURT: You may answer the question.

THE WITNESS: It's a mollusk with a shell on it. They will use the shell to blow into it. Like "Lord of the Rings," they use the conch shell. It's a mollusk-type thing. Typically it's in shallow water. A lot of times divers will free-dive, pick it up, poke a hole in the back of it and it allows you to pull the conch out. That's the meat part. They make conch fritters. It's a common thing in the Caribbean. You can also eat it raw, like, on salad. Like I say, the shell itself has a value.

BY MR. BAEZA:

Q. Agent, I have to say one thing. You said, "Lord of the Rings." I think you meant "Lord of the Flies."

A. Thank you.

Q. Are you familiar in your experience with whether conch can swim?

A. Normally it crawls on the bottom of the water.

Q. Sink?

A. Yes.

Q. Don't see floating conch shells?

A. No.

Q. Don't see schools of conch swimming around?

A. No.

MR. BAEZA: Thank you, Agent.

I tender the witness.

THE COURT: Mr. Dee?

MR. DEE: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. DEE:

Q. Special Agent, you talked about certain things about the vessels, the go-fast vessels, that you are familiar with as far as drug smuggling. You mentioned that a common element that they use is a blue tarp to cover the vessel in daytime. Do you recall that?

A. Correct.

Q. That's because, from a plane up above, that might blend

in with the sea and make it a little bit harder to see?

A. Correct.

Q. Okay. Now, as far as the actual route, you describe the Honduran Rise route, I believe is the term; is that correct?

A. That is correct.

Q. And basically the smuggling boats that take that route will go north out of Colombia and make a west or left turn and head to Honduras?

A. Correct.

MR. DEE: No other questions, Your Honor.

THE COURT: Mr. Brunvand?

CROSS-EXAMINATION

BY MR. BRUNVAND:

Q. Good morning.

A. Good morning.

Q. You provided the jury with an extensive bit of information this morning about how these general operations work. Would that be a fair assessment?

A. Yes, sir.

Q. And you yourself have not been on any of these types of vessels, transporting anything; correct?

A. I have been on go-fast vessels before.

Q. Transporting drugs?

A. No. Actually, yes, because I was moving it to

evidence.

Q. All right. But other than in the capacity as law enforcement, you haven't been on any of these types of vessels while the operation is taking place other than when the seizure takes place and then bringing the drugs to your ship or wherever you are bringing it?

A. Correct.

Q. Okay. The information that you provided the jury about how things generally work is information that you learned by talking to other individuals who were involved at the various stages. Is that a fair statement?

A. That and doing it myself, yes.

Q. Well, okay. I think you started out talking about how people are recruited to go on these trips; right?

A. Correct.

Q. And certainly you haven't been there during the recruitment process; right?

A. I have not.

Q. Okay. But the information that you provided to the jury about how that works, you have obtained that from individuals who were arrested and then sat down with you and told you how it worked in their particular case?

A. That is correct.

Q. Okay. And you indicated -- first of all, the motivation for those people who provide you with information

is they hope that it's going to result in them getting a lower sentence?

A. Correct.

Q. Okay. And you indicated that generally the people on the boats are fishermen; right?

A. Correct.

Q. That there are people above them who recruit people to go on the boat; right?

A. Yes.

Q. There are people that you call dispatchers?

A. Correct.

Q. And those are some of the players in the organization; right?

A. Absolutely.

Q. And your hope is that during your work you are able to climb all the way to the top and arrest the owners and operators of these organizations?

A. Absolutely.

Q. Okay. And you dealt with it at all the various stages. Is that a fair assessment?

A. Yes, sir.

Q. Okay. And you've talked to people, from the people that are on the boats to the owners; right?

A. Yes, I have.

Q. And the motivation, whether you are on the boat or an

owner, is to get a lower prison sentence -- right -- for talking with you?

A. For talking with me, yes. Their motivation is to make money but, yes, they are talking to me to lower their prison sentence.

Q. The motivation for talking to you is to get a lower prison sentence; right?

A. Right.

Q. In fact, the owners sometimes, whether they are in Colombia waiting to be brought to the United States or in the United States, will provide you with coordinates of where you might find a vessel with drugs?

A. That is correct.

MR. BAEZA: Object to the relevance, Your Honor.

THE COURT: I'm not in a position to know if it's relevant or not.

MR. BAEZA: May we approach, Your Honor?

THE COURT: Sure.

(*The following was held at sidebar*:)

MR. BAEZA: Your Honor, based on this line of questioning, it looks like it's intended to elicit some type of admission that sometimes these interdictions have somewhat higher-ups looking for a reduction in their sentence and provide that to law enforcement, but that still has no bearing on the relevance of these defendants' intent to

engage in a conspiracy and their attempt to possess cocaine with intent to distribute it.

We have not raised any information about how this vessel was located. We don't have all the information as part of this record. We don't intend that -- we have already presented testimony from the maritime patrol aircraft crew members about what they were tasked to do. There is no evidence we have heard about any tracking information printed on the vessel, anything about coordinates, and this looks like it's reasonably calculated to suggest that there is something nefarious afoot here or something untoward by the government where we are making a deal with some other higher level person in order to go after these fishermen.

MR. BRUNVAND: The government has alluded in great detail about how these trips operate, what the routes are, how things work and all the information that he relies on for purposes of presenting the testimony as to how everything works, from the owners to the dispatchers to the recruiters to the people on the vessels is information that he received from people that were cooperating and it's really for the purposes of showing that those people had motivation to fabricate.

So based on that, I believe it is fair game for us to discuss who he got the information from and what their motivations were. And I'm not -- as far as specifically

about whether or not there was a tracking device on this vessel or not, I'm not going there at this point. We dealt with that previously and the Court ruled on that previously.

MR. BAEZA: The suggestion then, Your Honor, is somehow these defendants were set up.

MR. BRUNVAND: We're not making that kind of argument.

THE COURT: I don't think he's made that suggestion.

MR. BAEZA: It's an inference, Your Honor.

THE COURT: You went into the owners, you went into the higher-ups and went into the whole thing, so I think he's entitled to cross-examine. Overruled.

MR. BAEZA: Yes, Your Honor.

(Sidebar ended.)

BY MR. BRUNVAND:

Q. Do you recall my question?

A. Yes.

Q. Okay.

A. Yes, they do.

Q. Okay. I believe my question was whether or not the owners will sometimes provide coordinates of vessels to you so that it will benefit you and it would also help them, hopefully, get a reduced sentence. Is that an accurate statement?

A. Yes, they do.

Q. Okay. Would you agree that -- the organizations that you've described and who you've described as some of the players that are involved in these organization, would you agree that some of these organizations are huge organizations?

A. Yes.

Q. Would you agree that some of these organizations are extremely powerful organizations?

A. Yes.

Q. Would you agree that some of these organizations deal with money in excess of a billion dollars?

A. Yes.

Q. Would you agree that some of these organizations are dangerous organizations?

A. Yes.

Q. Would you agree that there is an intimidation factor among people who live in the coastal communities of Colombia, be it Buenaventura, on the Pacific or in the Caribbean, as relates to these organizations?

A. Yes.

Q. There is a fear element?

A. Yes.

Q. You indicated generally how people are recruited and how people end up on these vessels; right?

A. Yes.
Q. You don't know specifically how these individuals ended up on this vessel?
A. I do not.
Q. You don't know what they may have been told?
A. I do not.
Q. Or by whom?
A. I do not.
Q. You don't know -- you testified about generally the people that are on these vessels when encountered by law enforcement will concoct a story about why they are there; right?
A. Correct.
Q. You don't know on this vessel whether or not if, in fact, the story was concocted, who may have concocted the story?
A. I don't have any idea.
Q. You don't know whether the captain of the vessel may have told the crew members this is the story you will tell?
A. I do not.
Q. Let's talk about the -- you were asked to describe the smell of cocaine.
A. Yes.
Q. Your description was it smells like cocaine.
A. Yes.

Q. You indicated maybe there is some solvents that you may smell?

A. It's a pungent, solvent-type smell.

Q. You've dealt with a lot of cocaine?

A. I have.

Q. And so it's reasonable for you to be familiar with the smell that you are now telling the jury about?

A. Absolutely.

Q. People who don't deal with a lot of cocaine wouldn't know what it smelled like?

A. No, they wouldn't.

Q. Would not.

When you described the -- I think you described the dimensions of a bale of cocaine.

A. Of a 20-kilo bale of cocaine.

Q. Of a 20-kilo bale of cocaine.

What are the general dimensions of a bale of marijuana?

A. Because marijuana -- like I said, cocaine is stacked by the kilos; marijuana is not. It's basically all grouped together and packaged. I would guess it's closer to about five feet, four-and-a-half feet by four-and-a-half feet by maybe two-and-a-half feet.

Q. Four-and-a-half feet by two-and-a-half feet by what?

A. Four feet. They are more square. And as I said, it's

more -- they are thick and they are light but because -- kilos are individual. Marijuana is packed together and just pressed and all tied up together.

Q. But marijuana, nevertheless, is packaged in bales as well; right?

A. It is.

Q. And so when you look at them from a distance, the marijuana -- I believe what you are indicating is the marijuana bales may be slightly larger than the cocaine bales?

A. Yes.

Q. Slightly bulkier?

A. Yes.

Q. Up to maybe a foot longer, a foot wider?

A. Correct.

Q. Is that a fair statement?

A. Yes.

Q. Somewhat difficult to distinguish from 6,000 feet. Would you not agree with that?

A. A bale by itself, without any context?

Q. Right.

A. Yes.

Q. Okay. Or multiple bales by themselves?

A. Without any context, absolutely.

Q. Okay. You talked about the different routes and the

destinations of the cocaine --

A. Correct.

Q. -- coming from Colombia; right?

A. Yes.

Q. And you indicated that the majority of the cocaine is headed for the United States?

A. Yes.

Q. Is that what you said?

A. I said the majority of the cocaine was traveling from South America into Central America for further distribution into Mexico and subsequently to the United States, but it can also go to Europe and Asia and other things once it reaches Mexico. The dynamic of the cartels are different than what they were in the '80s.

Q. Sure. So that's the cocaine that's in the Caribbean ocean, which is what we are talking about; right?

A. Yes.

Q. There are two primaries; the Pacific and the Caribbean; correct?

A. Correct.

Q. So cocaine that may be in the Caribbean ocean may be destined for the United States?

A. Yes.

Q. It may be destined for a ship that might be headed to Europe?

A. Correct.
Q. Might be headed to Asia?
A. Not typically.
Q. More likely in the Pacific?
A. In the Pacific. And if you are going to Africa, you would head directly east, and we don't have as much visibility because the Coast Guard protects north.
Q. Certainly Europe and Africa are two destinations from the Caribbean; right?
A. Yes.
Q. I think that's what you referred to when you talked about rendezvousing with maritime vessels in the Caribbean?
A. Correct.

MR. BRUNVAND: One moment, Your Honor.

That's all that I have, Your Honor.

THE COURT: Thank you.

Mr. Amador?

MR. AMADOR: Thank you, Judge.

CROSS-EXAMINATION

BY MR. AMADOR:

Q. Agent Ray, you talked about a zarpe and only dealing with fuel; but, in fact, a zarpe deals with crews and perhaps what they are doing on their trips; does it not?
A. Correct.
Q. It's not limited to just fuel?

A. True. It describes the number of crew members who are supposed to be on board and what they are doing.
Q. Now, the captain is in charge of the go-fast; correct?
A. Correct.
Q. He is the one that gives orders; correct?
A. Yes.
Q. Now, in these organizations that you -- I think that they were called transnational drug organizations?
A. Transnational criminal organizations.
Q. Okay. That happen to deal in drugs?
A. But they also do other crimes, so that way it's the general label. But, yes, we are looking at drug trafficking organizations.
Q. In the context that you are here today to testify about, these go-fast boats, and you've testified about how they are recruited, the members of go-fast, how they could be recruited, and there is not just the three or four people on the boat that are involved in a particular load; right?
A. Correct.
Q. There are the people that recruited them?
A. Yes.
Q. The people that perhaps hired those recruiters?
A. Correct.
Q. People that own the drugs?
A. Absolutely.

Q. And then there are people that perhaps did other acts in this transporting of drugs, like refueling?
A. Correct.
Q. And perhaps the people that organize that refueling operation?
A. Correct.
Q. And then on the other end there are people that purchased the drugs on these boats; correct?
A. Absolutely.
Q. And then those people, at times, hire other people to retrieve the drugs or to receive the drugs; is that right?
A. That is correct.
Q. So there is a number of levels of organization on the receiving end as well?
A. Absolutely.
Q. So it's fair to say that there are many, many, many people and levels in one transport of a go-fast shipment?
A. Yes. It's also more than one organization. Very few organizations control everything from start to finish. They subcontract out, and so you have people who specialize in, for example, the transportation of maritime and those will do the recruiting, the dispatching and that. So, yes, many different people, but it's also more than one, necessarily, organization.
Q. And many different levels of responsibility?

A. Absolutely.

Q. You mentioned that these recruiters -- your words -- prey on people?

A. What I say, they go after people they know that need money, but they are known -- they are well known and people will go to them when they want to go work and they want to move up.

Q. Those are your words, right? Prey on people?

A. I don't recall exactly what I said. They recruit people. And the people who want to get paid, they will go to the recruiter.

Q. I don't have anything further. Thank you.

THE COURT: Redirect, Mr. Baeza?

REDIRECT EXAMINATION

BY MR. BAEZA:

Q. Agent, I'm going to start with the basis of knowledge that you have on the process that we have heard about in terms of recruitment and whatnot. Okay?

A. Okay.

Q. The issue was raised during cross-examination that the information you are getting is from people who are cooperating with law enforcement in the hope of a reduced sentence. Do you recall that?

A. Yes.

Q. Approximately how many interviews have you been

involved in of crew members on go-fast vessels or any other people in the supply chain that we have talked about?

A. Several hundred.

Q. Of those several hundred, how much did they differ between what you've already testified to about the process?

A. They haven't.

Q. There was also some discussion about the recruitment of fishermen for these trips. Do you recall that?

A. I do.

Q. Are they done with money, guns? How are these people recruited?

A. It's through money. They are paid.

Q. So they don't give a person thousands of dollars while pointing a gun at them?

A. No.

Q. They don't give a person millions of dollars worth of cocaine, while giving them thousands of dollars, while pointing a gun at them?

A. They do not.

Q. Mr. Amador was referring to all these different transnational criminal organizations, the recruiters, the logistical side, the supply side. Do you recall that testimony?

A. I do.

Q. Do you agree that these typically involve more than two

people doing something illegal?
A. Absolutely.
Q. Is there another word for that in your training and experience?
A. Conspiracy.
Q. And in your training and experience, what is the key component between cocaine traffickers in Colombia and the cocaine traffickers in Central America receiving the cocaine?
A. The ones in Colombia, they own it and they pretty much -- I mean, back in the '80s and the during the war on drugs, they owned everything from supply all the way to distribution in Miami in the United States.

As time has progressed, the Colombians have pretty much said, hey, we will move the cocaine as far as up to Central America and let the Mexican cartels take it from Central America and move it up because it's less risk for us and we can still make enough money to make a living and make a profit without the whole end of supply and distribution.

So you see the fall of the Colombian cartels and the rise of the Mexican cartels. Nowadays what you see is the Colombians, by and large, they are paying it. They do the distribution into Central America and let the Mexicans then run it for process and distribution into the United States and the rest of the world.
Q. Was that an essential part for the Mexican cartels to

get the cocaine that you've talked about?

A. They need mariners to move it.

MR. BAEZA: No further questions.

THE COURT: Thank you, sir. You may step down.

(Witness exits the courtroom at 12:09 p.m.)

THE COURT: Ladies and gentlemen, we're going to recess for lunch at this time. We'll be in recess for an hour and 15 minutes. We'll start again at 1:25.

Please don't discuss the case. Please leave your pads face down on your chairs.

COURT SECURITY OFFICER: All rise for the jury.

(Jury exits courtroom at 12:10 p.m.)

THE COURT: We are in recess until 1:25.

(Recess taken from 12:11 p.m. to 1:26 p.m.)

COURT SECURITY OFFICER: All rise.

This Honorable Court is now in session.

THE COURT: Get the jury. Who is your next witness, Mr. Baeza?

MR. BAEZA: Special Agent Jennifer Doherty.

THE COURT: Will one of you get the witness, please.

MR. BAEZA: And just to be clear, is Special Agent Ray released and can watch the remainder of the trial?

MR. DEE: Yes.

THE COURT: Yes.

COURT SECURITY OFFICER: All rise for the jury.

(Jury enters courtroom at 1:35 p.m.)

COURT SECURITY OFFICER: Thank you. Please be seated.

THE COURT: Mr. Baeza, you may call your next witness.

MR. BAEZA: Yes, Your Honor. The United States calls Special Agent Jennifer Doherty.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes, I do.

THE COURTROOM DEPUTY: Please have a seat in the witness box.

Please state your name, and spell your last name for the record.

THE WITNESS: My name is Jennifer Doherty, D-o-h-e-r-t-y.

THE COURT: Mr. Baeza.

MR. BAEZA: Yes, Your Honor.

JENNIFER DOHERTY,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MR. BAEZA:

Q. Good afternoon.

A. Good afternoon.

Q. Would you kindly tell the jury your occupation, please.

A. I am a special agent with the Drug Enforcement Administration.

Q. How long have you been in law enforcement?

A. I've been a special agent for approximately 17 years. Before that, I was a police officer with the Elizabeth Police Department for approximately six years.

Q. And there are going to be interpreters and a court reporter translating and writing all this down. So if, when I ask, I need you to speak more slowly, please do so, okay?

A. Yes.

Q. Thank you. You said you were in federal law enforcement for 17 years?

A. Yes.

Q. And what agency or agencies have you spent those 17 years with?

A. The Drug Enforcement Administration.

Q. At any time, were you assigned to the Tampa district office for the Drug Enforcement Administration?

A. Yes.

Q. And is it okay if I, for the sake of brevity, refer to

it as the DEA now?
A. Yes, sir.
Q. Okay. When did you come to the DEA Tampa district office?
A. March of 2014.
Q. Have you been assigned to any particular groups or strike forces that is within the ambit of the Tampa district office?
A. Yes. I'm assigned to the Panama Express Strike Force.
Q. Would you describe for the jury, based on your knowledge of it, what is the Panama Express Strike Force?
A. It is a federal strike force comprised of the DEA, FBI, HSI, and U.S. Coast Guard, that investigates drug maritime smuggling organizations that transport drugs through international waters, like the Caribbean Sea and Pacific Ocean, to trans-shipment locations for further distribution to the United States.
Q. You used a couple of acronyms there: FBI, Federal Bureau of Investigation?
A. Yes.
Q. HSI is Homeland Security Investigations?
A. Yes.
Q. Okay. Are you assigned to any particular area of responsibility in the PanEx Strike Force?
A. Yes. PanEx North, which covers the Caribbean and

Atlantic Ocean.

Q. In your training and experience, are you familiar with common smuggling routes utilized in the Caribbean Sea?

A. Yes.

Q. Are you familiar with the use of what are referred to as go-fast vessels, pangas, planchas in the Caribbean Sea?

A. Yes.

Q. Are you familiar with the use of those vessels for the smuggling of cocaine in international waters?

A. Yes, I am.

Q. Are you experienced with the composition of crew members in those operations?

A. Correct.

Q. As part of your duties and responsibilities with this strike force, do you also assist other case agents in the conducting of post-arrest interviews?

A. Yes, I do.

Q. In general terms, will you describe -- withdrawn.

People detained in international waters, sometimes they're brought to the Middle District of Florida for prosecution?

A. Yes.

Q. Are they usually brought in bulk to the Middle District of Florida?

A. I'm sorry?

Q. In -- you know, several detainees are brought to the Middle District of Florida at a time?
A. Yes.
Q. And because of the number of people brought to the Middle District of Florida, agents often assist in the conducting of post-*Miranda* interviews?
A. That is correct.
Q. Are you trained in how to conduct a post-*Miranda* interview?
A. Yes, I am.
Q. Are you also trained in detecting any deception in what is being said?
A. Yes.
Q. Do you rely on your training, experience, and knowledge of an investigation when conducting a post-*Miranda* interview?
A. Yes, I do.
Q. Putting aside that we've all probably seen Law and Order and binge-watched on Netflix all these crime shows, what is *Miranda*?
A. *Miranda* is someone's right to remain silent, their right -- anything that they say can and will be held against them in a court of law, their right to an attorney, and if they cannot afford an attorney, an attorney will be provided to them.
Q. When conducting a post-*Miranda* interview of someone

suspected of smuggling cocaine in international waters, how is the -- what is the setup in terms of rooms and interview rooms for these kinds of interviews?

A. Well, at our PanEx office, we have an interview area in which it's designed for temporary detention of defendants while they're being processed and interviewed before being transported to the marshals at the Pinellas County Jail. These interview rooms are individual interview rooms that are wired with audio and video recording.

Q. Why do you use separate interview rooms for defendants? Why do you keep them all apart?

A. So it's just each interview is confidential.

Q. And what, if any, concerns are there about not getting the full story if there is more than one person in a room?

A. Correct. So you just -- basically, you separate them so that you can get each individual's story.

Q. What are the protocols that you follow as a special agent with respect to advising someone accused of a crime with their *Miranda* rights?

A. What is the process of *Miranda*?

Q. Well, what is your -- in your experience as a DEA agent, what are you required to do with respect to advising a defendant of their *Miranda* rights?

A. You read them their *Miranda* rights. And then if they want to continue speaking with agents, they waive their

rights and they sign the form.

Q. Okay. So there is a form, as well, that comes with this process?

A. Yes.

Q. What is the purpose of the form that is provided to a defendant?

A. Just so -- besides us reading it to them, if they can read, they also have the opportunity to review it themselves and sign it, which goes into evidence.

Q. And are they -- are they supposed to sign the form whether they choose to waive their rights or exercise their rights?

A. No. They only sign the form if they want to waive their rights.

Q. Okay. What, if any, protocol is there for recording the interviews?

A. So we give them the opportunity, we let them know that they have the opportunity to talk with agents, and that it is our policy to record the interview. And they then decide whether they do want to have the interview recorded or not.

Q. Okay. So your policy is to record, absent opposition from the person being interviewed?

A. Yes.

Q. In the course of your duties as a PanEx agent, were you involved in an interview of Mr. Meighan?

A. Yes, I was.
Q. Please take a moment to scan the courtroom, and let me know if you see him in the courtroom.
A. Yes. I see him right there (indicating).
Q. Would you describe him, please.
A. He has -- he's a thin male, he has an afro-type haircut.
Q. Okay. And where is he sitting in relation to everyone else in the courtroom?
A. He's sitting next to his attorney, to the right of his attorney.
Q. Okay. On what row here?
A. Oh, the first row.
Q. Okay. So closest to the podium?
A. Yes.
MR. BAEZA: Let the reflect that the witness has identified the defendant, Mr. Rudolph Meighan.
THE COURT: The record should so reflect.
BY MR. BAEZA:
Q. Were you -- so you were involved in the interview of Mr. Meighan; correct?
A. Yes, I was.
Q. Are you a fluent Spanish speaker?
A. Yes, I am.
Q. What language did Mr. Meighan conduct his interview in

with you?
A. In English.
Q. Was it your understanding that that was his language of choice?
A. Yes.
Q. At any time did the interview change from English to Spanish?
A. No.
Q. At any time was it requested to have an interview in Spanish?
A. No.
Q. At any time did you have trouble understanding Mr. Meighan during the course of this interview?
A. No.
Q. At any time did he give you the impression that he couldn't understand you?
A. No.
Q. Let's walk through this interview. And you had another agent in the room with you, as well; right?
A. Yes, I did.
Q. And is that a standard policy that is -- or standard protocol in the conducting of these interviews?
A. Yes, sir. There has to be at least two agents present.
Q. Okay. So you presented Mr. Meighan with the option of having the interview recorded?

A. Correct.

Q. What was his -- what did he do?

A. His preference was not to have the interview recorded, and he signed a recording declination.

Q. After advising him of his *Miranda* rights, what, if anything, did he do?

A. He indicated that he understood his rights, and he invoked his right to an attorney.

Q. All right. Now, after he invoked his right to an attorney, did the interview end?

A. Yes, it did end.

Q. Okay. At any time -- let me withdraw the question.

After he invoked his right to an attorney and the interview ended, what, if anything, happened next with Mr. Meighan?

A. We were in the interview room with Mr. Meighan, waiting to do his DNA swab and fingerprints and other processing. During that time, he initiated a conversation with agents in regards to his country, Belize, and also talked about -- he talked about -- I'm sorry. I lost my train of thought.

Q. Okay. What was the -- what was the impression that you had of the statements he was making, based on your training and experience?

A. Well, I remembered what I was going to say. Sorry.

Q. Okay.

A. So he had talked about his country, Belize, and then he had indicated that it's very difficult to find a good paying job in Belize and to support his family.

At that time, I had believed that Mr. Meighan wanted to speak with agents in regards to his involvement in his case. I then -- I explained his rights to him again, and he indicated that he wanted to speak with agents without an attorney present.

We provided him with the *Miranda* form for him to review again in which he signs and waived his rights, and indicated he wanted to speak with agents without an attorney present.

Q. Okay. Let's first talk about Mr. Meighan's travel. What, if anything, did he say about how he got from Belize to Colombia?

A. On October 3rd, 2018, he said he traveled to Cartagena, Colombia by himself. He said that from Belize, he had traveled to -- in a bus to Chetumal, Mexico. From Chetumal, Mexico, he took a plane to Mexico City, and he spent the night. The following day, he took another plane to Panama City, Panama, and took a connecting flight to Cartagena, Colombia.

Q. All right. So we have a bus from Belize to Chetumal?

A. Yes.

Q. That's spelled C-h-e-t-u-m-a-l?

A. Correct.

Q. Let's pull up Government Exhibit No. 9, which has been already admitted into evidence.

Special Agent Doherty, in your training and experience, are you familiar with the geography and general topography of the Caribbean?

A. Yes.

Q. Okay. So do you see a marking in the top left of the -- of Government Exhibit 9 on the green portion of the image?

A. Yes.

Q. What country is depicted there?

A. Belize.

Q. And then after leaving Belize, what conveyance did Mr. Meighan take to get into Mexico?

A. He took a bus.

Q. All right. And about how far, more or less, is Chetumal from the capital of Belize?

A. I'm not sure exactly how far, how long it would take to get there on bus.

Q. But after that bus, then there was a flight to where?

A. To Mexico City.

Q. Okay. And Mexico City, if we were to follow that map, about where on the screen would we -- or where on the wall would we be?

A. North.
Q. Okay. So we'd be off the screen at this point?
A. Off the screen, yes.
Q. Okay. And then a flight from Mexico City to where in Panama?
A. Panama City.
Q. Okay. And that's approximately where on the image? And you can touch the screen to show where that is.
A. Around here (indicating).
Q. All right. So it's approximately a few miles east of the Panama Canal?
A. Correct.

THE COURT: We have about three or four dots up there. So can we erase and maybe try this again.

BY MR. BAEZA:

Q. On the upper right is an arrow, a kind of module where you can clear the screen, if you look at the upper right of the screen. Let's do this. Can you circle where Panama City is?
A. I think it's around (indicating).
Q. You have to hold it down.
A. I'm sorry. Sorry.
Q. That's close enough. After Panama City, then, there was a third flight to Cartagena?
A. Yes.

Q. What, if anything, did Mr. Meighan say about who paid for his travel from Belize to Cartagena?
A. He indicated that someone else paid for his flight.
Q. What was the nationality of this person?
A. Mexican.
Q. What, if anything, did he say about his belief as to whether any of these Mexican nationals were involved in drug trafficking?
A. He did indicate that he believed that they were the recipients of cocaine on the drug venture.
Q. What, if anything, did he say about seeing any bales on the go-fast vessel that was interdicted on or about December 1st of 2018?
A. He indicated he didn't see any until the MPA was overhead and the bales were being jettisoned overboard.
Q. Based on your training and experience, both as a special agent and in your conducting of post-*Miranda* interviews, what was your belief about that statement?
MR. AMADOR: Objection. Relevance.
THE COURT: Sustained.
MR. BAEZA: I'll withdraw the question and rephrase.
BY MR. BAEZA:
Q. What was your response to his claim that he had not seen the bales?

A. I did not believe that.
Q. Why?
A. Because he was on just the sides of the go-fast vessel itself.
MR. DEE: Objection to speculation.
THE COURT: Sustained. I'm not going to allow this line of questioning.
MR. BAEZA: All right.
BY MR. BAEZA:
Q. What, if anything, did Mr. Meighan say about how long the vessel had been adrift?
A. For approximately six days.
Q. What, if anything, did Mr. Meighan say when there was any discussion about cocaine found on his hands?
A. He indicated that he -- the reason why he had tested positive for cocaine on his hands during the ion testing was because he was pushing bales away from the go-fast.
Q. Do you recall a reference to bales during the course of the interview with Mr. Meighan?
A. Well, when he said that he pushed the bales away from the go-fast.
Q. Based on your training and experience, what did you believe he was referring to when he said bales?
A. Cocaine.
MR. DEE: Object to speculation at this time.

THE COURT: I'll sustain. What she believed is not an issue here. Please don't ask those questions.

BY MR. BAEZA:

Q. What, if anything, did Mr. Meighan say about what he believed was in the bales?

A. He said cocaine.

MR. BAEZA: No further questions.

THE COURT: Mr. Dee.

MR. DEE: Yes, Your Honor. Thank you.

CROSS-EXAMINATION

BY MR. DEE:

Q. Good afternoon, Special Agent Doherty.

A. Good afternoon.

Q. Special Agent, you were asked some questions about Mr. Meighan and comments he made. So the first thing I would ask you is, your interview with Mr. Meighan was on what day?

A. It was on December 6th, 2018.

Q. So approximately five days after the interdiction at sea?

A. Yes.

Q. Okay. And you were asked about whether Mr. Meighan made a comment about the people in Belize or the Mexicans, excuse me, the Mexicans who paid for his trip. Do you recall being asked about that?

A. Yes.

Q. And do you have your report in front of you?
A. Yes, I do.
Q. Okay. And if for any reason I ask a question and you need to refer to that, please let me know, and look down and refer to it, and then let me know when you are through referring.
A. Okay.
Q. All right. Thank you. So when he advised -- you said that he said that he thought that these Mexicans had something to do with the receipt or receiving the cocaine?
A. Yes.
Q. And, now, he's making this comment after being arrested; is that correct?
A. Correct.
Q. So is it possible that he's talking about sitting here five days after I've been picked up at sea, and somebody paid for me to fly to Cartagena, that they might have had something to do with this?
A. There's a possibility.
Q. Okay. And did he also advise you that a gentleman by the name of Emiro Hinestroza Newbbooll was in charge of the trip?
A. Yes.
Q. And to your knowledge, was that the person that was the captain of this vessel?

A. Correct.

Q. Okay. Did he advise you at the time he went on the trip that he had met with some other individuals, and they talked about taking a fishing venture?

A. Yes.

Q. So he never said at the time of getting on this vessel that he was doing a cocaine venture, he said it was a fishing venture?

A. Yes, he did.

Q. Okay. Now, you testified that he said he never saw the bales; correct?

A. Correct.

Q. All right. Now, later in your interview, did he explain as to what he said was the first time he saw the bales?

A. Yes, he did.

Q. And was that when he said that someone was throwing them overboard?

A. Correct.

Q. And at same time, he continued to say that Emiro Hinestroza Newbbooll was the captain or the person in charge of the vessel?

A. Yes. He did say that.

Q. Okay. And when asked, was it -- did you ask him directly how did you get cocaine on your hands?

A. It was either me or Special Agent Timothy Campbell.
Q. So one of the agents in the room asked that question?
A. Yes.
Q. So when you asked him that question, you're now telling him that there is cocaine on his hands; correct?
A. Correct.
Q. And was not his response that it must have been, if he got in contact with it, pushing bales away from the boat?
A. Yes.
Q. Okay. That would be after he first saw the bales being thrown off the boat?
A. That is what he said.

MR. DEE: Thank you. No other questions, Your Honor.

THE COURT: Mr. Brunvand, do you have any questions?

MR. BRUNVAND: No, thank you.

THE COURT: Mr. Amador, do you have any?

MR. AMADOR: None.

THE COURT: All right. Mr. Baeza, any redirect?

MR. BAEZA: Briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. BAEZA:
Q. Special Agent Doherty, you were asked questions on cross-examination about claims made by Mr. Meighan about

going fishing. Do you recall that testimony?

A. Yes, I do.

Q. What was your recollection about where Mr. Meighan traveled in the Caribbean to go fishing?

A. The Serrana Bank.

Q. Let's pull up Government Exhibit 9 again. Special Agent Doherty, Government Exhibit 9 is back on the screen. Do you see Government Exhibit 9?

A. Yes.

Q. Would you circle on the screen where the Serrana Bank is.

A. It's right -- sorry.

Q. We get the picture.

A. Okay.

Q. Next, what, if anything, did Mr. Meighan say about what he was fishing?

A. He said conch.

Q. And what, if anything, did he say about where the conch was at the time of interdiction?

A. That they had thrown it overboard.

Q. And what, if anything, did Mr. Meighan say about why the vessel was drifting after they traveled to the Serrana Bank for fishing?

A. That they did not have any fuel.

MR. BAEZA: No further questions.

THE COURT: All right. Thank you. You may step down.

And you may call your next witness.

MR. BAEZA: The United States calls Special Agent Carlos Galloza.

THE COURT: Sir, if you will, come forward to be sworn.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE COURTROOM DEPUTY: Please have a seat in the witness box.

Please state your name, and spell your last name for the record.

THE WITNESS: My name is Carlos Galloza. Last name is spelled G-a-l-l-o-z-a.

THE COURT: Mr. Baeza.

MR. BAEZA: Yes, Your Honor.

CARLOS GALLOZA,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MR. BAEZA:

Q. Good afternoon, sir.

A. Good afternoon.

Q. Would you tell the jury your occupation, please.

A. I am a special agent with the U.S. Department of Justice, Drug Enforcement Administration.

Q. Is it okay if I refer to this as DEA throughout your testimony?

A. Yes, sir.

Q. How long have you been in law enforcement?

A. Twenty years.

Q. And how long -- what portion of that 20 years has been spent in federal law enforcement?

A. Twenty years.

Q. Would you describe where you've been all these 20 years.

A. I was initially assigned to the El Paso field division, and then I was transferred to the Caribbean division, where I spent five years. And then currently, I'm assigned to the Tampa district office for the past 12 years.

Q. So 17 years you've been in either the Caribbean or the Tampa field division?

A. Yes, sir.

Q. In those 17 years, how many of them have you spent in the Panama Express Strike Force?

A. The past 12 years.

Q. Past 12?

A. Twelve, yes.

Q. So you went from the Caribbean straight to the Panama Express Strike Force?

A. Yes, sir.

Q. During the course of that time, have you gained any training and experience on common smuggling techniques utilized in the Caribbean Sea?

A. Yes, sir.

Q. Common smuggling routes utilized in the Caribbean Sea?

A. Yes, sir.

Q. Approximately how many cases have you been involved in during the course of your 12 years with the strike force?

A. Well over 100 cases.

Q. In the course of your duties as a strike force agent, do you also assist other case agents in the conducting of post-*Miranda* interviews?

A. Yes, I do.

Q. What is your understanding of a post-*Miranda* interview?

A. A post-*Miranda* interview is conducted subsequent to a defendant being arrested, and it allows or gives an opportunity to the defendant to cooperate with the ongoing investigation.

Q. How are these interviews in general terms conducted?

A. Normally, once the defendant is arrested, he is brought to our office where he is interviewed by at least two agents. Prior to that, there is a series of protocol for prisoner processing prior to the interview.

Q. Would you describe those protocols for the jury.

A. Yes. Once the defendant arrives, he's placed in a holding cell, and subsequently he's taken to an interview room. He is informed of the identity of the agents and why he's being detained.

There is a series of forms that once an individual is arrested they have to be completed. One of them is part of the booking and procedure. One of them is personal history information, what we call a DEA 202, where we obtain biographical information on the defendant. And then we also -- at that time also notify our -- the consular office where the individual is a citizen of, and then we then also provide a form, advise them that our interviews are recorded, video and audio recorded. And they are given an opportunity, if they wish, not to have those interviews video and recorded as an option. And there is a form that they complete at that time. And then we move on to advising them of the -- their *Miranda* rights.

Q. On or about December 6th of last year, were you involved in conducting a post-*Miranda* interview of Calbot Reid-Dilbert?

A. Yes, sir.

Q. Please take a moment to look around the courtroom and let me know if you see him here.

A. Yes. He's the gentleman sitting in the second row, next to -- the black male with a suit. Has headphones, kind of a dark suit, beige shirt. He's the second one to the left of his attorney.

MR. BAEZA: Let the record reflect that the witness has identified the defendant, Calbot Reid-Dilbert.

THE COURT: The record should so reflect.

BY MR. BAEZA:

Q. Special Agent Galloza, you testified previously that there is a protocol that is followed during the course of these interviews. Based on your recollection of that interview, did you follow those protocols?

A. Yes, sir.

Q. Were you assisted by a second law enforcement officer?

A. Yes, I was.

Q. Was Mr. Reid-Dilbert advised of his rights to remain silent and his right to an attorney?

A. Yes, he was.

Q. Was he also advised of his right to decline the interview being recorded?

A. Yes, sir.

Q. What, if anything, did he do in response to being

advised of his right to decline having the interview recorded?

A. He read the form. I read the form, then he read it and then he signed it.

Q. Let's talk a little bit about language. Are you a fluent Spanish speaker?

A. Yes, I am.

Q. What was the language that this interview -- what language was this interview conducted in?

A. The interview initially when he was -- before the interview began, I asked him if he spoke and read Spanish. He indicated that he spoke and read Spanish and English, both languages.

Q. Okay. Was there a preferred language during the course of this interview?

A. Yes. He indicated that he preferred that the part associated with the forms or the paperwork be in Spanish. But the interview he said he was comfortable doing in English.

Q. Okay. So when these forms were presented to him to sign, what language were they all in?

A. Spanish.

Q. Was there any difficulty that you could observe -- withdrawn.

What, if any, difficulties did Mr. Reid-Dilbert

express in reading and understanding the forms?
A. None. And I advised him, also, that if he had any difficulties, that I would be more than willing to assist him and translate for him any part that he didn't understand.
Q. Did you have any difficulties in understanding the English that Mr. Reid-Dilbert was speaking to you?
A. No.
Q. What, if any, difficulties did Mr. Reid-Dilbert express to you regarding his understanding of the English you were speaking?
A. None.
Q. After being advised of his *Miranda* rights, what, if anything, did Mr. Reid-Dilbert do in response?
A. Initially, when he was advised of his *Miranda* rights, he was given a copy so he can review. After reviewing and reading the *Miranda* rights, he indicated that he wanted to speak to an attorney.
Q. And after advising that he wanted to speak to an attorney, what, if anything, did he subsequently say to law enforcement?
A. He -- so the interview was stopped. And then we -- I informed him that at this moment, he would be removed from the interview room and taken to finish his booking procedure. And at that time, he indicated to the agents that he wanted to speak to the agents without an attorney present.

Q. Was any subsequent waiver of his *Miranda* rights signed by him?
A. Yes. He then signed the waiver of rights form.
Q. And this was the form we already spoke about being in Spanish?
A. Yes, sir.
Q. Okay. Let's go through that interview. Did you have any media, anything to assist you in the conducting of this interview?
A. Yes.
Q. What did you have?
A. Prior to initiating the interview with Mr. Reid, we had a video recording of a vessel, a go-fast vessel, that depicted bales of cocaine floating, tied to a line on the side of the vessel and other bales being thrown overboard.
Q. And to your knowledge, was this a video of the vessel that was interdicted for which the defendant was on board?
A. Yes, sir.
Q. Okay. But you weren't personally involved in that interdiction; is that accurate?
A. Yes. That's very accurate.
Q. Okay. And we spent a day and a half watching that video about eight or nine times. I'm not going to show it to you again today; okay?
A. Thank you.

Q. All right. Did you present any portion of that video to Mr. Reid-Dilbert?
A. I did.
Q. What was his demeanor when you presented that video to him?
A. No reaction. He stayed very quiet. No change in his demeanor.
Q. What, if anything, did he say about how he was recruited to get on that vessel?
A. Mr. Reid stated that he had been approached by an unidentified male, and offered five million Colombian pesos to participate in a fishing trip.
Q. Just to be clear, did you say identified or unidentified?
A. Unidentified male.
Q. Okay. In your training and experience, are you familiar with the exchange rate of Colombian pesos to American dollars?
A. I am.
Q. Approximately how much is five million Colombian pesos?
A. At the current rate, it's the equivalent of approximately 1,500 U.S. dollars.
Q. Are you also familiar in your training and experience with the common rate for going on a fishing expedition in Colombia?

A. Yes, I am.

Q. Would you describe that, please, based on your training and experience?

A. Based on my training and experience, and from conducting multiple interviews with fishermen on these vessels, their salary is between --

MR. AMADOR: Objection. Hearsay.

THE COURT: I'm going to sustain the objection.

BY MR. BAEZA:

Q. Let's put aside --

MR. AMADOR: The Court's indulgence.

THE INTERPRETER: Excuse me, Your Honor. We have a technical problem.

(*Brief pause*.)

THE INTERPRETER: Thank you.

THE COURT: Okay. Mr. Baeza.

BY MR. BAEZA:

Q. Do you know, based on your training and experience, how much a fisherman is generally paid to conduct a fishing expedition off the coast of Colombia?

MR. AMADOR: Objection.

THE COURT: Does he know from his training and experience about how much a fisherman is paid?

MR. BAEZA: Yes, Your Honor.

THE COURT: Maybe you ought to establish a

predicate for that, because I would be interested to hear that.

BY MR. BAEZA:

Q. How do you know how much a fisherman is paid to conduct a fishing expedition off the coast of Colombia?

A. I've spoken to many fishermen regarding the going rate for fishing in Colombia.

Q. Is five million Colombian pesos consistent with what you know based on your training and experience?

A. No.

MR. AMADOR: Objection. Hearsay.

MR. BAEZA: I'm not asking for any statement, Your Honor.

THE COURT: I'll sustain the objection. Ask another question.

BY MR. BAEZA:

Q. Where did Mr. Reid-Dilbert say he was going in the Caribbean?

A. He said he was going to the Serrana Banks.

Q. Are you familiar with the location of the Serrana Bank in the Caribbean?

A. I am.

Q. Let's put up Government Exhibit 9, which has been previously admitted into evidence.

Agent Galloza, you have a screen in front of you

with -- of Government Exhibit 9 that has been previously admitted into evidence. Do you see the location of the Serrana Bank, sir?

A. I do.

Q. Is that consistent with your knowledge of the location of the Serrana Bank in the Caribbean Sea?

A. Yes, sir.

Q. What, if anything, did Mr. Reid-Dilbert say after traveling to the Serrana Bank?

A. Mr. Reid indicated that they, after arriving at the Serrana Bank, the experience -- the go-fast had mechanical problems with the go-fast engines. They would not start.

Q. As a result of the mechanical problems with the go-fast engine, what, if anything, did Mr. Reid-Dilbert claim was done with the engines?

A. He indicated that the engines were tied to a line and dropped in the ocean and used as anchors.

Q. After dropping the engines to use as anchors, how long did Mr. Reid-Dilbert say that the crew was adrift at sea?

A. Approximately five to six days.

Q. Were -- excuse me. Did you and your co-agent ask any questions about the suspected jettisoning of cocaine in this case?

A. Yes, we did.

Q. What, if anything -- withdrawn.

Did you ask him specific questions about the objects seen in the video that you presented to him?

A. Yes.

Q. What, if anything, did Mr. Reid-Dilbert say those objects were?

A. He indicated that they were bales of cocaine.

Q. Did he say anything about how he knew those were bales of cocaine?

A. Yes, he did.

Q. What did he say?

A. He indicated that he recognized that they were bales of cocaine by their packaging.

Q. What, if anything, did he say about what kind of fishing was being done at the Serrana Bank?

A. He said that they were going to go there to fish and dive for conch.

MR. BAEZA: No further questions.

THE COURT: All right. Mr. Amador.

MR. AMADOR: Thank you.

CROSS-EXAMINATION

BY MR. AMADOR:

Q. Agent Galloza, he also told you that he did not know that there were any drugs on that vessel; correct?

A. Yes.

Q. And he also told you that he didn't know that there

were any drugs on that vessel until he saw people throwing things off the vessel; right?

A. That's correct, sir.

Q. And that he didn't know that there was any cargo on the vessel until they started throwing the objects off the vessel?

A. Correct. Yes, sir.

MR. AMADOR: I have nothing further.

THE COURT: Mr. Dee, any questions?

MR. DEE: No, Your Honor. No questions.

THE COURT: Mr. Brunvand?

MR. BRUNVAND: No, thank you.

THE COURT: Mr. Baeza?

MR. BAEZA: No redirect, Your Honor.

THE COURT: Thank you, sir. You may step down.

You may call your next witness.

MR. BAEZA: The United States calls Special Agent John Bottone.

THE COURT: Sir, if you will, come forward to be sworn.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes, I do.

THE COURTROOM DEPUTY: Please have a seat in the witness box.

THE WITNESS: Thank you.

THE COURTROOM DEPUTY: State your name, and spell your last name for the record.

THE WITNESS: John Bottone, B-o-t-t-o-n-e.

THE COURT: Mr. Baeza.

MR. BAEZA: Thank you, Your Honor.

JOHN BOTTONE,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MR. BAEZA:

Q. Good afternoon, sir.

A. Good afternoon.

Q. Would you kindly tell the jury your occupation, please.

A. I'm a special agent with the Coast Guard Investigative Services.

Q. How long have you been in law enforcement in general?

A. Approximately 30 years.

Q. How long have you been in federal law enforcement?

A. Since 2002. February 2002.

Q. So from approximately 1989 to the present?

A. Yes, sir.

Q. What were you doing from 1989 to 2002?
A. I started out as a customs inspector with the U.S. Customs Service at JFK Airport in New York City. I left there in October of 1990, where I went to work for the New York City Police Department. I retired from the New York City Police Department in December of 2001, and I retired as a detective in the intelligence division.

From there I went to the United States Attorney's Office in the Southern District of New York -- I'm sorry, from the New York PD, I went to the Federal Air Marshal Service. And I was a federal air marshal from that time until January of 2004.

At that point, I was hired by the Southern District of New York, and I was hired as a criminal investigator in the Southern District of New York. And I stayed there until January 2007, when I came to work for the Coast Guard Investigative Service.
Q. And to be clear, the Southern District of New York, that's the federal district that encompasses Manhattan, the Bronx, and a couple of areas north of New York City?
A. Yes, sir.
Q. Okay. Are you assigned to any particular groups while a federal agent here in Florida?
A. Yes, I am.
Q. What are you assigned to?

A. I'm assigned to the Panama Express Strike Force here in Tampa.
Q. And how long have you been a Panama Express Strike Force agent?
A. I got assigned here in October of 2018.
Q. Would you describe your duties and responsibilities with the Panama Express Strike Force in relation to your role as a special agent.
A. Sure. Part of my job is to conduct transnational narcotics smuggling investigations for the Coast Guard and for the strike force.
Q. And in the course of those duties and responsibilities, did you have an occasion to conduct an interview of a man named Jorge Ramon Newball-May on or about December 6th of 2018?
A. Yes, sir, I did.
Q. Please take a moment to scan the courtroom, and let me know if you see him.
MR. BRUNVAND: Stipulate, Your Honor.
THE COURT: All right.
MR. BAEZA: We will move on, then.
BY MR. BAEZA:
Q. Is there a protocol in the Panama Express Strike Force for the conducting of post-*Miranda* interviews?
A. Yes.

Q. And would you describe what that protocol is for the jury, please.
A. So when -- when they arrive here in Tampa at our facility, we process them, you know, for their arrest. And part of the processing is to conduct a post-arrest interview as the first step as part of the process.
Q. And during the course of that interview, are they also advised of their rights to remain silent and their right to an attorney?
A. Yes, sir.
Q. Are they also advised that they can decline the recording of the interview?
A. Yes.
Q. Did you follow all of those protocols in this case?
A. Yes, I did.
Q. And do you speak Spanish, sir?
A. Yes, I do.
Q. Would you describe your experience with speaking Spanish?
A. I'm -- by nationality, I'm half Italian and half Puerto Rican. So my last name is Italian and my mother's maiden name is Hernandez. I grew up speaking Spanish.
Q. Okay. And what language was this interview conducted in?
A. Spanish.

Q. Did you have any trouble understanding the Spanish that was being spoken during the course of this interview?
A. No, sir.
Q. Did Mr. Newball-May express any difficulty in understanding the Spanish you were speaking?
A. No, sir.
Q. Were you joined by a second agent during the course of this interview?
A. Yes.
Q. Were you both in the interview room the entire time in conducting this interview?
A. Yes.
Q. Were you both speaking Spanish with Mr. Newball-May?
A. Yes.
Q. Did Mr. Newball-May have any difficulty understanding the Spanish spoken by the co-agent?
A. No.
Q. After being advised of his constitutional right to remain silent, what, if anything, did Mr. Newball-May do in response?
A. He provided a statement.
Q. Okay. And let me backtrack. Is there any form provided to a defendant who waives their right to remain silent?
A. Yes.

Q. Did Mr. Newball-May sign that form?
A. Yes, he did.
Q. And with respect to the recording of the interview, what, if anything, did Mr. Newball-May elect to do?
A. So they have an opportunity to have it recorded or not recorded. If they decide not to have it recorded, we have them sign a declination, which is a form that he signed.
Q. Let's discuss some of the statements Mr. Newball-May made to you.
A. Yes, sir.
Q. Where in Colombia did Mr. Newball-May say that he departed from?
A. He said they departed from Cartagena, Colombia.
Q. Okay. What, if anything, did Mr. Newball-May say about where he was going on this trip?
A. He said when they left Cartagena --

THE COURT: Let me interpret you. He's asking about a particular witness. So he's asking -- you keep using the word "they." Would you answer?

THE WITNESS: Yes, Your Honor. I apologize.

BY MR. BAEZA:

Q. We're speaking only about Mr. Newball-May.
A. Yes.
Q. What, if anything, did he say about where he was going on this trip?

A. He said he was headed to Ochoa Serrano to go conch fishing.
Q. Ochoa Serrano, do you know that place to be the Serrana Bank?
A. Yes.
Q. Up on the screen is Government Exhibit 9. Do you see the Serrana Bank depicted on Government's Exhibit 9?
A. Yes.
Q. Based on your training and experience, is that a true and accurate reflection of where the Serrana Bank is located in the Caribbean?
A. Yes.
Q. Did Mr. Newball-May say what the purpose was for him being at the Serrana Bank?
A. Yes. He said that he was going to go there to go conch fishing. They were going to go diving -- he was going -- excuse me, he was going to go diving for conch.
Q. After diving for conch, where did Mr. Newball-May say he went?
A. He said he was heading to San Andres because -- I'm sorry.
Q. And do you also see San Andres and Providencia on Government Exhibit 9?
A. Yes.
Q. Is that a fair and accurate depiction of where San

Andres and Providencia are located?

A. Yes.

Q. So after leaving the Serrana Bank and going south to the San Andres Island, did Mr. Newball say what happened to the vessel?

A. Yes. He said that en route between Serrana Bank and San Andres, that he had run out of fuel and his vessel became disabled.

Q. After the vessel had been disabled, how long did he say he was at sea?

A. He said he was disabled for approximately six days.

Q. Did he say anything about whether there was conch on board?

A. Yes.

Q. Did he make any statements about seeing any planes in the sky?

A. Yes.

Q. What, if anything, did he say that he did in response to the plane being seen?

A. He said that when he first saw the plane, he thought it was a Colombian Coast Guard plane.

Q. Okay. And what, if anything, did Mr. Newball-May do in response to seeing the -- what he believed to be the Colombian Coast Guard plane?

A. He said that the Colombian Coast Guard fines the

fishermen for having conch illegally. So when he saw the plane and he believed it to be a Colombian Coast Guard plane, he decided to -- he took a rope, and he had sacks of what he said was conch. He said he tied the sacks with about 15 to 17 sacks to a line, and then tied them to the engines. And it was two sets of 15 to 17 sacks, and they were tied to each engine and they were all thrown overboard.

Q. Okay. So in aggregate, he said 15 to 17 per engine; right?

A. Yes, sir.

Q. Are you aware of how many engines he was referring to?

A. He said there were two engines.

Q. Okay. So is it fair to say that, according to Mr. Newball-May, he was involved in throwing over between 30 and 34 bags of conch?

A. Yes, sir.

Q. And then tying those to an engine to sink them?

A. Yes.

MR. BAEZA: No further questions.

THE COURT: All right. Mr. Brunvand.

MR. BRUNVAND: No questions. Thank you.

THE COURT: Mr. Dee, any questions?

MR. DEE: No, Your Honor, no questions.

THE COURT: Mr. Amador, any questions?

MR. AMADOR: No, Judge, I do not.

THE COURT: Thank you. You may step down.

THE WITNESS: Thank you, Your Honor.

THE COURT: You may call your next witness.

MR. DERENZO: United States calls Lieutenant Commander Jeremy Montes.

THE COURT: Sir, if you will, come forward to be sworn.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm under penalty of perjury that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE COURTROOM DEPUTY: Please have a seat in the witness box.

Please state your name, and spell your last name for the record.

THE WITNESS: Jeremy Montes, M-o-n-t-e-s.

THE COURT: Mr. DeRenzo.

MR. DERENZO: Thank you, Your Honor.

JEREMY MONTES,

having been first duly sworn by the Courtroom Deputy, testified as follows:

DIRECT EXAMINATION

BY MR. DERENZO:

Q. Good afternoon, sir.
A. Good afternoon.
Q. Would you introduce yourself to the jury, and tell them what you do for a living.
A. Good afternoon. My name is Lieutenant Commander Jeremy Montes. I'm an officer in the United States Coast Guard, currently stationed at the 7th Coast Guard District Office of Law Enforcement in Miami, Florida.
Q. Before we get to your current unit and what you do there, could you tell the jury essentially how you got to your current position.
A. I attended the Coast Guard Academy from July of 2001 until May of 2005. I graduated with a Bachelor of Science in marine environmental science, with a focus on oceanography and chemistry.

From there, I was stationed on board the Coast Guard Cutter CAMPBELL, stationed in Portsmouth, New Hampshire, conducting law enforcement in the north Atlantic and the Caribbean, including three patrols down into the District 7 AOR.

From there, I was transferred to the Coast Guard Cutter AQUIDNECK, which was deployed to Iraq in support of Operation Iraqi Freedom. I was the operations officer of the ship, in charge of navigation and law enforcement aspects of what we were doing over in the Arabian Sea.

Following that, I was stationed as the Commanding Officer of the Coast Guard Cutter CHINOOK, 87-foot patrol boat, in New London, Connecticut, where we primarily did search and rescue and fisheries law enforcement in New England.

I then spent four years at the Coast Guard Academy teaching marine environmental -- excuse me, not marine environmental science -- nautical science, which is our professional maritime studies branch, which we teach the cadets navigation and seamanship in preparation of their commissioning and eventually going out into the Coast Guard.

After that, I was the operations officer on the Coast Guard Cutter TAMPA, where I was in charge of all the law enforcement missions, as well as the safe navigation of the cutter.

And then following that tour, I was stationed at District 7 down in Miami, where I've been for the last three years.

Q. Sir, you mentioned the District 7 AOR. What does AOR mean?

A. AOR is area of responsibility. District 7's extends from the South Carolina/North Carolina border down, including Georgia and a majority of Florida, all the way up the Gulf Coast up to the Panhandle, essentially.

And then that area also extends down to Puerto

Rico and the U.S. Virgin Islands for domestic waters, and also includes international waters all the way down to Central and South America. So we are in charge of the entire Caribbean Sea.

Q. During your studies at the U.S. Coast Guard Academy, you mentioned that you had an emphasis in oceanography; is that right?

A. Yes.

Q. What is that?

A. So there are three options in the marine science degree program, biology, oceanography and chemistry. We're required to take two of them, and I decided on oceanography and chemistry. Oceanography being kind of the macroscale look at what happens in the ocean with the interaction between winds and water, ocean currents, tides, you know, kind of the -- not so much regarding the fish or the chemical makeup of the ocean, but more of how the ocean moves and what its purpose is in, you know, kind of how the world exists.

Q. And how much of your Coast Guard career since you graduated from the academy has involved those particular things? The drifts of the currents and winds and things of that nature?

A. I have spent seven years of my career -- of my 14-year career afloat conducting missions on board Coast Guard cutters, of which that knowledge was directly relatable to

the conduct of my job. In particular, when you're piloting a ship, you've got both internal -- I compartmentalize it into two different factors; you've got internal and external factors affecting your ship.

So the internal ones are the propulsion. So you've got, you know, your engines are pushing you forward or back. Your rudders, whether they're turning left or right and they're directing your ship to turn left or right. So those are things that are directly under your control, so that's why I think of them as internal.

External factors being your wind and then the currents, whether those are ocean currents when you're in open ocean, or they're tidal currents when you're in a waterway like Tampa Bay. So the knowledge of those factors is directly relatable to driving the ship because particularly when you get into -- we call them restricted water transits, when you're in areas where you're close to hazards, coming into ports, you have to pay particular attention to those things as it affects the safety of the ship as you're attempting to moor or anchor up in shallow water.

Q. During your time at sea, have you either been qualified or tasked with navigating or driving the ship?

A. Yes. My tours, actually every single one of my float tours, I was either directly responsible for or reported

directly to the person who was responsible for the safe navigation of the vessel, or was the commanding officer who is overall in charge of the vessel.

So additionally to that, on my tour on TAMPA, I completed all qualification requirements and am certified as a navigator, which is a qualification that both the U.S. Coast Guard and the U.S. Navy kind of maintain together.

Q. And so in performing those responsibilities you just described, I take it from your testimony you had to be -- you're daily using your knowledge of currents and winds and how they affected your vessel?

A. Yes. In the conduct of my job, I both daily used it and also daily used my knowledge to teach and instruct people who are starting off in our organization to pay attention to these things and factor those into their decision-making.

Q. Where did that take place?

A. On board all of my ships. As soon as you get qualified, you've always got the next crop of people coming up behind you who are also working on their qualification. And then I also did more of that while I was teaching at the Coast Guard Academy, where I instructed the cadets on slowly breaking it down into smaller chunks to teach them kind of the elements of everything that would affect their ship while they're out there in a classroom environment.

Q. And whether you're navigating a ship or perhaps in your

current job at Coast Guard District 7, where would you find that information, the currents in a particular area or prevailing winds?

A. There is also often many tools that are available. The primary one that I use for ocean currents are some of the small scale or large area charts, nautical charts that are available often note on them what the ocean currents will be doing in that area.

There is also tide tables and tidal current tables available for planning out more of the -- again, the restricted waters, the waterways close to, you know, places where you've got more tidal current things. So I've used those, and then winds-wise, just a general understanding of the trade winds.

Q. Let's say way out in the ocean, where would you look for the prevailing currents, for instance?

A. I would look on the open ocean charts.

MR. DERENZO: May I approach the witness, Your Honor?

THE COURT: You may.

BY MR. DERENZO:

Q. Sir, I've handed you what's been marked for identification as Government's Exhibit 8. Take a look at that, and just look up when you're done.

Do you recognize Government's Exhibit 8?

A. I do.
Q. How do you recognize it?
A. This is Chart 400. It's a chart that I use on a daily basis in my current job, and I've used frequently in the past for open ocean transit planning.
Q. Okay. Is that the same kind of nautical chart you were talking about where one might find the currents or perhaps water depth in a particular area?
A. Yes.
Q. And does Government's Exhibit 8 for identification, fairly and accurately depict that chart that you just referenced that you use on a daily basis?
A. Yes.
Q. And looking at Government's Exhibit 8, other than perhaps the size, is there anything different about that?
A. No.

MR. DERENZO: Your Honor, I move to admit Government's Exhibit 8 for identification as Government's Exhibit 8.

THE COURT: Any objections?

MR. DEE: No objection, Your Honor.

THE COURT: Received into evidence Government's Exhibit 8.

(*Government Exhibit 8 received in evidence.*)

MR. DERENZO: Bring up Government's Exhibit 8.

BY MR. DERENZO:

Q. Okay. On that monitor in front of you, sir, you should see what's now been admitted as Government's Exhibit 8. And what exactly are we looking at here?

A. This is a nautical chart of the Caribbean Sea, the Gulf of Mexico, and a portion of the North Atlantic Ocean.

Q. Okay. And what are those -- perhaps we could zoom in on the bottom left-hand corner. What are those lines and numbers we see along the horizontal and vertical axis?

A. Those are lines of latitude for the horizontal and lines of longitude for the -- excuse me. Lines of latitude for the vertical and lines of longitude for the horizontal.

Q. And what do we use that for?

A. It's a method that was developed in order for us to identify a location on the Earth.

Q. Okay. So with a given latitude and longitude, we can figure out on a map where we're at?

A. Absolutely.

Q. Okay. And we can zoom out from there.

And what region are we looking at?

A. The Caribbean Sea. The chart is titled the West Indies, but it's the Caribbean Sea, the Gulf of Mexico and a portion of the North Atlantic Ocean.

Q. And are you familiar with this area?

A. Yes.

Q. Have you ever sailed it on board a Coast Guard vessel?
A. Yes.
Q. How many times?
A. Seven patrols on two different ships.
Q. Okay. I'm going to zoom in just a little bit on a portion of the map -- the chart, excuse me.

Do you see the Serrana Bank located in this portion?
A. I do.
Q. Perhaps circle it on that screen in front of you. You can use that touch screen.
A. (Witness complies.)
Q. Okay. You can zoom back out.

MR. DEE: I think one of the jurors had his hand up.

THE COURT: Yes?

THE JUROR: I need to use the rest room.

THE COURT: Good time. Let's take an afternoon break. We'll be in recess until 3 o'clock. You're welcome to walk around. Please don't discuss the case. Leave your pads on your chairs.

COURT SECURITY OFFICER: All rise for the jury.

(Jury exits courtroom at 2:46 p.m.)

COURT SECURITY OFFICER: Please be seated.

THE COURT: All right. Sir, you may step down.

Please don't discuss your testimony. We're in recess.

(Recess taken from 2:46 p.m. to 3:06 p.m.)

COURT SECURITY OFFICER: All rise.

This Honorable Court is now in session.

THE COURT: If I could get one of you to get the witness, and Mr. Fitchett -- sorry, I didn't see you. Take a seat.

COURT SECURITY OFFICER: All rise for the jury.

(Jury enters courtroom at 3:06 p.m.)

COURT SECURITY OFFICER: Thank you. Please be seated.

THE COURT: Mr. DeRenzo.

MR. DERENZO: Thank you, Your Honor.

BY MR. DERENZO:

Q. If you could, zoom in on Government's Exhibit 8 from, say, just north of Jamaica to include Central America and Colombia.

Lieutenant Commander Montes, are you familiar with the prevailing winds and currents in this area of the Caribbean?

A. Yes.

Q. And could you describe in general terms which direction they show?

A. To start with the ocean currents, it's -- the equatorial current that comes from the Atlantic Ocean comes

through the Caribbean, and then as it approaches this portion of the Caribbean, it kind of breaks off a little bit. A majority of the current will come in this direction and flow over the Nicaraguan Rise, go up towards the Yucatan Peninsula, and then continue its way along the East Coast of Florida as the Gulf Stream, and then back into the North Atlantic Ocean.

Another portion of the current, a smaller amount of it, won't actually be able to make it through there due to the volume of water that's moving. And it actually kind of follows a current down here where you get a small kind of eddy or -- not a counter current but more of an eddy that develops down in the Caribbean Basin there.

Q. And in this portion of Government's Exhibit 8, are you able to see the Serrana Bank and, if so, can you circle it?

A. Yes. Serrana Bank is located right there (indicating).

Q. Where is San Andres Island?

A. San Andres Island is -- I believe it's this island down here (indicating).

Q. And where is Jamaica?

A. Jamaica is up here (indicating).

Q. And at Coast Guard District 7, what are your day-to-day responsibilities?

A. My day-to-day responsibilities include the operational level decision-making for all law enforcement cases that

happen within the District 7 area of responsibility. Some collateral duties or additional duties that I have also include the live marine resources officer where I'm in charge of the fisheries law enforcement program for District 7, and I also work with our international -- or as part of our international affairs division.

Q. So if a, for instance, go-fast vessel suspected of engaging in narcotics trafficking was interdicted in the Caribbean, is that something you would have visibility on in your current duties?

A. Yes.

Q. Are you aware of the vessel interdiction that occurred on or about December the 1st, 2018?

A. I am.

Q. And do you know the approximate latitude and longitude where it was interdicted?

A. Let me see if I can -- do you mind if I clear off the markings I made?

Q. Whatever would aid you in your testimony.

A. Approximately that vicinity up there (indicating).

Q. Okay. And so what is there -- I see like a blue region just to the north of there. What is that?

A. Just to the north and east of that position is Pedro Bank.

Q. And -- okay. And so in that area of the Caribbean,

generally speaking, which directions do the currents blow?

A. Actually, just to help amplify, can we zoom in and include -- this is kind of a -- yeah, that will do.

So again, the approximate position of interdiction occurred roughly where that red dot is. And part of the chart markings on here, there's a lot of numbers and a lot of symbols. One of the chart markings I want to kind of highlight is this one right here. It's kind of a little bit difficult to see, but there's what could be described as a squiggly line with an arrowhead, and then there is a 1-1.5KN. And what that is denoting is the approximate ocean current direction and speed.

So in this location, along that vector, a mariner is reasonably expected to see a one to one and a half knot current to be occurring in that location. And for clarification, a knot is about 1.1 mile an hour. So we're talking about a mile, mile an hour to about 1.5 miles an hour.

Q. And so all things being equal, how is that -- the current in that area going to affect the vessel that's, say, disabled?

A. If a vessel is disabled in this area, there is only going to be a -- coming back to what I was talking about before, there's only going to be two external factors, which are the currents and the wind. So given the known of the

equatorial current moving through the Caribbean, and in this particular part of the Caribbean, moving in a northwesterly direction, the currents would push that vessel to the west or northwest, depending on where they're at.

And then additionally, on top of that, the winds, the other factor that's going to be affecting them, the trade winds in this location blow approximately -- depending on the day, they're called northeasterlies because they come from the northeast, so they're going to be blowing out of approximately northeast to east.

Q. Okay.

A. Which would -- sorry to interrupt, but the resultant force from that would be to the southwest or west, because you can think of where the wind is coming from, it's going to push you in the opposite direction of that.

Q. And one of your missions in the Coast Guard is search and rescue; right?

A. Yes.

Q. And I'm sure on occasion you have to find a vessel that's disabled and adrift at sea?

A. Yes.

Q. What are the kinds of things in particular, like in District 7, for instance, that you're going to have to take into account in figuring out where this vessel might be, if you know where it came from?

A. The factors we take into play mostly are the construction of the vessel, so whether or not it's a small vessel with not a lot of -- not a lot of draft, which is underwater portion of the hull or above water draft or -- not above water draft, but freeboard. The weight of the vessel and all of those -- that kind of -- the description of the vessel and its construction will help aid us in determining how much the environmental conditions are going to impact a vessel as it's out on the high seas.

Q. And why is it -- when you say freeboard, just to clarify for the jury, is that the area between, say, the waterline and the top of the hull of the boat?

A. Yes.

Q. Okay. Why is that important?

A. Basically everything above the waterline, we call it sail area, so the amount of the ship that's exposed to the -- exposed to the wind is the sail area. So that's going to denote how much effect the wind is going to have on the vessel. So it's kind of like aerodynamics. A small aerodynamic car is a lot easier to -- you know, it's going to be affected less by the wind than, say, a tractor-trailer would be.

Q. Okay. So, say, in a small shallow draft vessel, most of the freeboard above the water, what are the predominant forces that will affect how far and what direction the vessel

will drift?

A. A majority of the -- well, both the currents and the wind will have an effect, but the winds will affect a lightweight vessel that doesn't have a lot of hull down under the water, much more than a deeply ladened vessel. So a lightweight, small vessel will be pushed by both, but the wind will have a stronger effect on it.

Q. And in this part of the world there that we're looking at, labeled on this chart, Exhibit 8, as the Nicaraguan Rise, what are the prevailing winds? What is that direction?

A. The trade winds, again, are coming roughly this direction -- sorry for the pointer -- to this direction (indicating). So anywhere in between there.

Q. And that point you applied at the approximate location of the vessel interdiction on or about December the 1st of last year, are you able to tell from this chart what the water depth is in that area?

A. Yes. All the numbers that are noted, for instance, the closest number I would estimate to this, it would be possibly either the 1298 or the 1114 here. And on the margins of the chart, and in particular you can kind of see it up here, the depth for this chart is labeled in meters. So those numbers denote somewhere between 1114 and 1298 meters, or over 3,000 feet in the water, for a very simple number.

And I can confidently say over 3,000 feet of water

because this line right here where it starts out with the 1,000 and kind of follows this contour is called a depth contour. So everything within that depth contour is greater than 1,000 meters.

Q. Very deep?

A. Very deep.

Q. Okay. If we could, zoom back out. Perhaps zoom into the area similar to Government's Exhibit 9.

So again, Lieutenant Commander Montes, can you -- just for the jury's frame of reference, can you point out the approximate -- I know this is a smaller scale here -- the approximate location where the vessel was interdicted?

A. Up here right by the A in Nicaraguan Rise.

Q. And based on what you know about currents, navigation, winds, particularly in this region in the Caribbean Sea and your experience in sailing there, are you able to estimate approximately in six days' time where that vessel would have had to start out to arrive at that location if it were adrift during that period?

A. If a vessel was adrift for six days, without any propulsion or means of moving them, they were just subjected to the winds and the currents, I would estimate in the Caribbean region where they were at and where they ended up that they would have to start about, I would say, 160 to 180 miles to the east of that location.

Q. How do you get to that conclusion?

A. Given the construction of the vessel and the amount of wind and current available -- or not available, but that would be, you know, affecting the ship or the vessel at that point, I would estimate that the vessel would drift at approximately a knot to a knot and a half through this region during that time period. And doing that math over six days would have them a couple of hundred miles to the east. And I know it's roughly this position because I kind of did a little bit of that math and tried to figure out exactly where that would be because I don't really have a good distance scale on this chart right now.

Q. And, obviously, the boat might have moved a little bit here or there. But approximately that's where it would be six days prior, based on the winds and currents?

A. Yeah. That's a good estimated position.

Q. Okay. And approximately, let me get down to the -- you know, my mission here, but approximately how far is that location, your estimated time of breaking down, essentially, from the Serrana Bank?

A. How far is the estimated position from Serrana Bank of where they would have started?

Q. Yes.

A. Okay. So just to clarify, Serrana Bank, again, is down here (indicating), and this distance is about 300 nautical

miles.

Q. Okay. If the vessel were disabled, say, near the Serrana Bank and not the position you just demonstrated to the jury, based on what you know about the prevailing winds and currents in that area, are you able to estimate where that vessel would drift in six days' time?

A. Yes. Knowing that you've got more of a southerly current pushing it in this direction, due to Central America kind of getting in the way of where the water wants to move, and the fact that your winds would be coming out of the east, I would estimate that the vessel would be pushed in a west, southwesterly direction, probably at about the same speed, about a knot would be the same speed that they would be going without any propulsion.

Q. So in six days, in your estimation, where would the vessel be?

A. Just to do some -- probably within reason, somewhere in that region (indicating).

Q. Near the shores of Nicaragua?

A. Shores of Nicaragua, correct.

Q. How far is that location, approximately, from where the vessel interdicted on December the 1st of last year was interdicted by the Coast Guard?

A. Approximately 300 miles, again.

Q. And let's just say -- let's ask you one more

hypothetical here. If a vessel were on its way back to San Andres Island, can you circle that again, San Andres Island?

A. Here (indicating).

Q. And somewhere in between there, the vessel ran out of gas and became disabled, how would that affect where that vessel ended up?

A. I would say they would follow a similar path. If they had broke down on Serrana Bank or anywhere between Serrana Bank and San Andres Island, they would still follow that west-southwesterly direction further drift.

Q. So potentially you could be pushed farther south than that circle you drew right next to Nicaragua?

A. Yes. If the location of where the vessel became disabled was further south than not, starting on the Serrana Bank, and obviously with that starting position being further south, yes, they would end up even further south.

Q. So based on what you know about winds and currents and this area of the world, what is the likelihood that a vessel broke down around Serrana Bank could drift for six days and end up at that point approximately a hundred nautical miles off of Jamaica?

A. Based off my knowledge of the winds and currents in this region, I think it would be impossible to break down on Serrana Bank and end up at the location, you know, up on the Nicaraguan Rise to the north and to the east of where they

broke down.

Q. Thank you, sir.

MR. DERENZO: May I have just a moment, Your Honor?

THE COURT: You may.

MR. DERENZO: I tender the witness, Your Honor. Thank you.

THE COURT: All right. Mr. Dee?

MR. DEE: I have no questions, Your Honor.

THE COURT: Mr. Brunvand?

MR. BRUNVAND: No. Thank you.

THE COURT: Mr. Amador?

MR. AMADOR: No questions.

THE COURT: Thank you, sir. You may step down.

THE WITNESS: Thank you, Your Honor.

THE COURT: You may call your next witness.

MR. DERENZO: Your Honor, the United States rests.

THE COURT: Okay. Ladies and gentlemen, we have a matter to take up outside of your presence. And so I'm going to ask Mr. Fitchett to conduct you back to the jury room. I think it will probably take us about 15 minutes to do what we need to do, so you're welcome to walk around if you would like to walk around. Just be back in the jury room at 3:40. Leave your pads on your chairs.

COURT SECURITY OFFICER: All rise for the jury.

(Jury exits courtroom at 3:25 p.m.)

COURT SECURITY OFFICER: Please be seated.

THE COURT: Okay. The government has rested its case. So I'm going to ask the defendants one by one regarding any motions they might like to make to include a motion for judgment of acquittal. So Mr. Dee, I'll start with you.

MR. DEE: Thank you, Your Honor. May I approach the podium?

THE COURT: You may.

MR. DEE: Thank you.

Your Honor, at this time, based upon the government's close of the case, and on behalf of Mr. Rudolph Meighan, I would make a motion for judgment of acquittal pursuant to Rule 29, Federal Rules of Criminal Procedure. It is my position or our position that the government has closed, and that the evidence at this point in time is insufficient to sustain a conviction.

The government has, we believe, failed to prove the necessary elements to show that Mr. Rudolph Meighan knowingly, willfully or intentionally conspired with anyone to distribute or possess with intent to distribute five kilograms or more of cocaine. And, also, that he failed to prove -- or they failed to prove that he knowingly and intentionally possessed with an intent to distribute a controlled substance, which involved five kilograms or more

of a mixture of cocaine.

It's our position, Judge, that, one, the government has failed to present any evidence of any quantity of cocaine; that the government has, in fact -- the only cocaine evidence before the Court is ionscan testing that the expert witness identified that the actual quantity that's on the swabs is destroyed, and there is no cocaine remaining.

So I would argue that they have failed to provide any evidence as to any quantity of cocaine at this time.

Additionally, the conspiracy count goes to whether or not two or more individuals have agreed to commit some act, some illegal act. And we have no testimony before the Court as to any agreement between any of the three individuals here on trial or with anyone else to commit any criminal conduct. Thank you, Your Honor.

THE COURT: All right. What I would like to do, I know who's addressing this on behalf of the government, but I would like to hear from all of the defendants' attorneys, and then I will let you all address the arguments.

Mr. Brunvand.

MR. BRUNVAND: Your Honor, I would ask if I could just adopt. The argument would be the same on behalf of my client as far as the Rule 29, and I would also renew the motion in limine.

THE COURT: Mr. Amador?

MR. AMADOR: Thank you, Judge.

Judge, again, we would, also, on behalf of Calbot Reid-Dilbert, ask that you grant a judgment of acquittal based on Rule 29 because the government has failed to establish several of the elements required for a conviction under 46 U.S.C. 7503.

Judge, I don't think there's been any evidence that the defendant knowingly possessed cocaine. I don't believe there's been any evidence that the defendant intended to distribute cocaine. And I would argue that the government has not presented any evidence of the weight of the cocaine, other than Petty Officer Bomentre that said it was microscopic.

So based on that, I would ask that you grant a judgment of acquittal. And I would adopt, as well, the arguments made by Mr. Dee. Thank you.

THE COURT: Okay. Who is going to address this?

MR. DERENZO: I will, Your Honor.

THE COURT: Mr. DeRenzo, no surprise here, the motions go primarily to proving that it was cocaine and the amount of cocaine, which would also go to the intent to distribute.

And, obviously, there was -- not obviously, but there was also an argument that there was no evidence that there was a conspiracy or an agreement between or among the

people on the boat or the defendants on trial.

MR. DERENZO: I'll address the issue of the identity of the substance first, Your Honor. Of course, the standard here is taking all of the evidence in the light most favorable to the government. At this juncture, we've presented -- in large part, the video from the C-130 is probably the best evidence, and then we've had several Coast Guard witnesses come in and provide lay opinion testimony based on their pretty extensive experience in counter-narcotics operations. And I think all but one witness testified that the only drug that they had familiarity with is bales of cocaine.

And essentially, this case is very much like *United States versus Williams*, which we've talked about in the context of the motion in limine with respect to the ionscan evidence. But in that case, they also were not able to locate the contraband and, similarly, they had video from the -- it was actually, I think, clear video, some infrared video of bales, and they provided similarly lay testimony. And in that case, the Eleventh Circuit said that the evidence was sufficient on appeal.

The ionscan evidence is kind of a piece of the puzzle. So we -- I think it's probably obvious but, certainly, if you take it in the light most favorable to the government at this point that it's not conch in those bales.

The ionscan evidence tells you what illegal substance is there. So while not definitive, it's certainly a piece of the puzzle in a context of a Rule 29 motion.

Moving to -- and then, of course, with respect to at least two of the defendants, they themselves made admissions with respect to what was there and their knowledge of what it was.

So in terms of the quantity, we've had a number of people testify, Coast Guard boarding team members, Special Agent Ray, about the pretty consistent and typical quantity of a single bale, which would far exceed the threshold amount which we've pled, which is only five kilograms. So a single bale on average is 20. And whether you want to go by the statements provided by Mr. Newball-May about the number of bags of conch, you know, 30 to 34, or you just simply count the bales you see in the video were far in excess of five kilograms, viewing the evidence in the light most favorable to us.

In terms of the knowingly possessing contraband, the best evidence of that is the lies themselves. Again, taking the evidence in our -- the light most favorable to us, those false exculpatory statements show consciousness of guilt. They knew what they were doing and they knew it was illegal and that they, therefore, knowingly possessed not only a controlled substance but, in this case, cocaine.

Intent to distribute, clearly that amount of cocaine is not for personal use. Given Special Agent Ray's testimony about the typical drug flow from Colombia northward and the approximate wholesale value of that quantity of cocaine, that's more than enough to demonstrate the intent to distribute.

In terms of the conspiracy, there are several facts here which demonstrate that in this context. Simply getting on that kind of boat, obviously, the mere presence at the scene of a crime is not sufficient to show a conspiracy. But in this case, we don't have mere presence. We have a lot of exceptional circumstances that are common to boat cases but are not common to other types of conspiracies.

As Special Agent Ray talked about, essentially no innocent bystanders on a drug smuggling go-fast vessel. Your Honor, you saw the video of the northbound go-fast vessel underway with the tarps out, black hull. Additionally, a small area to actually stand on that boat. There's simply no way to be on the boat and not have some knowledge of what's going on. Obviously, we don't have to show a handshake or a conversation of how much they're paid, but this is more than mere presence.

So all of those factors surrounding the trip, the concerted effort to get rid of the contraband and they, you know, went to quite a lot of effort in showing the hour plus

video of what's going on on the boat. You can see several people moving around, picking up bales out of the water, jettisoning for an extended period of time, and then going to all the trouble to actually remove the engines from the vessel and get rid of the contraband. All of that is exceptional evidence to show at minimum that there was an agreement here, and there was some voluntary participation in it.

And so, in sum, we rely on those facts and the Eleventh Circuit's affirming of the conviction based on sufficiency of the evidence in *United States versus Williams*.

THE COURT: All right. Thank you. I'm going to deny the motion as it relates to each of the defendants. As far as the number one, there is no evidence regarding the substance or the bales or whatever was on the video being cocaine. Again, this is a motion for judgment of acquittal. I think the government referred to it, but at this point, I take everything at the -- in the best light of the United States.

We saw a video that had numerous bales strung out from the boat. We had testimony of witnesses who described ways cocaine is packaged when it's transported in this manner, and was consistent with that. We had the ionscan evidence of there being cocaine traces on the boat, as well as on the individual defendants.

I think all of those are sufficient for the jury to find beyond a reasonable doubt that the substance being thrown overboard or the bales being thrown overboard contained cocaine.

As far as the quantity, the verdict form is going to give this jury an opportunity to determine how much cocaine, if they believe it was cocaine, five kilograms or more, 500 grams or more, less than 500 grams. So if they believe it was not cocaine, then there won't be any quantity. But they do have the opportunity to determine if they believe the evidence supports five kilograms or more or not.

I think the evidence has been sufficient to support a verdict of five kilograms or more of cocaine, based simply on the video that we saw and the testimony of the witnesses regarding bales and how much cocaine an average bale contains.

So there certainly, I think, is evidence by which this jury could find the defendants guilty of the possession with intent to distribute five kilograms or more of cocaine.

And the amount of cocaine, if they do determine that, is certainly not for any kind of personal use. And I'm not even sure there is a crime for possession of cocaine while on board a vessel subject to the jurisdiction of the United States.

As far as the conspiracy, and we all know that a

conspirator doesn't have to know everything in order to be a part of the conspiracy. There doesn't have to be any agreement. I think the size of the vessel, the fact that it was four people in a very close quarters, a 30-foot vessel, and the fact that there was a lot of gasoline on the vessel, a lot of gasoline drums and a specific place where the alleged cocaine was stored, I think that just the close proximity, along with the amount of cocaine, is sufficient for a jury to determine there was an agreement.

And I don't think there's been any evidence that anyone removed themselves from the agreement. And, obviously, there were also admissions by at least two of the co-defendants. But I'm going to deny the motion as to each of the defendants.

So that's where we are. Mr. Dee, have you had an opportunity to talk with your client about whether or not he wishes to testify or not?

MR. DEE: Your Honor, he is not going to testify. That is our decision.

THE COURT: Do you have any objection to my inquiring of him?

MR. DEE: No, Your Honor.

THE COURT: Okay. Mr. Meighan, we're about to start the defendant's case. And you have an opportunity and a right to take the witness stand and testify in your own

behalf in this case. You also have a right not to testify, if you choose not to do that. And I will tell the jury they cannot consider that. But the decision is yours as to whether you want to take the stand and testify, tell your story, if you wish to do that.

Have you made up your mind as to whether you wish to testify or not?

DEFENDANT MEIGHAN: I wish not to testify.

THE COURT: And that's your decision?

DEFENDANT MEIGHAN: Yes, ma'am.

THE COURT: Okay. Thank you.

Mr. Brunvand, have you had an opportunity to discuss the pros and cons of testifying with Mr. Newball-May?

MR. BRUNVAND: We have.

THE COURT: And what is his decision?

MR. BRUNVAND: I believe it's still his decision that he does not wish to testify, but I would like for the Court to confirm that with him.

THE COURT: Okay. Thank you.

Mr. Newball-May, could I get you to stand up, please.

I'm going to repeat much of what I just said. But we're about to start the defense case. And so you have an opportunity, you have the right to take the witness chair and testify in your own behalf. You also have the right not to

testify, if that's what you choose to do. But I need to know from you what your decision is.

Do you wish to testify or not testify?

DEFENDANT NEWBALL-MAY: No.

THE COURT: You do not wish to testify?

DEFENDANT NEWBALL-MAY: No, Your Honor.

THE COURT: All right. Thank you, sir.

Mr. Amador, have you had an opportunity to talk about this with Mr. Reid-Dilbert as far as whether he wishes to testify or not?

MR. AMADOR: I have.

THE COURT: And what is his decision?

MR. AMADOR: He will not testify.

THE COURT: Do you have any objections to my confirming that with him?

MR. AMADOR: I do not.

THE COURT: Okay. Mr. Reid-Dilbert, would you stand, please, sir.

Just as I said two previous times, you have the right now to take the stand and testify in your behalf, tell your story, whatever it is you would like to say to these jurors. You also have the right not to testify, if that's what you choose to do.

Have you made a determination or a decision as to whether you wish to testify or do not wish to testify?

DEFENDANT REID-DILBERT: No, I'm not going to testify.

THE COURT: Okay. Thank you, sir. You may have a seat.

All right. Mr. Dee, do you have any other evidence?

MR. DEE: No, Your Honor. At this time, on behalf of Mr. Meighan, the defense would rest, and I would renew my Rule 29 motion.

THE COURT: And, good point. I'll address that in just a minute.

MR. DEE: Thank you.

THE COURT: Mr. Brunvand, do you have any evidence other than --

MR. BRUNVAND: No, Your Honor.

THE COURT: Any evidence?

MR. BRUNVAND: No additional evidence, Your Honor.

THE COURT: All right. Mr. Amador?

MR. AMADOR: I have none. I would rest.

THE COURT: And I should have -- Mr. Brunvand originally raised the issue of renewing his -- or the motion in limine that had been filed in this case, the *Daubert* motion regarding the ionscan testimony, and it was renewed, actually, I think before the witness testified, as well, or evidence came in. But my ruling would be the same on that.

And I'm assuming that everyone wishes to renew their Rule 29 motions.

MR. AMADOR: Yes, ma'am.

MR. DEE: Yes, Your Honor.

MR. BRUNVAND: Yes, Your Honor.

THE COURT: And my ruling would be the same as before. I would deny the motions.

Okay. Let's talk about planning for just a minute. It would be my suggestion, obviously, that it's a little late to start with any closing arguments this afternoon. And so it would be my suggestion that we send the jury home, and they come back at 9:30 tomorrow morning. And we can spend what time we have left to talk generally about the jury instructions and also closing arguments and those kind of things. Does anybody have any objections to just waiting until tomorrow to do closings?

MR. DERENZO: No, Your Honor.

MR. DEE: No, Your Honor.

MR. BRUNVAND: No, Your Honor.

THE COURT: Would anybody have objections in doing closings this afternoon?

MR. AMADOR: Yes.

MR. DEE: Yes.

THE COURT: All right. Let's bring the jury in. I'm going to have to ask you if you rest in front of the

jury.

MR. DEE: Yes, Your Honor.

COURT SECURITY OFFICER: All rise for the jury.

(Jury enters courtroom at 3:45 p.m.)

COURT SECURITY OFFICER: Thank you. Please be seated.

THE COURT: All right. As you heard right before we recessed, the government rested its case.

Mr. Dee, on behalf of your client.

MR. DEE: Your Honor, at this time on behalf of Rudolph Meighan, we would also announce that we rest.

THE COURT: Thank you.

And Mr. Brunvand, on behalf of Mr. Newball-May.

MR. BRUNVAND: We rest, Your Honor.

THE COURT: And Mr. Amador, on behalf of Reid-Dilbert?

MR. AMADOR: We rest, as well.

THE COURT: Okay. Ladies and gentlemen, both sides have rested their cases. And there are two matters remaining, instructions in the law which I will give you. And as I said earlier, I'll give a written set of jury instructions to each of you. We will read them aloud in court, and then you'll be able to take them back to the jury room during your deliberations.

Also, the other thing remaining is the closing

arguments by all of the attorneys involved.

And since it's about ten minutes of 4:00, I anticipate with four people making closing arguments, there is no way that we're going to finish by 5 o'clock today. So I'm going to recess at this time. I'll ask that you return in the morning at 9:30. When you return, as I said, we will have two things remaining in this trial, the closing arguments by the attorneys, the instructions in the law by me. Then you'll go back to the jury room to begin your deliberations.

I'm not quite sure what time that will be tomorrow, but it will be tomorrow. And once you begin your deliberations, obviously, you can take whatever time you need to reach a verdict in this case.

If you are still deliberating at 5 o'clock tomorrow afternoon, and you think there is no way we're going to reach a verdict here, then you're welcome to break apart and come back on Friday morning. So it's not one of those things where we lock you up in the hotel. Although, maybe you would like that. We don't do that.

All right. Do any of you have any questions?

(Unanimous negative responses.)

THE COURT: All right. Then leave your pads on your chairs. Please don't discuss the case with anyone, and I'll see you in the morning at 9:30.

COURT SECURITY OFFICER: All rise for the jury.

(Jury exits courtroom at 3:49 p.m.)

COURT SECURITY OFFICER: Please be seated.

THE COURT: Let's talk just generally about the jury instructions. Most of them are standard instructions, but I do have a couple of questions about some of the ones that were submitted.

I've had instructions submitted by the government. I have instructions that were submitted by Mr. Dee and Mr. Amador. I think you e-mailed us a couple or filed a couple of instructions that I need to talk about, as well.

So I would propose that you let me ask about those instructions that I might have a question about, and maybe you bring up any instructions you might have a question about. I will prepare a draft set and e-mail them to you this evening, along with the draft verdict form. And at 9:30 tomorrow or when I ask you -- I might ask you all to come back about 9:15, we will go over any objections you might have to any of them.

But I do have a couple of questions, and we might as well talk about it now before I prepare a draft set of instructions.

Let me start with the government's instructions. Obviously, when you submitted these instructions, I think you included instructions that, if the defendants took the stand,

we've got a couple of those standard instructions that there's an alternative instruction for when the defendant takes the stand or testifies and when a defendant does not testify. And since the defendants did not testify, I will give those, for example, 2.2, the duty to follow the instructions and presumption of innocence when a defendant does not testify. So I will take those out.

Let me just find the ones I want to ask about. All right. The first one I would like to ask about, Mr. DeRenzo or Mr. Baeza, who wishes to address this, this is the government's instruction, and it's on Page 27 of the submitted instructions, Middle District of Florida basic witnesses.

And I get this in every case. And most of the time, I do not give this instruction unless there's been some suggestions from the defendant, well, where was such and such? And so it would be my -- I mean, we've had a lot of witnesses, so it would be my thought that this is just not a necessary instruction.

MR. DERENZO: I totally understand the Court's position. We did call most of the boarding team, maybe called boarding officer and the interpreter, and so I don't have any case law -- additional case law or anything to support it.

THE COURT: Okay. There may be a -- I mean, I

don't think the defendant is going to make any arguments like where was -- I don't know who they would think was missing, but maybe someone, and I guess I could reconsider that situation. But I just think that's an unnecessary instruction. It's not a standard instruction and I'm not going to give that one.

On Page 31, it says confession or statement of multiple defendants. And it reads, if the government offers evidence that a defendant made a statement or admission to someone after being arrested or detained, you must consider that evidence with great care.

I normally put most of the titles in the instructions. I don't put the instruction number or anything of that sort. But I think it's helpful to a juror to be able to look at a title, but I'm not going to put confession in there. So I might say, statement of defendant, or something like that. Because I don't consider what evidence was produced here regarding any kind of admissions to be exactly confessions. So I might just title it statement of defendant.

The next one I would like to talk about is Page 33. And this is another instruction that I get often. It's not a standard instruction. The government calls it false exculpatory. And the citation for it is Modern Federal Jury Instruction G-11.

And then it says it was a proposed instruction in a case prosecuted by AUSA Jankowski in 1994, I guess, in front of Judge Lazzara. I'm not sure if Judge Lazzara gave it or not, but it was a proposed instruction. This is another instruction that's not on the top of my favorite instructions. This is certainly an argument that the government might make that, you know, the defendant gave a false statement in order to divert suspicion from himself. But it just doesn't seem this is something I ought to be telling the jury, unless the defendant wants this instruction for some reason.

MR. AMADOR: No. I don't think we do.

MR. DEE: No, Your Honor. Unfortunately, I'm stating my age. But I believe I was on that case that they cited, the case with Mr. Jankowski.

THE COURT: You were?

MR. DEE: I believe so.

THE COURT: Did Judge Lazzara give the instruction?

MR. DEE: I have no memory of that, Your Honor. I'm sorry.

THE COURT: All right. Mr. DeRenzo?

MR. DERENZO: Yes, Your Honor. Again, I don't have any Eleventh Circuit law or anything like that supporting it. Obviously, false exculpatory is essential to

this case. And our position was that it was in the middle there, permissible inference, but certainly not a mandatory one that would help the jury in evaluating what to do with those statements.

THE COURT: Okay. And I think you can certainly make whatever argument you might. I just think that's not something that the jury needs help with or that I should be helping them with. It just seems sort of common sense.

Page 39. Now, this is another instruction that is titled Middle District of Florida instruction, and it's got a couple of Middle District or Eleventh Circuit cases -- or one Fifth Circuit case, one Eleventh Circuit case. This instruction was provided by AUSA Koontz. Instruction is routinely given by the judges in Jacksonville. I routinely give this instruction, so you probably ought to change that at the bottom. Especially the fact that it was an instruction provided by AUSA Koontz.

But at any rate, it does -- and we tend to do that, we use and for or and or for and all the time. So it would be my thought that this is an instruction that ought to be given.

Any thoughts, Mr. Dee or Mr. Brunvand or Mr. Amador?

MR. BRUNVAND: I have no objection to it.

MR. DEE: No, Your Honor. I think I've been party

to this instruction.

THE COURT: I give it whenever it's asked, generally.

The offense instruction, I might make a couple of different wording changes, but not much. I know that we do now have a standard instruction on the possession of substance with the intent to distribute while on board a vessel subject to the jurisdiction of the United States.

This follows to some extent -- and I don't have a copy of it up here, unfortunately, but I know that the standard instruction does, which, really, I don't quite understand why it does, but it does have one of the elements that the jury has to determine, is that the vessel is a vessel subject to the jurisdiction of the United States.

However, it's -- there is also Eleventh Circuit case law that says as a matter of law it's my determination, and so I don't know why I would be instructing the jury on telling them it's an element they have to find when I tell them in the paragraph before that I instruct you as a matter of law that the vessel in the case is subject to the jurisdiction of the United States.

So I don't have any great objection to the way you've prepared this instruction.

Aiding and abetting, you charged aiding and abetting in Count Two.

Let's talk about Page 16. Deliberate ignorance as proof of knowledge. And this is a basic instruction, 9.1. And there are some cases that talk about -- you've cited a couple, but there are some more that talk about when this should be given and when it should not be given.

And I know from my own standpoint, I've given it when we've had a defendant testify, and the defendant testifies in such a way that he states about what his knowledge was and sets up a deliberate ignorance defense. Here we've had no testimony from any of the defendants in this case. We've had some admissions regarding fishing or some statements regarding fishing, which the government would title false exculpatory.

But I'm very hesitant to give this, even though in this case, obviously, a defendant's knowledge is an essential part of the crime. I think if the witness testified, got on the stand and had testified that he didn't know what was in those packages or that he didn't know cocaine was on the boat, I would consider giving this instruction. But I'm hesitant to give it under the instructions and based on the case law when the defendants don't take the stand to testify.

Mr. Amador?

MR. AMADOR: Thank you, Judge. With regard to the previous substantive instruction that you said you were going to give as the government has provided it to you, I would --

THE COURT: Wait. That's not on this instruction, that's on a previous instruction?

MR. AMADOR: It is.

THE COURT: Hold that thought. Mr. DeRenzo.

MR. DERENZO: So I think much of the evidence in the case points to the conclusion that, essentially, I can sum it up. Everybody that gets on a drug smuggling go-fast knows what's going on. My initial thought was in including that instruction, specifically because I think it was Mr. Dee's client who provided a -- in our view, a half truth when he talked about what was going on the boat. Oh, I didn't know there were bales until I turned around and saw bales, essentially. And so, although, obviously, he didn't testify, there is some record evidence about a claim, albeit our contention is that it's false, that he didn't know drugs were on the boat.

THE COURT: Okay. I'll think about it. I'm leaning now to not giving it. But I'll think about it.

MR. DEE: Judge, just so I can get my objection in since it was talked about with Mr. Meighan, I would object to this instruction. And my concern is that it talks -- as the case law that is cited in the instruction talks about a defendant purposely contriving to avoid the truth.

If the only statement is something that the government brought out, the defendant did not do anything in

this trial to contrive or do anything to hide the truth. So I would think the government is who brought out that testimony on direct examination, not the defendant. So I would stand by the cases cited saying that it should not be given.

THE COURT: Anybody have anything else?

MR. BRUNVAND: I'm not adding anything, just to indicate that I agree with the Court. I don't believe that this one is appropriate as it relates to this case.

THE COURT: All right. Mr. Amador?

MR. AMADOR: For purposes of the record, I agree.

THE COURT: Okay. Go back now to what you were also -- you were saying.

MR. AMADOR: Judge, in my instructions that I've presented to the Court --

THE COURT: All right. I haven't really had a chance to look at your instructions, only the lesser included ones which I was going to ask you about. But go ahead.

MR. AMADOR: I realize I filed them a little early this morning.

Well, I'm objecting based on the fact that it's not the standard instruction.

THE COURT: That it's what?

MR. AMADOR: It's not the standard instruction from the Eleventh Circuit, because the one that I got was

from the Eleventh Circuit, petit jury instructions. And I understand where the Court is coming from with regard to the first element. But I got the impression from that is that they would have -- not so much that the vessel is subject to the jurisdiction of the United States is an issue, but whether the defendant was on that vessel.

THE COURT: Okay. So what -- the jury instruction that you have submitted is the standard jury instruction?

MR. AMADOR: Yes, it is.

THE COURT: Okay.

MR. AMADOR: So I would ask that the Court give that instruction.

THE COURT: Okay. Well, obviously, I haven't had a chance to look at yours.

Mr. DeRenzo, you have modified this instruction. So you might want to tell me why you have modified it.

MR. DERENZO: Again, this is based on the cases we cited before with respect to the -- our motion to determine the subject matter jurisdiction in this case, whether or not the vessel was subject to U.S. jurisdiction.

My reading of the Eleventh Circuit case law on this, it's pretty explicit, I think they even used the word element. It's not an element of the offense. It's not in the purview of the jury, and so they shouldn't be instructed that that's something they have to even decide.

And so I think ultimately by including that instruction and saying, well, I've just determined this as a matter of law, it's going to be confusing to them. They're going to have to -- I think they're going to be wondering whether or not that's an issue they have to actually decide, if the vessel is subject to U.S. jurisdiction. By excluding it as an element, I think, as the Eleventh Circuit has said, it is the law in this circuit. It's making sure that they're only deciding the things that are in their purview.

THE COURT: I got the standard instruction book, but it doesn't have this instruction it. As I recall, there are four elements in the standard. Do you happen to have that in front of you?

MR. AMADOR: I do.

THE COURT: What's the one besides the jurisdiction?

MR. AMADOR: Defendant knowingly possessed the substance, the defendant intended to distribute the substance, and the weight of the substance was more than -- and it says threshold. But in the first element, what it says is, the first element is defendant was, and in brackets, on board a vessel of the United States, and then the second bracket is on board a vessel subject to the jurisdiction of the United States.

It isn't asking whether the boat was -- the vessel

was subject to the jurisdiction of the United States. It is declaring that it is subject to the jurisdiction of the United States.

I think the issue for that element is whether the defendant was on board the boat.

THE COURT: Okay. Susan, could you realtime Doug and get him to bring me a copy. While I'm seeing if I can get a copy up here, I don't think it's in this book. I think it's --

MR. AMADOR: I used the website, Judge.

THE COURT: And I'll come back to that. One thing I did pull out of your packets that I saw was different, you've got a lesser included, suggestion for a lesser included. For which count and what's the lesser included?

MR. AMADOR: I would argue to the Court that the lesser included is simple possession of cocaine. And it would be for both counts, both the substantive count and the conspiracy count.

THE COURT: So conspiracy to possess -- conspiracy to possess or possession of cocaine while on board a vessel subject to the jurisdiction of the United States?

MR. AMADOR: I mean, that's not an issue, really, because that's an element that's determined by the Court.

THE COURT: So what are you -- you don't have anything filled in here. What are you suggesting is the

lesser included?

MR. AMADOR: Possession.

THE COURT: Just simple possession?

MR. AMADOR: Yes, ma'am.

THE COURT: Okay. You may not have seen this either, Mr. DeRenzo. But Mr. Amador is suggesting as to both counts that there be given a lesser included offense of possession of cocaine or conspiracy to possess cocaine.

MR. DERENZO: Your Honor, I'm looking at Title 46 70503(a)(1) prohibits manufacture, distribution or possession with the intent to distribute. I do not see where Title 46 prohibits the simple possession, even if it were supported by the evidence. So I don't think it is a lesser included.

THE COURT: Is it a crime to possess cocaine out on the water?

MR. AMADOR: Well, I would submit to the Court that it is. And I would argue that, you know, this -- Title 46, as we have been arguing, at least this side of the bar has been arguing, it's not just Title 46. You also have to include the penalty factors. So I would argue that that should be and is a lesser included offense.

I don't have any case law on this particular issue with regard to the MDLDA, but I do have case law that says that certainly for possession with intent to distribute, possession is a lesser included offense. And I also have

case law that says that simple possession is a lesser of conspiracy to possess with intent to distribute.

THE COURT: And I don't disagree with that. I have -- have you ever been a part of a case in which -- a boat case in which a possession lesser included was given?

MR. AMADOR: No, Judge. I don't recall any case that I've had of this type that I've asked for this, but I'm asking for it in this case, and I think the facts of this case sort of fit in the sense that I appreciate the government's, you know --

THE COURT: Why -- I mean, the whole idea, at least as I understand it, with the intent to distribute is that the government is alleging that there is five kilograms or more of cocaine.

Now, obviously, the jury can make a determination that they haven't proven that, but they can find possession with intent to distribute less than five kilograms of cocaine. But under the facts of this case, I don't know how they could just find simple user amount.

MR. AMADOR: Well -- and here's my argument with respect to that. The government's evidence has been that there was microscopic amounts of cocaine on their hands. So that would be the possession. And the argument would be that the government, while they have presented inference -- evidence about inferences and opinions that this -- these

bales were cocaine, we don't have definitive proof of that. What we have definitive proof of is microscopic amounts of cocaine were on their hands. And that's where my argument is coming from.

THE COURT: Mr. DeRenzo, any response you would like to make?

MR. DERENZO: Two things. One, I don't think a rational jury could conclude that $18 million worth of cocaine is personal use here. It's just -- I don't think there's going to be any facts in evidence that a rational jury could conclude simple possession here. Either it's an acquittal or it's a conviction. The only thing to determine is what is the amount.

And, again, there is -- if I don't believe -- there may be a subject matter jurisdiction issue if we're talking about simple possession. It's just not a crime under Title 46. If you're in state waters, if you're in federal waters, certainly the Coast Guard can board you. And if you have a dime bag worth of marijuana or 20 tons of coke, certainly we can prosecute you under the Controlled Substance Act. But out in the middle of the ocean, our special maritime jurisdiction comes from Title 46. And Title 46, as far as I can tell, doesn't criminalize possession. So I don't think it's a lesser included, you know, unless and until the Eleventh Circuit says otherwise.

THE COURT: All right. Let me go back to the standard. I have it now in front of me. The standard instruction of possession on vessel of the United States subject to the jurisdiction of the United States. The standard instruction reads, it's a federal crime for -- I'm not going to read the whole thing, I promise. It's a federal crime for anyone on board a vessel subject to the jurisdiction of the United States to knowingly possess a controlled substance with the intent to distribute it. Cocaine is a controlled substance within the meaning of the law. The defendant can be found guilty of the crime only if each of the following facts are proven beyond a reasonable doubt.

One, the defendant was on board a vessel subject to the jurisdiction of the United States. And that's the issue we've been talking about. Two, the defendant knowingly possessed the cocaine. Three, the defendant intended to distribute the cocaine. And, four, the weight of the cocaine was more than the threshold.

And then it goes on to say, I instruct you as a matter of law that the vessel involved in this case is a vessel subject to the jurisdiction of the United States.

And then it suggests that we also say that the defendant charged -- is charged in the indictment with distributing or possessing with intent to distribute a

certain quantity or weight. And I'm missing Page 2. I have one, and I go to three. Okay.

MR. AMADOR: Would you like it, Judge?

THE COURT: Do you have a copy?

MR. AMADOR: I do.

THE COURT: Can I borrow yours?

(*Document tendered.*)

THE COURT: But you may find the defendant guilty of the offense if the quantity of the controlled substance he should be held responsible for is less than the amount of weight charged. Thus, a verdict form prepared with respect to the defendant, as I will explain it in a moment, will require you to find -- if you find the defendant guilty, to specify on your verdict your unanimous finding concerning the weight of the controlled substance attributable to defendant.

So we tell them and we give them a verdict form that says, you know, this is what you have to find if you find the defendant guilty. You've got to tell us about the weight that you're going to hold the defendant accountable for.

So what do I put in number four when it says the weight -- if I were giving the standard, the weight of the cocaine was more than, and then it says threshold?

MR. AMADOR: Five kilograms because that's the threshold, I would think, of the crime charged.

THE COURT: Well, then, how could that be an element if we then tell the jury, you can find them guilty if you find them guilty of possession of something less than that? That's also part of the standard.

MR. AMADOR: Right. And then the jury verdict form says, as guilty of possession with intent to deliver, and then it has the quantity.

THE COURT: Right.

MR. AMADOR: Do you find it was more than five kilograms? Do you find if it was more than 500, or do you find, I guess, less than 500?

THE COURT: Right. Okay.

MR. DERENZO: Your Honor, may I be heard briefly on that issue?

THE COURT: Yes.

MR. DERENZO: Okay. So the reason I excluded that from the standard instruction, because I believe in the Eleventh Circuit they haven't -- the Eleventh Circuit hasn't ruled in the context of Title 46. There is quite a bit of case law in the context of Title 20 offenses, which tracks the language, you know, exactly. And they said that even post-*Apprendi*, the weight of a drug is not an element in the sense that, without it, you're not guilty of the crime. I mean, that's the, you know, textbook, black letter law definition of an element.

So I think as the Court was eluding there, you can be guilty under either Title 46 or Title 20, as long as we prove beyond a reasonable doubt that he possessed a controlled substance and you intended to distribute it.

It's then, under *Apprendi*, something we have to prove in order to get the increased penalty, but it is not something we have to prove beyond a reasonable doubt in order for them to convict.

So if we were to include element four as the standard instructions have it, it would be confusing to the jury because, on the one hand, the jury form says you can find them guilty just by having cocaine, possessing in some way, intending to distribute it. And that's what we have to prove beyond a reasonable doubt.

And if you include that, it's -- I don't see how it's not a contradiction for them. They don't -- if we include that element, and they determine that, for some reason, we haven't shown beyond a reasonable doubt that it's five or more kilograms, under this instruction, they must check the box not guilty. And I don't think that's an accurate statement of the law.

THE COURT: This doesn't tend to make any sense to me, either. So, I mean, I see why you've eliminated both of the elements you have eliminated. I just thought we should have this discussion.

Mr. Amador or Mr. Dee or Mr. Brunvand, having looked at any of the other instructions by the government, or any other instruction, is there anything before I send out -- and we'll have another charge conference after I send out my proposed set in the morning. But is there anything else you want me to consider? Anything else I should be looking at?

MR. DEE: Judge, I believe that you do this usually, you do take out all annotations, comments, that type of substance that's added to the instruction?

THE COURT: Yes.

MR. DEE: Okay. I just wanted to make sure that's on the record.

MR. DERENZO: Your Honor, could I clarify one point on the jurisdiction issue?

THE COURT: Yes.

MR. DERENZO: In reading this, it says, the defendant can be found guilty of this crime only if each of these things are proven beyond a reasonable doubt. So when I read this, despite the later instruction that, hey, I've already decided this thing, so just ignore what I just said, it says, in order to prove that, or convict, it has to be proven beyond a reasonable doubt that he was on board a vessel subject to the United States jurisdiction.

That is simply not an accurate statement of the law. We don't have to prove the jurisdictional element

beyond a reasonable doubt. And that has been decided several times now by the Eleventh Circuit. Thank you.

THE COURT: Okay. Thank you. All right. I will e-mail you a copy of the proposed instructions, and I'll just ask you if you'll be back at 9:15, and that will give us a few minutes to talk about them. Let's talk about closings.

Mr. DeRenzo, are you making closings?

MR. DERENZO: I am, Your Honor.

THE COURT: How long do you anticipate?

MR. DERENZO: I was going to ask for 40 minutes and 20 minutes reserved for rebuttal.

THE COURT: Okay. Mr. Dee?

MR. DEE: Your Honor, I would probably only need 20 minutes, at the most.

THE COURT: Mr. Brunvand?

MR. BRUNVAND: Twenty minutes, Your Honor.

MR. AMADOR: I was going to say a half hour, but I don't think I'm going to use it all.

THE COURT: That's fine.

MR. AMADOR: And, Judge, the other instruction that I included there was the lesser included offense instruction.

THE COURT: I know.

MR. AMADOR: The one says, you know, that there is a lesser included offense.

THE COURT: No. Then maybe I don't know. I have two lesser included offenses. One is for single, meaning as I interpret it, one of the counts, and the other was for both of the counts. Is there something else?

MR. AMADOR: No. If that's what you've got, that was it. I just thought that there was the instruction for possession, simple possession, and then there was an instruction that says, you know, you can consider there is a lesser included offense.

THE COURT: Okay. I'll look at your proposed instructions. And actually, I didn't even know I had them until Mr. Bates told me, and these were the ones he pulled as being different from the government. So, anyway. All right. I'll send out something this afternoon. Thank you.

(Proceedings adjourned at 4:24 p.m. and reconvened on May 9, 2019.)

\- - -

UNITED STATES DISTRICT COURT )
)
MIDDLE DISTRICT OF FLORIDA )

**REPORTER CERTIFICATE**

I, Scott N. Gamertsfelder, Official Court Reporter for the United States District Court, Middle District of Florida, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript from the stenographic notes taken by the undersigned in the matter of *UNITED STATES vs. RUDOLPH RANDOLPH MEIGHAN, JORGE RAMON NEWBALL MAY, and CALBOT REID-DILBERT*, Case No. 8:18-cr-594-T-24JSS (Pages 1 through 211), and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

/s/ *Scott N. Gamertsfelder*, *RMR, FCRR*

*Official Court Reporter*

Date: September 23, 2019