```
                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
                         TAMPA DIVISION


UNITED STATES OF AMERICA,        ) Tampa, Florida
                                 )
                   Plaintiff,    ) No. 8:18-cr-594-T-24JSS
                                 )
                                 ) Docket No. 119
            vs.                  )
                                 ) May 9, 2019
RUDOLPH RANDOLPH MEIGHAN,        )
JORGE RAMON NEWBALL MAY, and     )
CALBOT REID-DILBERT,             )
                                 )
                   Defendants.   ) Courtroom 10B
_____)
```

**EXCERPT TRANSCRIPT OF JURY TRIAL**
BEFORE THE HONORABLE SUSAN C. BUCKLEW
UNITED STATES DISTRICT JUDGE

(Government and Defense Closing Arguments)

*Official Court Reporter:*

*Scott Gamertsfelder, RMR, FCRR*
*801 North Florida Avenue*
*Tampa, Florida 33602*
*Telephone: (813) 301-5898*

*(Proceedings reported by stenotype; Transcript produced by computer-aided transcription.)*

**A P P E A R A N C E S**

**GOVERNMENT COUNSEL:**

      **Daniel M. Baeza, Assistant U.S. Attorney**
      **Nicholas DeRenzo, Assistant U.S. Attorney**
      United States Attorney's Office
      400 North Tampa Street, Suite 3200
      Tampa, Florida 33602
      (813) 274-6000

**DEFENSE COUNSEL:**

      **David A. Dee, Esq.**
      Law Offices of David A. Dee, PA
      311 South Brevard Avenue
      Tampa, Florida 33606
      (813) 258-0406

      **Bjorn E. Brunvand, Esq.**
      Bjorn E. Brunvand, PA
      615 Turner Street
      Clearwater, Florida 33756
      (727) 446-7505

      **Pedro Amador, Jr., Esq.**
      Law Office of Pedro Amador, Jr.
      2203 North Lois Avenue, Suite 925
      Tampa, Florida 33607
      (813) 250-0556

                **ALSO PRESENT:**

                   James Plunkett, Interpreter

                   Jesse Leonor, Interpreter

                 - - -

## TABLE OF CONTENTS

|                                               | **PAGE** | **LINE** |
|-----------------------------------------------|----------|----------|
| Closing Argument by Mr. DeRenzo...............  | 4        | 4        |
| Closing Argument by Mr. Dee...................  | 27       | 22       |
| Closing Argument by Mr. Brunvand..............  | 36       | 25       |
| Closing Argument by Mr. Amador................  | 44       | 4        |
| Rebuttal Closing Argument by Mr. DeRenzo......  | 48       | 5        |

THE COURT:  Mr. DeRenzo, you may make a closing argument on behalf of the United States.

MR. DERENZO:  Thank you, Your Honor.

Conch or cocaine.  Conch or cocaine, ladies and gentlemen.  That's really, when you boil it all down, what this case is about, because on one hand you have all the ridiculous lies you heard about over the last few days of this trial.  The lies that started on that go-fast vessel, boarded by the Coast Guard on December 1, last year.  The lies continue even after the defendants were brought back to Tampa, Florida, arrested, and interviewed by federal agents.

You recall those lies, I'm sure.  First one started when the Coast Guard boarded this vessel, trying to figure out if there is a nationality of the vessel.  And they asked them, What are you guys doing out here?  They were trying to determine the purpose of their voyage.  And first it was, well, we are fishing, fishing for mahi.  Coast Guard said, okay, we don't see any fishing poles or fishing gear.  There is no ice, no hooks, all the things you would expect to see if they are fishing.

Then the lies change.  Oh, no, not mahi.  We made a mistake.  It's conch, right?  Diving for conch.

The Coast Guard asks, okay, where's your catch?  Oh, we threw it overboard.  Why did you do that?  Oh, when we saw the Coast Guard plane flying through the air.  Okay.

Well, how did you get all the way out here, about a hundred nautical miles south of Jamaica?  Well, we drifted for six days.  Six days.  And you heard later that the lies were they drifted from a very specific area, the Serrana Bank where they are diving for conch.

Naturally, the Coast Guard boarding team, who you heard from, asked, well, you don't have any engines on the boat.  Why is that?  Strange thing to be in the middle of the Caribbean Sea with no engines on the boat.  One of the boarding team members even said they never have seen anything like that.

They said they used their engines as anchors. Exactly what you would expect a person to do if they are simply out of fuel, drifting for days, with no land in sight, a hundred miles from the nearest point of land.  You are out of gas.  Maybe a fisherman comes by, maybe the Coast Guard. Dump your engines overboard to try to use them as anchors?

Ladies and gentlemen, that's the problem with lies.  It's hard to keep them straight, and they kept changing in this case.  They kept it together a little bit on the go-fast vessel because they are all together.

The Coast Guard asked the captain first and then they asked Mr. Reid-Dilbert, Mr. Newball May the same question, and they all said basically the same thing.  And during that time, although they didn't ask -- as you heard

from Petty Officer Rivera, the translator, they did not ask Mr. Meighan those questions, but he didn't correct anybody. He didn't say anything different.

How do you know they are lies at this point? Well, you've got the video from the C-130.  That's Government Exhibits 2A through 2Q.  We gave you all of the video from the C-130.  We watched about an hour or so of it in the courtroom.  Thank you for being patient watching that.  I know it was a lot, but it was important that you see that vessel, not out of gas, moving around and initially spotted by the C-130, throttled down, underway at a high rate of speed, headed north, nowhere near Cartagena, Colombia, and moving in the exact opposite direction.

You saw that vessel move around, driving around, gathering the bales in the water.  Beyond all doubt, not out of fuel and certainly not drifting for six days.

If that wasn't enough, ladies and gentlemen, the last witness you heard from, Lieutenant Commander Montes, he told you he works down in District 7 for the Coast Guard, something of an expert in drifting and winds and currents. And what was the last word you heard during his testimony? That claim about being adrift for six days from the Serrana Bank, impossible.  Impossible.  So that's the lies on the one hand.  The ridiculous lies.  We will talk about it more and what they mean.

So, again, on the one hand you have this ridiculous story about conch diving and on the other hand you have all the evidence in this case.  All of the other evidence points to one conclusion and one conclusion only, that this was a routine four-man cocaine smuggling operation that started in Colombia, taking a known smuggling route to go to Belize and distribute that cocaine to other people.

You saw the bales floating in the water.  You can count them for yourself.  You have the video.  You heard how much a bale weighs.  It's 40 to 50 pounds, about 20 kilograms for a regular-size bale, and you heard how those bales are described.

So in this case you can count the bales on the video, or you can just take Mr. Newball May's word when he talks about the 15 to 17 bags of conch tied to each rope, two ropes.  On the low end, conservatively, that's 30 bales of cocaine.  Do a little bit of math.  So 30 times 20, we are talking about 600 kilograms of Colombian cocaine, which would be worth approximately $18 million wholesale, as Special Agent Ray talked about.  That's the Costco price of cocaine.  Street-level, two, three, four times that amount.

Now, I realize that before this week you might not have known a lot about maybe what the Coast Guard does.  You probably didn't know a whole lot about counter-narcotics interdictions and operations.  I'm fairly confident you

didn't know a whole lot about ion scan instruments from your day-to-day lives or your jobs.  You may not have ever seen a bale of cocaine.  You may not have ever seen a drug smuggling go-fast vessel or what they look like and how they are equipped for smuggling.

You may not have known about these routine go-fast vessel maritime smuggling operations that originate in source countries like Colombia and these vessels make their way north into Central America to smuggle this cocaine to the United States of America.

You may not have known that this is routine, that the crew that was used in this case, just like every other crew, usually have two or three people from South America, in this case, Colombia, one person from Central America, whose job it is to be the load guard.

That's what Special Agent Ray described it as, but essentially he's the representative of the drug trafficking organization in Central America.  This is routine.  This is happening every day.  And these boats are loaded to the brim with really only two things.  Cocaine and gasoline.  Because that's the only thing that's needed other than the crew to get that cocaine from South America to Central America.

This is not anything new or novel.  You may have not known about it, but you do now.  What happened in this case, it wasn't the ridiculous lies.  The truth is all four

of those people on the boat, the co-conspirators, they were in on it.  They were hired to transport that cocaine from Colombia to Belize, as you heard from Special Agent Ray and, frankly, from Mr. Meighan himself.  He was the load guard.

The defendants Reid-Dilbert and Newball May, they're mariners.  They might not be the captain, they might not be the load guard, but they are essential personnel to get that cocaine from point A to point B.

It's not a one-man operation, and that's what you heard from Special Agent Ray when he told you how these things work.  And, of course, as the judge recently instructed you, you can use your common sense and your reasoning when you are figuring out what's going on.  Examine the evidence.  Common sense tells you that in the Caribbean Sea or the Eastern Pacific Ocean -- you saw some of the weather out there.  You saw the waves.  One man can't do this job.  It's an all-hands-on-deck situation.

So what the defendants did in this case, they boarded that 30-foot go-fast vessel, and we have seen pictures of it, at this point several times, and it was filled to the brim with pictures of cocaine and gasoline.

They left Cartagena on a known smuggling route. You heard Special Agent Ray describe the three primary smuggling routes in the Caribbean Sea.  The two that are most relevant in this case, you've got the Latoro route, which

goes along the coast, where they are popping in and out of the territorial seas at the various Central America countries, and they head north.

There was the one they were using in this case where they essentially headed north, they refueled near Jamaica, and then they headed west for Central America, whether Honduras, or in this case, Belize.  So this is a known smuggling route.  Again, this is routine.

On these boats, and on this boat, the defendants are running as fast and as hard as you can.  That's why you have all that fuel on board.  There is no time to stop.  If you stop, you might get caught, whether it's by local law enforcement from Colombia, other Central American countries, or in this case, the Coast Guard.

When you are running that fast and that hard in those seas, you have to take turns driving.  You saw that vessel a few times now.  That tarped bow covered up the drugs and the gasoline, and the area in the back where everybody is standing, it's about four foot by seven foot.  Four grown men standing there.  There is nowhere else to stand.  There is nowhere else to sit down.

One person cannot drive the hundreds of miles through open ocean to get to Belize.  You have to take turns, and that's basically what you heard from Special Agent Ray.

Everyone has a job to do.  So if you're not

driving the vessel, what are the defendants doing?  They are looking out.  They are looking out for local law enforcement. They are looking out for the Coast Guard.  They are looking out for other vessels.

When they finally reach the area where they are going to refuel near Jamaica, they saw that Coast Guard plane in Exhibit 1.  And you heard from the two aircrew members on board the C-130 and you recall that bright white and orange plane.  You can't miss it.  You can't miss it.  In fact, the defendants, they even admit they saw the Coast Guard plane when they threw over the conch.

And as soon as they see the Coast Guard plane, what happens?  They are drifting for six days.  You know what they would do?  They would signal for help, maybe shoot up one of those flares you saw on the vessel.  No, as soon as they saw the Coast Guard they start throwing the cocaine overboard, one bale, two bales.  One after the other.  You all saw it with your own eyes.

Exhibit 2Q you've seen several times at this point.  This is literally minutes after the vessel is underway.  After the defendants see the Coast Guard they start chucking those 40-to-50-pound bales overboard, one after the other, tied together.  And you can see the bales clear as day, in HD, splashing into the water.

Now, again, you might not have seen a bale of

cocaine before, but you know how much 40 or 50 pounds is and you know the kind of splash you would see from a 40- or 50-pound package of something. You see these rectangular objects floating around the ocean, very consistent size and shape.

For over two hours they are throwing them overboard, two strings, one after the other. When we watched all of that video on the first day of our case and Petty Officer Dickinson sitting right there on the witness stand, you could see, as he described, two strings initially jettisoned from the middle of the boat. They walked them toward the back. Why are they doing that? Because they are going to tie them to the engines. One engine, one string, and sink it to the bottom of the Caribbean Sea.

Then you are going to see -- and take your time, review the video. We gave it all to you. You'll see one engine and only one string, and then you'll see that vessel make its way around, not really going any particular direction. They are gathering up all the remaining cocaine because they've only got one shot. One engine left to get rid of it all, and they saw the Coast Guard and they know what's about to happen.

You heard from Special Agent Ray, he told you about a typical boarding. There is a maritime patrol aircraft like the C-130 in this case and then usually there

is a boarding team who arrives on a small boat.  The drug

traffickers down in Colombia, ladies and gentlemen, they know

this because this is routine.  People get caught.  They find

out why they got caught, and they know what the Coast Guard

does.

The defendants in this case knew what was about to

happen when they saw that Coast Guard C-130.  And this is the

best evidence of all (indicating).

If you recall, when you watched all of that video,

there was a moment where you can see -- not as clear as that

video, but you can see a smaller group of bales gathered

toward the back of the boat, and one engine.

Within five to ten minutes later, the C-130 goes

through the clouds and then suddenly no bales, no engines.

You don't have to really wonder what happened as the C-130

went through the clouds.  The defendants did exactly what

they did with the first string of bales.  They tied it to the

engines and they sank it.

Then, and only then -- and you can see this in the

video, after they got rid of all the evidence, or so they

thought, they removed the tarp from the vessel and just were

sitting there waiting, waiting for the inevitable, for the

Coast Guard to show up.

They drifted and they waited for hours.  You can

see the time of day on the video.  It's dusk.  It's late

afternoon, early evening, and when the Coast Guard finally
arrived on the screen it was later on December 1st, about 10,
11 o'clock at night.  It was dark.  You remember them
describing it.  You couldn't even see the vessel it was so
dark.  No navigation lights.  Even though they had night
vision goggles, it was hard to see.

In that time, between when they got rid of all of
the cocaine, sank it to the bottom of the ocean, what were
the defendants doing?  Nothing else to do on that boat but
get your story straight.

They conspired together and they concocted the
ridiculous lies that I mentioned earlier and that they told
to the Coast Guard.  Diving for conch, in the Serrana Bank,
you are drifting for six days, used our engines as anchors
and now we are here.

Then fast-forward to their arrest here in Tampa,
Florida.  Those lies started to unravel.  They started to
unravel a little bit on the boat.  But, again, the defendants
are there.  They can kind of keep their stories straight.
But now after they are arrested, and they are separated and
they are interviewed, and they are confronted with the video
and the ion scan evidence, which we will talk about in a
minute, now the stories, the lies, start to unravel a little
bit.

Defendant Meighan, remember what he said.  You

heard from the federal agents who interviewed these three individuals.  As my colleague, Mr. Baeza, alluded to in his opening statement, they admit what they simply couldn't deny when confronted with the evidence.  He's watching a video, the sail video, more or less, that you are watching right now, and he sees the cocaine bales floating.  He sees them splash in the water.  He sees them tied together.  You can't claim that's conch anymore; right?

So he admitted that those white floating things were bales of cocaine.  That's what he said during his interview.

He also admitted that it wasn't really -- it wasn't an accident that he ended up on a low-profile go-fast smuggling boat, leaving from Colombia and ended up floating, with no engines, near Jamaica, in the middle of the Caribbean Sea.  He told federal agents -- and you heard about that, how he got to Colombia.  He traveled from Belize to Mexico to Panama and eventually to Colombia; right?  All of those Central America countries he passes through to make his way to Colombia.

It's not an accident, ladies and gentlemen.  He's there for a very specific purpose.  He even said that the person who bought his plane ticket is essentially a drug trafficker.  He said he didn't pay for his ticket, and he believed the person who bought the ticket was the person

receiving the drugs.

And, again, use your common sense. You know how people behave when they are confronted with evidence they are not telling the truth or they did something wrong. You don't have to be an expert in ion scan technology to understand that. You just have to have a little time on planet Earth.

We see children behave the same way. Right when they get caught with their hand in the cookie jar, they lie, sometimes, and then they are confronted with the truth and then they back up just a little bit; right? Okay. I'll admit that but I can't admit this other thing.

And that's what Mr. Meighan did. He didn't tell the whole truth. He still stayed with that ridiculous, impossible lie. Diving for conch in the Serrana Bank. They ran out of gas and drifted for six days.

You don't have to guess. You don't have to wonder or speculate whether that's true or not. It's impossible. And you saw with your own eyes that vessel was not out of gas. Both things cannot be true at the same time.

So that's Mr. Meighan.

What about Mr. Reid-Dilbert? When he was interviewed, similar. He admitted a couple of things. He was hired to be on that boat. So, again, like Mr. Meighan, it's not an accident that he finds himself on a drug smuggling boat. He was paid up front $1500 -- or the

equivalent, excuse me, of $1500 U.S.  And like Mr. Meighan, he admitted that the bales were cocaine, and he actually recognized it was cocaine.  How?  Because he recognized the packaging.

Now, how would he recognize the packaging to be cocaine?  Probably seen cocaine before in a bale, just like the ones you saw floating through the ocean.

Again, use your common sense.  Use your reasoning when you think about that.  He's paid up front $1500 to go fishing?  Is a fisherman going to get paid before he even catches anything?  Was he going to get paid when he gets back to the dock with whatever he caught for the day?

He got paid up front because that's what drug traffickers do when they hire people to be on drug trafficking boats.  They pay them up front and say, hey, if you do a good job, if you deliver the load of cocaine, if you are successful, you'll get the rest.  He admitted a little bit, but then he still is stuck with that ridiculous lie.

He was in the Serrana Bank.  They used the engines as anchors, drifting for six days.  Ladies and gentlemen, you saw the engines on the boat until they were removed, one after the next.  Both things cannot be true at the same time.

Finally, Mr. Newball May, his lies are the most ridiculous.  In some ways they are the same.  He says they were diving for conch, like his co-conspirators

Mr. Reid-Dilbert and Mr. Meighan.  He goes a step further and says they were actually on their way back to San Andreas, which if you recall, is southwest of the Serrana Bank, and they ran out of gas on the way back.

Why does that matter?  Well, Lieutenant Commander Montes told you what that's going to do is push them even farther south and farther west in six days.  They would have been on the beach of Nicaragua, or thereabout, in six days.  That's 300 nautical miles away from where they were interdicted by the Coast Guard, without their engines.

And you remember what he said?  What's the likelihood of drifting from Serrana Bank to where they are interdicted?  Impossible.

But he told a little half-truth, right?  He talked about those two lines we just discussed.  Two lines, 15 to 17 sacks of conch, tied together, and then tied to the engines.

So to his credit, at least, he didn't stick with the ridiculous lie about using the engines as anchors.  Instead, the new lie for him is that in order to avoid a fine he got rid of the only way and the only hope of getting back to shore if you are out of gas.  He tied all the conch to the engines and sunk it to the bottom of the ocean.

Now, ladies and gentlemen, when the defendants concocted these ridiculous lies, when they persisted in some of them with federal agents, they weren't counting on a few

things.  They weren't counting on C-130s having the ability to record in HD, in full color, and that one day that video would be presented in this courtroom.

They weren't counting on ion scan technology and the ability to find trace amounts of cocaine on the boat -- right -- in the central cargo holds, where that cocaine was stored before they threw this overboard, on their hands, on the forearms.  Weren't counting on any of that.

And they weren't counting on Lieutenant Commander Montes coming in here and talking about drifts and currents and knowing exactly how a boat that was disabled would drift based on the way the world is physically.

Ladies and gentlemen, they also weren't counting on you.  Now, in a few minutes you will have to go deliberate, and that's an important duty.

Thank you for your attention and your patience throughout this trial.  The judge just instructed you on the law and some of the things -- well, the things we have to prove on each count.  Now, as I discussed earlier, this case is routine.  It's not new or novel.  It's not that complicated, actually.

But I'm going to make it even less complicated. I'm going to go through the things that we have to prove, and we did prove, so that when you go back there and deliberate your job will be easy.

There are a couple of things that Count One and Count Two have in common.  You probably noticed that when the judge instructed you on the law, the first thing is that the vessel that the defendants were on is a vessel subject to the jurisdiction of the United States.

That's a lot of legalese.  But, fortunately, all you have to decide is whether the defendants were on the vessel that you saw in this case, because the judge has instructed you as a matter of law, which means the judge decided the legal issue, and she's now instructing you that that issue has been decided, that the vessel in this case, the same vessel you watched on that big screen, the same vessel that the defendants were detained by the Coast Guard, on the same vessel that left Colombia with all that cocaine on it, was subject to the jurisdiction of the United States.

That's not something you have to worry about.  But if you are wondering, the reason is because it's a state-less vessel.  It didn't have a flag.  It didn't have a valid claim of nationality that could be confirmed by the country that was claimed in this case, Colombia.  And under international law, a state-less vessel is subject to the jurisdiction of any country -- Colombia, Jamaica, or the United States.

THE COURTROOM DEPUTY:  Mr. DeRenzo, it's ten of.

MR. DERENZO:  Thank you.

The other things that are in common here is that

there is cocaine and it's 5 or more kilograms.  We will get to the issue of the cocaine in a second, but think about -- just assume for a second that what you see floating in the water is cocaine.  Well, there is clearly more than 5 kilograms.

All of the evidence in this case, all of the testimony from every single confident witness -- from Special Agent Ray is one bale [sic] is 20 kilograms.  And do you remember why that is?  One kilogram that's weighed out has a very specific size and weight.  It's taped up, and those are stacked up ten high and then another ten right next to it.  So one bale is 5 kilograms.  And you watched the video.  There is at least 30, if not more.

The cocaine -- now, I would love to have brought into court during this week some of that cocaine, perhaps put a DEA analyst on the stand and ask them what it was when they analyzed it in the lab.  The reason I can't do that is because the defendants themselves sank it to the bottom of the Caribbean Sea.  But unfortunately for them, that works both ways.

When they get rid of the evidence, that tells you they know what's in it.  They know it's illegal, and they will literally risk their lives to get rid of it.  So the only question should be, what illegal substance is it?

And we have proven through not only the testimony

of every single Coast Guard witness from the TACLET in San Diego, but also the expert testimony from Senior Chief Bomentre on the ion scan result that the illegal substance in those bales was cocaine.

They didn't find any -- when they tested, they didn't find any marijuana on board; right?  It was only trace amounts of cocaine.

All of the boarding team told you that they have seen cocaine in the aggregate, thousands of bales of cocaine, and they all told you that -- you saw this Exhibit 2Q.  It is bales of cocaine floating in the water.  They have a very distinctive size, a distinctive shape, and you can see it with your own eyes, splashing in the water.

Consider the ion scan results themselves.  If you recall, we were talking about the central hold.  That's probably the most important one.  When you go back and look at the results, look at that one.  Senior Chief Bomentre, who is an expert in this field, told you it's as close to perfect as you can get.

Everyone was given the ham analogy, Publix deli. So 24 out of 30 tests they did.  One, cocaine.  Two, cocaine. Three, cocaine.  So 24 out of 30, all cocaine.

Remember, the delta was 4 microseconds off. Microseconds.  Right.  You can't even blink your eyes that fast.  From the drift time, you would expect for a molecule

of cocaine going through this instrument, 4.  The threshold is 50.  This is 4.  So if zero is the bulls-eye, it's right there.

It's as perfect as you can get.  And keep in mind, we are not in a laboratory.  We are on a floating vessel in the middle of the Caribbean Sea.  There is water splashing up, all over the place.  There is crew on board.  People are moving around.  People are touching things.

What did he tell you?  That's where the cocaine was stored and it was on there recently.  So you didn't really have to wonder what those white floating bales in the water were.  Fortunately we have trace evidence of what it was before the defendants got rid of it.  And it's all over their hands and it's on their forearms.

In terms of possession, the judge has instructed you, you don't have to actually physically hold an object. It can be joint.  In this case, all of the defendants jointly possessed this cocaine.  And because the indictment charged aiding and abetting, as long as you assist other people in possessing that cocaine, even if you don't put it on the boat or take it off, or maybe you're not the one who threw it in the water, if you help out in that possession, that's sufficient.

Intent to distribute.  Right.  We have to show not just possession but with the intent to distribute.  Well,

that's easy, ladies and gentlemen.  There is no way any of
the defendants were personally using 600 kilograms of
cocaine.  The whole reason it's on the boat is to distribute
it to other people.  The fact they didn't actually get to do
that because the Coast Guard intervened does not make them
not guilty of that crime.

All that matters is they had the intent to
distribute that.  And if you look closely at the instructions
on that issue, it doesn't mean they are going to sell it on
the street corner in Tampa or they were going to sell it to
the people in Central America.  As long as they were going to
transfer it to other people, that's intent to distribute.

Now we move to the conspiracy count.  As the judge
just told you, we don't have to prove that everybody was a
member of the plan or that there was a formal agreement.  All
that's required is that they in some way agreed to do
something illegal.  That's it.  And that they willfully and
knowingly joined in it.

You know the word "conspiracy" kind of conjures up
some, I think, gut-level emotions.  But it's a lot simpler in
the law.  It's a plan to do something illegal in some way,
big or small, and you join in it.

So even if they didn't know all the details -- and
this is in the instructions you have.  Even if they didn't
know everybody who was involved in the plan, even if they

only had a minor part in the general understanding of what was going on, if they willfully and knowingly joined in it, they are guilty.

So the real question is, when it comes to conspiracy, how do you know they are all guilty?  That's what it comes down to.

First of all, you have the vessel.  And you've seen that vessel, Exhibit 4H.  The size and layout, it is a 30-foot boat.  There is no way to be on that boat with 600 kilograms of cocaine and not know what's going on.  This fits the profile of the drug smuggling boat in every possible way. Painted black, no navigation lights, outfitted with very specific fuel delivery system for only one purpose.

If you recall Petty Officer Ramos's testimony, he was the engineer, small boat engineer, never seen this setup on fishing boats.  Only on cocaine smuggling boats.  And that's for a very good and anticipated and obvious reason.

How about the smell of cocaine?  You heard from Special Agent Ray about the very distinct chemical smell of cocaine.  So we have four guys on a boat that's 30 feet long with 600 kilograms of cocaine.  The smell, ladies and gentlemen, would have been obvious.

How about the amount of cocaine?  Whoever owned this cocaine, whoever hired these guys, are they going to let some innocent bystander, a fisherman, get on their boat with

$18 million worth of cocaine?  Not a chance, ladies and gentlemen.  Again, use your common sense.  Use your reasoning.

The length of the trip.  Right.  We are going from Colombia to Belize.  We already talked about that a little bit.  Several days, hundreds of miles, rough seas, hot sun, little to no food or water, everybody has a job to do, and everybody is taking turns driving.  Maybe the captain is telling people where to go, but everybody is participating. In a typical crew, which we talked about, this fits the profile in every possible way.

Finally, ladies and gentlemen, you have the getting rid of the evidence, the cocaine all over everyone's hands, the demeanor of the crew when the Coast Guard arrives. It's not thank God the Coast Guard is here to save us from drifting.  They know what's up.  They know the jig is up.

Finally, the lies.  They lied for the same reason that they got rid of all that cocaine, the same reason they literally risked their lives at sea, whether it's getting run over by a freighter, getting tossed overboard and drowning, no chance to get back to land.  They risked their lives to get rid of that evidence.  That was for one reason.  Because they knew they were guilty and because they are guilty of conspiring and possessing that cocaine with the intent to distribute to others.

Thank you.

THE COURT:  Mr. Dee, on behalf of Rudolph Randolph Meighan?

MR. DEE:  Your Honor, may we have a brief break before we start?

THE COURT:  Sure.  Let's take about ten minutes.  And you are welcome to walk around.  That will put us back at 11:20.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury exits courtroom at 11:10 a.m.)

THE COURT:  All right.  We are in recess until 11:20.

(Recess taken from 11:10 a.m. to 11:20 a.m.)

COURT SECURITY OFFICER:  All rise.

This Honorable Court is now in session.

THE COURT:  Will you get the jurors.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury enters courtroom at 11:21 a.m.)

COURT SECURITY OFFICER:  Thank you.  Please be seated.

THE COURT:  Mr. Dee, on behalf of Rudolph Randolph Meighan?

MR. DEE:  Thank you.  May it please the Court, ladies and gentlemen of the jury, counsel for the government, Counsel, gentlemen who are sitting here with us.

Ladies and gentlemen, when I spoke with you Monday

morning, I believe it was -- might have been Monday afternoon -- about my opening comments, I asked you to not assume things and don't speculate.

Unfortunately, now as you sit here and I stand here three days later, that's exactly what the government has asked you to do.  They have asked you to speculate and assume what took place.

I show you Government's Exhibit 9, which is in evidence.  The government's expert witnesses tell you that right here was the interdiction point.  Well, that we know because of an airplane circling, and we have longitudes and latitudes and we know where that boat is sitting.  But their experts tell you that that boat left here and went straight north and then they made a left turn toward Honduras, what they call the Honduras Rise, and that's where that boat was going.  There's been absolutely no evidence to that. Absolutely no evidence.

So the defendants said they went to the Serrana Bank and conch dove, and the government said that's impossible.  Isn't it just as possible the boat went to the Serrana Bank and then up north?  Why do I say isn't it impossible?  Because if something else is possible, then there is not guilt beyond a reasonable doubt, and we have no evidence how that boat traveled.  Just that the government's expert says, well, that's where every boat goes.

I feel I need to address some comments made in the government's closing, and I will try to do some of that now.

First, Mr. DeRenzo talked about when the boarding crew arrived at the boat they started asking them questions and they answered the questions. I appreciate that he didn't come in here and say Mr. Meighan never answered any questions. But, yet, you are going to continue to hear they did this and they did that.

Your Honor instructed you that each individual defendant is here as an individual. It's not all for one and one for all. I ask you to take every piece of evidence individually and ask if it applies or not applies to Mr. Meighan.

Now, very interesting, because our experts tell us that the boat had to come north and then turn west toward Honduras, the boat was only 110 miles south of Jamaica. It's possible that boat was going to Jamaica. But I guess according to our experts, no one in Jamaica has cocaine or uses cocaine because the boat was going to turn left and go to Honduras.

Why do I say it could have gone to Jamaica? Again, if there's a possibility of something else, that's not guilt beyond a reasonable doubt.

Now, Mr. DeRenzo told you that Mr. Meighan was the load guard for this vessel, and the experts define the load

guard as a representative of the people who are going to
receive the drugs.

Okay.  And they talked about a 16- or $18 million
load on this boat.  So this is Mr. Meighan's property that
was taken when he was arrested.  He has approximately 520
Mexican pesos on him.  I'm not sure what the coin
denominations are, a passport and some identification.

Notice, you didn't hear the expert tell you that
smugglers travel with passports, to know where they are
coming from and where they have been, because they don't.
Mr. Meighan traveled to Colombia and believed he was going on
a fishing trip.

I would venture to say that the 520 Mexico pesos
is probably not worth a lot of American dollars.  But he's
the load guard.  That's a very fancy name.  Absolutely,
again, no evidence that Mr. Meighan was a load guard.

Now, they talked about the boat itself.  It was
set up with a tarp covering everything so nobody could see
it.  I would submit, when you watch that video, it's pretty
easy to spot that red tarp floating in the blue ocean.
Normally smuggling boats would have a blue tarp on it because
it would blend in with the ocean.  It would be harder for the
Coast Guard plane to see it.

As I told you -- I guess there is not any other
way to describe it.  The theme of my opening and closing is,

don't assume.  But Mr. DeRenzo himself actually asked you to assume for a second.

Now, he was doing it to say, assume it is cocaine. Let's show you what the quantity is.  Again, ladies and gentlemen, we can't assume or speculate.  You have to be convinced beyond a reasonable doubt as to all the elements of these crimes.

You have to -- and Your Honor gave you the instructions.  I thought about reading them again, but you have them.  You can read them.  You can read what the presumption of innocence is.  You can read what the guilt beyond a reasonable doubt definition is.  You can read what knowingly, willingly, and intentionally is.  You can read about mere presence at a scene of a crime doesn't make you part of a conspiracy.

You have the instructions, and please do read them.  But don't assume and don't speculate.

The ion scan, it's very interesting testimony from Senior Chief Bomentre.  I'm going to show you the one that the government used in their closing.  The location is the center hold, a 24 out of 30 hit, a negative 2 delta, cumulative amplitude of 4352.  A near-perfect hit, according to Senior Chief Bomentre.

But, then, when you ask him about the other ones, for example, Mr. Meighan's hand, who has a negative 19, or 9

times the higher delta ratio, a cumulative amplitude of 431, or 10 percent of what he got, was a near-perfect hit, and a number of 1 percent up on top, he says it doesn't matter. It's a hit. But you can't have it both ways. Either the numbers mean something or they don't mean anything.

If the numbers don't mean anything, why do we print them? Why don't we just say, yes, cocaine is present? Period. It's time to make more assumptions, more speculation. You can't have it both ways. Either those numbers mean something and Smith Detection put them there for a reason or they don't mean anything and maybe the ion scan really is not that great of a device.

Again, back to don't assume.

Your Honor has instructed you -- Her Honor instructed you to rely on your own memory, not my memory. But, ladies and gentlemen, on May 6th, which was Monday, United States Coast Guard Pilot James McCormack watched that video and was asked what were those white packages going overboard on the boat. My note said he said it resembles cocaine. Again, he wants you to presume and speculate, it resembles cocaine.

On May 7th, Petty Officer Eric Lauginiger was asked the same question, with that same video playing, and said it appears to be cocaine bales.

Later on May 7th, Coast Guard Petty Officer Paul

Fahey gave even a more, I believe, honest answer, but more descriptive and said those white packages, they look like packages that could be possibly contraband.

Does that sound like guilt beyond a reasonable doubt?  You've had three officers from the United States Coast Guard, who I think were being honest.  They were looking at a video.  They weren't there.  They didn't see those bales.  They saw them from 6700 feet up in the air and 3 to 4 miles away, on a video.

Petty Officer Tyler Perio also used the term, on May 7th, about 2:20 in the afternoon, appears to be cocaine. Ladies and gentlemen, again, I stress, appears to be, looks like what could possibly be, is not guilt beyond a reasonable doubt.  And that is the burden that you have to say the government must pass.

There was a lot of talk in trial about this boat did not have a zarpe on it.  And why wouldn't it have one? Because the zarpe requires you to say how much fuel you have, how many members you have, and where you are going.  But then on cross-examination, when each of the experts were asked -- or the officers were asked who is in charge of the zarpe, the captain.  It's the captain's position.  The captain, Emiro Hinestroza Newbbooll.  It's his position, his duty to have that, not a crew member who believes they are going out fishing.

Now, Mr. Meighan's statements.  You all remember special agent -- DEA Special Agent Jennifer Doherty saying she interviewed Mr. Meighan.  He first asked for a lawyer.  Then he said, no, I will go ahead and talk to you, for whatever reason, and he signed the form and said I'll talk to you.

He is now speaking to her on December 6th of 2018, five days after he's been detained and arrested for a cocaine venture.  She asks him, How did you get the cocaine on your hand?  She or the other officer in there.  And he said, Must have been pushing bales away from the boat.  I don't know.

Okay.  He's not arguing with her.  He's taking her statement as true that there was cocaine on his hand, and he said that must have been why.

On cross-examination she was asked, When did he tell you he saw bales?  He said he first saw bales when the planes started flying over and the captain directed them to start doing something.  And he saw them -- he did not say himself -- throwing them overboard.

In hindsight -- we've probably all heard that story hindsight is foresight.  We all have 20/20 vision in hindsight.  He looked, and that must have been what happened.  The captain told me to throw these things overboard.  I touched it.  I don't know.

He doesn't know what an ion scan is.  There is no

evidence that any of us knew what an ion scan was before Senior Chief Bomentre testified to us, explained to us what it is.  Then they said, well, he admitted that the people who paid for his ticket were recipients of the cocaine.

I would submit to you that the evidence is not that he admitted that.  What he said was, yeah, that could be what happened.  I don't know.

Again, he is looking backwards.  Unfortunately, he's speculating.  But he's saying, okay, I mean, you are telling me there was cocaine on the boat.  You are telling me there is cocaine on my hands.  That must have been what happened.

He's not saying, let me tell you what happened.  I was paid by somebody in Belize to do this, and all these type things.  That's not what he told Special Agent Doherty.  He acknowledged her questions and said that must be why it happened, or that's why it happened, not making it true himself.  He clearly stated throughout his statements that the captain was in charge, and he did not know there was anything on that boat until directed by the captain for them to throw it overboard.

Ladies and gentlemen, you may be sitting here today saying, when I look at that boat and I look at that video, seems like that's cocaine.  I mean, my God, we have a whole crew of Coast Guard officers telling me it was cocaine.

I had the United States attorneys telling me it was cocaine. Probably is.

That's not guilt beyond a reasonable doubt. That's probably is. Your duty is to find whether or not Rudolph Meighan knew -- knowingly, willingly, and intentionally possessed cocaine with the intent to distribute it or if he conspired to distribute it with intent to distribute.

I would submit to you, ladies and gentlemen, the government has not proven that. And furthermore -- I have to address it because it's part of the verdict form. If you disagree with me and you think it was cocaine, clearly the government has not proved that there was more than 5 kilograms of cocaine.

In fact, the only cocaine that was recovered was run through an ion scan machine and destroyed. There is no cocaine here because the ion scan destroys the evidence.

Thank you very much for your time. Thank you all for listening to me. And I believe that you will agree with me when you get back in the jury room and come back with a verdict of not guilty. Thank you.

THE COURT: Mr. Brunvand, on behalf of Jorge Ramon Newball May.

MR. BRUNVAND: Thank you, Your Honor.

Good morning. As you already know, my name is

Bjorn Brunvand.   I represent Jorge Ramon Newball May.

Members of the jury, Mr. Newball May did not get on that vessel in Colombia with the knowledge that he was on a cocaine transportation mission.

Members of the jury, there has not been one piece of evidence in this case that would suggest or support the government's position that my client ordered that vessel with the knowledge that he was on a vessel transporting cocaine.

Now, because of that -- regardless of what the government said in their closing, because of that, my client remains an innocent man.   The presumption of innocence remains as relates to my client.

The government will say that, wait a minute, and they have put on their witness, Special Agent Ray, I believe it was, who says, well, no one gets on these vessels unless they know what's going on.

That may be the case in most of the cases, but recall Special Agent Ray's testimony on cross-examination, when I spoke with Special Agent Ray, he corroborated, first of all, that the organization behind this boat is a very large billion-dollar organization.   The drug cartel.

It is an organization that's feared by the locals. It is a powerful and dangerous organization.   The suggestion is that only people who know what they are getting involved in end up on those vessels.

I would respectfully suggest to you, I haven't
proven otherwise, but the question for you is, is it
reasonable that someone may end up on that vessel without
having knowledge of the purpose of the trip?

I would suggest to you that is reasonable.  Why is
it reasonable?  Well, you heard from the government's
witnesses that there is a lot of planning involved in these
types of trips.  There are certain routes they generally
take.  There are two types of trips I would suggest to you.
There's the trips where the cocaine is being distributed and
intended for distribution, whether it's on a vessel at high
seas, whether it's to Mexico, whether it's for further
distribution in Europe, Africa, or the United States.

There's also a few trips that are basically trips
involving cocaine that I would refer to as a sacrificial
trip, sacrificial trip because, as you heard from Special
Agent Ray, there are powerful individuals within the cartel,
be it in Colombia or in prison in the United States, who will
hand over a vessel full of cocaine for the purposes of
reducing their sentences.  Those are the two types.

I would suggest the majority of them are for
distribution, but some of them, as agreed by the government,
are there because someone is turning over the vessel to the
government so that they can get a reduction in their sentence.

The people that provided the information to the

government that the government relies on for their premise that only people who know that they are getting involved in a drug trafficking venture will board such a boat are people who have cooperated with the government.

They are people who have been arrested and cooperated with the government so they can get a reduced sentence. I will respectfully suggest to you, the people who might try to cooperate with the government and suggest to the government they didn't know that they were getting involved in a drug transportation when they got on the vessel are not going to be allowed to cooperate with the government because they are not interested in that. They are not interested in that.

Only if they say, We got on the boat, we all knew what we were doing and we are all guilty, is the government interested in their cooperation.

Now, why is it reasonable that from time to time individuals may end up crewing on a vessel without knowledge that it's a cocaine transportation trip? It's reasonable because, as indicated by the government's witness, these trips are planned, they are refueling vessels that are waiting to refuel. There are people that are waiting for the merchandise to arrive and sometimes, even though they are planned, for whatever reason crew members may not show up, may get sick, may not be available, and then the captain

needs to find a replacement crew member at the last minute.

It is not at all unreasonable from time to time, when time is short, that the captain may find someone without feeling the need to tell this individual what the trip is really about.

The captain may lie -- just like the captain lied to the agents and Coast Guard, may lie to my client about the purpose of the trip. If, in fact -- and the government cannot -- cannot -- they have not presented a single piece of evidence to the contrary about my client's knowledge when he boarded that vessel. It's not there. It's completely absent.

Now, once you are on the vessel, once you are at high seas -- I can't remember which one of the witnesses, but one of the witnesses I asked the question, Is it really an option at that point to say, Okay, sorry, I'm leaving? It's not an option. Okay. It's not an option.

Quite frankly, is it an option at that point when the captain tells you, This is the story you will tell to the authorities when you are being questioned a few hours or a few days? Is it an option to say, Sorry, no, I'm not participating in that? I would suggest to you it's not an option. Why is it not an option? It's not an option because the captain -- the captain, who is not here, but you've heard of him -- you heard testimony about him, is a representative of the cartel. He was recruited by a recruiter of the

cartel.  He's a representative of the cartel.

You go against what the captain says, you go against the cartel and you put yourself and your family and your friends at risk.  That's why Agent Ray said people are in fear.  The people who live there are in fear.

The bottom line is, if you get on that vessel and you don't know that you are getting on a vessel that's transporting narcotics, then you're not guilty.  It doesn't matter, if at some point you should know, that these bales must be contraband.

I would suggest to you, members of the jury, based on what we have seen on video repeatedly that it's not at all unreasonable for someone to believe that what we see in the water is contraband.

I would suggest to you, evidence as to whether or not it is, in fact, cocaine or something else, we had to speculate.  We had to speculate.  Most likely probably is.  Although, I believe, if you look at the evidence of these ion scan results, there are some other controlled substances that show up in the evidence, and review that yourself and examine that.

You know, I questioned -- I believe it was Senior Chief Michael Bomentre -- he's the guy who was the expert on the ion scan.  First of all, the suggestion was never that that particular witness would fabricate or create false

evidence of cocaine.  That wasn't the suggestion.

That's not the suggestion against any of these honorable witnesses.  The suggestion was that life is not black and white.  The government would like for it to be black and white but, really, life is not black and white.  It is shades of gray.

The ion scan that's being produced by this company, it's called Smith Detection, that we don't really know much about other than they sold -- by 2011 they sold about a half a billion dollars worth of these machines.  And so the suggestion is that it's not too much for us to ask that someone from that company, someone who is an engineer or a toxicologist or chemist, someone who was actually involved in creating this machine, come in and explain to us the foundation for this allegation that less than 1 percent -- that less than 1 percent are false-positives.

Is it significant?  Is it important to consider? Absolutely.  But does this really matter in the big picture of things?  No, it really doesn't matter, because in the big picture of things, if my client ended up going on that vessel in Colombia, in Cartagena, Colombia, or nearby, and at the time he did not know that he was getting on a cocaine or any type of contraband venture, then he's not guilty.

It doesn't matter how many lies may have been told.  Doesn't matter how many times the government stands up

here and says how ludicrous the statements were. Doesn't matter what happened at sea. Doesn't matter what he says when he comes to the United States, because it's all consistent -- it's all consistent with him telling everyone what the captain -- what the captain of this vessel told him to say, on behalf of the cartel.

That's what matters. That's the hand of the cartel. With that, and with that unknown factor, there can only be one verdict in this case. That verdict has to be not guilty as to both counts because there is no evidence. There is zero evidence that my client got on a vessel and ended up on the high seas, with the knowledge that he was getting involved in the transportation of cocaine.

Once he knows or once he suspects it and once he suspects the cartel is involved, it's not knowingly and voluntarily. It's under duress and in fear for his own safety and the safety of his family and friends.

And, members of the jury, based on that absence of evidence you have to agree, based on the fact that life is not black and white but shades of gray, that he remains not guilty. He remains an innocent man. And after you deliberate and evaluate all the evidence, justice demands that you will reach a verdict of not guilty as to each count as relates to my client.

Thank you.

THE COURT:  Mr. Amador, on behalf of Calbot Reid-Dilbert.

MR. AMADOR:  Thank you.

Ladies and gentlemen of the jury, it's your decision to make about what the facts are in this case and what's been proven beyond a reasonable doubt.

Agent Ray sat on that stand and told you that the people that go on the trips get paid between 10- and $40,000. That's what he said.

He told you 5 million pesos, Colombia pesos, is worth approximately $1,500.  A far cry from $10,000 to $40,000.  And I say this because the evidence from Mr. Reid-Dilbert's mouth was that he was offered a job for 5 million pesos to go fishing.  Not what the government said in its closing, that he admitted that he was paid 5 million pesos to go on a drug trip.  That never came out of his mouth.  That didn't come from that stand (indicating).  Agent Galloza did not say that because that, in fact, is not true.

Now, the government only -- I elicited from Agent Galloza the amount of money that my client was offered and that my client said, after he saw bales being thrown over, that based on how it was packaged, that appeared to be cocaine.  But they didn't elicit that.  I had to elicit from Agent Galloza that my client said that he did not know that there was any cargo on that vessel until he saw people

throwing bales overboard and that he did not know that there was any drugs on that vessel until they were being thrown overboard.

We have to look at all of the elements of the case.  I submit to you that my client's own statement establishes that he's not guilty of these charges.

We have to go through all the elements, and we have seen ad nauseam the video of the go-fast boat with the bales behind it.  And we have heard, as has already been stated, that some of the Coast Guard officers said that it appeared to be cocaine; maybe it was cocaine; it's possibly cocaine.  But that's not the standard that the government has to be held to.  It isn't.  It's beyond a reasonable doubt, and they haven't established beyond a reasonable doubt that those packages contained cocaine or, for that matter, any other illegal substance.  We can only guess on that.

Now, the government said what illegal substance it is in its closing, and it said the only evidence was that there were -- it was only trace amounts of cocaine.

Well, that's not exactly all that was found by the ion scan.  In the first result, the first receipt, if you recall, the government told its witness to just flip that page.  Flip the page, because it doesn't fit the script.  So that shows that there is MDMA and PCP, not just cocaine.

The receipts here are only of the ones that showed

positive, and we are still wondering what those 3 percent mean.  We don't know.  Seems to be rather important, because the company, on its receipt, in the section that says "alarm," has cocaine and a percentage.  You would think that would be important, but we don't know what that percentage means.

Now, you'll get back there, and there is another exhibit that deals with these very tests.  Bear with me one second.

There is the log, and this shows all of the tests that were taken.  All of them.  There was testimony that they tested the console because that's where it's most likely to have cocaine.  There is no cocaine.  They tested the starboard rail.  No cocaine in one, but they found cocaine in the other.  They tested the forward hatch twice.  Once it tested positive; once it did not.

Then we have the testing positive for the MDMA and PCP.  There are places where they tested essentially the same place and it tested negative and positive.  I submit to you that that is unreliable.  Those results are unreliable.

Now, let's talk about the videos that you saw, and you heard the government's witnesses say that there was someone kicking the bales, and some of them were white.  One in white was kicking the bales.  There was someone in white always doing something with the bales.  And then they

presented you this picture and they identified the four individuals in the picture.  And who is dressed in white?  Lo and behold, the real enemy here.  The captain.

I submit to you that there are no videos of my client engaging in discarding these bales.  Primarily the videos are of the guy dressed in white.  But, again, even if my client did it because he was told to, because he is a mariner, not the captain, he's required to follow the captain's orders.

They have to prove that when he got on that boat, he knew that there was cocaine on board and intended to distribute that cocaine.  And there has been zero evidence of that.  Zero.

Now, the government talks about the smell of cocaine.  But remember, ladies and gentlemen of the jury, those cocaine bales, if it is, in fact, cocaine, the testimony is they are hermetically sealed so they float.  So I'm not sure there would be a whole lot of odor.  And then they attribute the odor to someone knowing that there must be contraband on board, and there is no evidence of that at all.

Now, I will submit to you that you'll get all of these exhibits back there, and that guy is the only one that has an electronic device in his possession.  That guy. Again, the guy in white, the captain (indicating).

Ladies and gentlemen, the government hasn't proven

these charges beyond a reasonable doubt.  And as a result,
you should find Calbot Reid-Dilbert not guilty.  Thank you.

        THE COURT:  Mr. DeRenzo, in rebuttal.

        MR. DERENZO:  Yes, Your Honor.  Thank you.

        Ladies and gentlemen, when you go back to
deliberate, look at those jury instructions closely and
recall what the judge told you is the law that you will have
to follow when you decide a verdict in this case.

        What you won't find in those jury instructions is
any words that say we have to weigh out cocaine in a
courtroom or in a DEA lab somewhere to prove how much cocaine
was on that vessel and how much cocaine the defendants were
asked to distribute and conspired to distribute to other
people.  You won't see that, because that's not the law.

        What you will see is an instruction about
circumstantial evidence -- and keep in mind, this is a drug
conspiracy.  Conspiracies -- criminal conspiracies, by their
very nature, are hidden.

        Folks in the business of drug trafficking go to a
lot of effort to make sure their activities are hidden.
Right?  They are not going to have video of a handshake or
necessarily a telephone recorded conversation back in
Cartagena, Colombia, before the defendants get on the boat.

        If that were the law, we wouldn't convict a lot of
persons of conspiring to commit crimes.  That's not the law,

and you won't find that in those jury instructions.

The law is -- and what it says in those instructions is circumstantial evidence is just as good as direct evidence. Right? You don't have to have an eyewitness at the scene of every crime.

Circumstantial evidence, as the judge has explained to you, is kind of a fancy term, but it's really not that complicated. You look at all of the circumstances around an event or fact; and if it points to that fact, that's enough proof.

We have heard some discussions about you can't prove the government hasn't proven that my client knew what he was doing. Ladies and gentlemen, I think perhaps I was in a different courtroom than my colleagues this week because there's all kinds of circumstantial evidence that these people knew what they were doing.

Knowledge. Intent. These are the kind of things that you're not going to have a whole lot of direct evidence of. We are talking about someone's state of mind. By its very nature, until we have the ability to read people's minds, you are going to prove it by circumstantial evidence.

So think about the circumstances here. Right? What kind of conclusions and logic would you have to leap to to believe that four people left Colombia on a boat with that much cocaine that's obviously a drug smuggling boat and they

didn't know.  That's the very definition, ladies and gentlemen, of unreasonable doubt.  It's not our burden.  It's never been our burden.  Our burden is just to prove beyond a reasonable doubt, and that's -- I'm sure you've heard the term before, but it's also not that complicated.

It's not new.  Been using it in American courtrooms for decades and decades.  And even before we had DNA evidence, fingerprints, and ion scan technology and smart phones and video cameras on every corner, the same standard applied back then, and it applies here today.

The instructions that you've heard and you'll have back in that deliberation room are based on your reasoning and your common sense.  Ask yourself what makes sense. What's reasonable based on the evidence.

I would like to respond to a couple of things. First, what Mr. Amador said about his client, Mr. Reid-Dilbert.

He focuses on an ion scan result in the bow of the boat.  What he doesn't want you to focus on is the trace amounts of cocaine on his client's hands and his forearms. He doesn't want you to focus on that because there is only one reasonable conclusion; that's that he was holding a bale of cocaine when he was chucking it over the side or pulling it back on board.

Go through that video.  In particular, look at Exhibit 2E, at about 11 minutes and 30 seconds.  Ask yourself

what color shirt the person is wearing.  Is it white or is it blue?  Look at the other people around the back of the boat. Look what they are doing.  Look for a person in a bright blue shirt.

He just told you that was his client.  Does it look like he's just standing there, not knowing what's going on?  Watch the people moving about that boat, taking off the engines, tying the cocaine to the engines.

Remember what Petty Officer Ramos said on that stand?  It takes two people about two hours to take off two outboard engines, saw all the cables, all the fuel lines. That's not a one-man show.  It's an all-hands-on-deck evolution, and that includes Reid-Dilbert, that has cocaine all over him.

He also doesn't want you to focus on what his client said about what was in those white floating things. Don't take my word for it; take the defendant's word for it.

Let's talk about Mr. Dee's client, Mr. Meighan. Something else is possible, I think, is what Mr. Dee said. Our burden is not to prove beyond all possible doubt.  If that were our burden, you can always ask yourself if something is possible.  Who knows; right?  All kinds of conspiracy theories.  There is all kinds of possibilities. That's not our burden.

What the jury instructions say is look at the

evidence.  The evidence.  Not speculating.  The evidence.

Use your reasoning and common sense, and that is our burden

to prove beyond a reasonable doubt.  If you have to force

yourself to make a doubt, if you are just speculating, yeah,

I think this is possible, that's not reasonable doubt, ladies

and gentlemen.  That's the very definition of unreasonable

doubt.  You are speculating if you are forcing it.  It's not

based on the evidence.

     He wants you to believe -- Mr. Dee -- that it's a

mere coincidence that his client is on a go-fast smuggling

boat and he got there from Belize not by his own means,

because he told the agents there is not a lot of work in his

country and somebody else paid for his trip, and he believes

it was the person who was going to get the drugs.  It's just

a coincidence he was on that boat.

     Ladies and gentlemen, it's no coincidence because

he was in on it.  He believed he was taking a fishing trip.

Then, why did he constantly lie to the agents about it?  The

same ridiculous lie that everyone else told.  He lied because

he knew he was guilty, and because he was guilty.

     They want -- the defense doesn't want to focus on

the lies because they are impossible to be true, but the lies

tell you what's in the state of mind of the person telling

the lie.

     Again, don't take my word for it.  Take the

defendant's word for it.  Mr. Meighan, he told you what was in those white floating bales that you saw in that video that he saw in that interview room.  It's cocaine.  By the way, just like everybody else on that go-fast smuggling vessel, he had cocaine on his hands.

There are no innocent bystanders in a maritime cocaine smuggling operation.  That's an unreasonable conclusion to think that a cartel who owns the cocaine or is paying someone else to transport the cocaine is going to just let somebody tag along.

There is a lot of talk about deflecting blame to the captain; right?  It was the captain.  He came up with the whole idea.  You see, the captain, who is allegedly in charge of 600 kilograms of cocaine, $18 million worth, who is responsible to whoever hired him is just going to let somebody tag along?  Not in a million years, ladies and gentlemen.

Look at that boat.  Can you imagine a person walking up to a pier and thinking, yes, we are just going fishing on this boat?  Is that possible?  Is that reasonable? Does that make sense?  Absolutely not.

How about Mr. Brunvand and his comments about Mr. Newball May?  A lot of talk about conspiracy theories and what might have happened back in Colombia.  Did you hear one bit of testimony about threats and duress?  Did you hear any

testimony about that?  Did you have any evidence whatsoever
of that?  Absolutely not.

          Your verdict has to be based on the evidence.  My
comments are not evidence.  Neither are theirs.

          You won't find the word duress in the jury
instructions.  You didn't hear the judge instruct you on it
either -- duress.  Again, this is a distraction and
diversionary tactic.  They don't want you to focus on the
evidence and the facts and the indisputable facts that his
client stuck to the ridiculous lie to the bitter end.

          The suggestion that the captain forced him to
lie -- who is the captain in charge of?  Who can he direct to
do anything, lie or otherwise?  Only his crew, ladies and
gentlemen.  The captain and his crew are all guilty.

          The crew member is just as guilty as the captain.
You will not see in those jury instructions that only the
captain can be guilty of a conspiracy or only the captain can
be guilty of possessing with intent to distribute cocaine.
That's because that's not the law.

          You've heard a lot of talk about the ion scan
instrument, but just recall one piece of testimony from
Senior Chief Bomentre when I asked, Senior Chief, what is the
possibility -- what is the likelihood that all nine of those
alarms for cocaine, positive tests, are all false positives?
Do you remember what he said?  Not possible.  Not possible.

So to speculate that they are all false, there was no cocaine on the boat and that we haven't met our burden to prove that those white floating objects contain cocaine, ladies and gentlemen, that's unreasonable doubt.

You have to assume Senior Chief Bomentre has no idea what he's talking about and that what he told you is not the case, that it's impossible for all of them to be false.

At the end of the day, ladies and gentlemen, a case like this where there is a lot of circumstantial evidence and, frankly, a lot of direct evidence in terms of the video that you have, it's like a jigsaw puzzle.  If you look at one piece, you're not really sure what you are looking at.  But as you start putting the pieces together -- maybe you start on the outside with the flat piece.  You know where they go, and you put it together, and maybe it's an old jigsaw puzzle.  Maybe you are missing a piece or two.  When you look at a jigsaw puzzle, you know what you are looking at.  That's circumstantial evidence, and that's this case, ladies and gentlemen.

When you look out, zoom out, don't just look at one piece of evidence.  Look at all the evidence.  And when you put all those pieces together, there is only one reasonable conclusion.  There is only one conclusion that makes sense, and that's that the defendants were all in on it and they are all guilty of conspiring together and with other

people to distribute, to possess with intent to distribute

5 kilograms or more of cocaine and the actual possession of

that amount of cocaine on a vessel subject to the

jurisdiction of the United States.

       I thank you all for your time and attention

throughout the course of this trial.  On behalf of the United

States government, I ask that you return a verdict of guilty

for all three defendants.

       Thank you.

       (12:15 p.m.)

               - - -

UNITED STATES DISTRICT COURT   )
                                                         )
MIDDLE DISTRICT OF FLORIDA      )


## REPORTER CERTIFICATE


I, Scott N. Gamertsfelder, Official Court Reporter for the United States District Court, Middle District of Florida, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript from the stenographic notes taken by the undersigned in the matter of *UNITED STATES vs. RUDOLPH RANDOLPH MEIGHAN, JORGE RAMON NEWBALL MAY, and CALBOT REID-DILBERT*, Case No. 8:18-cr-594-T-24JSS (Pages 1 through 56), and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.



/s/ *Scott N. Gamertsfelder*, RMR, FCRR

*Official Court Reporter*

                              Date: November 7, 2019